**UNITED STATES FEDERAL DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **Josephine Chien** ) | Case No: 16-1583 |
| **Jalan Medan Merdeka Selatan No. 3-5** ) | |
| **Jakarta, Indonesia** ) | **(i)** For violations of Title VII and Section 1981 for discrimination, hostile work environment and retaliation. |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| **John F. Kerry, Secretary of State.** ) | |
| **U.S. Department of State** | **Jury Demand** |
| **2201 C. Street. NW.** | |
| **Washington D.C.** | |
| Defendant. | |

## Introduction

Josephine Chien by and through her undersigned counsel bring this action for race discrimination under Section 1981 and Title VII; a hostile work environment under Title VII and retaliation under Section 1981 and Title VII against the Defendant John F. Kerry, Secretary of State, for the U.S Department of State.  Chien has been an employee of the State Department since 1999.  She is an Asian female of Taiwanese-American descent. In 2011, during her assignment in Libya, her supervisors assigned tasks to her in a discriminatory manner, whereby certain tasks were given to males as opposed to females. This again occurred in 2012 during her tour in Pakistan. In late 2012 and mid 2013, when after again complaining about discriminatory behavior, she was again retaliated against when she was not selected for foreign assignments.

Consequently, an action under Title VII and Section 1981 now follows.

**Part I. Parties**

1. Josephine Chien is an Asian-American female from Taiwan. She has been an employee of the U.S. Department of State since 1999. She is still employed by the State Department. She is an employee under 42 USC § 2000(e) *et seq* under Title VII.

2. John F. Kerry is the Secretary of the U.S Department of State, the federal agency and defendant in this action.

**Part II. Statement of Facts**

3. Chien is a present employee of the State Department. She is employed as the Assistant Regional Security Officer (ARSO). She is a Taiwanese-American female.

**March 2010-January 2011 deployment in Los Angeles**

4. In March 2010, she was employed at the Los Angeles (L.A) satellite office in West L.A. Her supervisor was Michael Lodi. Lodi would frequently communicate with her disparagingly shouting and screaming at her. Chien found this demoralizing as Lodi would not communicate in this manner with other non-Asian members of the staff or male members of the staff. Her colleague and special agent Bret Newton (Caucasian male) told her that he was aware of the prejudice from Lodi and encouraged her to file a complaint against Lodi. Her colleague and special agent John Ming Chen, also observed Lodi's demeaning treatment of Chien and that Lodi was unprofessional towards Chien.

**Protected Activities**

5. Lodi also refused all training requests and overseas assignments to Chien. Chien had asked Lodi for hardship assignments to Yemen, Iraq and Afghanistan, only to be told that because she was the duty agent, she could not be assigned overseas.

6. Consequently sometime in November 2010, Chien approached assistant special agent in charge Whitney Savageau seeking a transfer to the L.A Field Office[1]. Around December 1, 2010, Chien also had a meeting with Savageau whereby she stated her concerns about Lodi, in that he was treating her differently and discriminating against her. Chien also informed Savageau that Lodi had denied her training and assignments. Chien told Savageau to keep the matter private and also told her specifically to not inform Lodi of her discussions with her (Savageau). Savageau told Chien to discuss her concerns with Chief Jeff Lefter. Chien did so on the same day or on December 1, 2010. She again reiterated her conversations with Savageau with Lefter

7. Barely 24 hours later or on December 2, 2010, Lodi had a meeting with Chien. Lodi informed Chien that Savageau had a conversation with him about her complaint. Lodi told Chien that "it was not a smart move as I am still writing your evaluation." He then proceeded to engage in a monologue whereby Lodi informed Chien that she "should know how the system works" and that her transfer sought to the L.A. Field office would "poison the office."

8. Upon the conclusion of the conversation, Chien immediately contacted Lefter by email. She again asked for a transfer, and told Lefter that she felt that Lodi had threatened her by saying that "I am still writing your evaluation." Lefter contacted Chien by telephone and told her that he will speak with Savageau about Lodi.

9. Chien then contacted the "Human Resources Career Development and Assignments" and sought advise and transfer. She was finally transferred in January 2011.

---

[1] She was as we indicated working at the L.A Satellite office in West L.A.

10. In the interim, and true to form, post December 2, 2010, or sometime on June 3, 2011[2], Lodi gave Chien a negative performance evaluation, accusing her of lacking in communication and interpersonal skills. There were no facts to corroborate these allegations. This negative evaluation prevented Chien from being granted tenure within the Agency.

11. The tenure board in turn, denied her tenure in 2012, citing to Lodi's comments regarding her lack of interpersonal and communication skills.

12. In March 2013, Chien challenged/appealed this evaluation by Lodi. Her challenge was successful and in July 2013, Lodi's 2011 evaluation of Chien was overturned.  She was granted tenure soonafter.

**Libya Assignment March – May 2011**

13. Around May 2011, Chien was now assigned to the U.S Embassy in Libya. She was part of the protective detail to the Special Envoy to Libya, Chris Stevens. She was employed at the Tactical Operations Center (TOC) answering telephones, monitoring traffic and issuing equipment to other TOC agents on the ground.

14. Upon her arrival, Chien was told that all agents initially served at TOC, and after a few weeks, they would be sent to the field. All the other TOC agents in Libya were male.

15. After two (2) weeks of her arrival in March 2011, she asked her shift leader if she could be sent to the field, as part of the security detail for a motorcade. She was told by her supervisor, that she would remain as a TOC agent, and that there were no plans to rotate her.

---

[2] Final Agency Decision (FAD)pg. 16

**16.** When other male agents arrived for their assignments at Libya, they were immediately placed on field or security detail. An assignment to the field is vitally important to Chien (and other agents) as she received valuable credit in her performance evaluations for it.

**17.** A positive performance evaluation in turn results in promotion and/or pay raises and other advanced assignments.

**18.** Consequently sometime in March/April 2011, Chien asks the Agent in Charge, Scott Moretti that she be assigned to a field position. Moretti says, "We don't do rotations." Barely an hour later, Agent Joel Ortez asked Moretti, if he can be rotated from a limousine driver to another position, because Ortez had been a limousine driver for weeks and needed a new rotation/assignment. Moretti's immediate reply to Ortez was, "Sure Buddy!"

**19.** Soonafter, Chein also learned from Mr. Khamprasong Bounkong, that when management had learned a female agent was being assigned to Libya, one of the bosses said, "Why would they send a female from headquarters to a Muslim country?"

**20.** Chien was deeply displeased by the Agency's discriminatory assignments of tasks to male agents, as she had undergone similar firearms training, emergency and critical thinking training. She felt that the only reason she was being denied rotation to the field, was because she was a female. This was made all the more concerning to her, when as part of her single "protective detail" she was awarded a "Group Meritorious Award" for a bombing occurring on June 1, 2011.

**21.** Additionally she also noticed that as the only female TOC agent on staff, the other male agents would make routine or mundane requests to her on housekeeping issues, such as requesting clean towels, toilet paper and clean laundry. These requests were never made to the other male TOC agents on duty.

**February 2012-March 2013: Pakistan Assignment**

22. In February 2012, Chien began her assignment in Pakistan. During this period Chien was the Assistant Regional Security Officer (ARSO) in the U.S Embassy in Islamabad, Pakistan. With the exception of Chien and another African-American male, it was again a predominately all Caucasian and male work environment.

23. In Pakistan, she was supervised by John Krajicek and Peter Thiede.

24. She was supervised by Kraicek from February 2012-August 2012 and Thiede from August 2012-March 2013.

25. As the ARSO and under the direction of Krajicek she oversaw the Surveillance Detection Program[3], the Local Guard Force (LGF) Residential Program, the Residential Security Program (RSP), the Logistics / Procurement Program, and the Information / Cyber Security Program.

26. When Chien was under the direction of Thiede from August 2012-March 2013, she oversaw the Residential Security Program, the Surveillance Detection Program, the Soft Target Program, and the Physical Security Program.

27. Sometime in June 2012, her first supervisor Krajicek assigned another male agent, Rob Holbrook to take over the decision making responsibilities of the Surveillance Detection (SD) program. From June 2012-August 2012, Krajicek (for reasons unknown) would also communicate directly with the Locally Employed Staff (LES) on Chien's duties and programs without directly communicating with her.

28. In October 22, 2012, Chien also learned that the residential guards she originally oversaw as under the Residential Program were reassigned to the new ARSO or Mr. Luc Townsend

---

[3] She overtook this program in May 2012.

(Caucasian Male). Chien alleges that the removal of her programs was motivated by racial or sexual animus, as the programs of other Caucasian males were not removed by either Krajicke or Thiede.

**In January 2013, during her 5 year security clearance update she was asked questions on her naturalized U.S. citizen father & her colleagues were asked about her prior EEO activities[4]**

29. In November 2012, while Chien was still in Pakistan[5], she submitted her Standard Form (SF) 86[6], "*Questionnaire for National Security Positions*" via an online database. This form is used for background investigations for individuals requiring access to classified information.

30. In January 2013, Chien was interviewed by Patricia Gunning[7] and Albert Anderson. Gunning and Anderson asked her about her brother in Taiwan, and whether she had hooked up with an NYPD Swat Officer. Ms. Gunning also asked her, "how people like you [from Taiwan] are able to be loyal to the United States?[8]"

31. Also in January 2013, her supervisor from the Office of Personal Security & Suitability (PSS) questioned her on why her father was not listed as a "foreign contact." She replied that as this was not her initial clearance, but a 5 year update, per instructions from her supervisor at PSS, she was not required to resubmit information that was already in her files[9].

32. Upon her return from Pakistan to the United States, or sometime in March/April 2013, Chien learned from her colleagues George Terterian & Alexa Landreville, that the security

---

[4] Pages 26-29 of the Investigative Report
[5] As mentioned above, she was in Pakistan from February 2012-March 2013.
[6] Available at https://www.opm.gov/forms/pdf_fill/sf86.pdf
[7] A/k/a Patricia Crampton, p. 26 of 51 of the Investigative Report.
[8] Ms. Gunning's statement does not acknowledge these allegations; p. 27 of 51 of the Investigative Report
[9] Complainant's EEO Affidavit dated June 11, 2013, p. 22.

investigators had asked them if Chien had ever complained about work place harassment, a hostile work environment, discrimination or retaliation.

33. Chien believes that this extra scrutiny during her January 2013 clearance interview was a result of her prior EEO activities and therefore in retaliation to her protected activities[10].

**Restriction on Foreign Assignments While in Pakistan. Assignment back to Washington D.C.**

**34.** Once again, like the restrictions placed on Chien during her tour in Los Angeles, and Libya, while in Pakistan, Chien was again restricted in her choice of assignments.

**35.** Around summer 2012, as Chien was bidding for other foreign assignments, she went to Ms. Mary Grey, the Human Resources Officer (HRO) at Embassy Islamabad to enquire about the status of her foreign bids. Ms. Grey said she knows Diplomatic Security (DS) Sr. Career Development and Assignment Officer (CDA) Laurie Darlow in Washington, D.C and offered to make a phone call to inquire about Chien's bidding.

**36.** Ms. Grey spoke to Chien some days later and informed her that Ms. Darlow told Ms. Grey: "tell her to bid for domestic assignments". Chien asked why she was to only bid on domestic assignments. Ms. Grey did not provide an answer but implied that the order came from Ms. Darlow and it is unlikely Chien will receive any overseas assignments. Ms. Grey then advised Chien to cooperate in the process by placing a bid on a domestic position suggested by her Career Development Officer (CDO) Ed Allen.

---

[10] In *Chatlin v. Navy*, EEOC Request No. 05900188 (June 1, 1990) the Commission found that the agency's decision to initiate a review of a security clearance was not the result of any substantive decision making process and was therefore reviewable by the Commission. *See also Fonda-Wall v. Dep't of Justice*, EEOC Appeal No. 0720060035 (July 28, 2009)

37. Ed Allen also told Chien that because she is untenured, he (Allen) is going to ask the Panel to direct her to an unspecified post. Eventually, Chien was given a domestic assignment at the Bureau of Conflict and Stability Operations (CSO) in Washington, DC. At the time, the CDA was aware this CSO position was in the process of being eliminated.

38. A month before Chien departed from Islamabad, or on Jan. 31, 2013, Chien was told by her CDO Michael Kerns to bid again. Chien placed several foreign bids including bids to: Africa, South America, and Europe. She also asked Embassy Islamabad's Regional Security Officer (RSO) John Eustace to assist her in securing an onward position. Mr. Eustace offered to call Ms. Darlow to inquire about Chien's bidding status. As a result, he too informed Chien that she was not being given foreign assignments and that "it all came down to Dubai." Mr. Eustace informed her that Ms. Laurie Darlow told Mr. Eustace that Chien is to bid for domestic assignments only.

### Dubai Assignment/Handshake in April 2012

39. In late March 2012, after being given a department of state "Handshake" to the Dubai assignment in late March 2012, whereby Chien agreed to accept the Dubai assignment. Chien had to negate on her handshake in April 2012, because HRO Mary Grey informed her that the State Department could not guarantee the security of her then boyfriend by including him on the Travel Authorization as an accompanying Member of Household (MOH). This on account that under Sharia law, her boyfriend could be arrested for cohabitating with Chien.

40. Chien was therefore being blackballed or retaliated against for breaking her Dubai assignment.

41. On March 10, 2013, Mr. Michael Kearns too sends her an email, informing her that while her bids for foreign assignments were considered by the DS Panel, "They would like you to consider one of many domestic positions."

42. In CDO Ed Allen's April 13, 2012 email to Chien, Mr. Allen informed her that the DS panel agreed to break her handshake to Dubai and she was to "re-bid with all of the other remaining Winter bidders. You will not receive any additional consideration for your AIP tour." Nevertheless, Ms. Chien was not given equal opportunities in her re-bidding.

43. Other agents similar situated as Chien who broke their handshakes/assignments, but yet were assigned overseas include Mr. Rajan Buck, Mr. Robert Whitney, Mr. Larry Jordan and a forth male individual who was stationed in London, England. Chien again felt that the State Department was having a different standard for males versus females and/or those effecting Asians.

44. Also for the Tunis position (TED Feb 2013), for which Chien applied in Oct. 2012, it went to Ms. Tiffany McCabe a Caucasian female, pay grade FS 06; for the Abu Dhabi position (TED 7/2013), which Chien applied in Jun. 2012 it went to a Caucasian male, pay grade FS 05. Chien is higher ranking and is a pay grade FS 04.

45. Finally on or about August 12, 2013, after bidding on 18 overseas NOW positions and being denied for all of them, her supervisor Mr. Ollie Ellison informed Chien that he was informed by Mr. Kearns, Chien was being denied for foreign assignments because "it has to do with something out of L.A."

46. As mentioned at the outset, Chien had filed a prior hostile work environment and discrimination complaint in Los Angeles (L.A.) against Supervisory Special Agent Mr.

Michael Lodi in December 2010 and an Employee Evaluation Report (EER) grievance in March 2012. She was supervised in L.A. by Mr. Lodi form March 2010-Jan 2011.

**<u>Since February 2013, Chien has also been denied forward assignments for position submitted in June 2013, July 2013, August 2013 & September 2013[11].</u>**

44. The table below summarizes the positions applied for the periods June 2013 – September 2013. She has been denied for all of them, other than assigned to her present position in Indonesia. The allegation in here is that of the 30 odd positions she applied for during 2012 - September 2013, she was awarded only one (1) position in Indonesia. Chien alleges that she was denied her favored positions because of discrimination and retaliation.

| Dates of Positions Applied | Positions Bid/Applied |
|---|---|
| June 2013 | 1. Position No. 56013003, Grade 04, located in Casablanca;<br>2. Position No. 56777162, Grade 04, located in Ljubljana;<br>3. Position No. 56777164, Grade 04, located in Tallinn;<br>4. Position No. 56777161, Grade 03, located in Istanbul;<br>5. Position No. 56013006, Grade 03, located in Doha;<br>6. Position No. 56777163, Grade 04, located in Munich;<br>7. Position No. 56457020, Grade 03, located in Phnom Penh;<br>8. Position No. 56720152, Grade 03, located in Tokyo;<br>9. Position No. 56170320, Grade 03, located in Jakarta[12];<br>10. Position No. 56495036, Grade 03, located in Bangkok;<br>11. Position No. 56777165, Grade 04, located in Valletta; |

---

[11] Page 29 of 51 of the Investigative Summary
[12] She is presently assigned to this Position; it was however not her first choice

| | | |
|---|---|---|
| | | 12. Position No. 56013011, Grade 03, located in Tunis;<br>13. Position No. 56196138, Grade 03, located in Rangoon;<br>14. Position No. 56013010, Grade 03, located in Tunis;<br>15. Position No. 56013017, Grade 04, located in Bishkek; &<br>16. Position No. 57013001, Grade 04, located in Algiers. |
| | July 2013 | 1. Position No. 56060005, Grade 03, located in Ankara;<br>2. Position No. 56679001, Grade 03, located in Tokyo. |
| | August 2013 | 1. Position No. 56777015, Grade 03, located in Istanbul;<br>2. Position No. 56001700, Grade 04, located in Bern;<br>3. Position No. 56327000, Grade 05, located in Ankara;<br>4. Position No. 56013002, Grade 03, located in Abu Dhabi; and<br>Position No. 56111025, Grade 03, located in Chengdu |
| | September 2013 | 1. Position No. 6457005, Grade 04, located in Adana. |

## **Part III. Exhaustion of Administrative Remedies**

**47.** Chien files this action in this court, after exhausting her administrative remedies by filing with the State Department Equal Employment Opportunity (EEO) office and by filing a claim with the Equal Employment Opportunity Commission (EEOC)

**48.** On March 10, 2014, she received the Agency's Investigative Report Agency Case Number DOS-F-038-13, and on March 17, 2014, she filed a timely request for a hearing with the EEOC Administrative Judge.

49. On May 21, 2015, Administrative Judge Ivey issued a scheduling order in the aforementioned case number and also assigned the EEOC Case No. 570-2014-00654X

50. On March 7, 2016, the undersigned counsel filed a "Notice of Withdrawal for Request for Hearing" and that the Agency issue a Final Agency Decision in this matter.

51. The Final Agency Decision was received on May 8, 2016.

52. On August 3, 2016, we filed the instant complaint or well within the 90 days to do so.

53. There are no administrative requirements under Section 1981.

54. Plaintiff has no other administrative obligations.

## Part IV. Causes of Action
## Count I. Race & Sex Discrimination Under Title VII

55. Plaintiff reincorporates by reference all the allegations above.

56. Title VII prohibits discrimination on the basis of race and sex.

57. Defendant discriminated against the Plaintiff on the basis of race and sex in violation of Title VII by denying the Plaintiff equal terms and conditions of employment and/or by refusing to assign her to assignments.

58. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the

discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

59. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

### Count II. Hostile Work Environment & Harassment Under Title VII

60. Plaintiff alleges and incorporates all the paragraphs above.

61. Defendant created a hostile work environment and/or harassed Plaintiff because of her race and sex; the offending conduct was unwelcome, was based on race and/or sex and was sufficiently severe or pervasive when it altered the conditions of her employment and created an abusive work environment and was imputable to her employer the U.S. Department of State.

62. The affirmative defense of *Faragher*[13] and *Ellerth*[14] allows an employer to avoid strict liability for a supervisor's harassment of an employee if no tangible employment action was taken against the employee. Examples of tangible employment action include "discharge, demotion, or undesirable reassignment." *Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 266 (4th Cir.2001).

63. Plaintiff here suffered tangible employment actions when she was assigned locally or within the United States and/or when she was refused to assignments with greater pay and responsibility within Europe and or Iraq, Afghanistan and Yemen. She continues to be denied foreign assignments or assignments of her choosing, only for the Defendant to

---

[13] *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)
[14] *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742 (1998)

routinely award these assignments to other individuals who are not Asian and or Asian-females.

64. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

65. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## **Count III.  Retaliation Under Title VII**

66. Plaintiff alleges and incorporates all the above paragraphs.

67. Plaintiff engaged in protected activity and opposition to practices made unlawful under Title VII while employed by Defendant.

68. As a result of her protected activity and opposition to practices made unlawful under Title VII, Plaintiff was subjected to multiple adverse employment actions, up to and including a negative performance evaluation, denial of tenure, over-scrutinization of her security clearance and/or denial of foreign assignments.

69. A casual connection exists between Plaintiff's protected activity and the adverse employment actions taken by Defendant.

70. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

71. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

### Count IV. Race Discrimination Under Section 1981

72. Plaintiff reincorporates by reference all the allegations above

73. Defendant intentionally discriminated against Plaintiff Josephine Chien on account of her race, Asian/Taiwanese, in violation of 42 U.S.C. § 1981 by denying her equal terms and conditions of employment and/or by not assigning her tasks provided to other non-Asians.

74. Plaintiff's discrimination was not experienced by other non-Asian employees of the Defendant.

75. Defendant's intentionally interfered with Plaintiffs contract of employment

because of their discriminatory animus towards her race. Defendants acted in a willful and wanton manner and in callous disregard for the federally-protected rights of the Plaintiff.

76. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

77. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## Count V. Retaliation Under § 1981

78. Plaintiff alleges and incorporates all the above paragraphs.

79. Plaintiff engaged in protected activity and opposition to practices made unlawful under Section 1981 while employed by Defendant.

80. As a result of her protected activity and opposition to practices made unlawful under Section 1981, Plaintiff was subjected to multiple adverse employment actions, up to and including a negative performance evaluation, denial of tenure, over-scrutinization of her security clearance and/or denial of foreign assignments.

81. A casual connection exists between Plaintiff's protected activity and the adverse employment actions taken by Defendant.

82. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

83. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## Part V. Relief Sought.

WHEREFORE, the Plaintiff Josephine Chien respectfully requests this Court award economic damages to be proved at trial, and in addition:

A. Enter judgment for the Plaintiff Josephine Chien against Defendant the U.S Department of State on all Counts, in an amount no less than five hundred thousand dollars.

B. Declare that the conduct of Defendant is in violation of Title VII and Section 1981

C. Award the Plaintiff full back pay and front pay, including salary, benefits, entitlements, loss of professional status and career-enhancing opportunities, bonuses', cash awards, loss of retirement savings and benefits and other remuneration and privileges of employment retroactive to the date of any unlawful employment action found to have occurred in this case.

D. Award the Plaintiff compensatory damages for emotional distress injuries and loss;

E. Award Plaintiff pecuniary and out of pocket expenses;

F. Order Defendant to pay all reasonable attorney's fees, court costs, and expenses incurred by Plaintiff as a result of Defendants' actions and inactions, as well as pre judgment and post-judgment interest; and

G. Order such other equitable and legal relief as the Court deems just and appropriate.

## Part VI. Jury Trial Demanded.

Plaintiff demands a jury trial for this action.

Respectfully Submitted,

/s/ A.J Dhali
Dhali PLLC
1828 L. Street. NW. Suite 600
Washington D.C. 20036
T: (202) 556-1285
F: (202) 351-0518
Email: ajdhali@dhalilaw.com
*Attorney for the Plaintiff Josephine Chien*
Wednesday August 3, 2016

## Certificate of Service.

Upon issuance of the Summons from this Court, copies of the Summons and Complaint will be mailed to:

(1) United States Department of Justice (DoJ). Attorney General Loretta Lynch
Rm B103. 950 Pennsylvania Ave. Washington D.C. 20530-0001

(2) United States Attorney for the District of Columbia
Channing D. Phillips
Attn: Civil Process Clerk
555 4th Street, NW
Washington, D.C 20530

(3) the U.S. Department of State
The Executive Office. Office of the Legal Advisor, S.A. -17
600 19th Street. NW. Suite 5.600
Washington D.C. 20522
Attn: Alicia Frechette, Ex. Director.

/s/ A.J Dhali