## UNITED STATES FEDERAL DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| **Josephine Chien** ) | Case No: 16-1583 (APM) |
| **Plaintiff,** ) | |
| ) | **(i)**   Violations of Title VII for |
| **vs.** ) | discrimination, hostile work |
| **Rex Tillerson, Secretary of State.** ) | environment & retaliation. |
| **U.S. Department of State** ) | |
| **Defendant.** ) | **Jury Demand** |
| | |
| | **Plaintiff's 2nd Amended** |
| | **Complaint.** |

_____

### Introduction

Per the April 27, 2017, Right to Sue[1] received by counsel for the plaintiff, Josephine

Chien on EEOC Case No. DOS -0188-16, undersigned counsel Dhali PLLC timely files this 2nd

Amended Complaint (SAC) for additional allegations of discrimination, hostile work

environment and retaliation against the Agency, the U.S. Department of State. The allegations

concerning the SAC are alleged after ¶ 59 and refer to all the allegations raised in Case No.

DOS-0188-16[2].

Chien has been an employee of the U.S. State Department since 2009.  She is an Asian

female of Taiwanese-American descent.

In May 2011, during her assignment in Libya, her supervisors assigned tasks to her in a

discriminatory manner, whereby certain tasks were given to males  only. This again occurred in

---

[1] Under this April 27, 2017 "Right to Sue" letter and the federal regulations, Plaintiff has 90 days from 4/27/2017 to file her allegations under this case number EEO Case No. DOS-0188-16
[2] They may also have been summarized on page 50 of the ROI (Investigative Summary pg. 6 of 30)

2012 during her tour in Pakistan. In late 2012 and mid 2013, when after again complaining about discriminatory behavior, she was once more retaliated against when she was not selected for foreign assignments.

Consequently, an action under Title VII now follows.

## Part I. Parties

1.  Josephine Chien is an Asian-American female from Taiwan. She has been an employee of the U.S. Department of State since 2009. She is still employed by the State Department, though she was recently recommended for a 'select out' or termination by the State Department because of her protected activities[3]. She is an employee under 42 USC § 2000(e) *et seq* under Title VII.

2.  John F. Kerry is the Secretary of the U.S Department of State, the federal agency and defendant in this action.

## Part II. Exhaustion of Administrative Remedies

3.  Chien files this action in this court, after exhausting her administrative remedies by filing with the State Department Equal Employment Opportunity (EEO) office and by filing a claim with the Equal Employment Opportunity Commission (EEOC).

4.  On March 10, 2014, she received the Agency's Investigative Report Agency Case Number DOS-F-038-13, and on March 17, 2014, she filed a timely request for a hearing with the EEOC Administrative Judge.

5.  On May 21, 2015, Administrative Judge Ivey issued a scheduling order in the aforementioned case number and also assigned the EEOC Case No. 570-2014-00654X to this action.

---

[3] Once a notice to sue is issued regarding her termination, the Plaintiff may amend her present complaint again to allege this additional cause of action. Defendant's are thus placed on notice of our subsequent amendment.

**6.** On March 7, 2016, the undersigned counsel filed a "Notice of Withdrawal for Request for Hearing" and that the Agency issue a Final Agency Decision in this matter.

**7.** The Final Agency Decision was received on May 8, 2016.

**8.** On August 3, 2016, we filed the instant complaint or well within the 90 days to do so.

**Part III. Statement of Facts**

**9.** Chien is a present employee of the State Department. She is employed as the Assistant Regional Security Officer (ARSO). She is a Taiwanese-American female.

**March 2010-January 2011 deployment in Los Angeles Satellite Office[4]**

**10.** In March 2010, she was employed at the Los Angeles (L.A) satellite office in West L.A. Her supervisor was Michael Lodi. Lodi would frequently communicate with her disparagingly shouting and screaming at her. Chien found this demoralizing as Lodi would not communicate in this manner with other non-Asian members of the staff or male members of the staff. Her colleague and special agent Bret Newton (Caucasian male) told her that he was aware of the prejudice from Lodi and told her he will back her up if she files a complaint against Lodi. Her colleague and special agent John Ming Chen, also observed Lodi's demeaning treatment of Chien and that Lodi was unprofessional towards Chien.

**Protected Activities**

**11.** Lodi also refused all training requests and overseas assignments to Chien. Chien had asked Lodi for hardship temporary duty assignments to Yemen, Iraq and Afghanistan,

---

[4] Because of the interconnecting nature of the events, for the periods 2010-September 17, 2012, we are only providing this information to the Court as plaintiff's background evidence of her claims. Unless new evidence comes to light during the course of discovery, we agree with Defendant in its Motion to Dismiss that only acts post September 18, 2012 can be heard. However, insofar as the Plaintiff has also alleged acts for a hostile work environment, so long as a single act falls within the statutory period, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Nat'l R.R. Passenger Corp v. Morgan,* 536 U.S. 101, 114, 117 (2002)

only to be told that because she did not have the High Threat Training, she could not be recommended and supported by the Los Angles Field Office (LAFO). However, a Caucasian female, Joyce Alberts, who had just returned from a temporary duty assignment (TDY) in Iraq told Chien she too did not have High Threat Training, and yet was able to be assigned to Iraq.

**12.** Consequently, sometime in November 2010, Chien approached assistant special agent in charge Whitney Savageau seeking a transfer to the L.A Field Office[5]. Around December 1, 2010, Chien also had another meeting with Savageau whereby she stated her concerns about Lodi, in that he was treating her differently and discriminating against her. Chien also informed Savageau that Lodi had denied her training and career enhancing TDY requests. Chien told Savageau to keep the matter confidential and also told her specifically to not inform Lodi of their discussions. Savageau told Chien to discuss her concerns with Chief Jeff Lefler. Chien did so on the same day or on December 1, 2010. She again reiterated her conversations with Savageau with Lefler to keep her reporting of Lodi confidential for fear of retaliation.

**13.** Barely 24 hours later or on December 2, 2010, Lodi had a meeting with Chien. Lodi informed Chien that Savageau had a conversation with him about her complaint. Lodi told Chien that "it was not a smart move as I am still writing your EER." (Employee evaluation report.) He then proceeded to engage in a monologue whereby Lodi informed Chien that she "should know how the system works" and that her transfer sought to the L.A. Field office would "poison the office."

---

[5] She was as we indicated working at the L.A Satellite office in West L.A.

**14.** Upon the conclusion of the conversation, Chien immediately contacted Lefler by email. Chien again asked for a transfer, and told Lefler that she felt that Lodi had threatened her by saying that "I am still writing your EER." Lefler contacted Chien by telephone and told her that he will speak with Savageau about Lodi. Savageau returned to Chien with the reason that there is no cubical space in LAFO for her so the transfer will not take place soon.

**15.** Chien then contacted the "Human Resources Career Development and Assignments" and sought advise. She was finally transferred in January 2011.

**16.** In the interim, and true to form, post December 2, 2010, or sometime on April, 2011 June 3, 2011[6], Lodi gave Chien a negative performance evaluation in her EER, accusing her of lacking in communication and interpersonal skills. There were no facts to corroborate these allegations. Chien again reached out to Chief Lefler and sought to have the false evaluation statements removed.  Nothing was done.  This negative evaluation prevented Chien from being granted tenure within the Agency.

**17.** The tenure board in turn, denied her tenure in 2012, citing to Lodi's June 3, 2011, EER of Chien, regarding  her lack of interpersonal and communication skills.

**18.** In March 2013, Chien challenged/appealed this evaluation by Lodi. Her challenge was successful and in July 2013, Lodi's 2011 evaluation of Chien was overturned.  She was granted a second review on her tenure.  She was then granted tenure.

   **Libya Assignment –May 2011**

---

[6] Final Agency Decision (FAD)pg. 16

**19.** Around May 2011, Chien was now under a different supervisor. She was told there is an urgent need to have an agent in Benghazi, Libya and she was assigned to that temporary duty assignment.

**20.** After two (2) weeks of her arrival in Benghazi, she asked her shift leader Harlin Bryant if she could be rotated out as part of the security detail in the motorcade. Bryant told her to speak to Agent in Charge Scott Moretti.

**21.** Chien asks the Agent in Charge, Scott Moretti that she be rotated to a different position. Moretti says, "We don't do rotations." Barely an hour later, Agent Joel Ortez (Male) asked Moretti, if he can be rotated from a limousine driver to another position, because Ortez had been a limousine driver for some time and needed a new rotation/assignment. Moretti's immediate reply to Ortez was, "Sure Buddy!"

**22.** When other male agents arrived for their assignments at Libya, they were placed on field or security detail after a week or two in the TOC. Soonafter, Chein also learned from Mr. Khamprasong Bounkong, that when "one of the supervisors" had learned a female agent was being assigned to Libya, he said, "Why would they send a female to a Muslim country?"

**23.** Chien was offended by the Agency's discriminatory assignments of tasks to male agents, as she had undergone the same training as the males. She felt that the only reason she was being denied rotation, was because she was a female. This was made all the more concerning to her, when as part of her single "protective detail" she was awarded a "Group Meritorious Award" for a bombing occurring on June 1, 2011.

**24.** Additionally she also noticed that as the only female TOC agent on staff, the other male agents would make routine or mundane requests to her on housekeeping issues, such as

requesting clean towels, refill coffee, toilet paper and clean laundry. These requests were never made to the other male TOC agents on duty.

**25.** She felt these tasks were meant to harass her.

### February 2012-March 2013: Pakistan Assignment

**26.** In February 2012, Chien began her assignment in Pakistan. During this period Chien was the Assistant Regional Security Officer (ARSO) in the U.S Embassy in Islamabad, Pakistan.  It was again a predominately all Caucasian and male work environment.

**27.** In Pakistan, she was supervised by John Krajicek then Peter Thiede.

**28.** She was supervised by Kraicek from February 2012-August 2012 and Thiede from August 2012-March 2013.

**29.** As the ARSO and under the direction of Krajicek she oversaw the Surveillance Detection Program[7], the Local Guard Force (LGF) Residential Program, the Residential Security Program (RSP), the Logistics / Procurement Program, and the Information / Cyber Security Program.

**30.** When Chien was under the direction of Thiede from August 2012-March 2013, she oversaw Residential Security Program, the Surveillance Detection Program, the Soft Target Program, and the Physical Security Program.

**31.** Sometime in June 2012, her first supervisor Krajicek assigned another male agent, Rob Holbrook to take over the decision making responsibilities of the Surveillance Detection (SD) program., Krajicek (for reasons unknown) would also communicate directly with the Locally Employed Staff (LES) on Chien's duties and programs without directly communicating with her. Krajicek did not do so with other agents.

---

[7] She overtook this program in May 2012.

**In January 2013, During Her Five (5) Year Background Investigation Update She Was Asked Questions On Her Naturalized U.S. Citizen Father & Enquired About Her Prior EEO Activities[8]**

**32.** In November 2012, while Chien was still in Pakistan[9], she submitted her Standard Form (SF) 86[10], "*Questionnaire for National Security Positions*" via an online database. This form is used for background investigations.

**33.** The Office of Personal Security and Suitability (PSS) accused Chien of not listing her father, Yi Yeng Chien, as a foreign contact. Chien replied she followed the instructions and definitions of a "foreign contact" listed on the SF 86. Her father has been a U.S citizen and has resided in the U.S for more than 30 years, and under SF 86 is not a "foreign contact." Nevertheless, PSS demanded Chien to reviser her SF86 and list her father as a foreign contact.

**34.** In June 2013, Chien was interviewed by Patricia Gunning[11] and Albert Anderson.

**35.** Both Gunning and Anderson are not employees of the Agency[12].

**36.** Gunning and Anderson asked Chien whether she had hooked up with an NYPD Swat Officer. Ms. Gunning stated that "hooking up with someone" speaks about her "moral character." Ms. Gunning also asked her, "how do people like you [immigrants] are able to find loyalty to this country?[13]"

---

[8] Pages 26-29 of the Investigative Report
[9] As mentioned above, she was in Pakistan from February 2012-March 2013.
[10] Available at https://www.opm.gov/forms/pdf_fill/sf86.pdf
[11] A/k/a Patricia Crampton, p. 26 of 51 of the Investigative Report.
[12] Agency Response to Chein Interrogatories No. 11 dated 10/26/2015 ("Upon information and belief, Albert Anderson, Patricia Gunning and Patricia Crampton are not Agency employees.")
[13] Ms. Gunning's statement does not acknowledge these allegations; p. 27 of 51 of the Investigative Report

**37.** Attorney Andrew Large, of the American Foreign Service Association (AFSA) was present in the interview and noted these comments.

**38.** Also in January 2013, PSS again questioned her on why her mother and brother were not listed as "foreign contacts." Chien replied that PSS had sent her an email, and in this email it said, since this is an updated background investigation, Chien is only to provide information she had not previously disclosed. Chien had provided her mother and brother's full information in her previous reporting, therefore, she followed PSS' instruction and only provided new information from 2007 onwards.

**39.** Upon her return from Pakistan to the United States, or sometime in March/April 2013, Chien learned from her friend and colleague George Terterian & Alexa Landreville, that the security investigators had asked them if Chien had ever complained about work place harassment, a hostile work environment, discrimination or retaliation.

**40.** None of these questions posed by Gunning and Anderson posed any threat to national security or had any relevancy to national security. These questions also had no nexus to any claims that Chien was a national security risk because she had filed an EEO complaint.

**41.** Chien deemed questions concerning her prior EEO activities as dissuading her from filing further EEO charges against the Agency.

**42.** Chien then approached her Caucasian male colleague, Timothy Kerwin, if during his background investigation, he had been asked about his family's migration history, and if he (Kerwin) could be loyal to the United States or if he (Kerwin) had "hooked up" with any woman? And if he (Kerwin) had filed any prior EEO complaints. Kerwin said "No."

Kerwin replied his five-year update took place over the phone and was over in less than 30 minutes.

43. Chien believes that this extra scrutiny during her January 2013 background investigation was a result of her prior EEO activities and therefore in retaliation to her protected activities[14].

**Restriction on Foreign Assignments While in Pakistan. Assignment back to Washington D.C.**

44. Once again, like the restrictions placed on Chien during her tour in Los Angeles, and Libya, while in Pakistan, Chien was again restricted in her choice of assignments.

45. Around summer 2012, as Chien was bidding for other foreign assignments, she went to Ms. Mary Grey, the Human Resources Officer (HRO) at Embassy Islamabad to enquire about the status of her foreign bids. Ms. Grey said she knows Diplomatic Security (DS) Sr. Career Development and Assignment Officer (CDA) Laurie Darlow in Washington, D.C and offered to make a phone call to inquire about Chien's bidding.

46. Ms. Grey spoke to Chien some days later and informed her that Ms. Darlow told Ms. Grey: "tell her [Chien] to bid for domestic assignments". Chien asked why she was to only bid on domestic assignments. Ms. Grey did not provide an answer but implied that the order came from Ms. Darlow and it is unlikely Chien will receive any overseas assignments. Ms. Grey then advised Chien to cooperate in the process by placing a bid on a domestic position suggested by her Career Development Officer (CDO) Ed Allen.

---

[14] In *Chatlin v. Navy*, EEOC Request No. 05900188 (June 1, 1990) the Commission found that the agency's decision to initiate a review of a security clearance was not the result of any substantive decision making process and was therefore reviewable by the Commission. *See also Fonda-Wall v. Dep't of Justice*, EEOC Appeal No. 0720060035 (July 28, 2009); see also *Rattigan v. Holder*, 643 F.3d 975, 986 (D.C. Cir 2010) ("…we have no doubt that a reasonable jury could find that OIO's security referral itself well might dissuade a reasonable worker from making or supporting a charge of discrimination.")

**47.** Ed Allen also told Chien that because she is untenured, he (Allen) is going to ask the Panel to direct her to an unspecified post if she does not bid on domestic positions. Eventually, Chien was given a domestic assignment at the Bureau of Conflict and Stability Operations (CSO) in Washington, D.C. At the time, the CDA was aware this CSO position was in the process of being eliminated.  Chien learned of the elimination and asked Ed Allen to panel her for another position so she would not be disadvantaged when the position is eliminated and there are no more assignments left to choose from.  Ed Allen refused.

**48.** A month before Chien departed from Islamabad, or on Jan. 31, 2013, Chien was told by her new CDO Michael Kerns to bid again because the CSO position was eliminated. Chien placed several foreign bids including bids to: Africa, South America, and Europe. She also asked Embassy Islamabad's Regional Security Officer (RSO) John Eustace to assist her in securing an onward position. Mr. Eustace offered to call Ms. Darlow to inquire about Chien's bidding status. As a result, he too informed Chien that she was not being given foreign assignments and that "it all came down to Dubai." Mr. Eustace informed her that Ms. Laurie Darlow told Mr. Eustace that Chien is to bid for domestic assignments only.

### Dubai Assignment/Handshake in April 2012

**49.** In late March 2012, Chien was given a  DS "Handshake" to the Dubai assignment,. Before the assignment was confirmed, Chien had to negate on her handshake in April 2012, because HRO Mary Grey informed her that the State Department could not  provide any assistance to her then boyfriend by including him on the Travel Authorization as an

accompanying Member of Household (MOH). This on account that under the UAE's Sharia law, her boyfriend could be arrested for cohabitating with Chien.

50. Chien was therefore being blackballed or retaliated against for breaking her Dubai assignment.

51. On March 10, 2013, Mr. Michael Kearns too sends her an email, informing her that while her bids for foreign assignments were considered by the DS Panel, "They would like you to consider one of many domestic positions."

52. In CDO Ed Allen's April 13, 2012 email to Chien, Mr. Allen informed her that the DS panel agreed to break her handshake to Dubai and she was to "re-bid with all of the other remaining Winter bidders. You will not receive any additional consideration for your AIP tour." Nevertheless, Ms. Chien was not given equal opportunities as the rest of the Winter bidders in her re-bidding.

53. Other agents similarly situated as Chien who broke their handshakes/assignments, but yet were assigned overseas include Mr. Rajan Buck, Mr. Robert Whitney, Mr. Larry Jordan and a forth male individual who was stationed in London, England. Chien again felt that the State Department was having a different standard for males versus females and/or those effecting Asians.

54. Also for the Tunis position (TED Feb 2013), for which Chien applied in Oct. 2012, it went to Ms. Tiffany McCabe a Caucasian female, pay grade FS 06.

55. Upon information and belief, Mccabe did not have the required High Threat training at the time she was awarded the assignment.

56. For the Abu Dhabi position (TED 7/2013), which Chien applied in Jun. 2012 it went to a Caucasian male, pay grade FS 05. Chien is higher ranking and is a pay grade FS 04.

**57.** Finally on or about August 12, 2013, after bidding on 18 overseas NOW positions and being denied for all of them, her supervisor Mr. Ollie Ellison informed Chien that he was informed by Mr. Kerns, Chien was being denied for foreign assignments because "it has to do with something out of L.A."

**58.** As Chien mentioned at the outset, Chien had filed a prior hostile work environment and discrimination complaint in Los Angeles (L.A.) against Supervisory Special Agent Mr. Michael Lodi in December 2010 and an Employee Evaluation Report (EER) grievance in March 2012. She was supervised in L.A. by Mr. Lodi form March 2010-Jan 2011.

**Since February 2013, Chien has also been denied forward assignments for positions submitted in June 2013, July 2013, August 2013 & September 2013[15].**

**59.** The table below summarizes the positions applied for the periods June 2013 – September 2013. She has been denied for all of them. The allegation in here is that of the 30 odd positions she applied for during June -September 2013, she was denied her favored positions because of discrimination and retaliation.

| Dates of Positions Applied | Positions Bid/Applied |
|---|---|
| June 2013 | 1. Position No. 56013003, Grade 04, located in Casablanca; 2. Position No. 56777162, Grade 04, located in Ljubljana; 3. Position No. 56777164, Grade 04, located in Tallinn; 4. Position No. 56777161, Grade 03, located in Istanbul; 5. Position No. 56013006, Grade 03, located in Doha; 6. Position No. 56777163, Grade 04, located in Munich; 7. Position No. 56457020, Grade 03, |

---

[15] Page 29 of 51 of the Investigative Summary

| | |
|---|---|
| | located in Phnom Penh; |
| | 8. Position No. 56720152, Grade 03, located in Tokyo; |
| | 9. Position No. 56170320, Grade 03, located in Jakarta[16]; |
| | 10. Position No. 56495036, Grade 03, located in Bangkok; |
| | 11. Position No. 56777165, Grade 04, located in Valletta; |
| | 12. Position No. 56013011, Grade 03, located in Tunis; |
| | 13. Position No. 56196138, Grade 03, located in Rangoon; |
| | 14. Position No. 56013010, Grade 03, located in Tunis; |
| | 15. Position No. 56013017, Grade 04, located in Bishkek; & |
| | 16. Position No. 57013001, Grade 04, located in Algiers. |
| July 2013 | 1. Position No. 56060005, Grade 03, located in Ankara; |
| | 2. Position No. 56679001, Grade 03, located in Tokyo. |
| August 2013 | 1. Position No. 56777015, Grade 03, located in Istanbul; |
| | 2. Position No. 56001700, Grade 04, located in Bern; |
| | 3. Position No. 56327000, Grade 05, located in Ankara; |
| | 4. Position No. 56013002, Grade 03, located in Abu Dhabi; and Position No. 56111025, Grade 03, located in Chengdu |
| September 2013 | 1. Position No. 6457005, Grade 04, located in Adana. |

---

[16] This bid in Jakarta, Indonesia was awarded to a white male.

**Allegations Concerning EEO Case No. DOS-0188-16 for the 2nd Amended Complaint**

**60.** Plaintiff Chien for the periods September 8, 2014 – August 8, 2016[17], was again serving as the Area Regional Security Officer (ARSO) this time at the U.S Embassy in Jakarta, Indonesia.  There was 7 ARSOs stationed in Jakarta. Her immediate supervisor was Robert Castro, a Mexican-American male, the Deputy Regional Security Officer (DRSO).

**61.** On October 9, 2015, Diplomatic Security sent an email to the ARSOs for a temporary duty assignment (TDY) to the U.S. Embassy in Kuala Lumpur (KL), Malaysia[18].

**62.** On this same day 10/9/2015, Chien sends an email to her Deputy Regional Security Officer (DRSO) Robert Castro volunteering for this position. Castro is a Mexican-American male[19] and her immediate supervisor[20].  Castro was also told "by unnamed individuals of prior difficulties she has had in earlier assignments […] He is also aware of Chien sending articles of discrimination to post officials.[21]"

**63.** Castro asks to see her. She does so on 10/19/2015 and he again asks Chien to send him a second email for the posting in KL. She does so again on 10/19/2015. She never hears back from Castro.

**64.** In late October 2015, Chein again asks about the TDY to KL. Castro informs her that he needs her to be in Jakarta. Chien was under the impression that no one would be sent to KL.

**65.** In mid-November 2015, she noticed that her white colleague Mike Bjelavic had not come to work for a few days. On November 24, 2015, Castro during a weekly staff meeting

---

[17] Report of Investigation (ROI) pg. 53
[18] Both Malaysia and Indonesia are in South East Asia.
[19] Report of Investigation (ROI) pg. 51.
[20] ROI pg. 53
[21] ROI pg. 52

asked Bjelavic how was his assignment in KL[22]?   This was the first time she learned she was denied the TDY to KL.

**66.** During her time in Jakarta, Chien applied to approximately 26 TDYs for assignments at Beijing to Warsaw. She was rejected for all of them[23]. These 26 TDYs are listed below.

| Post | Title | Position # | Grade | # of bidders |
|------|-------|-----------|-------|--------------|
| Beijing | ARSO | 56312259 | 03 | 2/2 |
| Chengdu | ARSO | 56148000 | 03 | 7/7 |
| Kuala Lumpur | ARSO | 56133442 | 03 | 8/11 |
| Berlin | ARSO | 56777027 | 03 | 24/38 |
| Brussels | ARSO | 56777028 | 03 | 25/39 |
| Dublin | RSO | 56777004 | 03 | 64/65 |
| Frankfurt | ARSO | 56900101 | 04 | 22/25 |
| Kyiv | ARSO | 56777043 | 03 | 11/11 |
| Lisbon | ARSO | 56777053 | 03 | 21/43 |
| Ljubljana | RSO | 56777014 | 03 | 35/39 |
| London | ARSO | 56777032 | 03 | 21/32 |
| Luxembourg | RSO | 56777007 | 03 | 35/39 |
| Monterrey | RSO | 56083000 | 03 | 13/13 |
| Munich | ARSO | 56777163 | 04 | 14/14 |
| Paris | ARSO | 56777035 | 03 | 18/23 |
| Paris | ARSO | 56777002 | 03 | 18/27 |
| Paris | ARSO | 56101076 | 03 | 18/30 |
| Rome | ARSO | 56777038 | 03 | 26/40 |
| Singapore | ARSO | 56177005 | 04 | 6/7 |
| Skopje | ARSO | 56777067 | 03 | 11/18 |
| Stockholm | ARSO | 56019224 | 04 | 13/15 |
| Tokyo | ARSO | 56720152 | 03 | 12/19 |

[22] This allegation was timely filed within 45 days of 11/24/2015; it was emailed to the EEO on 1/4/2016
[23] Pg. 4 of the ROI, counsel's letter dated 3/19/2016.

| | | | | |
|---|---|---|---|---|
| Toronto | RSO | 56079001 | 03 | 22/23 |
| Toronto | ARSO | 56149999 | 03 | 19/32 |
| Vienna | ARSO | 56621000 | 03 | 24/35 |
| Warsaw | ARSO | 56777041 | 03 | 8/14 |

**67.** While at Jakarta, other agents (other than Chien) had received TDYs. They include Joseph Williams (African-American, Male) and Mike Bjelacic (Caucasian Male). TDYs are a factor for promotions and higher pay and are included as a factor in an employees, employee evaluation reports (EERs).  By not selecting Chien for any of the 26 TDYs while, other non-Asian and non-female ARSOs were, the Agency discriminated and retaliated against Chien resulting in loss of monetary benefits.

**68.** While at Jakarta, Castro also engaged in hostile work environment and retaliatory acts against Chien.

**69.** For instance on November 13, 2015, while supervising guards at the gate of the Embassy, and a local TV camera crew on security issues, Castro pulled Chien away and told her that "sometimes we have to compromise security for efficiency…"

**70.** Indonesia is a Muslim-majority country and has been a victim of international terrorism. As part of her duties, she is to train the guards on access control. Chien is not aware of Castro preventing any male ARSOs from doing their assignments.

**71.** On February 11, 2016, Castro also attempted to make an unofficial request to station nurse Susan Stewart (Caucasian female) about Chien's 3 day leave request. Steward "did not respond to Castro's inquiry due to privacy[24]" concerns.

---

[24] ROI pg. 55 (investigative summary pg. 11 of 30)

**Protected Activity**

**72.** On March 7, 2016, Chien engaged in protected activity and made a complaint of discriminatory treatment by Castro to the Deputy Chief of Mission (DCM) for the Embassy. Chien told the DCM that Castro was discriminating against her at work by giving better treatment to male ARSOs.

**73.** On March 10, 2016, Castro suddenly changed her work hours and ordered Chien to report to work at 7:30 am. Prior to March 10, 2016, Chien had a flexible reporting time and used to report to work anytime from 8 to 8:30 am.

**74.** On March 10, 2016, Chien reported to work at 8:30 am and Castro made the new reporting time of 7:30 am retroactive and deemed her late by one hour for failing to report to work by 7:30 am. Chien was thus placed on absent without leave (AWOL) status for one hour.

**75.** Chien alleges that she worked for a full day from 8:30 am to 5:30 pm on March 10, 2016, and Castro should not have deemed her AWOL on this day. Chien also alleges that no other ARSOs arrive at 7:30 am.

**76.** Soonafter Castro assigned Chien to "duty week" without informing Chien.

**77.** 'Duty Week" is when the State Department informs its employees (and in this case the ARSOs) that they are to be on standby for assignments during their days off. While on "duty week" the ARSO may not travel outside of Jakarta […] and constantly check their blackberries for messages and emails after hours.[25]"

**78.** Chein was assigned to "duty week" for May 9, June 13, June 27 and July 25, 2016[26].

---

[25] ROI pg. 60 (Investigative Summary pg 16 of 30)
[26] Id.

79. After checking her schedule for the week of July 18, 2016 and determining that she would not be assigned to "duty week" Chien made plans to travel outside of Jakarta.

80. When in this case the schedule was already finalized, the usual practice is for Castro to obtain consent from the ARSOs to determine their availability for "duty week."

81. In the case of Chien however, Castro modified her weekly schedule (already finalized) and without providing prior notification to Chien, placed her on unexpected duty week for July 18, 2016. Chien had already made plans to travel and was forced to cancel her travel plans.

82. No other male or non-Asian ARSO was treated similarly.

83. On June 2, 2016, for reasons not known, Chien was also restricted on further leave requests. On May 2016, she had 220 hours of annual leave and 301 hours of sick leave[27].

84. On July 14, 2016, she received an email from payroll that her weekly salary was being deducted for 9 hours as "leave without pay" for the period 3/14/2016[28].

85. On July 28, 2016, Chien emailed payroll and HR to protest the pay reduction for the period 4 month earlier on 3/14/2016. Chien informed payroll and HR that on 3/4/2016 she was on sick leave and she also worked a full day on 3/10/2016.

86. On July 28, 2016, Chien receives an email from Alan Alanso in HR informing her that Castro had ordered the pay reduction based on his reading of the Foreign Affairs Manual (FAM). The reading of the FAM does not warrant a pay reduction for the 3/14/2016 period.

87. These and other hostile work environment and retaliatory actions had a detrimental effect on Chien's ability to concentrate at work.

---

[27] ROI pg. 65 (Investigative Summary pg 21 of 30)
[28] ROI pg. 28

**88.** She is presently on one years approved medical leave by the Agency as a result of the hostile work environment and retaliation.

## Part IV. Causes of Action
## Count I. Race & Sex Discrimination Under Title VII

**89.** Plaintiff reincorporates by reference all the allegations above.

**90.** Title VII prohibits discrimination on the basis of race and sex.

**91.** Defendant discriminated against the Plaintiff on the basis of race and sex in violation of Title VII by denying the Plaintiff equal terms and conditions of employment and/or by refusing to assign her to assignments.

**92.** As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

**93.** As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## Count II. Hostile Work Environment & Harassment
## Under Title VII

**94.** Plaintiff alleges and incorporates all the paragraphs above.

**95.** Defendant created a hostile work environment and/or harassed Plaintiff because of her race and sex; the offending conduct was unwelcome, was based on race and/or sex and

was sufficiently severe or pervasive when it altered the conditions of her employment and created an abusive work environment and was imputable to her employer the U.S. Department of State.

96. The affirmative defense of *Faragher*[29] and *Ellerth*[30] allows an employer to avoid strict liability for a supervisor's harassment of an employee if no tangible employment action was taken against the employee. Examples of tangible employment action include "discharge, demotion, or undesirable reassignment." *Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 266 (4th Cir.2001).

97. Plaintiff here suffered tangible employment actions when she was assigned locally or within the United States and/or when she was refused to assignments with greater pay and responsibility within Europe, Iraq, Afghanistan, Yemen and other locations around the world. She continues to be denied foreign assignments or assignments of her choosing, only for the Defendant to routinely award these assignments to other individuals who are not Asian and or Asian-females.

98. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf.

---

[29] *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)
[30] *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742 (1998)

99. As a result of her distress, Chien's health continues to be negatively affected and she has had to take one year Leave Without Pay to tend to her health after her posting in Jakarta, Indonesia.  She is seeking loss of incoming for this year of leave due to mental distress and health effects from the discrimination and retaliatory acts committed by the Department.

100. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## Count III.  Retaliation Under Title VII

101. Plaintiff alleges and incorporates all the above paragraphs.

102. Plaintiff engaged in protected activity and opposition to practices made unlawful under Title VII while employed by Defendant.

103. As a result of her protected activity and opposition to practices made unlawful under Title VII, Plaintiff was subjected to multiple adverse employment actions, up to and including a negative performance evaluation, and denial or delay of tenure. Additionally, she was singled out for unlawful questions concerning her prior EEO activities and further denied foreign assignments and other "terms and conditions of employment."

104. A casual connection exists between Plaintiff's protected activities and the adverse employment actions taken by Defendant. Any or all of these acts could well have dissuaded "a reasonable worker from making or supporting a charge of discrimination.[31]"

105. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of

---

[31] Rattigan v. Holder, 643 F.3d 975,986 (D.C. 2010)

employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf.

106. As a result of her distress, Chien's health was negatively affected and had to take one year Leave Without Pay to tend to her health after her posting in Jakarta, Indonesia.  She is seeking loss of incoming for this year of leave due to mental distress and health effects from the discrimination and retaliatory acts committed by the Department. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

**Part V. Relief Sought.**

WHEREFORE, the Plaintiff Josephine Chien respectfully requests this Court award economic damages to be proved at trial, and in addition:

A. Enter judgment for the Plaintiff Josephine Chien against Defendant the U.S Department of State on all Counts, in an amount to be determined by the jury;

B. Declare that the conduct of Defendant is in violation of Title VII;

C. Award the Plaintiff full back pay and front pay, including salary, benefits, entitlements, loss of professional status and career-enhancing opportunities, bonuses', cash awards, loss of retirement savings and benefits and other remuneration and privileges of employment retroactive to the date of any unlawful employment action found to have occurred in this case.

Reimburse the salary loss during the one year Leave Without Pay.

D. Award the Plaintiff compensatory damages for emotional distress injuries and loss;

E. Award Plaintiff pecuniary and out of pocket expenses;

F. Order Defendant to pay all reasonable attorney's fees, court costs, and expenses

incurred by Plaintiff as a result of Defendants' actions and inactions, as well as pre judgment and post-judgment interest; and

G. Order such other equitable and legal relief as the Court deems just and appropriate.

### Part VI. Jury Trial Demanded.

Plaintiff demands a jury trial for this action.

Respectfully Submitted,

/s/ A.J Dhali

Dhali PLLC

1828 L. Street. NW. Suite 600

Washington D.C. 20036

T: (202) 556-1285

F: (202) 351-0518

Email: ajdhali@dhalilaw.com

*Attorney for the Plaintiff Josephine Chien*

Tuesday July 25, 2017