**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
JOSEPHINE CHIEN,                        )
                                        )
    **Plaintiff,**                   )
                                        )
       **v.**                )     **Case No. 16-cv-01583 (APM)**
                                        )
JOHN J. SULLIVAN, acting Secretary      )
of State,[1]                            )
                                        )
    **Defendant.**                   )
_____ )

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION

Plaintiff Josephine Chien is employed by the U.S. Department of State as an Assistant Regional Security Officer. Based on events that allegedly began with her initial assignment in the Foreign Service in 2010 and continued during subsequent assignments in various U.S. offices and embassies abroad, Plaintiff filed this lawsuit against Defendant Secretary of State under Title VII of the Civil Rights Act of 1964, alleging race and sex discrimination, hostile work environment, and retaliation. Several motions to dismiss and amended complaints later, Defendant now moves for partial dismissal of Plaintiff's Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, the court denies Defendant's Second Renewed Motion for Partial Dismissal.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes the current acting Secretary of State as the defendant in this case.

## II.    BACKGROUND

### A.    Factual Background

Plaintiff Josephine Chien, a Taiwanese-American woman, has been employed by the U.S. Department of State since 2009 and currently serves as an Assistant Regional Security Officer ("ARSO") within the Foreign Service.  Pl.'s Second Am. Compl., ECF No. 19 [hereinafter SAC], ¶¶ 1, 9; *see* Def.'s Second Renewed Mot. for Partial Dismissal, ECF No. 21, Mem. in Supp. of Def.'s Second Renewed Mot. for Partial Dismissal, ECF No. 21-1 [hereinafter Def.'s 2d Renewed Mot.], at 2.  Because Plaintiff's allegations of discrimination, hostile work environment, and retaliation span over six years during her various Foreign Service assignments, and only some of those allegations are relevant to Defendant's present motion,[2] the court provides only a brief summary of Plaintiff's employment history here, referring to her specific allegations in further detail below as necessary.

Los Angeles Assignment:  In March 2010, Plaintiff was assigned to a satellite office of State's Los Angeles Field Office.  *See* SAC ¶ 10.  While in L.A., Plaintiff was supervised by Michael Lodi, who Plaintiff alleges discriminated against her by frequently screaming at her in a disparaging and demoralizing manner and by refusing her training and overseas assignments requests. *See id.* ¶¶ 10–12.  She also alleges that Lodi retaliated against her by threatening to block her transfer to the main field office and by giving her an unwarranted negative performance evaluation.  *See id.* ¶¶ 12–18.  Plaintiff remained in the L.A. satellite office under Lodi's supervision until January 2011.  *Id.* ¶¶ 15, 19.

---

[2] *See, e.g.*, SAC at 3 n.4 (acknowledging that due to Plaintiff's failure to timely exhaust her administrative remedies, the court may only hear claims arising out of events that occurred after September 18, 2012, unless those events are part of the same actionable hostile environment claim).

Benghazi, Libya Assignment: After Plaintiff was transferred out of the L.A. satellite office, she received a temporary duty assignment in Benghazi, Libya in May 2011. *Id.* ¶ 19. Plaintiff alleges that she was the only female agent on staff in Benghazi and that her new supervisors discriminated against her by denying her duty rotations and giving male agents preferential treatment and better assignments. *See id.* ¶¶ 19–24. She further alleges that her male colleagues harassed and discriminated against her by making "routine and mundane requests to her on housekeeping issues." *Id.* ¶¶ 24–25.

Islamabad, Pakistan Assignment: In February 2012, Plaintiff was assigned as an ARSO to the U.S. Embassy in Islamabad, Pakistan, *id.* ¶ 26, where she remained for approximately one year, *see id.* ¶ 48. Plaintiff claims that she was harassed and/or discriminated and retaliated against in various ways during her assignment in Pakistan, but her allegations generally fall into one of four categories. First, Plaintiff alleges that in June 2012, her supervisor at the time, John Krajicek, reassigned to a male agent the decision-making responsibilities for one of the programs that Plaintiff was tasked with overseeing. *See id.* ¶¶ 28–31. Plaintiff also avers that Krajicek refused to communicate with her directly regarding her duties and programs, and that Krajicek did not do so with other agents. *Id.* ¶ 31.

Second, Plaintiff claims that she was "blackballed or retaliated against" after she broke a "handshake" agreement with State in April 2012 concerning an assignment to Dubai. *See id.* ¶¶ 49–50; *see also id.* ¶ 49 (explaining that Plaintiff had to negate her handshake agreement after a human resources officer informed her that the agency could not provide assistance to her then-boyfriend by including him as a member of household on the travel authorization due to Sharia law in Dubai). Plaintiff alleges that after the Dubai incident, she was not given the same opportunity as other officers when she re-bid for another foreign assignment in or around April

2012.  *See id.* ¶¶ 52–53.  In that regard, Plaintiff also contends that State imposed "a different standard for males versus females and/or . . . Asians" and non-Asians.  *See id.* ¶ 53–56.  Plaintiff alleges that during the summer of 2012, when she was bidding on her next assignment to begin in 2013, she was told to apply only for domestic positions.  *See id.* ¶¶ 45–46, 49–52.  By contrast, Plaintiff says that similarly situated male agents who broke their handshake agreements still received foreign assignments.  *Id.* ¶ 53.  Relatedly, Plaintiff alleges that on at least two occasions, she was denied a foreign assignment in favor of a non-Asian man and woman, respectively, who were less senior than she was.  *See id.* ¶¶ 54–56.  In the end, Plaintiff was ultimately given a future *domestic* assignment in the Bureau of Conflict and Stability Operations in Washington, D.C., scheduled to begin sometime after her Pakistan assignment.  *See id.* ¶ 47.

Third, Plaintiff alleges that in January 2013, as part of her five-year background investigation update, she was interviewed by investigators about prior "hook[ ] up[s]" and her family in Taiwan.  *See id.* ¶¶ 32–38.[3]  Soon thereafter, Plaintiff learned that, as part of the investigation, the investigators had contacted her colleagues and asked them about whether Plaintiff "had ever complained about work place harassment, a hostile work environment, discrimination or retaliation."  *See id.* ¶ 39.  Plaintiff's white male colleague, however, was not asked any such questions during his five-year background investigation update.  *See id.* ¶ 42.  Plaintiff therefore claims that the "extra scrutiny" she received was in retaliation for her protected EEO activities.  *Id.* ¶ 43.

---

[3] Although Plaintiff alleged that she was interviewed in January 2013 in her original complaint, *see* Compl., ECF No. 1, ¶ 31, her amended complaints inconsistently refer to January 2013 and June 2013 as the interview date, *see* Am. Compl., ECF No. 10, ¶¶ 34, 38, 43; SAC ¶¶ 34, 38, 43.  Because the section heading also refers to January 2013, *see* SAC at 8, and that date falls within the general timeline outlined by Plaintiff, the court assumes the interview took place during her Pakistan assignment simply for ease of analysis in organizing the many factual allegations.

Finally, Plaintiff alleges that in late January 2013, about a month before she left Pakistan, her career development officer instructed her to re-bid for her next assignment because the aforementioned Bureau of Conflict and Stability Operations position in Washington, D.C. had been eliminated. *Id.* ¶ 48. Plaintiff placed several foreign bids, but was informed that she would not receive a foreign assignment and, once again, was encouraged to consider only domestic assignments. *See id.* ¶¶ 48, 51. In particular, Plaintiff alleges that after the Regional Security Officer at the Embassy in Islamabad offered to call a senior career development and assignment officer about Plaintiff's bidding status, he told her that "it all came down to Dubai," *id.* ¶¶ 45, 48, presumably a reference to Plaintiff breaking her handshake agreement to serve in Dubai.

Washington, D.C. Assignment:[4] Following her assignment in Pakistan, which ended in or around late February 2013, *see* SAC ¶ 48, Plaintiff continued to bid for "forward assignments" in foreign countries, to no avail, *see id.* ¶ 59. Plaintiff alleges that she applied for roughly 30 positions between June 2013 and September 2013, and that she was denied all such positions because of discrimination and retaliation. *Id.* ¶ 59; *see id.* at 13–14 (listing positions); *see also id.* ¶ 57 (alleging that in August 2013, after she was denied 18 foreign assignments, Plaintiff was told that "it ha[d] to do with something out of L.A.").

Jakarta, Indonesia Assignment: From September 2014 to August 2016, Plaintiff served as an ARSO in Jakarta, Indonesia, where she was supervised by Robert Castro, a Mexican-American male. *See id.* ¶ 60. As discussed below, the following allegations concerning Plaintiff's

---

[4] According to Defendant, Plaintiff accepted a position at the Bureau of Diplomatic Security in April 2013. *See* Def.'s 2d Renewed Mot. at 4. But that allegation is nowhere in Plaintiff's Second Amended Complaint. *See* SAC; *cf.* Def.'s Mot. for Partial Dismissal, ECF No. 8, Mem. in Supp. of Def.'s Mot. for Partial Dismissal, ECF No. 8-1, at 4 (acknowledging that, at least in her original complaint, Plaintiff did not mention starting a two-year domestic position in Washington, D.C. in April 2013). Nevertheless, because Plaintiff at least implies that she accepted an assignment in Washington, D.C., *see* SAC at 10, the court once again will assume that Plaintiff was assigned to some position in D.C. following her assignment in Pakistan for the sole purpose of facilitating organization of the facts alleged by assignment.

assignment in Jakarta led Plaintiff to file a separate administrative complaint and are generally referred to by both parties as the "new allegations" in the Second Amended Complaint.

On October 9, 2015, Plaintiff volunteered for a temporary duty assignment ("TDY") at the U.S. Embassy in Malaysia. *Id.* ¶¶ 61–62. Several weeks later at a staff meeting, however, Plaintiff learned that one of her white male colleagues received the TDY. *Id.* ¶ 65. Moreover, while Plaintiff applied to approximately 26 TDYs in other foreign countries during her Jakarta assignment, Plaintiff alleges that "other non-Asian and non-female ARSOs" were selected for these positions instead of her. *Id.* ¶¶ 66–67. Plaintiff claims that Defendant discriminated and retaliated against her by denying her these assignments, "resulting in the loss of monetary benefits." *Id.* ¶ 67; *see also id.* (alleging that "TDYs are a factor in promotions and higher pay and are included as a factor in . . . employee evaluation reports").

In addition, Plaintiff alleges that Castro created a hostile work environment and engaged in retaliatory acts against her. *Id.* ¶¶ 68, 87. For example, Plaintiff alleges that Castro prevented her from performing her duties when supervising embassy guards in November 2015, *see id.* ¶ 69, and attempted to make an unofficial request from an Embassy nurse regarding Plaintiff's sick leave in February 2016, *see id.* ¶ 70. Further, Plaintiff alleges that after she filed a discrimination claim against Castro on March 7, 2016, *see id.* ¶ 72, Castro retaliated against her by changing her work hours, placing her on AWOL status for one hour, assigning her to "duty week" without notifying her, restricting her leave requests, and deducting hours from her paycheck. *Id.* ¶¶ 73–86; *see also* ¶¶ 81–82 (noting that with respect to her last-minute assignment to "duty week," no other male or non-Asian ARSO was treated similarly).

### B.    Procedural Background

On August 3, 2016, Plaintiff filed suit against Defendant under Title VII of the Civil Rights Act of 1964,[5] alleging facts that generally correspond with those set forth in paragraphs 1 through 59 of the Second Amended Complaint and asserting claims of race and sex discrimination, hostile work environment, and retaliation. *Compare* Compl., ECF No. 1, *with* SAC. These facts pertain to events that began with Plaintiff's initial assignment in March 2010 and end with the denial of her bids for foreign assignments in September 2013. *See id.* In her original complaint, Plaintiff alleged that she exhausted her administrative remedies as to these claims by filing her first administrative complaint (case number DOS-F-038-13). *See* Compl. ¶¶ 47–54.

On January 24, 2017, Defendant moved for partial dismissal of Plaintiff's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Def.'s Mot. for Partial Dismissal, ECF No. 8, Mem. in Supp. of Def.'s Mot. for Partial Dismissal, ECF No. 8-1 [hereinafter Def.'s Mot.]. Defendant argued, among other things, that Plaintiff failed to timely exhaust her administrative remedies with respect to her Title VII claims that arose prior to September 18, 2012 (i.e., more than 45 days after Plaintiff first contacted an EEO counselor), and that Plaintiff's retaliation claim based on the her security clearance investigation was non-justiciable under *U.S. Department of Navy v. Egan*, 484 U.S. 518 (1988). *See* Def.'s Mot. at 2–3, 8–14. Defendant did not, however, seek dismissal of Plaintiff's claims relating to her allegation that she was "denied forward assignments for positions submitted in June 2013, July 2013, August 2013, [and] September 2013." *Id.* at 11 n.4 (quoting Compl. at 11); *accord* Def.'s 2d Renewed Mot. at 6.

---

[5] In her original Complaint, Plaintiff also asserted claims under 42 U.S.C. § 1981. *See* Compl., ECF No. 1, ¶¶ 72–83. She abandoned those claims in subsequent amended complaints. *See* Am. Compl., ECF No. 10, at 15–18; SAC at 20–23; *see also* Pl.'s Opp'n to Def.'s 12(b)(6) Mot., ECF No. 11.

Plaintiff filed her First Amended Complaint on February 14, 2017, correcting some of the deficiencies identified by Defendant. *See* Am. Compl., ECF No. 10 [hereinafter FAC]. For example, Plaintiff conceded that the court "only has jurisdiction over her discrimination and retaliation claims post September 18, 2012." Pl.'s Opp'n to Def.'s 12(b)(6) Mot., ECF No. 11, at 1; *accord* FAC at 3 n.2. Nevertheless, Plaintiff maintained that "insofar as [she] . . . alleged acts for a hostile work environment, so long as a single act falls within the statutory period, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'" FAC at 3 n.2 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 117 (2002)); *accord* SAC at 3 n.4. Because Plaintiff filed her First Amended Complaint within 21 days of Defendant's motion to dismiss, and therefore filed the amended pleading as a matter of right, *see* Fed. R. Civ. P. 15(a)(1)(B), the court denied Defendant's motion for partial dismissal as moot. *See* Minute Order, Feb. 15, 2017.

Defendant renewed his motion on March 30, 2017. *See* Def.'s Renewed Mot. for Partial Dismissal, ECF No. 13, Mem. in Supp. of Def.'s Renewed Mot. for Partial Dismissal, ECF No. 13-1 [hereinafter Def.'s Renewed Mot.]. In this motion, Defendant reiterated his argument that Plaintiff's retaliation claim based on the security clearance investigation was non-justiciable under *Egan*. *See id.* at 2, 6–9. He also contested Plaintiff's attempt to resuscitate her hostile work environment claim with respect to acts that occurred prior to September 18, 2012, which she conceded she failed to timely exhaust. *See id.* at 2–6. Specifically, Defendant argued that Plaintiff's time-barred claims did not form "part of the same actionable hostile work environment claim" as the claims that were timely raised and thus could not be considered for purposes of determining liability. *See id.* Defendant further asserted that the only actions that allegedly

occurred after September 18, 2012, i.e., the denial of foreign assignments,[6] did not rise to the level of a hostile work environment. *See id.* at 4–5.

Before the court could rule on Defendant's renewed motion, Plaintiff filed a motion for leave to file a Second Amended Complaint. *See* Mot. for Pl.'s Second Am. Compl., ECF No. 17. The court ultimately granted Plaintiff's motion and denied Defendant's renewed motion for partial dismissal without prejudice. *See* Minute Order, Aug. 8, 2017. Accordingly, on August 8, 2017, Plaintiff filed her Second Amended Complaint. *See* SAC. The Second Amended Complaint adds allegations concerning incidents that occurred during Plaintiff's assignment in Jakarta, Indonesia, and which gave rise to discrimination, hostile work environment, and retaliation claims pressed by Plaintiff in a *second* administrative complaint (case number DOS-0188-16). *See* SAC at 1, 15–20. Plaintiff's Second Amended Complaint, which is now the operative complaint in this matter, asserts violations under Title VII for: (1) race and sex discrimination (Count I), *see* SAC ¶¶ 89–93; (2) hostile work environment and harassment (Count II), *see id.* ¶¶ 94–100; and (3) retaliation (Count III), *see id.* ¶¶ 101–106.

On October 6, 2017, Defendant filed a Second Renewed Motion for Partial Dismissal, in which he incorporates the arguments made in his previous motions by reference and moves to dismiss the new allegations in the Second Amended Complaint in their entirety pursuant to Rule 12(b)(6). Def.'s 2d Renewed Mot. at 1–2. With respect to the new allegations, Defendant argues that Plaintiff fails to state a claim upon which relief can be granted for two independent reasons:

---

[6] Although the security-clearance update investigation also occurred after September 18, 2012, Defendant contends that the investigation cannot be considered as part of Plaintiff's hostile work environment claim because it is non-justiciable under *Egan*. *See id.* at 4–5. However, even reading the complaint(s) in the light most favorable to Plaintiff, the court does not find Plaintiff to have alleged a hostile work environment claim based on the investigation. *See* FAC ¶¶ 32–43, 64–70; SAC ¶¶ 32–43, 94–100; *see also* Pl.'s Opp'n to Def.'s 12(b)(6) Mot., ECF No. 14, at 4–6 (arguing that for purposes of her hostile work environment claim, the otherwise time-barred actions "are related to the denial of foreign assignments," without any mention of the security clearance investigation). Thus, the court does not consider that argument here.

(1) "Plaintiff fails to allege an adverse action that can support a cognizable disparate treatment claim," and (2) "Plaintiff fails to allege a sufficient causal connection between any adverse action and her race, gender, or any prior EEO activity." *Id.* at 2.

Defendant's motion is now ripe for consideration.

## III.    LEGAL STANDARD

When evaluating a motion under Rule 12(b)(6), the court "construe[s] the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). The court need not accept as true, however, "a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In the Title VII context, a plaintiff need not plead facts establishing a prima facie case to survive a motion to dismiss. *Townsend v. United States*, 236 F. Supp. 3d 280, 309 (D.D.C. 2017) (citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008)); *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002). The court may, however, "explore the plaintiff's prima facie case at the dismissal stage to determine whether the plaintiff can ever meet h[er] initial burden to establish a prima facie case." *Gilliard v. Gruenberg*, No. 16-cv-2007, 2018 WL 1471949, at *5 (D.D.C. Mar. 26, 2018) (alteration in original) (internal quotation marks omitted). That is, accepting the plaintiff's factual allegations as true and drawing all inferences in her favor,

the court must determine whether "the plaintiff has alleged factual content in her complaint that 'allows the court to draw the reasonable inference that the defendant is liable [under Title VII] for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

## IV. DISCUSSION

Title VII prohibits a federal employer from discriminating against an employee based on her race, sex, or nationality. *Baird v. Gotbaum (Baird II)*, 792 F.3d 166, 168 (D.C. Cir. 2015) (citing 42 U.S.C. § 2000e-16(a)). Title VII also makes it unlawful to retaliate against an employee "because [s]he has opposed any practice made unlawful by [Title VII][.]" *Id.* (second alteration in original) (quoting 42 U.S.C. § 2000e-3(a)). Both of these provisions also encompass a claim based on a "hostile work environment." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (discrimination); *Baird II*, 792 F.3d at 168 (retaliation).

In this case, Plaintiff asserts violations under Title VII for race and sex discrimination, hostile work environment "and harassment," and retaliation. To recap, in his present motion, Defendant does not seek dismissal of Plaintiff's Title VII claims related to the allegations that Plaintiff "was denied forward assignments for positions submitted in June 2013, July 2013, August 2013, and September 2013." Def.'s 2d Renewed Mot. at 6 (citing SAC ¶ 59). Rather, Defendant seeks dismissal of Plaintiff's remaining claims on three grounds. First, Defendant urges the court to dismiss Plaintiff's Title VII claims to the extent those claims are based on incidents that allegedly occurred prior to September 18, 2012. Because Plaintiff concedes that she cannot rely on pre-September 18, 2012 events to support her disparate treatment or retaliation claims, *see* SAC at 3 n.4, the only claim at issue is Plaintiff's hostile work environment claim. Second, Defendant argues that to the extent Plaintiff's retaliation claim is premised on "extra scrutiny" she allegedly received during her security clearance investigation, that claim is non-justiciable and therefore

must be dismissed.  Third and finally, Defendant contends that the new allegations in the Second Amended Complaint fail to allege an adverse employment action or a causal connection between such action and Plaintiff's race, sex, or prior EEO activities.  Because Defendant seeks dismissal of the new allegations in their *entirety*, Defendant presumably seeks dismissal of any hostile work environment claim based on the new allegations as well.

The court will address each of these arguments in turn.

### A.    Hostile Work Environment

The court begins with Defendant's first argument concerning exhaustion and Plaintiff's hostile work environment claim.  The parties agree that Plaintiff failed to exhaust any Title VII claim based on actions that occurred prior to September 18, 2012, and thus, at the very least, that she cannot rely on such actions to support a claim of discrimination or retaliation.  *See* SAC at 3 n.4.  Defendant, however, also maintains that Plaintiff is barred from relying on such actions to support her hostile work environment claim.  *See* Def.'s Renewed Mot. at 2–6; *see also* Def.'s 2d Renewed Mot. at 1 ("Plaintiff fails to allege a plausible continuing violation theory that would permit her to recover vis-à-vis her hostile work environment claim based on acts that allegedly occurred more than 45 days prior to Plaintiff contacting an EEO counselor[.]").  While Defendant acknowledges that earlier, time-barred incidents can qualify "as part of the same actionable hostile work environment claim . . . if they are adequately linked into a coherent hostile environment claim," Def.'s Renewed Mot. at 4 (quoting *Baird v. Gotbaum (Baird I)*, 662 F.3d 1246, 1251 (D.C. Cir. 2011)); *see Morgan*, 536 U.S. at 120–21, he contends that Plaintiff fails to allege facts that plausibly satisfy that standard here, *see* Def.'s Renewed Mot. at 5–6.

The court need not resolve this argument at present, however, for two reasons.  First, although Defendant clearly acknowledges that Plaintiff has asserted a hostile work environment

claim in the Second Amended Complaint based on the new allegations concerning Plaintiff's time in Jakarta, Def.'s 2d Renewed Mot. at 5, 11–12, Defendant does not directly challenge the sufficiency of Plaintiff's pleading of that claim in his present motion. Rather, as to these new allegations, Defendant argues only that Plaintiff has failed to plead plausible claims of discrimination and retaliation. *See id.* at 1–2, 8–14. He is entirely silent as to whether those same allegations support a hostile work environment claim. At least at the motion to dismiss stage, the court treats Defendant's silence as a concession as to the plausibility of Plaintiff's hostile work environment claim based on the events alleged to have occurred in Jakarta. *Cf. Sierra v. Hayden*, 254 F. Supp. 3d 230, 245 (D.D.C. 2017) (refusing to dismiss a discrimination claim based on non-promotion where the defendant did not move to dismiss that action in particular, and noting only that such a claim was "likely dismissible"); *see also id.* ("[S]ua sponte Rule 12(b)(6) dismissal is appropriate only when it is patently obvious that the plaintiff could not have prevailed on the facts alleged in [her] complaint." (alterations in original) (internal quotation marks omitted) (citing *Fields v. Bellamy*, No. 93-5274, 1994 WL 549470, at *1 (D.C. Cir. 1994))).

To be sure, Defendant does incorporate by reference the argument made in his earlier motion for partial dismissal—directed at the First Amended Complaint—that Plaintiff's hostile work environment claim does not meet the high bar established for such claims under *Harris*. *See* Def.'s 2d Renewed Mot. at 1; Def.'s Renewed Mot. at 5. That argument, however, pertains only to the sufficiency of Plaintiff's pleading of a hostile work environment based on events occurring between September 18, 2012, and October 2013, i.e., before Plaintiff's assignment to Jakarta. *See* Def.'s Renewed Mot. at 4–5; FAC at 3–14. Merely incorporating an argument about a different time period does not suffice to challenge Plaintiff's hostile work environment claim based on the later events occurring in Jakarta. *Cf. Doe v. Siddig*, 810 F. Supp. 2d 127, 137–38 (D.D.C. 2011)

(declining to give "serious attention" to the defendants' argument in support of dismissal where defendants failed to make "any attempt to correlate their [unsupported] argument to the factual allegations set forth in the . . . [c]omplaint," because "'courts need not resolve arguments raised in a cursory manner and with only the most bare-bones arguments in support.'" (citing *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997))). Accordingly, Plaintiff's Second Amended Complaint states a hostile work environment claim that may proceed to discovery.

Second, having concluded that Plaintiff has stated *some* plausible claim of a hostile work environment, the court will not attempt, at this stage, to parse the different time periods within the Second Amended Complaint to ferret out the alleged acts for which Defendant can and cannot be held liable under such claim. Although far from a model of clarity, the Second Amended Complaint appears to assert a single hostile work environment claim beginning with Plaintiff's initial assignment in L.A. and continuing through her assignment in Jakarta. *See* SAC ¶¶ 48, 57; *id.* at 3 n.4; *see also* Pl.'s Opp'n to Def.'s 12(b)(6) Mot., ECF No. 14, at 1–2. Whether Plaintiff can sustain that theory is ultimately a matter of proof that will depend, in part, on whether the events alleged "are adequately linked into a coherent hostile environment claim." *See Baird I*, 662 F.3d at 1251.[7] And, even if, say, the pre-September 18, 2012 allegations cannot be "adequately linked" to the events occurring after that date, those otherwise stale allegations might, as Defendant concedes, be of possible relevance to the extent "they are provided exclusively as non-actionable

---

[7] The court recognizes that in *Baird*, the court was confronted with a motion to dismiss and therefore addressed the question whether the alleged employment actions were *plausibly* linked to one another such that they formed one coherent hostile work environment claim. *See Baird II*, 792 F.3d at 170–71. But in *Baird*, the plaintiff "made no serious attempt to tie [her allegations] together." *Id.* at 171. In this case, Plaintiff at least makes some effort to do so. *See* Pl.'s Opp'n to Def.'s 12(b)(6) Mot., ECF No. 14, at 1–2, 5–6. In any event, the court here need not further consider whether Plaintiff has plausibly alleged a sufficient connection for an additional reason. Because Defendant fails to articulate the "actionable hostile work environment claim" that this court should use as the benchmark for purposes of determining whether the actions are "adequately linked" under *Morgan* and *Baird*, the court declines to consider any such argument for the same reasons stated above.

14

'background evidence.'" Def.'s Renewed Mot. at 3; *see also Morgan*, 536 U.S. at 113 (explaining

that while "discrete discriminatory acts are not actionable if time barred," an employee may use

such acts "as background evidence in support of a timely claim"). Thus, given that, at this stage,

all of the Second Amended Complaint's allegations might have *some* relevance to Plaintiff's

hostile work environment claim, the court deems it better left until summary judgment to determine

the precise contours of that claim and the evidence that might support it. *See Guerrero v. Vilsack*,

134 F. Supp. 3d 411, 432–33 (D.D.C. 2015); *cf. id.* at 432 (citing cases in which other courts in

this district have "likewise refrained from deciding, based on an EEO complaint alone, whether

alleged violations are discrete or continuing").[8]

### B. Justiciability of Plaintiff's Retaliation Claim Based on the Security Clearance Investigation

The court turns next to Plaintiff's retaliation claim premised on the "extra scrutiny" she

allegedly received during a five-year security-clearance update investigation. Defendant contends

that this claim is non-justiciable under *U.S. Department of Navy v. Egan*, 484 U.S. 518 (1988), and

its progeny. *See* Def.'s Mot. at 12–14; Def.'s Renewed Mot. at 6–9.

In *Egan*, the Supreme Court held that the Merit Systems Protection Board lacked the

authority to review a federal employee's complaint about the denial of a security clearance. 484

U.S. at 526–30. The Court stated that, "[f]or 'reasons . . . too obvious to call for enlarged

discussion,' the protection of classified information must be committed to the broad discretion of

the agency responsible, and this must include broad discretion to determine who may have access

---

[8] Plaintiff is reminded, however, that "[t]he *Morgan* principle is not . . . an open sesame to recovery for time-barred violations." *Baird I*, 662 F.3d at 1251. "Both incidents barred by the statute of limitations and ones not barred can qualify as 'part of the same actionable hostile environment claim' only if they are adequately linked into a coherent hostile environment—if, for example, they involve[ ] the same type of employment actions, occur[ ] relatively frequently, and [are] perpetrated by the same managers." *Id.* (quoting *Morgan*, 536 U.S. at 120–21); *see also Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 71 (D.D.C. 2013) (applying *Morgan* to the 45-day regulatory time limit to contact an EEO counselor); *id.* at 71 n.11 (citing cases). Plaintiff will have to come forward with evidence of such an "adequate linkage" to survive summary judgment.

to it." *Id.* at 529 (alteration in original) (citation omitted). "[I]t is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Id.* The ordinary presumption favoring reviewability of administrative actions, the Court explained, "runs aground when it encounters concerns of national security." *Id.* at 526–27.

Applying *Egan* in the Title VII context, the D.C. Circuit has held that "an adverse employment action based on [a] denial or revocation of a security clearance is not actionable under Title VII." *Ryan v. Reno*, 168 F.3d 520, 524 (D.C. Cir. 1999). In *Ryan*, the plaintiffs were denied federal jobs because they were not granted the required security clearances, a decision that the plaintiffs asserted was discriminatory. *Id.* at 522–23. Stating that it was "necessary" to apply the *McDonnell Douglas* burden-shifting analysis to determine the merits of the plaintiffs' claims,[9] the court concluded that it could not "clear the second step of *McDonnell Douglas* without running smack up against *Egan*." *Id.* at 523–24. In particular, because the federal agency had proffered the plaintiffs' inability to obtain security clearances as its non-discriminatory reason for the non-hiring, the court ruled that plaintiffs "could not challenge the proffered reason's authenticity without also challenging its validity." *Id.* at 524. Challenging the reason's validity, in turn, would have required the plaintiffs to ask the court to review the merits of the security clearance decisions—a result forbidden by *Egan*. *See id.*; *see also Foote v. Moniz*, 751 F.3d 656, 658–59 (D.C. Cir. 2014); *Bennett v. Chertoff*, 425 F.3d 999, 1003 (D.C. Cir. 2005).

But under this Circuit's precedent, *Egan* also has its limits. In *Rattigan v. Holder*, the D.C. Circuit held that *Egan* does not "insulate[ ] from Title VII *all* decisions that might bear upon an

---

[9] In cases where there is no direct evidence of discrimination or retaliation, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Weber v. Battista*, 494 F.3d 179, 182 (D.C. Cir. 2007). Under that framework, the plaintiff bears the burden of establishing a prima facie case of discrimination or retaliation, as defined below. *See Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).

employee's eligibility to access classified information." 689 F.3d 764, 767 (D.C. Cir. 2012). Because "*Egan* emphasized that the decision to grant or deny security clearance requires a '[p]redictive judgment' that 'must be made by those with the necessary expertise in protecting classified information,'" *id.* (alteration in original) (quoting *Egan*, 484 U.S. at 529), the court reasoned that *Egan* does not preclude all review of decisions by employees who lack expertise in security matters and merely report security concerns. *Id.* at 768; *see also id.* at 771 (holding that *Egan* does not apply to claims premised on the assertion that "agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false").

Here, Defendant argues that the allegation that Plaintiff received "extra scrutiny" during interviews related to her security clearance investigation "directly implicate[s] agency decisions regarding her security clearance," and thus is "the type of discretionary action[ ] that [is] exempted from review" under *Egan* and its progeny. Def.'s Mot. at 12, 14. This argument, however, misapprehends the nature of Plaintiff's claims. Here, Plaintiff does not allege that her security clearance was denied or revoked, *see* SAC at 8–10, or even that Defendant initiated review of her security clearance for retaliatory reasons, *see id.* (characterizing the inquiry as a five-year background investigation update). Rather, she claims that she received "extra scrutiny" during her security-clearance update investigation in retaliation for her prior EEO activities. *See id.* ¶ 43. Specifically, Plaintiff alleges that the investigators asked her friends and colleagues whether she "had ever complained about work place harassment, a hostile work environment, discrimination or retaliation," *id.* ¶ 39, and that Plaintiff deemed these inquiries "as dissuading her from filing further EEO charges against the Agency," *id.* ¶ 41. These questions, however, when considered at the motion to dismiss stage, have no apparent connection to national security or any "[p]redictive

judgment" about Plaintiff's security-clearance worthiness and thus do not run afoul of *Egan*. *See Egan*, 484 U.S. at 529. Moreover, in *Rattigan*, the D.C. Circuit emphasized that its duty was not only to follow *Egan*, "but also to preserv[e] to the maximum extent possible Title VII's important protections against workplace discrimination and retaliation." 689 F.3d at 770 (alteration in original) (internal quotation marks omitted). Heeding that guidance here, the court cannot conclude that Plaintiff's claim must be dismissed as non-justiciable.

### C. Plaintiff's New Discrimination and Retaliation Claims

Finally, the court turns to the new allegations in the Second Amended Complaint, which Defendant seeks to dismiss in their entirety. As discussed, Defendant does not address whether those allegations are insufficient to support a hostile work environment claim, and the court therefore will not dismiss the new allegations on that ground.

Instead, Defendant focuses on why the new allegations fail to state a claim of discrimination or retaliation under Title VII. Although the pleading of a prima facie case under *McDonnell Douglas* is not required to survive a motion to dismiss, *see Swierkiewicz*, 534 U.S. at 510–11, it is helpful to set forth the elements of a prima facie case here in order to frame Defendant's arguments. To state a prima facie case of discrimination, a plaintiff must show that "[1] she is part of a protected class under Title VII, [2] she suffered a cognizable adverse employment action, and [3] the action gives rise to an inference of discrimination," that is, "an inference that [her] employer took the action because of [her] membership in the protected class." *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015); *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (internal quotation mark omitted). To state a prima facie case of retaliation, a plaintiff must show that "[1] she engaged in activity protected by Title VII, [2] the employer took [materially] adverse action against her, and [3] the employer took that action because of [her]

protected conduct." *Walker*, 798 F.3d at 1091–92; *see Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008).

With this general framework in mind, Defendant argues that the new allegations should be dismissed under Rule 12(b)(6) for two separate reasons. First, Defendant contends that Plaintiff fails to allege any adverse employment action that can support her discrimination and retaliation claims. *See* Def.'s 2d Renewed Mot. at 2, 8–13. Second, Defendant contends that, even if Plaintiff has sufficiently alleged adverse action, she fails to allege a causal connection between such action and her race, sex, or prior EEO activity. *See id.* at 2, 13–14. The court addresses each of these contentions in turn.

### 1.    *Adverse Employment Action*

Because the standard for what constitutes adverse action differs in discrimination and retaliation cases, *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006), the court will address these claims separately. Beginning with Plaintiff's new discrimination claim in the Second Amended Complaint, Plaintiff alleges that she was discriminated against when Defendant denied her a TDY in Malaysia and 26 other TDYs, ranging from Beijing to Warsaw. *See* SAC ¶¶ 60–67, 91; Pl.'s Opp'n to Def.'s Second 12(b)(6) Mot., ECF No. 22 [hereinafter Pl.'s Opp'n], at 3–4; *cf.* Def.'s 2d Renewed Mot. at 9–11. Plaintiff says that her white and African-American male colleagues were treated better than she was because they were awarded the TDYs that she was denied. *See* Pl.'s Opp'n at 1, 3 (citing SAC ¶ 67).

Defendant urges the court to dismiss Plaintiff's new discrimination claim because "[a] TDY denial is not considered an adverse employment action absent materially adverse consequences, which Plaintiff has not demonstrated." Def.'s 2d Renewed Mot. at 11 (citing cases). But Defendant reads the complaint too narrowly. Plaintiff here has alleged not only that "TDYs

are a factor for promotion and higher pay and are included as a factor in . . . employee evaluation reports," but that in her case the denial of TDYs also "result[ed] in a loss of monetary benefits." SAC ¶ 67. The alleged loss of "monetary benefits" sets this matter apart from those authorities cited by Defendant. *Cf. Nichols v. Truscott*, 424 F. Supp. 2d 124, 136–38 (D.D.C. 2006) (holding, at summary judgment stage, that the repeated denial of plaintiff's requests for detail assignments was not adverse "because it did not have 'materially adverse consequences' or result in 'objectively tangible harm'"); *Moore v. Ashcroft*, 401 F. Supp. 2d 1, 32 (D.D.C. 2005) (holding, at summary judgment stage, that even if the defendant thwarted the plaintiff's participation in a TDY assignment, the plaintiff failed to demonstrate any "materially adverse consequences" of that action). Plaintiff therefore has alleged facts that plausibly establish that, as a result of the denials, she experienced "materially adverse consequences affecting the terms, conditions, or privileges of [her] employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002); *see Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (noting that in most cases, a tangible employment action will "inflict[ ] direct economic harm." (emphasis omitted) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998))). That is all that is required at the motion to dismiss stage.

Next up is Plaintiff's retaliation claim. "'Adverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim." *Baloch*, 550 F.3d at 1198 n.4. "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse," which means "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (internal quotation marks omitted).

As part of her new allegations in the Second Amended Complaint, Plaintiff avers that she engaged in protected EEO activity on March 7, 2016, when she informed her Deputy Chief of Mission that her supervisor (Castro) was discriminating against her by giving better treatment to male ARSOs. *See* SAC ¶ 72; Pl.'s Opp'n at 2, 4. Thereafter, Plaintiff alleges that: (1) Castro suddenly changed Plaintiff's reporting time from 8:30 a.m. to 7:30 a.m. and made the change effective retroactively, causing her to be placed on AWOL status for one hour, *see* SAC ¶¶ 73–75; (2) Castro assigned Plaintiff to "duty week" without sufficient notice and more often than her male and non-Asian colleagues, *see id.* ¶¶ 76–82; *cf.* Def.'s 2d Renewed Mot. at 9; (3) Plaintiff was restricted on further leave requests, *see* SAC ¶ 83; and (4) Castro authorized Plaintiff's weekly salary to be deducted by nine hours for "leave without pay," even though she was on approved sick leave during that time, *see id.* ¶¶ 84–86. *See* Pl.'s Opp'n at 2, 4–5; *cf.* Def.'s 2d Renewed Mot. at 9, 12–13.[10]

The first, third, and fourth actions all concern leave issues. As to those issues, Defendant argues that such "minor workplace occurrences do not rise to the level of an actionable adverse action." *See* Def.'s 2d Renewed Mot. at 12 (citing cases). True, the Supreme Court has held that Title VII's anti-retaliation provision only protects individuals from retaliation that "produces an

---

[10] Defendant reads the Second Amended Complaint to also assert hostile work environment and, as relevant here, retaliation claims based upon other alleged incidents, such as Castro pulling Plaintiff away from her duties supervising guards at the Embassy gate on November 30, 2015, *see* SAC ¶¶ 69–70, and attempting to make an unofficial request to an Embassy nurse regarding Plaintiff's leave request on February 11, 2016, *see id.* ¶ 71. *See* Def.'s 2d Renewed Mot. at 11 (arguing that "such actions by her supervisor, even if true, do not constitute adverse employment actions for purposes of discrimination or retaliation"). In her Opposition, however, Plaintiff only focuses on those actions that occurred after March 7, 2016, when she informed the Deputy Chief of Mission that Castro was discriminating against her. *See* Pl.'s Opp'n at 2, 4–5. Because it is far from clear whether the Second Amended Complaint asserts a *retaliation* claim with respect to those allegations, *see, e.g.*, SAC ¶ 103, the court follows Plaintiff's lead in describing the claims set forth in her own complaint. In any event, even if the complaint were to assert a retaliation claim based on those two allegations, the court would dismiss such a claim for lack of causal connection between the alleged actions and the prior EEO activity. Assuming the truth of the facts alleged in the Second Amended Complaint, both actions occurred *before* Plaintiff contacted the Deputy Chief of Mission regarding Castro. "To state the obvious, an employee cannot claim retaliation for protected activity that has yet to occur." *Ames v. Nielsen*, 286 F. Supp. 3d 70, 84 (D.D.C. 2017).

injury or harm," and not "those petty slights or minor annoyances that often take place at work and that all employees experience." *See Burlington N.*, 548 U.S. at 67–68. But the examples of "minor workplace occurrences" cited by Defendant are distinguishable from the allegations in this case. Take *Aldrich v. Burwell*, 197 F. Supp. 3d 124 (D.D.C. 2016), for example.. As Defendant acknowledges, the court in that case was concerned with "close scrutiny, monitoring, or tracking of an employee's whereabouts." Def.'s 2d Renewed Mot. at 12 (quoting *Aldrich*, 197 F. Supp. 3d at 132). In *Aldrich*, the district court held that the plaintiff failed to plead facts showing that her supervisor's leave restriction constituted a materially adverse action where "[a]ll that was demanded of her was that she 'announce any arrival, as well as well as each and every departure during the day, that might take 15 minutes or more.'" *See Aldrich*, 197 F. Supp. 3d at 134 (quoting the plaintiff's complaint). Here, by contrast, Plaintiff alleges that her supervisor retaliated against her by not only affirmatively *restricting* her leave requests but also placing her on AWOL status after retroactively changing her work hours and authorizing her pay to be deducted for hours that were pre-approved for sick leave. It is at least plausible that these actions, either individually or collectively, could have dissuaded a reasonable worker from making a charge of discrimination.[11]

That leaves the second action concerning Plaintiff's assignment to "duty week," during which State employees are required to be on standby for assignments on their off days. *See* SAC

---

[11] The court pauses to note one caveat with the leave restriction, *see* SAC ¶ 83. While the other two cases cited by Defendant suggest that a leave restriction, standing alone, is insufficient to support a claim of retaliation, *see Ramsey v. Moniz*, 75 F. Supp. 3d 29, 54 (D.D.C. 2014); *Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 98 (D.D.C. 2011), it is not clear that Plaintiff is in fact challenging the restriction as a stand-alone act of retaliation here, *see* Pl.'s Opp'n at 2, 4–5. In any event, both of those cases were decided on summary judgment and involved plaintiffs who failed to articulate "any context regarding the restriction or any evidence to conclude that it would have dissuaded a reasonable employee from pursuing an EEO claim, as required." *Ramsey*, 75 F. Supp. 3d at 54; *cf. Douglas-Slade*, 793 F. Supp. 2d at 98. For these reasons, and because "the significance of any given act of retaliation will often depend upon the particular circumstances," *Burlington N.*, 548 U.S. at 69, the court declines to reach the issue here at the motion to dismiss stage, *cf. Sims v. District of Columbia*, 33 F. Supp. 3d 1, 12–13 (D.D.C. 2015) (concluding, at summary judgment stage, that "the denial of a regular schedule or days off" and "the denial of plaintiff's leave request" could constitute adverse action for purposes of establishing a prima facie case of retaliation).

¶ 77; *see also id.* (noting that during duty weeks, ARSOs "may not travel outside of Jakarta" and must "constantly check their blackberries for messages and emails after hours"). Plaintiff alleges that Castro assigned her to "duty week" for May 9, June 13, June 27, and July 25, 2016. *Id.* ¶ 78. Additionally, Plaintiff avers that Castro, in contravention of his usual practice, unexpectedly assigned Plaintiff to duty week for the week of July 18, 2016, without giving her prior notice, thereby causing her to cancel already finalized travel plans. *Id.* ¶¶ 79–81. Plaintiff alleges that "[n]o other male or non-Asian ARSO was treated similarly," *id.* ¶ 82, and that she was given such assignments in retaliation for her prior EEO activity, *see id.* ¶¶ 68, 72, 87.

Defendant asserts that such action does not constitute an "adverse employment decision[ ]." *See* Def.'s 2d Renewed Mot. at 12–13. D.C. Circuit precedent, however, says otherwise. "In the retaliation context, instead of requiring a significant change in employment status to constitute adversity, an action is adverse if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Crowley v. Vilsack*, 236 F. Supp. 3d 326, 330 (D.D.C. 2017) (quoting *Burlington N.*, 548 U.S. at 68). Applying that standard, the D.C. Circuit has held that "[a] reasonable employee might well be dissuaded from filing an EEOC complaint if she thought her employer would retaliate by burying her in work." *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010); *see Jouanny v. Embassy of France in the U.S.*, No. 16-cv-135, 2017 WL 2455023, at *6 (D.D.C. 2017) (holding that allegations concerning the defendant nearly doubling the plaintiff's workload to pressure her to quit "satisifie[d] the adversity requirement for a retaliation claim" (citing *Mogenhan*, 613 F.3d at 1166)). Accordingly, Plaintiff's retaliation claim based on the assignment of additional "duty weeks" satisfies that standard at the motion to dismiss stage.

## 2.    Causal Connection

Alternatively, Defendant contends that even if Plaintiff has sufficiently alleged adverse action, Plaintiff's new discrimination and retaliation claims still fail because she does not allege any causal connection between the asserted action and her race, sex, or prior EEO activity. *See* Def.'s 2d Renewed Mot. at 2, 13–14. The court, however, need only address this argument in the context of Plaintiff's discrimination claim.[12] According to Defendant, "Plaintiff's vague assertions that she believes that male and non-Asian [ARSOs] were treated better than her are . . . inadequate to support a discrimination claim." *Id.* at 14.

The court disagrees. At the motion to dismiss stage, "Plaintiff need only allege that [s]he 'suffered an adverse employment action . . . because of [her] race . . . [or] sex[.]'" *Munro v. LaHood*, 839 F. Supp. 2d 354, 360–61 (D.D.C. 2012) (quoting *Baloch*, 550 F.3d at 1196); *see also Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 90 (D.D.C. 2009) (noting that "the threshold for pleading facts in support of a Title VII discrimination claim is a low one," and that "district courts should not undertake a 'full causation analysis' in evaluating the sufficiency of the prima facie case"). And, "an inference of discrimination may be drawn where an 'employer treated other employees of a different race . . . [or] sex . . . more favorably in the same factual circumstances.'" *Townsend*, 236 F. Supp. 3d at 309 (quoting *Brady*, 520 F.3d at 495). Here, Plaintiff offers her colleagues Mike Bjelavic and Joseph Williams as comparators who were treated more favorably because they

---

[12] The court does not address causal connection as to Plaintiff's retaliation claim for several reasons. First, insofar as the alleged adverse actions occurred after March 7, 2016, Defendant does not dispute causation. *See* Def.'s 2d Renewed Mot. at 13–14. Second, insofar as the alleged adverse actions occurred before March 7, 2016, Plaintiff does not characterize those actions as relevant to proving her retaliation claim. *See* Pl.'s Opp'n at 4–5. Concededly, the court may have misinterpreted Plaintiff's pleading, as it does not clearly delineate what actions are relevant to Plaintiff's discrimination, retaliation, and hostile work environment claims, respectively. For instance, the Second Amended Complaint is vague as to whether the 26 TDY denials occurred before or after March 7, 2016, the date of her protected activity. Plaintiff asserts no precise timeline as to these denials. *See* SAC ¶ 66. However, in a footnote, she cites a March 19, 2016 "counsel's letter" to support the allegation that Plaintiff "was rejected for" all 26 TDYs. *Id.* at 16 & n.23. If the TDY denials in fact occurred on or about March 19, 2016, then a causal connection between those denials and Plaintiff's prior EEO activity is at least plausible.

24

were non-Asian and male in the same factual circumstances (i.e., in the selection of ARSOs for TDYs).  *See* SAC ¶¶ 60–67; Pl.'s Opp'n at 1–4.  Thus, Plaintiff has plausibly alleged that she was discriminated against on the basis of race and sex.

*     *     *

In sum, the court denies Defendant's Second Renewed Motion for Partial Dismissal of Plaintiff's new discrimination and retaliation claims concerning incidents that allegedly occurred during her Jakarta assignment.  Additionally, insofar as Plaintiff's hostile work environment claim is based on such allegations, the court will allow that claim to go forward.  At the summary judgment stage, the court will decide whether Plaintiff's other hostile work environment claims are part of the "same hostile work environment" as the claim premised on the new allegations and, if not, whether any of those other claims (to the extent they were timely exhausted) are actionable as a separate hostile work environment claim.[13]  Finally, the court finds that *Egan* does not bar review of Plaintiff's retaliation claim based on "extra scrutiny" she received during her security-clearance update investigation.  Accordingly, Defendant's motion to dismiss is denied in this respect as well.

## V.     CONCLUSION AND ORDER

For the foregoing reasons, Defendant's Second Renewed Motion for Partial Dismissal, ECF No. 21, is denied.


Dated:  April 25, 2018                             Amit P. Mehta
                                                   United States District Judge

_____

[13] As explained above, Plaintiff concedes that her discrimination and retaliation claims based on incidents that allegedly occurred prior to September 18, 2012, are time-barred.  *See* SAC at 3 n.4; *see also* Pl.'s Opp'n to Def.'s 12(b)(6) Mot., ECF No. 11, at 1.  Accordingly, the court does not read the Second Amended Complaint to assert such claims and need not grant Defendant's motion on those grounds.  But to the extent there is any question remaining as to the viability of those claims, they are dismissed.