UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOSEPHINE CHIEN, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>ANTONY BLINKEN, Secretary, U.S.<br>Department of State, )<br><br>*Defendant*. ) | Civ. A. No. 16-1618 (JDB) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF RENEWED MOTION FOR JUDGMENT AS A MATTER
OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

MATTHEW M. GRAVES
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

DANIEL P. SCHAEFER
Assistant United States Attorney

*Counsel for Defendant*

# TABLE OF CONTENTS

Introduction...............................................................................................................................1

Factual Background and Procedural History ...........................................................................2

    A.    Pre-Trial Motions................................................................................................2

    B.    Trial....................................................................................................................4

Legal Standards.........................................................................................................................9

    A.    Renewed Motion for Judgment as a Matter of Law ...........................................9

    B.    Motion for New Trial or Remittitur ..................................................................11

Argument .................................................................................................................................13

I.     The Court Should Enter Judgment as a Matter of Law on Plaintiff's Retaliation Claim Challenging Her Duty Schedule Assignments..................................................13

    A.    To Constitute a Material Adversity, an Employee Must Experience a Significant and Sustained Increase in Her Workload. ..........................................13

    B.    No Reasonable Jury Could Find That Plaintiff Experienced a Significant and Sustained Increase in Her Workload After She Complained of Discrimination. . 17

II.    The Court Should Order a New Trial on the Last Retaliation Claim Because the Jury's Verdict Went Against the Clear Weight of the Evidence. ....................................25

III.   The Court Should Order a New Trial on the Limited Issue of Emotional Distress Damages Unless Plaintiff Agrees to a Remittitur of Damages to $50,000......................26

Conclusion ..............................................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Achagzai v. Broad. Bd. of Governors*,
   Civ. A. No. 17-0612 (RDM), 2018 WL 4705799 (D.D.C. Sept. 30, 2018) ............................ 14

*Achagzai v. Broad. Bd. of Governors*,
   Civ. A. No. 17-0612 (RDM), 2020 WL 5530135 (D.D.C. Sept. 14, 2020) ............................ 15

*Allen v. Napolitano*,
   774 F. Supp. 2d 186 (D.D.C. 2011) ............................................................. 14, 16, 23

*Allied Chem. Corp. v. Daiflon, Inc.*,
   449 U.S. 33 (1980) .......................................................................... 11

*Bowie v. Maddox*,
   540 F. Supp. 2d 204 (D.D.C. 2008) .......................................................... 10

*Bridgeforth v. Jewell*,
   721 F.3d 661 (D.C. Cir. 2013) ........................................................... 13, 24

*Brodetski v. Duffey*,
   141 F. Supp. 2d 35 (D.D.C. 2001) ......................................................... 15, 16

*Burlington Indus., Inc. v. Ellerth*,
   524 U.S. 742 (1998) ...................................................................... 16

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53 (2006) ................................................................. 13, 15, 22, 24

*Carey v. Piphus*,
   435 U.S. 247 (1978) ...................................................................... 27

*Chien v. Pompeo*,
   Civ. A. No. 16-1583 (APM), 2020 WL 10457008 (D.D.C. Dec. 7, 2020) ...................... 3, 4

*Chien v. Sullivan*,
   313 F. Supp. 3d 1 (D.D.C. 2018) ..................................................... passim

*Crady v. Liberty Nat. Bank & Tr. Co. of Indiana*,
   993 F.2d 132 (7th Cir. 1993) ............................................................. 16

*Crowley v. Vilsack*,
   236 F. Supp. 3d 326 (D.D.C. 2017) ......................................................... 3

*Daniels v. District of Columbia*,
   15 F. Supp. 3d 62 (D.D.C. 2014) .......................................................... 28

*Department of Navy v. Egan*,
    484 U.S. 518 (1988) .................................................................... 2, 3

*Dwyer v. Deutsche Lufthansa, AG*,
    686 F. Supp. 2d 216 (E.D.N.Y. 2010) .................................... 12

*Earl v. Bouchard Transp. Co.*,
    917 F.2d 1320 (2d Cir. 1990) ................................................... 12

*Gasperini v. Ctr. for Humans., Inc.*,
    518 U.S. 415 (1996) ............................................................... 11, 12

*Gray v. Foxx*,
    637 F. App'x 603 (D.C. Cir. 2015) ........................................ 25

*Grogan v. Gen. Maint. Serv. Co.*,
    763 F.2d 444 (D.C. Cir. 1985) .............................................. 11

*Hetzel v. County of Prince William*,
    89 F.3d 169 (4th Cir. 1996) ..................................................... 31

*Hooks v. Wash. Sheraton Corp.*,
    578 F.2d 313 (D.C. Cir. 1977) .............................................. 12

*Hutchinson v. Stuckey*,
    952 F.2d 1418 (D.C. Cir. 1992) ............................................ 11

*Jean-Baptiste v. District of Columbia*,
    931 F. Supp. 2d 1 (D.D.C. 2013) ................................... passim

*Jefferson v. Milvets Sys. Tech., Inc.*,
    986 F. Supp. 6 (D.D.C. 1997) ................................................ 29

*Langevine v. District of Columbia*,
    106 F.3d 1018 (D.C. Cir. 1997) ........................................ 11, 12

*Lee v. District of Columbia*,
    19 F. Supp. 3d 281 (D.D.C. 2014) .................................... 11, 25

*Liberatore v. CVS N.Y., Inc.*,
    160 F. Supp. 2d 114 (D.D.C. 2001) .......................... 10, 29, 30

*Linn v. United Plant Guard Workers of Am.*,
    383 U.S. 53 (1966) ................................................................... 12

*Machesney v. Larry Bruni, M.D., P.C.*,
    905 F. Supp. 1122 (D.D.C. 1995) ..................................... 11, 25

*Martinez v. District of Columbia,*
  503 F. Supp. 2d 353 (D.D.C. 2007) .................................................. 11

*McNeal v. Hi-Lo Powered Scaffolding, Inc.,*
  836 F.2d 637 (D.C. Cir. 1988) ........................................................ 11

*Mogenhan v. Napolitano,*
  613 F.3d 1162 (D.C. Cir. 2010) ............................................... 3, 14, 15

*Morales v. Gotbaum,*
  42 F. Supp. 3d 175 (D.D.C. 2014) ............................... 15, 16, 22, 23, 24

*Morris v. Pruitt,*
  308 F. Supp. 3d 153 (D.D.C. 2018) ................................................ 25

*Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.,*
  493 F.3d 160 (D.C. Cir. 2007) ........................................................ 10

*Mungin v. Katten Muchin & Zavis,*
  116 F.3d 1549 (D.C. Cir. 1997) ...................................................... 16

*Nyman v. FDIC,*
  967 F. Supp. 1562 (D.D.C. 1997) ......................................... 26, 30, 32

*Peyton v. DiMario,*
  287 F.3d 1121 (D.C. Cir. 2002) ................................................ passim

*Pittington v. Great Smoky Mountain Lumberjack Feud, LLC,*
  880 F.3d 791 (6th Cir. 2018) .......................................................... 29

*Pyramid Secs. Ltd. v. IB Resol., Inc.,*
  924 F.2d 1114 (D.C. Cir. 1991) ...................................................... 21

*Radtke v. Lifecare Mgmt. Partners,*
  795 F.3d 159 (D.C. Cir. 2015) ........................................................ 11

*Rainone v. Potter,*
  388 F. Supp. 2d 120 (E.D.N.Y. 2005) ............................................. 32

*Reeves v. Sanderson Plumbing Prod., Inc.,*
  530 U.S. 133 (2000) ...................................................................... 10

*Robinson v. District of Columbia,*
  341 F. Supp. 3d 97 (D.D.C. 2018) .................................................. 29

*Saba v. USDA,*
  26 F. Supp. 3d 16 (D.D.C. 2014) .................................................... 14

*Scott v. Harris*,
  550 U.S. 372 (2007)..................................................................................... 21

*Siegel v. Mazda Motor Corp.*,
  878 F.2d 435 (D.C. Cir. 1989) .................................................................. 10

*Sorrell v. Paige Indus. Servs., Inc.*,
  Civ. A. No. 15-2004 (TJK), 2021 WL 2156693 (D.D.C. May 27, 2021) .............................. 25

*Spence v. Bd. of Educ. of Christina Sch. Dist.*,
  806 F.2d 1198 (3d Cir. 1986)..................................................................... 31

*Walden v. Patient-Centered Outcomes Rsch. Inst.*,
  177 F. Supp. 3d 336 (D.D.C. 2016) .......................................................... 14

*Waterhouse v. District of Columbia*,
  298 F.3d 989 (D.C. Cir. 2002) .................................................................. 10

*Wiley v. Glassman*,
  511 F.3d 151 (D.C. Cir. 2007) .................................................................. 13

*Wulf v. City of Wichita*,
  883 F.2d 842 (10th Cir. 1989) .................................................................. 32

**Statutes**

42 U.S.C. Section 1981a ............................................................................. 26

**Rules**

Fed. R. Civ. P. 37 ...................................................................................... 28

Fed. R. Civ. P. 50 ........................................................... 4, 5, 6, 7, 9, 10, 17

Fed. R. Civ. P. 59 ...................................................................... 9, 11, 12

## Introduction

After a seven-day jury trial, the jury returned a verdict in favor of Defendant Antony Blinken, in his official capacity as Secretary of State ("Defendant"), on Plaintiff's discrimination claim and one of Plaintiff's retaliation claims. On a second retaliation claim that only challenged a couple of extra weekly assignments that Plaintiff received for an emergency duty schedule, and nothing else, the jury entered a verdict in Plaintiff's favor, and awarded her $650,000, more than twice the statutory maximum. This erroneous and grossly excessive verdict is a miscarriage of justice and cannot stand.

Defendant is entitled to judgment as a matter of law on Plaintiff's retaliation claim challenging her duty-schedule assignments because Plaintiff failed to make a showing sufficient to prove that she suffered a materially adverse action—an element on which she bore the burden of proof. At most, Plaintiff's evidence showed that she was assigned four duty weeks in a 12-week period, instead of two weeks, like other agents. Viewing Plaintiff's testimony and evidence from the perspective of a reasonable person in Plaintiff's position, considering all the circumstances, and drawing all doubts and reasonable inferences in her favor, Plaintiff's extra assignments to the duty schedule in the weeks following her discrimination complaint would not have dissuaded a reasonable person from filing a discrimination complaint. Plaintiff introduced no testimony or evidence that her actual workload increased even slightly because of a few extra duty-schedule assignments—let alone substantially. Moreover, any unproven increase in Plaintiff's workload was temporary, lasting at most three months. As a matter of law, Plaintiff's assignments to the duty schedule following her discrimination complaint did not amount to a materially adverse action that can sustain a retaliation claim.

Though judgment as a matter of law is warranted here, the Court should at least grant a new trial or order remittitur. As one alternative to entering judgment for Defendant, the Court

should order a new trial on the single retaliation claim that the jury decided in favor of Plaintiff because the verdict on that claim went against the clear weight of the evidence. Additionally, the jury's verdict was so far beyond all reason as to "shock the conscience" and "so inordinately large" that it exceeded the maximum limit of a reasonable range within which the jury may properly operate. Therefore, as a second alternative to judgment as a matter of law, the Court should order a new trial on the limited issue of compensatory damages, unless Plaintiff agrees to a remittitur of damages from the statutory maximum of $300,000 to $50,000.

### Factual Background and Procedural History

Plaintiff Josephine Chien serves as a Special Agent in the U.S. Department of State (the "Department"), Bureau of Diplomatic Security. Plaintiff filed this lawsuit against Antony Blinken, in his official capacity as Secretary of State, under Title VII of the Civil Rights Act of 1964, alleging race and sex discrimination, retaliation, and hostile work environment.

**A.     Pre-Trial Motions**

*1.     Defendant's Motions to Dismiss*

On April 25, 2018, following two amended complaints and three motions to dismiss, the Court issued a decision to deny Defendant's second renewed motion for partial dismissal. *See generally Chien v. Sullivan*, 313 F. Supp. 3d 1 (D.D.C. 2018). The Court found that Plaintiff had plausibly alleged discrimination on the basis of race and sex, retaliation, and hostile work environment. The Court also rejected Defendant's argument that Plaintiff's retaliation claim based on alleged "extra scrutiny" that Plaintiff received during her security clearance update investigation was non-justiciable under *Department of Navy v. Egan*, 484 U.S. 518 (1988).

Of relevance to this post-trial motion, the Court rejected Defendant's argument that Plaintiff's complaint failed to state a plausible retaliation claim because Plaintiff's assignments to the duty week schedule did not constitute an adverse action. *Id.* at 17. "'In the retaliation

context, instead of requiring a significant change in employment status to constitute adversity, an action is adverse if it would have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Crowley v. Vilsack*, 236 F. Supp. 3d 326, 330 (D.D.C. 2017)). "Applying that standard, the D.C. Circuit has held that '[a] reasonable employee might well be dissuaded from filing an EEOC complaint if she thought her employer would retaliate by burying her in work.'" *Id.* (quoting *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010)). "Accordingly, Plaintiff's retaliation claim based on the assignment of additional 'duty weeks' satisfies that standard at the motion to dismiss stage." *Id.*

### 2. *Defendant's Motion for Summary Judgment*

Following fourteen months of discovery, the Court granted in part and denied in part Defendant's motion for summary judgment. *See generally Chien v. Pompeo*, Civ. A. No. 16-1583 (APM), 2020 WL 10457008 (D.D.C. Dec. 7, 2020). The Court denied Defendant summary judgment on the discrimination claim based on Plaintiff's placement in a domestic position in 2013 but limited the evidence that Plaintiff could offer on that claim. *Id.* at *2. The Court denied summary judgment on Plaintiff's discrimination claim based on her failed bid for a temporary duty assignment in Kuala Lumpur in 2016. *Id.* at *3.

The Court also denied summary judgment on Plaintiff's retaliation claims based on extra scrutiny allegedly received during her security clearance investigation in 2013 (*id.* at *6), the amendment of her work hours (*id.*), and her placements on the duty week schedule while she was assigned to Embassy Jakarta in 2016 (*id.* at *7). On the retaliation claim relating to the duty schedule, which is the last claim at issue in the present motion, the Court determined that "the conflict in the record is just enough to create a genuine dispute over how many [Assistant Regional Security Officers] were available for duty-week assignment during the relevant period." *Id.*

The Court granted summary judgment to Defendant on Plaintiff's retaliation claim challenging her placement on absent without leave status in 2016. *Id.* at \*7. Additionally, the Court granted summary judgment to Defendant on Plaintiff's hostile work environment claim. *Id.* at \*5-6.

### B.    Trial

#### 1.    *Plaintiff's Claims*

The trial in this matter involved the following five claims that survived summary judgment: (1) a discrimination claim based on Plaintiff's placement in a domestic position in 2013; (2) a retaliation claim based on extra scrutiny Plaintiff allegedly received during her security clearance investigation in 2013; (3) a discrimination claim based on Plaintiff's failed bid for a temporary duty assignment in Kuala Lumpur in 2016; (4) a retaliation claim based on her supervisor, Robert Castro, amending her work hours to an earlier start time in 2016; and (5) a retaliation claim based on Castro assigning her extra duty weeks in 2016.

#### 2.    *Plaintiff's Case-in-Chief*

Plaintiff called four witnesses during her case-in-chief. Plaintiff testified about the discrimination and retaliation she encountered during her employment and the mental or emotional injuries that she suffered. Plaintiff's treating psychologist, Dr. Marcella Marcey, testified regarding her diagnoses and treatment of Plaintiff. Two other witnesses, George Terterian and Andrew Large, testified in support of Plaintiff's retaliation claim premised on extra scrutiny during her security clearance reinvestigation. Because the jury decided that retaliation claim in Defendant's favor, their testimony is not at issue in Defendant's post-trial motions.

#### 3.    *Defendant's First Rule 50 Motion*

At the close of Plaintiff's case-in-chief, Defendant brought an oral motion for judgment as a matter of law under Rule 50(a). On the discrimination claim challenging her placement in a

domestic assignment in 2013, Defendant argued that Plaintiff's evidence failed to show that she experienced an adverse action or that her race or gender was a determining factor in that decision. 3/3/22 AM Trial Tr. 4-12.[1]  The Court granted Defendant's Rule 50(a) motion on this first discrimination claim for two reasons.  *Id.* at 30:5-6.  First, the Court found "no evidence that she experienced a tangible harm as a result of the denial of a foreign assignment in 2012 [or] 2013."  *Id.* at 26:20-24.  Second, no "reasonable jury could find that [Plaintiff] was subject to discrimination . . . based on her race or sex" when the Department denied her bids for foreign assignments and instead placed her in a domestic assignment.  *Id.* at 28:12-14.

On the discrimination claim challenging a denial of a temporary duty assignment in Kuala Lumpur, Defendant argued that Plaintiff's evidence failed to show that the denial constituted an adverse action or that her race or gender was a determining factor in the selection decision.  *Id.* at 30:12-15.  The Court deferred a decision on the first issue of whether the denial constituted an adverse action.  *Id.* at 39:5-7.  On the second issue, the Court found the evidence sufficient to create a fact question for the jury.  *Id.* at 35:22-36:2, 37:4-38:14,

On the retaliation claim challenging her supervisor's decision to move up her start time to 7:30 AM, Defendant argued that the jury could not find from the evidence that any schedule change was a materially adverse action that would have dissuaded a reasonable worker from making or supporting a charge of discrimination.  *Id.* at 41:19-25.  The Court granted Defendant's motion on this claim, finding that Plaintiff failed to show that any change in her work hours rose to the level of adversity required to support a retaliation claim.  3/3/20 PM Trial Tr. 10:12-15:11.  Plaintiff's evidence failed to show that any change in her work hours was

---

[1]     A composite of the individual pages of the trial transcripts that are cited in these Motions are attached as Defendant's Exhibit 1.

anything other than a trivial harm.  *Id.* at 15:5-11.  A finding that a reasonable person would not be dissuaded by the action was further corroborated by the fact that Plaintiff was not harmed.  *Id.* at 15:5-11.

On the retaliation claim challenging Plaintiff's extra assignments to the duty schedule while assigned to Embassy Jakarta in 2016, Defendant argued that the evidence did not show that any alleged increase in her workload with respect to the duty schedule was materially adverse as required to prove retaliation.  3/3/22 AM Tr. 61:23-62:22.  The evidence in Plaintiff's case-in-chief, viewed in a light most favorable to Plaintiff, showed that she was assigned four duty weeks out of 12 weeks.  Plaintiff complained about her supervisor's discrimination on March 8, 2016.  *Id.* at 64:24-25.  According to Plaintiff, the evidence showed that "on the April 14th [duty schedule], Ms. Chien had 4 duty weeks out of 12 weeks."  *Id.* at 64:7-11.  As her counsel explained at the motion hearing, "if you start from the first day of her rotation to the last, it's 4 and 12; and there is nobody else that comes close to that."  *Id.*  The Court noted that there was no way for the jury to know whether those weeks had already been assigned to Plaintiff before she complained of discrimination on March 8, 2016.  *Id.* at 64:20-22, 65:3-19.  Moreover, as the Court further observed, Plaintiff only served three out of the four weeks, and she traded one of her three weeks with another agent.  *Id.* at 65:20-23.  For the Rule 50(a) motion, however, the Court still considered it a jury question whether the assignment of extra duty weeks might dissuade a reasonable employee from filing an EEO complaint.  *Id.* at 66:14-67:5.

Finally, on the retaliation claim based on extra scrutiny allegedly received during the security clearance investigation in 2013, the Court rejected Defendant's argument that Plaintiff offered insufficient evidence of causation and pretext.  *Id.* at 74:19-75:4.  In sum, at the close of

Plaintiff's case the Court granted judgment in favor of Defendant on two out of the five claims. That left two retaliation claims and one discrimination claim to be decided by the jury.

### 4.    *Defendant's Case-in-Chief*

Defendant called five witnesses during its case-in-chief.  The first three witnesses— Patricia Gunning, Albert Anderson, and Patricia Crampton—testified concerning Plaintiff's retaliation claim premised on extra scrutiny during the security clearance investigation.  Their testimony is not at issue in Defendant's post-trial motions because the jury decided that claim in favor of Defendant.  The testimony of Robert Castro and James Murphy addressed Plaintiff's discrimination and retaliation claims that challenged the Department's actions taken while she was assigned to Embassy Jakarta in 2016.

### 5.    *Defendant's Second Rule 50 Motion*

For the three surviving claims, Defendant renewed its Rule 50 Motion at the close of its case-in-chief.  For Plaintiff's retaliation claim premised on the extra scrutiny she received during the security clearance investigation, the Court again found that it presented a fact question for the jury to decide whether the case manager and investigators had the requisite knowledge of the 2012 EEO complaint that was the basis for that retaliation claim.  3/8/22 Trial Tr. 26:16-29:11.

Defendant also renewed its argument that the evidence failed to show that any extra duty-week assignments that Plaintiff received after she complained of discrimination constituted a materially adverse action.  As Defendant argued, "covering an extra duty week or two under the most generous possible reading, that type of short-term, temporary increased workload, as a matter of law, does not constitute an action that's materially adverse to a degree that would dissuade somebody from filing an EEO complaints."  *Id.* at 35:5-10.  The Court again noted that Plaintiff had introduced no evidence that would permit the jury to find that she worked the duty schedule with greater frequency than she had before she complained of discrimination in March

2016. *Id.* at 36:19-37:14. The Court also noted that the evidence showed that Plaintiff complained about it again in June 2016, "so it's not like she was dissuaded." *Id.* at 35:13-14. The Court surmised the arguments Plaintiff's counsel could permissibly make in closing, based on the evidence, as follows:

> At most, [Plaintiff is] going to be able to argue . . . you can look at the April schedule. She had four duty weeks over 12 weeks. That's a lot more than what you heard Mr. Castro testify he ordinarily would have assigned somebody to. [I]t's the best [Plaintiff] can do, because [she doesn't have] anything to compare it to. I mean, if I'm a juror, I'm wondering, well, what was the schedule before March? Nobody knows, because there's no evidence about it.

> So [Plaintiff's counsel] can't come in . . . [and] reasonably . . . say, you know . . . [Castro] retaliated against her because he increased her duty weeks. There's no evidence he increased her duty weeks. The only evidence is that she had more duty weeks than somebody would frequently have. . . . [T]here's no evidence as to what the duty schedule was before March, none. So I don't know how you come in and say, [w]ell, he changed the schedule.

*Id.* at 37:16-38:9. The Court still allowed the claim to go to the jury, but with a limiting instruction. "I'll let it go to the jury, but I do think it's important, now that we've thought and talked about this, that the jury have a specific instruction here about the theory of adversity and that we quote the language from *Mogenhan* that the Court says can rise to adversity; that is, burying a person in work. And the jury will have to decide whether this constitutes burying somebody in work." *Id.* at 41:7-13.

On the third and final claim of discrimination challenging the denial of the 10-day temporary duty assignment, the Court similarly concluded that it was "willing to consider tweaks to the jury instructions to ensure the jury is clear that just any ordinary [temporary duty assignment] can't rise to the level of an adverse action." But the Court was still "inclined to let it go to the jury and see what they do." *Id.* at 52:2-13.

### 6.     *The Jury's Verdicts*

The jury returned a verdict in favor of Defendant on the discrimination claim challenging the denial of the temporary duty assignment to Kuala Lumpur in 2016.  The jury found in favor of Defendant on this first claim because it found that Plaintiff had not proven by a preponderance of the evidence that she suffered an adverse action.  Verdict Form at 1 (ECF No. 101).  The jury also found in favor of Defendant on the retaliation claim challenging extra scrutiny received during the 2013 security clearance investigation.  The jury found in favor of Defendant on this second claim because the jury found that Plaintiff had not proven by a preponderance of the evidence that the Department retaliated against her for participating in protected activity by over-scrutinizing her application for a security clearance in 2013.  *Id.* at 2.

The jury found in favor of Plaintiff on the last retaliation claim challenging Plaintiff's duty-schedule assignments.  The jury found that Plaintiff had proven by a preponderance of the evidence that any extra duty weeks she was assigned in 2016 while assigned to Embassy Jakarta were a materially adverse action.  *Id.* at 3.  The jury also found that Plaintiff proved by a preponderance of the evidence that the Department retaliated against her for participating in protected activity by assigning her extra duty weeks.  *Id.*  For this last claim, the jury awarded Plaintiff $650,000 in damages.  *Id.*

After the jury returned its verdict, the Court established a schedule for Defendant to file a renewed motion for judgment as a matter of law under Rule 50(b) or, in the alternative, for a new trial under Rule 59.  3/10/22 Trial Tr. 12:24-13:14; Order, Mar. 15, 2022 (ECF No. 103).

## Legal Standards

### A.     Renewed Motion for Judgment as a Matter of Law

"Pursuant to [Rule] 50(b), this Court may direct entry of judgment as a matter of law if there is no legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff."

*Liberatore v. CVS N.Y., Inc.*, 160 F. Supp. 2d 114, 116 (D.D.C. 2001). "A moving party is entitled to judgment as a matter of law against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002).

"Judgment as a matter of law is appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in [defendants'] favor." *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 165 (D.C. Cir. 2007) (citation omitted). "Nevertheless, the evidence presented by the plaintiff must be 'significantly probative,' rather than 'merely colorable' for the jury's verdict to stand." *Bowie v. Maddox*, 540 F. Supp. 2d 204, 207 (D.D.C. 2008) (quoting *Siegel v. Mazda Motor Corp.*, 878 F.2d 435, 437 (D.C. Cir. 1989)).

The standard for judgment as a matter of law under Rule 50 "mirrors" the standard for summary judgment under Rule 56. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 149 (2000). When deciding a motion for judgment as a matter of law, the Court "should review all of the evidence in the record. *Id.* at 150. "In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. The Court "should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (internal quotations omitted).

**B.      Motion for New Trial or Remittitur**

"Federal Rule of Civil Procedure 59(a)(1) provides in relevant part that '[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court.'" *Radtke v. Lifecare Mgmt. Partners,* 795 F.3d 159, 163 (D.C. Cir. 2015) (quoting Fed. R. Civ. P. 59(a)(1)). One such reason exists "where the verdict is against the weight of the evidence." *Lee v. District of Columbia,* 19 F. Supp. 3d 281, 285-86 (D.D.C. 2014) (citing *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 433 (1996)). "A new trial 'should be granted only where the court is convinced that the jury verdict was a seriously erroneous result and where denial of the motion will result in a clear miscarriage of justice.'" *Lee*, 19 F. Supp. 3d at 286 (quoting *Martinez v. District of Columbia*, 503 F. Supp. 2d 353, 355 (D.D.C. 2007)). "[W]hen a jury's verdict is supported by sufficient evidence, . . . [t]he trial court's contrary view of the credibility of the witnesses does not justify the granting of a new trial." *Hutchinson v. Stuckey*, 952 F.2d 1418, 1420-21 (D.C. Cir. 1992); *see also Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997) ("The [*Hutchinson*] court emphasized that a trial judge's disagreement with the jury on credibility of witnesses does not justify the granting of a new trial.").

"The decision whether to grant a motion for a new trial is ordinarily 'entrusted to the sound discretion of the trial court.'" *McNeal v. Hi-Lo Powered Scaffolding, Inc.*, 836 F.2d 637, 646 (D.C. Cir. 1988) (citation omitted) (quoting *Grogan v. Gen. Maint. Serv. Co.*, 763 F.2d 444, 447 (D.C. Cir. 1985))); *see also Gasperini*, 518 U.S. at 433 ("the authority of trial judges to grant new trials . . . is large"); *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) (authority to grant a new trial "is confided almost entirely to the exercise of discretion on the part of the trial court"); *Machesney v. Larry Bruni, M.D., P.C.*, 905 F. Supp. 1122, 1130 (D.D.C. 1995) ("In

ruling on a motion for a new trial, the trial judge has a greater degree of discretion than when ruling on a motion for a judgment as a matter of law.").

A trial judge's broad discretion under Rule 59 "includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini*, 518 U.S. at 433; *see also Hooks v. Wash. Sheraton Corp.*, 578 F.2d 313, 316 (D.C. Cir. 1977) (district courts "[have] broad discretion to order a remittitur in lieu of a new trial"). Indeed, if a damages award is excessive, a trial judge has a "duty" to require a remittitur or grant a new trial. *Linn v. United Plant Guard Workers of Am.*, 383 U.S. 53, 65-66 (1966).

"In this Circuit, remittitur is appropriate only when either '(1) the verdict is beyond all reason, so as to shock the conscience, or (2) the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate.'" *Jean-Baptiste v. District of Columbia*, 931 F. Supp. 2d 1, 12-13 (D.D.C. 2013) (quoting *Peyton v. DiMario*, 287 F.3d 1121, 1126-27 (D.C. Cir. 2002)). "Courts may not set aside a verdict merely because the judge would have awarded a different amount." *Id.* at 13 (citing Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2807 (3d ed.)). A "reduction is only allowable if it 'permits recovery of the highest amount the jury tolerably could have awarded.'" *Id.* (quoting *Langevine*, 106 F.3d at 1024).

Remittitur also serves the laudable ends of avoiding delay and expense and limiting judicial intrusion into the jury's domain. *See Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990); *Dwyer v. Deutsche Lufthansa, AG*, 686 F. Supp. 2d 216, 218 (E.D.N.Y. 2010).

## Argument

I. **The Court Should Enter Judgment as a Matter of Law on Plaintiff's Retaliation Claim Challenging Her Duty Schedule Assignments.**

To establish a prima facie case of retaliation, a plaintiff must show that (i) she engaged in statutorily protected activity; (ii) she was subjected to an adverse action; and (iii) there is sufficient evidence to infer a causal connection between the two. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). Defendant is entitled to judgment as a matter of law on Plaintiff's retaliation claim challenging her duty-week assignments because Plaintiff failed to carry her evidentiary burden on the second element of her prima facie case. No reasonable jury could conclude from the trial evidence that any extra or disproportionate assignments to the duty schedule that Plaintiff received in the weeks or months following her complaint might have dissuaded a reasonable worker from making a charge of discrimination.

A. **To Constitute a Material Adversity, an Employee Must Experience a Significant and Sustained Increase in Her Workload.**

In the retaliation context, an adverse action must "produce[ ] an injury or harm" that is material in nature. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). A materially adverse action for the purpose of a retaliation claim is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68. The distinction between "material adversity" and "trivial harms" is critical to this analysis. *Id.* at 64, 67-68. Normally, "petty slights, minor annoyances, and simple lack of good manners" will not deter victims of discrimination from complaining about discrimination. *Id.* at 68; *see also Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (adverse action must do more than merely "make[ ] an employee unhappy"). The Court must examine the specific facts of the case when assessing adverse actions, because "[c]ontext matters." *Burlington N.*, 548 U.S. at 69.

"Changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes." *Allen v. Napolitano*, 774 F. Supp. 2d 186, 203 (D.D.C. 2011) (quotation marks and citation omitted). "'Courts have consistently held that . . . increased workload,' standing alone, does not rise to the level of adverse employment action.'" *Achagzai v. Broad. Bd. of Governors*, Civ. A. No. 17-0612 (RDM), 2018 WL 4705799, at *7 (D.D.C. Sept. 30, 2018) (quoting *Saba v. USDA*, 26 F. Supp. 3d 16, 25 (D.D.C. 2014)). But the D.C. Circuit has also reasoned that a "reasonable employee might well be dissuaded from filing an EEO complaint if she thought her employer would retaliate by burying her in work." *Mogenhan*, 613 F.3d at 1166.[2]

Courts in this jurisdiction have interpreted *Mogenhan* to mean that for an increase in workload to rise to the level of a materially adverse action, a plaintiff must allege, and ultimately prove, a "significant," "great," or "dramatic" increase in her workload. *See Walden v. Patient-Centered Outcomes Rsch. Inst.*, 177 F. Supp. 3d 336, 344 (D.D.C. 2016) (citing *Mogenhan*, 613 F.3d at 1166) ("[T]he D.C. Circuit has held that *significantly* increasing an employee's workload may support a retaliation claim." (emphasis added)); *Allen*, 774 F. Supp. 2d at 203 (finding plaintiff's changes in work assignments did not rise to the level of adverse action because the evidence did not show that "her workload increased *dramatically* or that she was *buried in work*" (emphasis added)).

---

[2]     In *Mogenhan*, a female employee brought an action against the Secret Service, alleging violations of the Rehabilitation Act. The *Mogenhan* court held that a genuine issue of material fact existed as to whether the Secret Service retaliated against the plaintiff in ways that might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Among other evidence, the plaintiff "state[d] that less than one month after her supervisor published her complaint to colleagues, he increased her workload to five to six times that of other employees, indicating that he was 'doing so to keep [the plaintiff] too busy to file complaints.'" *Id.* at 1166 (citation omitted).

Moreover, a plaintiff cannot establish an adverse employment action if the evidence only shows that the employee received a heavier workload on a temporary or infrequent basis. *See Brodetski v. Duffey*, 141 F. Supp. 2d 35, 45 (D.D.C. 2001). "Put differently, . . . increased work must be frequent or particularly onerous to be material; otherwise they are *de minimis* and 'trivial.'" *Morales v. Gotbaum*, 42 F. Supp. 3d 175, 198 (D.D.C. 2014).

Indeed, courts in this jurisdiction have consistently granted summary judgment in cases in which the plaintiffs' evidence did not show a significant and sustained increase in an employee's workload. The *Morales* court held that the plaintiff's evidence that his supervisors retaliated against him on three separate occasions by imposing unreasonable project deadlines, and on two other occasions by compounding the deadlines with unnecessary requirements, viewed in light most favorable to plaintiff, did not constitute an adverse action.

> Assessing the alleged unreasonable deadlines and reporting requirements in this case . . . while also viewing them 'from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,' . . . the Court finds that they do not amount to materially adverse actions. Although the deadlines and reporting requirements placed plaintiff under some pressure and induced some stress—particularly when in May 2008 he was also covering for co-workers who were out of the office—this is not a case where plaintiff was frequently or permanently subjected to unduly burdensome or arduous assignments. Moreover, with respect to the ATB project, this is not a situation where the extra assignment 'buried' plaintiff in work.

*Id.* at 198, n.17 (quoting *Burlington N.*, 548 U.S. at 71, and citing *Mogenhan*, 613 F.3d at 1166). As the Court further reasoned, "[t]his infrequent imposition of demanding goals . . . is unlikely to prevent a reasonable employee from engaging in protected activity and therefore does not amount to a materially adverse action." *Id.* (citations omitted).

In *Achagzai v. Broad. Bd. of Governors*, Civ. A. No. 17-0612 (RDM), 2020 WL 5530135, at *7 (D.D.C. Sept. 14, 2020), another case decided at summary judgment, the plaintiff asserted that his workload "doubled" because of a reassignment. Considering the entire record,

and viewing the facts in light most favorable to Plaintiff, the Court still concluded that no reasonable jury could find that Plaintiff's increased workload constituted a material adverse action.

Similarly, in *Brodetski*, 141 F. Supp. 2d at 45,[3] the Court held that a federal employer's conduct of assigning an employee to a disproportionate number of night shifts and solo shifts on a news desk normally staffed with four or more employees did not constitute an adverse employment action as required to support a retaliation claim. The employer's conduct occurred eight times over a two-year period, the employee's assignment at the news desk was a temporary arrangement due to staff shortage, and the employer altered the employee's night shifts after he complained. 141 F. Supp. 2d at 45. As the *Brodetski* court reasoned in granting summary judgment to the employer on this issue, "it is not out of the ordinary for employees to have been expected to shoulder an extra load on occasion . . . or to have been asked to step in if there were unexpected staff shortages." *Id.* (citing *Crady v. Liberty Nat. Bank & Tr. Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)). "Courts are not in a position to review every task that management assigns to employees." *Id.* (citing *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C. Cir. 1997). "In light of defendants' response to plaintiff's concerns, as well as the temporary and infrequent nature of the assignments over two years, plaintiff's allegations do not establish sufficiently adverse actions to sustain a prima facie case of retaliation." *Id.* (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (adverse employment action requires a "significant change in employment status")).

---

[3] *Brodetski* was decided before *Mogenhan*, but courts in this jurisdiction still cite the earlier case for the proposition, which still stands, that an employee receiving a heavier workload on a temporary and infrequent basis is not materially adverse because employees should expect to shoulder an extra load on occasion. *See, e.g., Allen*, 774 F. Supp. 2d at 203; *Morales*, 42 F. Supp. 3d at 198.

**B.      No Reasonable Jury Could Find That Plaintiff Experienced a Significant and Sustained Increase in Her Workload After She Complained of Discrimination.**

Undisputed evidence at trial showed that Plaintiff's assignments to the duty schedule in the weeks and months following her discrimination complaint in May 2016 were neither frequent, nor particularly onerous.[4]

It is undisputed that Plaintiff engaged in protected activity on or about March 8, 2016, when she complained to Deputy Chief of Mission, Brian McFeeters, that her direct supervisor, Robert Castro, was discriminating against her.  3/2/22 AM Trial Tr. 100:6-13; *see also* Joint Exhibit ("JX") 7 (2017 ROI 154-56 at 155).[5]  Plaintiff claimed that Castro retaliated against her for bringing this complaint by assigning her extra duty weeks.  3/2/22 AM Trial Tr. 100:6-9.

As Plaintiff explained, "duty weeks are assigned to the officers in each [of the] respective offices in the [Regional Security Office]."  3/1/22 AM Trial Tr. 67:16-18.  "One agent would be

---

[4]      As an initial matter, nothing that was argued or decided at the motion to dismiss or motion for summary judgment phases (or not argued by Defendant at the summary judgment phase) precludes Defendant from asserting this argument in its Rule 50(b) motion.  In its first decision at the motion to dismiss phase, the Court held that Plaintiff's retaliation claim based on the assignment of additional duty weeks satisfied the pleading requirements, *Chien*, 313 F. Supp. 3d at 17, but that was an *as-alleged* challenge by Defendant.  The present Rule 50(b) motion presents an *as-proven* challenge.

Defendant did not argue in its motion for summary judgment that Plaintiff's assignments to the duty schedule following her discrimination complaint did not constitute a materially adverse action.  Defendant argued instead that Plaintiff failed to produce sufficient evidence from which a reasonable jury could find that Castro's explanations for her assignments were pretext for retaliation.  As the Court noted at the Rule 50 motion hearing during trial, Defendant did not waive an argument by not including it as part of the summary judgment motion.  Plaintiff still bore the burden of proving by a preponderance of the evidence at trial that she was subjected to a materially adverse employment action. 3/3/22 AM Trial Tr. 43:3-7. In reviewing the present motion under Rule 50(b), the Court must consider whether a reasonable jury could return a verdict based on the evidence presented at trial.

[5]      A composite of the parties' trial exhibits cited in these Motions are attached as Defendant's Exhibit 2.

the duty agent for that week. And he or she would be on call 24/7 for all kinds of responses, emergency or nonemergency." *Id.* at 67:19-21. "That means extra work because . . . if you have calls that you need to take either within or outside of the office hours that's extra work on top of your assigned programs already." *Id.* at 68:2-4. Additionally, the on-duty agent cannot leave the city and must remain sober, because the agent must be available to respond on short notice. *Id.* at 68:5-19. According to Plaintiff, this made working the duty schedule "not very desirable." *Id.* at 68:18-19.

Plaintiff's supervisor, Robert Castro, further explained in unrebutted testimony that the emergencies an agent who was assigned to the duty schedule might have to respond to included things like vehicle accidents, kidnappings, missing American citizens, and domestic violence. 3/7/22 PM Trial Tr. 28:25-29:20. The duty schedule was a rotation, with all the agents taking turns covering one week at a time. *Id.* at 28:13-24, 29:25-30:14. Normally, the Office Management Assistant, or Office Management Specialist, would prepare the duty schedule, based on the list of available agents. *Id.* at 30:15-31:10. The Office Management Assistant or Office Management Specialist would send around an email periodically with the duty schedule, and the Office would also discuss the schedule at weekly staff meetings. *Id.* at 31:11-17. Agents were allowed to trade weeks if they needed to. *Id.* at 31:18-32:13. The four regular Assistant Regional Security Officers (at that time, Special Agents Josephine Chien, Todd Wallace, Joe Williams, and Mike Bjelajac) covered most of the duty schedule weeks. In addition, the two ARSO Investigators (or ARSO-I's), Agents Curtis Spindler and David Scholtes, and Deputy Regional Security Officer Robert Castro, also covered the duty schedule, but less frequently than the regular ARSOs. *Id.* at 32:13-14. The two ARSO-I's spent 80% of their time investigating visa fraud, and only 20% of the time supporting the law enforcement and security functions of

the Regional Security Office, such as providing duty-week coverage. 3/7/22 PM Trial Tr. 36:8-14.

Plaintiff testified that, at some indeterminate point in time (i.e., "one day"), "it came to my attention that within a 12-week span, I was assigned four duty weeks." 3/1/22 AM Trial Tr. at 68:24, 69:5-6. Plaintiff believed that this was more than her fair share of weeks on the duty schedule. Because there were supposed to be "seven agents rotating each week," Plaintiff was only supposed to be assigned to the duty schedule "once every eighth week." *Id.* at 69:1-4.

On direct examination, Plaintiff was shown a copy of the RSO Duty Schedule for April through August 2016 that was last updated on April 14, 2016. JX 11 (STATE 2540-41). This earlier version of the RSO Duty Schedule showed that Plaintiff was assigned to four weeks in a 12-week span. *Id.*; 3/1/22 AM Trial Tr. 70:13-71:2. This earlier version of the Duty Schedule from April showed that Plaintiff was assigned the weeks of May 9, 2016, June 13, 2016, June 27, 2016, and July 25, 2016. 3/1/22 AM Trial Tr. 70:13-71:2. On cross-examination, Plaintiff admitted that she did not actually serve all four of the duty weeks that she was initially assigned in April. 3/2/22 AM Trial Tr. 101:18-104:12.

> Q.     [Y]our name appears on this schedule four times, and that's what you testified previously, right?
>
> A.     Yes.
>
> Q.     You didn't actually serve all four of those duty weeks, right?
>
> A.     I believe that's correct. Or not full four.

*Id.* at 104:6-12.

On multiple occasions between April and June 2016, Plaintiff complained about what she perceived as extra or unbalanced assignments to the duty schedule. On April 28, 2016, Plaintiff sent an email to McFeeters and others, complaining of "additional retaliatory acts, including

19

unfair duty schedule assignments." Plaintiff's Exhibit ("PX") 18 at 1; 3/1/22 AM Trial Tr. 73:3-10. On June 2, 2016, Plaintiff sent another email to McFeeters, again complaining (erroneously, based on the duty schedules and her admission at trial) that she was assigned four times more duty weeks than other agents since she had complained of discrimination. JX 9 at 1; 3/1/22 AM Trial Tr. 74:14-15; 3/2/22 AM Trial Tr. 101:9-14.

On June 20, 2016, Plaintiff exchanged a series of emails with Sheree Hall, the Office Management Specialist for the Regional Security Office. PX 20 at 2 (Chien 159-60); 3/7/22 PM Trial Tr. 55:24-56:8, 57:4-58:3 (from examination of Castro). These emails included even more complaints from Plaintiff about the fact that she had been assigned four duty weeks out of 12 weeks. PX 20. One of Ms. Hall's responses reflects that changes were being made to the Duty Schedule. *Id.* at 2.

Plaintiff's two-year assignment in Jakarta ended, and she left post, in early August. 3/2/22 AM Trial Tr. 104:20-23, 105:5-11. A later revised version of the RSO Duty Schedule, last updated on August 15, 2016, showed that Plaintiff was assigned to only three weeks, not four.[6] JX 14 (STATE 2546-47); 3/2/22 AM Trial Tr. 105:5-8, 106:2-109:22 (Plaintiff's testimony); 3/7/22 PM Trial Tr. 33:21-36:7 (Castro's testimony). According to the revised Duty Schedule from August 2016, all four of the regular ARSOs (Special Agents Chien, Bjelajac, Wallace, and Williams) were assigned either three or four weeks between April and August 2016.

---

[6] The revised version from August showed that Plaintiff was assigned the duty weeks of May 9, 2016, June 27, 2016, and July 18, 2016. JX 14 (STATE 2546-47); 3/2/22 AM Trial Tr. 105:5-8, 106:2-109:22 (Plaintiff's testimony).

| RSO Duty Schedule for April to August 2016 Number of Duty Weeks Assigned Between April 11, 2016, and August 29, 2016 | | |
|---|---|---|
| **Position** | **Agent** | **Number of Weeks Assigned** |
| ARSO | Bjelajac, Michael | 4 |
| ARSO | Chien, Josephine | 3 |
| ARSO | Wallace, Todd | 3 |
| ARSO-I | Spindler, Curtis | 3 |
| ARSO | Williams, Joe | 3 |
| ARSO-I | Scholtes, David | 2 |
| DRSO | Castro, Robert | 2 |

JX 14; 3/2/22 AM Trial Tr. 110:13-113:20 (Plaintiff's testimony); 3/7/22 PM Trial Tr. 35:20-36:7 (Castro's testimony).

When shown this document during cross-examination, Plaintiff still maintained that she had served more than her fair share of weeks during this stretch that followed her discrimination complaint against Castro.

> Well, again, if we look at the same set of time frame, 12 weeks, if I took four weeks, that leaves eight of the weeks for the six male agents to share. And I think that's quite simple math. I get four, and most of them get one. And only two of them, two of the six, get two.

3/2/22 AM Trial Tr. 113:9-14. As shown above, Plaintiff's testimony here that she "took four weeks" contradicted her admission on cross-examination that she did not serve four weeks. Moreover, the later version of the schedule showed that she served three weeks, not four, and that she switched one of her weeks with another agent.[7]

---

[7]     Plaintiff should not benefit from an inference in her favor by contradicting her own evidence or failing to explain that contradiction. *See Pyramid Secs. Ltd. v. IB Resol., Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991) (in opposing a motion for summary judgment, "a party may not create a material issue of fact . . . by contradicting its prior sworn testimony . . . unless the shifting party can offer persuasive reasons for believing the supposed correction."); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one

On rebuttal, Plaintiff testified that she worked the week of June 13, which the August version of the schedule showed as assigned to David Scholtes. 3/7/22 PM Trial Tr. 101:5-12. Here, Plaintiff was referring to an email exchange she had with Sheree Hall about who was assigned to the Duty Schedule during the week of June 13, 2016. *See* PX 20 at 1-2. In this email exchange, Plaintiff said that she had received a call on June 20 concerning an emergency matter that was supposed to be handled by the agent on duty for the week of June 13. Plaintiff asked Ms. Hall to check the Duty Schedule to see which agent was assigned to the week of June 13. Ms. Hall responded, "Oh? Sorry about that. I thought I had updated it on the sharepoint site for Dave [Scholtes] covering for you June 13-20 . . . The list notes your next duty as June 27–July 4." *Id.* at 2. From this exchange, Plaintiff surmised that she had in fact worked the duty schedule during the week of June 13.

Viewing Plaintiff's testimony and evidence "'from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances,'" Plaintiff's assignments to the duty schedule in the weeks and months following her discrimination complaint did not amount to a materially adverse action. *See Morales*, 42 F. Supp. 3d at 198 (quoting *Burlington N.*, 548 U.S. at 71). As the Court noted at the motions hearing, the evidence did not show, or permit a reasonable inference, that Castro changed the schedule or increased her duty weeks after she filed the complaint. *See* 3/8/22 Trial Tr. 37:16-38:9. At most, the evidence showed that over a 12-week period Plaintiff was assigned four duty weeks, whereas the other agents were assigned

---

of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). But whether it was three or four duty weeks that Plaintiff was assigned in a 12-week period is immaterial. Either way, it was neither a substantial nor permanent increase in workload.

one or two weeks.[8]  Assuming a seven-agent rotation in which all seven agents shared the duties evenly (and putting aside Mr. Castro's unrebutted testimony indicated that two of the seven agents were ARSO-Is and did not evenly share in this duty), Plaintiff should have only been assigned about two of those weeks.

No reasonable juror could find from the evidence that Plaintiff's duty-week assignments increased dramatically or that she was "buried" with work during those weeks.  *See Allen*, 774 F. Supp. 2d at 203.  Her placements on the duty schedule only meant that Plaintiff needed to be on call in the event of an emergency.  There was no evidence that her actual workload or hours changed at all during those weeks.  For example, Plaintiff did not testify or introduce any evidence that showed that she needed to respond to one or more emergencies during the weeks that she was assigned that required her to put in extra hours or work.  The evidence showed only that during one of her duty weeks, Plaintiff received one phone call.  *See* PX 20 at 2.  Receiving a single phone call is a far cry from being "buried" in work.  The fact that Plaintiff needed to remain in the city and stay sober so that she was available to respond in the case of an emergency is a mere "triviality" or "minor annoyance" that as a matter of law cannot sustain a retaliation claim.

Even if two or three extra duty-schedule assignments could be considered a heavier workload, any extra work was, at most, a temporary and infrequent occurrence.  *See Morales*, 42 F. Supp. 3d at 198 (finding no materially adverse action because plaintiff was not "frequently or permanently subjected to unduly burdensome assignment").  At most, the evidence showed that

---

[8]      Between May 9, 2016, and August 1, 2016, Joe Williams was initially assigned two weeks, Todd Wallace was initially assigned two weeks, and Mike Bjelajac was initially assigned one week.  Of course, if Plaintiff did not cherry-pick a 12-week period that began and ended with weeks initially assigned to Plaintiff, the initial assignments become more evenly balanced.

Plaintiff worked two or three more duty weeks than other agents in Jakarta during a single

12-week period.  Again, the jury was given no evidence on which to compare those 12 weeks

against any prior period, thereby necessitating the jury instruction used by the Court.  Undisputed

evidence that both parties relied upon at trial, namely, the Duty Schedules, showed that the

agents' duty-schedule assignments generally evened out when accounting for a longer period

from April to August 2016.  *See* JX 11 & 14.

Moreover, it is undisputed that Plaintiff's two-year assignment in Jakarta was scheduled

to conclude (and did in fact conclude) in August 2016.  This context cannot be ignored since

there was no possible way that any increase in Plaintiff's workload, vis-à-vis the duty schedule

or otherwise, could have lasted longer than a few months after Plaintiff filed her complaint.  The

extra weekly assignments to the duty schedule that Plaintiff received on a short-term basis,

without a showing of a substantial increase in workload, or any other showing of actual harm, is

merely a "trivial" or "minor annoyance" that would not deter a reasonable employee from

engaging in protected activity.  *See Burlington N.*, 548 U.S. at 67 ("'We speak of material

adversity because we believe it is important to separate significant from trivial harms.");

*Bridgeforth*, 721 F.3d at 663 (adverse action must do more than merely make an employee

unhappy); *Morales*, 42 F. Supp. at 198 ("[I]ncreased work must be frequent or particularly

onerous to be material; otherwise they are de minimis and 'trivial.'").

Lastly, it is undisputed that after her first discrimination complaint against Castro in

March 2016, Plaintiff complained several times to Deputy Chief of Mission McFeeters, and

others, about having to cover more than her fair share of duty weeks.  Plaintiff's own complaints

about her assignments to the duty schedule in the months following her complaint further

undercut an argument that a reasonable worker in Plaintiff's position would have felt dissuaded

under these circumstances from filing a charge of discrimination.  *See Gray v. Foxx*, 637 F. App'x 603, 608 (D.C. Cir. 2015) ("Gray's filing of her formal EEO complaint after being removed from the presentation undercuts any argument that a reasonable worker would be dissuaded from filing a charge of discrimination after removal from the presentation."); *Sorrell v. Paige Indus. Servs., Inc.*, Civ. A. No. 15-2004 (TJK), 2021 WL 2156693, at *10 (D.D.C. May 27, 2021) (citing *Gray*, 637 F. App'x at 608) ("Moreover, that Sorrell filed an administrative complaint two weeks after not receiving a response to his request underscores this conclusion— Sorrell was not in fact deterred from pursuing his claim of discrimination."); 3/3/22 PM Trial Tr. 12:6-23, 13:20-14:8 (noting, in reference to a different retaliation claim that the Court granted judgment as a matter of law to Defendant, that "even Ms. Chien was not dissuaded by the change in the work hours from furthering her protected activity", because she continued to complain about that after her discrimination complaint).  Because Plaintiff failed to carry her burden of showing a materially adverse action, Defendant is entitled to judgment as a matter of law.

## II. The Court Should Order a New Trial on the Last Retaliation Claim Because the Jury's Verdict Went Against the Clear Weight of the Evidence.

As a first alternative to judgment as a matter of law, the Court should grant a new trial on only the last retaliation claim that challenged Plaintiff's assignments to the duty schedule.  The jury's verdict on that claim in favor of Plaintiff was "seriously erroneous" and denial of this motion will result in a "clear miscarriage of justice."  *See Lee*, 19 F. Supp. 3d at 286.

The standard for a new trial is "less onerous" than one for judgment as a matter of law.  *Morris v. Pruitt*, 308 F. Supp. 3d 153, 166 (D.D.C. 2018); *see also Machesney*, 905 F. Supp. at 1130.  For this reason, the Court may grant a new trial if the Court finds that the jury's verdict went against the clear weight of the evidence, even if the Court does not conclude that judgment as a matter of law is appropriate.

As the foregoing analysis demonstrated, the jury's verdict on the last retaliation claim was not supported by sufficient evidence that Plaintiff's assignments to the duty schedule rose to the level of a materially adverse action. As also demonstrated above, the Court need not assess the credibility of the trial witnesses to justify the granting of a new trial. Therefore, for the same reasons as argued above in support of judgment as a matter of law, the Court should grant a new trial because the jury's verdict went against the weight of the evidence and a serious miscarriage of justice would result if the verdict were to stand.

**III.   The Court Should Order a New Trial on the Limited Issue of Emotional Distress Damages Unless Plaintiff Agrees to a Remittitur of Damages to $50,000.**

As a second alternative to judgment as a matter of law, the Court should order a new trial on the limited issue of non-economic injuries, such as emotional distress, unless Plaintiff agrees to a remittitur of damages from $300,000, which is the maximum amount of compensatory damages that Plaintiff could recover under Title VII, to $50,000.

On the last retaliation claim challenging Plaintiff's duty-schedule assignments, the jury returned a verdict in Plaintiff's favor for $650,000. "The amount of compensatory damages that [Plaintiff] could recover in this case is, however, limited by 42 U.S.C. Section 1981a (b)(3)(D) to a maximum of $300,000." *Nyman v. FDIC*, 967 F. Supp. 1562, 1570 (D.D.C. 1997). But that figure is still excessive and unsupported by the evidence. A new trial on damages for the claim on which Plaintiff prevailed or remittitur is necessary to prevent a "seriously erroneous result" and "clear miscarriage of justice." *See id.* at 1569.

Remittitur is warranted under either of the D.C. Circuit's accepted standards. First, the "verdict is beyond all reason, so as to shock the conscience." *Peyton*, 287 F.3d at 1126-27. Second, "the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate." *Id.*

Compensatory damages in a Title VII case must be proven and cannot be presumed. *Peyton*, 287 F.3d at 1126 (citing *Carey v. Piphus*, 435 U.S. 247, 263-64 (1978)); *see also Jean-Baptiste*, 931 F. Supp. 2d at 14 ("The plaintiff bears the burden of proving she suffered noneconomic injuries such as emotional distress, pain and suffering, reputational harm, etc."). For the single retaliation claim on which she prevailed, Plaintiff's evidence was insufficient to support the excessive jury award.

In this case, Plaintiff offered her own testimony as proof of her emotional distress damages. Plaintiff testified that the acts of retaliation that she suffered while in Jakarta, including specifically the change in her duty hours, the denial of her temporary duty assignment, and her additional duty weeks, caused her to feel "helpless" and "hopeless." 3/1/22 PM Trial Tr. 23:17. Plaintiff testified that she "couldn't sleep," she "had anxieties episodes," and she "started experienc[ing] acute symptomatic heart palpitation and irregular beats." *Id.* at 24:1-3. Other physical symptoms also started showing while Plaintiff was assigned to Jakarta, including specifically "shingles" and "stress hives." *Id.* at 24:4-5.

Plaintiff attempted to further testify that her conditions worsened after she left Jakarta. *Id.* at 25:21. She said she was later diagnosed with "mitral valve prolapse," which she described as "a condition that one of my valves wouldn't close right." As she further explained, "that's causing . . . irregular heartbeat and, sometimes, the physical symptoms of difficulty breathing." *Id.* at 25:25-26:2. In response to an objection from Defendant, the Court instructed the jury "to disregard that last piece of testimony about what Ms. Chien . . . was diagnosed with and what she was told by the cardiologist." The Court instructed the jury to ignore Plaintiff's testimony about her cardiologist's diagnoses because of Plaintiff's "complete failure" to disclose the evidence and "because they [the jury] are now left with the impression that what happened in Jakarta

somehow caused her heart problems." *Id.* at 26:10-21. Plaintiff then resumed, "to be honest, I felt – back then, I felt more anger than anything else." *Id.* at 27:11-12.

Additionally, Plaintiff offered testimony from her treating psychologist, Marcella Marcey. As to this second witness, the Court sustained Defendant's objection at the pretrial conference to Plaintiff's proffer concerning Dr. Marcey's expected testimony. The Court ruled that it would "not permit Dr. Marcey to testify as to causation or compensatory damages because of Plaintiff's failure to make the requisite expert disclosure under Rule 26(a)(2)(C) and because such failure is neither 'substantially justified' nor 'harmless.'" Minute Order, Feb. 24, 2022 (citing Fed. R. Civ. P. 37(c)(1), *Daniels v. District of Columbia*, 15 F. Supp. 3d 62, 68-73 (D.D.C. 2014)). The Court further explained the grounds for its ruling to limit Dr. Marcey's testimony at trial. *See* 2/28/22 AM Trial Tr. 8-10. Because Plaintiff failed to disclose Dr. Marcey as an expert witness, and Plaintiff's failure was neither substantially justified nor harmless, the Court would not permit Dr. Marcy to testify on causation. *Id.*

At trial, Dr. Marcey testified that she began treating Plaintiff in April 2016. 3/2/22 PM Trial Tr. 84:20. Dr. Marcey initially diagnosed Plaintiff with "major depression, first episode, moderate." *Id.* at 85:13-14. Later, Dr. Marcey changed her diagnosis to post-traumatic stress disorder. *Id.* at 85:23-25. Dr. Marcey said that she has been treating Plaintiff for her emotional condition, on and off, since 2016. *Id.* at 88:7-24. Over the course of Dr. Marcey's treatment, Plaintiff's physical symptoms have improved. *Id.* at 89:11-12.

In sum, Plaintiff and her psychologist, Dr. Marcey, testified that Plaintiff experienced psychological problems in 2016 while she was assigned to Jakarta. Dr. Marcey first diagnosed Plaintiff with depression, but then later changed her diagnosis to post-traumatic stress disorder. The Court instructed the jury to disregard Plaintiff's testimony about her irregular heartbeat

condition or the cause of that physical condition.  Especially given the lack of evidence that a couple of extra duty weeks that Plaintiff was assigned while in Jakarta caused any of her physical or emotional injuries, "neither the quality nor the quantity of evidence presented at trial" supports a $650,000 compensatory damages award.  *See Liberatore*, 160 F. Supp. 2d at 120 (concluding that a similarly deficient trial record did not support the jury's excessive award for emotional distress damages).  Put simply, an award of $650,000 based on Plaintiff's having to serve two extra "on call" weeks is facially "beyond all reason," *Peyton*, 287 F.3d at 1126-27, and is so obviously outside the reasonable range for the facts of this case that either a new trial on damages or remittitur is required.

Moreover, Plaintiff did not furnish any expert report or testimony regarding any physical, emotional, or psychological condition.  While a plaintiff is not required to offer expert testimony to support a damages award, the weight of the evidence must support the damages given.  *Jean-Baptiste*, 931 F. Supp. 2d at 20 (citing *Jefferson v. Milvets Sys. Tech., Inc.*, 986 F. Supp. 6, 8 (D.D.C. 1997)).  A "'Title VII plaintiff bears the burden of proving damages with reasonable certainty[.]'"  *Robinson v. District of Columbia*, 341 F. Supp. 3d 97, 109 (D.D.C. 2018) (quoting *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 799 (6th Cir. 2018)).  For the jury to permissibly award money damages for mental pain, emotional distress, or loss of reputation, and other non-monetary losses, Plaintiff bore the burden of proving, by a preponderance of the evidence, that those losses were caused by her placement on the duty schedule in 2016.  *See* Compensatory Damages Instruction, ECF No. 95 at 20-21.  Plaintiff failed to offer sufficient evidence for a reasonable juror to find that the Department's conduct in assigning Plaintiff a few extra duty weeks caused any of the physical, emotional, or psychological injuries that Plaintiff suffered during or after her assignment in Jakarta.

Similar cases demonstrate that the jury award here was excessive and unreasonable. The D.C. Circuit has instructed that courts should rely principally on evidence submitted at trial in determining damages awards. *Peyton*, 287 F.3d at 1127. Yet, "courts must have some guidepost with which to determine whether a remittitur is appropriate and what amount serves as the 'highest level the jury tolerably could have awarded.'" *Jean-Baptiste*, 931 F. Supp. 2d at 14. Thus, the Court may consider, at least in part, similar cases to determine an appropriate damages award. *See id.*

After surveying cases from this and other circuits, the *Nyman* court concluded that "in discrimination and retaliation cases the range of jury awards is generally between $10,000 and $150,000." *Nyman*, 967 F. Supp. at 1571. *Nyman* involved four claims, including that the defendant retaliated against the plaintiff by not promoting her and increasing her pay and violated the Equal Pay Act by paying her less than male counterparts. *Id.* at 1567-68. The jury found in the plaintiff's favor on most of them. *Id.* On damages, the plaintiff successfully introduced evidence that she suffered severe consequences as a result of the discrimination, including hypertension and reduced life expectancy, and she was forced to stop working for a time. *Id.* at 1572. Even so, the *Nyman* court remitted the jury's award of $350,000 in compensatory damages to $175,000. *Id.* Even though the defendant's actions had "severe and uncontroverted consequences" on the plaintiff, the plaintiff's injuries "[did] not warrant the highest recoverable damages award under Title VII." *Id.*; *see also Liberatore*, 160 F. Supp. 2d at 119 (citing *Nyman*, 967 F. Supp. at 1571-72).[9]

---

[9] The *Liberatore* court similarly ordered a new trial on the issue of emotional distress damages, unless plaintiff that prevailed on a claim of wrongful termination agreed to remit the damages from $1.1 million to $200,000. The plaintiff's claim that he felt humiliated and became nervous whenever called into supervisor's office were insufficient to sustain award, especially because his anxieties could have been attributed to other causes.

In a 2013 decision, this Court "examined similar cases to determine whether more recent awards suggest a higher amount." *Jean-Baptiste*, 931 F. Supp. 2d at 17. In *Jean-Baptise*, the jury awarded $3.5 million in compensatory damages. The Court held that the award was so great as to shock the conscience, and so inordinately large as to obviously exceed the maximum limit of reasonable range within which jury could properly operate, thus warranting remitter, or in the alternative, a new trial on damages. In *Jean-Baptiste*, a female lifeguard brought claims for retaliation and hostile work environment under Title VII, the D.C. Human Rights Act, and the D.C. Whistleblower Act. The court noted that "the conduct alleged in this case was no doubt disgusting and extremely troubling, and the jury had good reason to be disturbed by the facts." The plaintiff described a work atmosphere in which her supervisor asked her out on dates, spoke in sexually crude language, and sexually propositioned her. The court found that the plaintiff's testimony regarding her injuries was not sufficient to support a $3.5 million verdict. The highest amount the jury tolerably could have awarded, based on the damages she proved, was $350,000 (or 10% of what the jury awarded).[10]

As federal courts of appeals have consistently held, massive damages awards for modest injuries caused by relatively minor violations are not permitted, and are subject to remittitur. *See Hetzel v. County of Prince William*, 89 F.3d 169, 171-74 (4th Cir. 1996) (holding that plaintiff's $500,000 award for emotional distress in a Title VII employment discrimination and retaliation case, which was based "almost entirely on plaintiff's own self-serving testimony" and that of her co-workers, was "grossly excessive" and remanding the award for remittal by the district court); *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986)

---

[10]    The court did not impose the $300,000 statutory cap on damages under Title VII on plaintiff's state-law claims. *Id.* at 19.

(affirming the district court's remittitur, holding that "emotional distress damages may not be presumed," and that plaintiff's testimony in that employment retaliation case, by itself, was insufficient to support jury's $22,060 award for emotional distress damages); *Wulf v. City of Wichita*, 883 F.2d 842, 874-75 (10th Cir. 1989) (holding that plaintiff's $250,000 award for emotional distress damages in an employment retaliation case, based on plaintiff's own testimony and that of his wife, was excessive and remanding for the district court to remit the award to an amount not to exceed $50,000); *Rainone v. Potter*, 388 F. Supp. 2d 120, 124-25 (E.D.N.Y. 2005) (remitting $175,000 damages award to $50,000 in case where plaintiff was diagnosed with major depression, saw a psychologist for four years, and had difficulty sleeping, and explaining that cases with emotional distress awards over $100,000 "generally contain evidence of debilitating and permanent alterations in lifestyle.").

The facts of this case are far less severe than in, for instance, the *Nyman* or the *Jean-Baptiste* cases. Plaintiff was not fired, denied a promotion, or subjected to sexual harassment. At most, she was on-call for two more weeks than the other agents on her team during a single 12-week period. And while there was some evidence that incidents in Jakarta caused Plaintiff stress, there was no evidence of severe, life-altering medical conditions caused by the two extra duty weeks. The maximum amount recoverable under Title VII "should be reserved for the most egregious cases of unlawful conduct." *Nyman*, 967 F. Supp. at 1572. This is not one of those cases. Keeping in mind that Plaintiff did not prevail on two out of her three Jakarta claims, $50,000 is the maximum limit of a reasonable range of damages for any emotional distress caused by the single act of retaliation that she proved at trial, which amounted only to two extra duty weeks. Even a $50,000 award would be high, but, unlike the jury's actual award, it would

not be so inordinately large as to shock to conscience and exceed the range within which the jury may properly operate.

   With due respect to the jury, the trial evidence did not justify the inordinately large amount that the jury awarded Plaintiff for the single retaliation claim on which she prevailed at trial.  It will result in a clear miscarriage of justice if it stands.  Accordingly, the Court should direct Plaintiff to either accept a reduced award in the amount of $50,000, which is the highest amount the jury tolerably could have awarded based on the evidence or elect a new trial on the issue of non-economic damages.

*   *   *

## Conclusion

For the foregoing reasons, Defendant respectfully requests that the Court enter judgment as a matter of law in Defendant's favor. In the alternative, the Court should order a new trial or remittitur of the jury's excessive damages award.

Dated: April 7, 2022
      Washington, DC

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar. #481052
United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division


By: _____*/s/ Daniel P. Schaefer*_____
    DANIEL P. SCHAEFER, D.C. Bar # 996871
    Assistant United States Attorney
    555 Fourth Street, NW
    Washington, DC 20530
    (202) 252-2531
    Daniel.Schaefer@usdoj.gov

*Counsel for Defendant*