# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOSEPHINE CHIEN,                    )
                                    )
          Plaintiff,                )
                                    )    CV No. 16-1583
       vs.                          )    Washington, D.C.
                                    )    February 28, 2022
ANTONY J. BLINKEN,                  )    10:00 a.m.
                                    )
          Defendant.                )    Morning Session
_____)


         TRANSCRIPT OF JURY SELECTION PROCEEDINGS
         BEFORE THE HONORABLE AMIT P. MEHTA
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          Bruce Allan Fredrickson
                            WEBSTER & FREDRICKSON, PLLC
                            1101 Connecticut Avenue, NW
                            Suite 402
                            Washington, D.C. 20036
                            (202) 659-8510
                            Email:
                            bfredrickson@
                            websterfredrickson.com

                            Geoffrey H. Simpson
                            WEBSTER & FREDRICKSON
                            1775 K Street, NW
                            Suite 290
                            Washington, D.C. 20006
                            (202) 659-8510
                            Email: gsimpson
                            @websterfredrickson.com

                            Kelly Brian McClanahan
                            NATIONAL SECURITY COUNSELORS
                            4702 Levada Terrace
                            Rockville, MD 20853
                            (301) 728-5908
                            Email:
                            kel@nationalsecuritylaw.org

APPEARANCES CONTINUED:

For the Defendant:               Daniel Patrick Schaefer
                                 Christopher Hair
                                 U.S. ATTORNEY'S OFFICE
                                 FOR THE DISTRICT OF COLUMBIA
                                 555 Fourth Street, NW
                                 Washington, D.C. 20530
                                 (202) 252-2531
                                 Email:
                                 Daniel.Schaefer@usdoj.gov
                                 Email:
                                 christopher.hair@usdoj.gov

Also Present:                    Samuel Birnbaum
                                 Rafael Gallardo

Court Reporter:                  William P. Zaremba
                                 Registered Merit Reporter
                                 Certified Realtime Reporter
                                 Official Court Reporter
                                 E. Barrett Prettyman CH
                                 333 Constitution Avenue, NW
                                 Washington, D.C. 20001
                                 (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1  whether, if she learned about the purported retaliation

2  after the litigation commenced, whether that can be

3  considered adversity or not.  And, again, I thought the

4  answer was, well, she actually learned about this prior to

5  the litigation commencing.

6  So that seems to me to be an open issue; that if

7  Mr. Terterian has only looked at this for the first time in

8  2019 after the litigation commenced, it still leaves the

9  open question in my mind about whether something that was

10  learned or not known by Ms. Chien during the relevant period

11  could be considered retaliatory.  So I'll just leave it at

12  that.

13  Dr. Marcey's testimony that has been proposed,

14  I indicated that she would be limited, and I essentially

15  granted what was an in-limine request by the government to

16  exclude testimony concerning causation.

17  In the Minute Order, I cited Chief Judge Howell's

18  decision in *Daniels v. District of Columbia*, 15 F. Supp. 3d

19  at 62 from 2014.  And, you know, Rule 26(a)(2)(C) is fairly

20  clear that if somebody is not retained as an expert, the

21  defendant, or the sponsoring party, I should say, has to

22  provide a summary of that person's anticipated testimony.

23  You don't have to provide the kind of report that you do for

24  someone who is a retained expert.

25  The only information that was provided regarding

Dr. Marcey during discovery was an identification of who

Dr. Marcey was and an address. There was no other

disclosure made with respect to Dr. Marcey.

Yes, it is true that Ms. Chien signed a release

for medical records, but I've not been given any

representation that Ms. Chien herself actually supplied

medical records as part of discovery to the defense.

And so there really was no summary of Dr. Marcey's

anticipated testimony, as is required under

Rule 26(a)(2)(C), and either not in terms of a formal

summary or something that would be sort of tantamount to a

summary.

And I've been involved in cases where a

combination of disclosure of medical records and the like

might be tantamount to a summary, but there's nothing like

that here.

You know, the closest the plaintiff has come is in

her Pretrial Statement to say, Dr. Marcey has been

Ms. Chien's treating psychologist since 2016; she's expected

to testify to Ms. Chien's compensatory damages. You know,

that Pretrial Statement is, A, too late; but even if it was

timely, you know, that statement does not provide a summary

of Dr. Marcey's anticipated testimony.

So the question then becomes whether the failure

to disclose was substantially justified or harmless under

1  Federal Rule of Civil Procedures 37(c)(1), and the answer

2  was:  There's no basis for -- there's been no justification

3  given to me for why Dr. Marcey's summary was not provided.

4          I don't think the fact that she was identified and

5  a release was provided is sufficient justification, and

6  I don't think it's harmless.  The defense has a right to

7  know under the rules what her testimony will be, and the

8  failure to make that disclosure, in my view, is not

9  harmless.

10         So for all those reasons, I will limit

11 Dr. Marcey's testimony and not permit her to testify on

12 causation, which I think is in the nature of expert

13 testimony, and I think Judge Howell's decision in *Daniels*

14 really lays that out quite well.

15         Finally, there is the issue of Mr. Cadogan.  This

16 is Darwin Cadogan.  Ms. Chien had sponsored him, and it's

17 not at all unclear to me based on the Pretrial Statement,

18 because there were slightly descriptions of his expected

19 testimony.

20         At page 10, it says Mr. Cadogan is an experienced

21 DS agent -- I'm not sure what DS stands for -- but DS agent

22 and is expected to testify concerning the security clearance

23 review standards and processes employed by DS based on his

24 employment with DS.

25         Then if you look at page 21, which is where the

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOSEPHINE CHIEN,                          )
                                          )
          Plaintiff,                      )
                                          )    CV No. 16-1583
       vs.                                )    Washington, D.C.
                                          )    March 1, 2022
ANTONY J. BLINKEN,                        )    9:40 a.m.
                                          )
          Defendant.                      )    Morning Session
_____)      Day 2


TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:              Bruce Allan Fredrickson
                                WEBSTER & FREDRICKSON, PLLC
                                1101 Connecticut Avenue, NW
                                Suite 402
                                Washington, D.C. 20036
                                (202) 659-8510
                                Email:
                                bfredrickson@
                                websterfredrickson.com

                                Geoffrey H. Simpson
                                WEBSTER & FREDRICKSON
                                1775 K Street, NW
                                Suite 290
                                Washington, D.C. 20006
                                (202) 659-8510
                                Email: gsimpson
                                @websterfredrickson.com

                                Kelly Brian McClanahan
                                NATIONAL SECURITY COUNSELORS
                                4702 Levada Terrace
                                Rockville, MD 20853
                                (301) 728-5908
                                Email:
                                kel@nationalsecuritylaw.org

APPEARANCES CONTINUED:

For the Defendant:          Daniel Patrick Schaefer
                            Christopher Hair
                            U.S. ATTORNEY'S OFFICE
                            FOR THE DISTRICT OF COLUMBIA
                            555 Fourth Street, NW
                            Washington, D.C. 20530
                            (202) 252-2531
                            Email:
                            Daniel.Schaefer@usdoj.gov
                            Email:
                            christopher.hair@usdoj.gov

Also Present:               Samuel Birnbaum
                            Rafael Gallardo

Court Reporter:             William P. Zaremba
                            Registered Merit Reporter
                            Certified Realtime Reporter
                            Official Court Reporter
                            E. Barrett Prettyman CH
                            333 Constitution Avenue, NW
                            Washington, D.C. 20001
                            (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| PLAINTIFF's: | | | | |
| JOSEPHINE CHIEN | 21 | | | |

– – –

INDEX OF EXHIBITS

– – –

| PLAINTIFF'S | IDENTIFIED | ADMITTED |
|-------------|------------|----------|
| 13 | | 25 |
| 18 | | 72 |

– – –

INDEX OF EXHIBITS

– – –

| JOINT | IDENTIFIED | ADMITTED |
|-------|------------|----------|
| 3 | | 29 |
| 4 | | 31 |
| 2 | | 38 |
| 6 | | 45 |
| 5 | | 48 |
| 7 | | 57 |
| 8 | | 65 |
| 8 | | 69 |
| 9 | | 74 |

- - -

INDEX OF EXHIBITS

- - -

| DEFENDANT'S | IDENTIFIED | ADMITTED |
|---|---|---|
| 8 | | 80 |
| 12 | | 83 |
| 14 | | 88 |

1   inappropriate.  And I have asked them -- you know, the

2   rumors, do you have any corroborating facts, evidence, or

3   records?  And I have expressed concerns to my -- some of my

4   friends as well, as well as one senior retired DS agent.

5        Q    And did you submit a complaint on this subject to

6   the EEO office?

7        A    Yes.

8             I have -- I updated -- well, I should say I

9   submitted an amendment to my original EEO reporting.

10       Q    And did you request any documents concerning the

11  security-clearance process?

12       A    Yes.

13            I submitted a FOIA request in 2013 for my

14  security-clearance file.

15       Q    And did you receive documents in response to that

16  FOIA request?

17       A    Yes.

18       Q    And did you review those documents?

19       A    Later, I submitted in 2013, and I did not receive

20  it still either the end of 2015 or early 2016.

21            And the reason I say that is because in the FOIA

22  package, the latest dated document was August 2015.  So that

23  must have meant that they sent that package after August

24  2015.

25            And the envelope was the address of my Virginia

1    residence address.  But in 2015, I was already in Jakarta.

2              So the package, I saw the envelope that has a

3    forwarding sticker onto the original address.  So because

4    we're overseas DPO, it -- you know, the transmission time,

5    it varies.

6              So I can only do my best calculation that between

7    the time that they actually sent out that package to my

8    Virginia address, then the Post Office tried to deliver,

9    cannot deliver, kicked it back to State Department.

10             State Department took the time to change it to the

11   forwarding address, to a DPO, I mean, Diplomatic Post Office

12   address, and then put the sticker on, and then send it right

13   out and forward to me -- I honestly do not remember when,

14   but I know it's at least months later.

15        Q    Okay.

16             Now, and you did review the contents of the FOIA

17   response; is that right?

18        A    I did ultimately reviewed it, yes.

19        Q    Okay.

20             Did you have any concerns over what was contained

21   in the records?

22        A    Yes.

23             My first concern was, I remember a memo by

24   Ms. Patricia Gunning basically spelled out the concern of my

25   EEO claim, and that was a memo by itself, noting the EEO.

1      Q    And I'd like to show Ms. Chien

2  Plaintiff's Exhibit 13.

3           And can you see Plaintiff's Exhibit 13?

4      A    Yeah.  Can you go back up to the whole entire

5  document?

6      Q    Please go back.

7           Just the first page.

8      A    Same.

9      Q    Just the first page?

10     A    Right there.  Thank you.

11     Q    And what is the first page of

12 Plaintiff's Exhibit 13?  And what's the date of it?

13     A    It's a memorandum, July 10th, 2013.

14     Q    And --

15     A    Subject:  Josephine H. Chien, Case No. 408030.

16          MR. SIMPSON:  And I'd like to move to admit

17 Plaintiff's Exhibit 13.

18          MR. SCHAEFER:  No objection.

19          THE COURT:  Okay.  Plaintiff's 13 will be

20 admitted.

21                              (Plaintiff's Exhibit 13
                                 received into evidence.)
22 BY MR. SIMPSON:

23     Q    And so, Ms. Chien, is this the memorandum that you

24 stated that you had a concern about?

25     A    Yes.

      Q     And why did you have a concern about it?

      A     My EEO, it's right there, spells out in my
security file.  And the tone -- it's a warning memorandum
for everyone to see that they were concerning of my EEO
activity and believe that I will take some sort of action.
They didn't spell out what kind of action.

            EEO is -- a legal action is my civil right.
So this is -- I -- I was really surprised to see an actual
memo in my security file referencing my EEO.

      Q     And upon your review of the documents that you got
back from your FOIA request, did you have any other concerns
of what you saw in there?

      A     It basically refutes a lot of the statements that
were made to me by Ms. Crampton and Mr. Anderson, their
reasoning of why my security-clearance process this time is
very different.

            They said I did not have my -- I didn't have a
security clearance, period.  First, they said, you know, we
don't have a security clearance from Secret Service.

            And then they said, Well, we don't have a security
clearance of you from CBP.

            And I looked at the document later carefully that
there were, I believe, at least in two occasions in their
records checks, that mentioned I have up to -- a security
clearance in 2005 from Department of Homeland Security, and

1   that is my employment with Customs and Border Protection.

2           So they did a check on that.  They have a date of

3   when I received that clearance.  They have a date of --

4   another one is 2007, Department of Homeland Security.  That

5   is when I was in Secret Service, because both agencies were

6   under -- are under Department of Homeland Security.

7           So their records check did -- revealed my prior

8   two security clearances in two different dates from

9   Department of Homeland Security.

10          And I also saw an email from Secret Service to

11  Diplomatic Security Service, DS; Personnel Security and

12  Suitability, PSS, transferring my security clearance and

13  transferring my security-clearance file with attachments as

14  well.

15  Q    And did you have any further concerns about the

16  reported investigation?

17  A    Yes.

18          I found that -- just about all of the report of

19  investigations mention about my EEO or concerning from

20  people, commenting about my EEO or me voicing my opposition

21  to discrimination.

22          Also, many things described in the report were

23  just inaccurate, if not outright false.

24          There were -- especially Ms. Crampton's interview

25  report of me, it was just filled with errors and false

1  other ARSOs?

2      A    Because I know when other people arrive and leave,

3  and they're not required to be in by 7:30.

4      Q    And what was Mr. Castro's response?

5      A    Angry.

6      Q    And can you describe that a little bit further,

7  about how he responded?

8      A    I think it's in his email.

9      Q    If we can go to page 1 of that exhibit.

10     A    The bolded words; the caps; the long, long email,

11 I can tell -- my attempt to try to just explain, but tell

12 him, Yes, I will do that as long as you apply that to

13 everybody -- well, please apply that to everybody.

14         And he disagreed.

15     Q    If we can go back to page 2.

16         So I want to move on to another subject, and

17 that's something called duty weeks.  What are duty weeks?

18     A    Duty weeks are assigned to the officers in each

19 respective offices in the RSO.  One agent would be the duty

20 agent for that week.  And he or she would be on call 24/7

21 for all kinds of responses, emergency or nonemergency.

22     Q    And was it desirable to be put on duty weeks?

23     A    It's not.

24     Q    And how does an assignment on being placed on a

25 duty week affect or limit an agent?

1    A    That means extra work because you -- if you have

2 calls that you need to take either within or outside of the

3 office hours that's extra work on top of your assigned

4 programs already.

5         Also, if you're the duty agent, you cannot leave,

6 not just the District, but you cannot leave the city.  So --

7 because you need respond within one hour.  And in Jakarta,

8 that basically means you cannot go anywhere.

9         Jakarta, officers in Jakarta, including me, we

10 take frequent trips outside of the city for morale purposes.

11 And if you're on duty, you cannot go anywhere.

12         And also, you don't really have the liberty to

13 drink, because if you need to respond to any situations in

14 an hour, you need to be legally sober.  You need to be

15 aware.

16         That was not a problem for me because I'm not a

17 drinker anyways; however, just the fact that you are limited

18 of what you can do outside of your office hours is not very

19 desirable for everybody.

20    Q    And did you have a concern over the assignments of

21 duty weeks to you in 2016?

22    A    Yes.

23    Q    And what was your concern?

24    A    I think one day it came to my attention that

25 suddenly I noticed I have -- my duty weeks assignments grew.

1    And it went from -- on a rotational basis.  So we have seven

2    agents rotating each week.  That means I would get duty once

3    every eighth week, I would get another one.  So once every

4    seven weeks.

5          But it came to my attention that within a 12-week

6    span, I was assigned four duty weeks.  So that leaves the

7    eight remaining weeks for six agents to share.  That's

8    definitely not on a rotational basis.

9      Q    Were you aware of any reasons regarding agent

10   staffing or travel that would explain you being assigned

11   four duty weeks in a 12-week period?

12     A    No.

13         MR. SIMPSON:  All right.  If we could bring up

14   Joint Exhibit 11.

15         Move to admit Joint Exhibit 11.

16         MR. SCHAEFER:  No objection.

17         THE COURT:  Joint 11 will be admitted.

18                                   (Joint Exhibit 11
                                     received into evidence.)
19

20         MR. SIMPSON:  If we can scroll through and take a

21   look at Joint Exhibit 11.

22         So if we can go back to the top of the first page.

23

24

25

BY MR. SIMPSON:

Q    And this document says, "Updated April 14th, 2016."

Do you see that?

A    Yes.

Q    And generally speaking, what's your recollection of whether you saw this document or one like it?

A    I'm sorry.  I don't understand.

Q    Yeah.  I said, when did you first see this document?  Or did you see this document?

A    After April 14th.

Q    Okay.

And I just want to go through if we can see, start counting what you mean by four weeks -- four duty weeks in a 12-week span.

So when do you see your name first appear on the list?

A    First one is May 9th, 2016.  That's me.

Q    And the second time you see it?

A    And then you go down to June 13th; that's me again.

Q    And when did you see you next?

A    And then you go down one week later; June 27th, that's me again.

Q    And if we can go to the next page?

1      A      And then here is me again, July 25th.  So four

2  weeks -- three weeks later.

3      Q      And did you complain about being assigned extra

4  duty weeks?

5      A      I wouldn't say complained, but I raised concern

6  and objection because this is not how it has always been --

7  and not just at this post.  It's at every post, domestic or

8  overseas.

9          Duty roster is on a rotational basis, and no one

10  had come to me and asked me if that -- I can swap my duty

11  week with them or if I can cover them for their duty weeks,

12  because this is how it works.  You're assigned duty weeks --

13  a duty week months ahead.  So these duty schedules, rosters

14  were made months ahead.

15          If you need to go out of town -- if, for some

16  other personal or official reason, you cannot be a duty

17  agent during your assigned duty week, you swap with someone.

18  And this is, you know, how it was done to me.

19          For example, I had to go back to L.A. for my

20  sister's funeral, and I -- someone swapped that week with

21  me.  So it's always how it's worked.

22          No one asked me to swap with them.  No one asked

23  me if I can cover for them.  They just appear for me.  So --

24          MR. SIMPSON:  I'd like to move to

25  Plaintiff's Exhibit 18.

1          MR. SCHAEFER:  I'm sorry.  One moment.

2          Okay.  Thanks.

3    BY MR. SIMPSON:

4     Q     Ms. Chien, what is Plaintiff's Exhibit 18?

5     A     It is my email to the DCM, Deputy Chief of

6    Mission, Mr. McFeeters.

7     Q     And what's the date of that email?

8     A     April 28th.

9          MR. SIMPSON:  Move to admit

10   Plaintiff's Exhibit 18.

11         MR. SCHAEFER:  No objection.

12         THE COURT:  Okay.  Plaintiff's 18 will be

13   admitted.

14                              (Plaintiff's Exhibit 18
                                received into evidence.)
15

16         MR. SIMPSON:  And if we can go down to the

17   paragraph that says, "This has been a long year for me."

18   BY MR. SIMPSON:

19    Q     And if you could read the first couple of lines of

20   that paragraph, Ms. Chien.

21    A     Yes.

22         "This has been a long year for me.  In addition to

23   handling normal RSO operations, I have been forced to spend

24   my time defending myself against a supervisor bent on making

25   me regret the fact that I filed a discrimination complaint."

1      Q     And if we can go down to the next paragraph that

2   starts "Besides," and if you could read that paragraph.

3      A     "Besides the retaliatory actions I reported in my

4   last email to you, there has been additional retaliatory

5   acts, including unfair duty schedule assignments and

6   uninformed change of my work requirement in EER."

7      Q     And just to -- you mentioned the unfair duty

8   schedule assignments.  What did you mean by that?

9      A     That was the duty weeks that suddenly appeared to

10  be my mine after I reported discrimination.

11     Q     Now, if you recall, you had a March 17th email to

12  Mr. McFeeters as well.

13           Do you remember that?

14     A     Yes.

15     Q     Between that March 17th and this April 28 emails,

16  did you have any further conversations with Mr. McFeeters

17  about any of your concerns of discrimination or retaliation?

18     A     I don't believe so.  I don't remember.

19     Q     Okay.

20     A     But I believe this is --

21     Q     To your knowledge, did Mr. McFeeters do anything

22  to assist you with your complaints of discrimination or

23  retaliation?

24     A     No.

25           MR. SIMPSON:  And we can move to Joint Exhibit 9.

1                And move to admit Joint Exhibit 9.

2                MR. SCHAEFER:  No objection.

3                THE COURT:  Joint 9 will be admitted.

4                                    (Joint Exhibit 9
                                     received into evidence.)
5

6                MR. SIMPSON:  I'm sorry, Your Honor?

7                THE COURT:  Joint 9 is admitted.

8    BY MR. SIMPSON:

9         Q     So, Ms. Chien, what is Joint Exhibit 9?

10        A     It's another plea for help to Mr. McFeeters and

11   reporting basically more retaliations from Mr. Castro.

12        Q     And if you look at the beginning of the second

13   paragraph, if you could just read that first sentence.

14        A     "I've been assigned other agents' work and 4 times

15   more for duty weeks than others since my complaint."

16        Q     And did you receive any response from

17   Mr. McFeeters?

18        A     No.

19        Q     Now, below this email, there's an email to

20   Brenda Wells.

21              Do you see that?

22        A     Yes.

23        Q     We'll move on from that.

24              When did you leave the post in Jakarta?

25        A     I believe it was the first week of August 2016.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOSEPHINE CHIEN,            )
                           )
       Plaintiff,      )
                           )   CV No. 16-1583
     vs.              )   Washington, D.C.
                           )   March 2, 2022
ANTONY J. BLINKEN,      )   9:45 a.m.
                           )
       Defendant.      )   Morning Session
_____)   Day 3


TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          Bruce Allan Fredrickson
                        WEBSTER & FREDRICKSON, PLLC
                        1101 Connecticut Avenue, NW
                        Suite 402
                        Washington, D.C. 20036
                        (202) 659-8510
                        Email:
                        bfredrickson@
                        websterfredrickson.com

                        Geoffrey H. Simpson
                        WEBSTER & FREDRICKSON
                        1775 K Street, NW
                        Suite 290
                        Washington, D.C. 20006
                        (202) 659-8510
                        Email: gsimpson
                        @websterfredrickson.com

                        Kelly Brian McClanahan
                        NATIONAL SECURITY COUNSELORS
                        4702 Levada Terrace
                        Rockville, MD 20853
                        (301) 728-5908
                        Email:
                        kel@nationalsecuritylaw.org

APPEARANCES CONTINUED:

For the Defendant:          Daniel Patrick Schaefer
                            Christopher Hair
                            U.S. ATTORNEY'S OFFICE
                            FOR THE DISTRICT OF COLUMBIA
                            555 Fourth Street, NW
                            Washington, D.C. 20530
                            (202) 252-2531
                            Email:
                            Daniel.Schaefer@usdoj.gov
                            Email:
                            christopher.hair@usdoj.gov

Also Present:               Samuel Birnbaum
                            Rafael Gallardo

Court Reporter:             William P. Zaremba
                            Registered Merit Reporter
                            Certified Realtime Reporter
                            Official Court Reporter
                            E. Barrett Prettyman CH
                            333 Constitution Avenue, NW
                            Washington, D.C. 20001
                            (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PLAINTIFF's: | | | | |
| JOSEPHINE CHIEN | 5 | | | |

– – –

INDEX OF EXHIBITS

– – –

| DEFENDANT'S | IDENTIFIED | ADMITTED |
|---|---|---|
| 30 | | 32 |
| 42 | | 41 |

– – –

INDEX OF EXHIBITS

– – –

| JOINT | IDENTIFIED | ADMITTED |
|---|---|---|
| 14 | | 105 |

1    routinely.  So it wouldn't provide, you know, the

2    career-enhancing opportunities like Mr. Henwood had

3    mentioned for this Kuala Lumpur TDY.

4        Q    I want to turn to the other claim that you've

5    asserted about the duty schedule, okay?

6            Now, you've claimed that Mr. Castro retaliated

7    against you by giving you extra duty weeks after you've

8    brought the complaint to Mr. McFeeters, right?

9        A    Correct.

10       Q    And we've already seen from the earlier emails

11   that your complaint to Mr. McFeeters was on March 8th,

12   right?

13       A    That sounds about right, yes.

14           But also, I didn't just walk into his office.

15   I had arrange -- I had to arrange a time neat him.  So the

16   arrangement would be prior to the 8th.

17       Q    Sure.  Early March of 2016, right?

18       A    Yes.

19           MR. SCHAEFER:  Let's turn to Joint Exhibit 9.

20   BY MR. SCHAEFER:

21       Q    And now we're back here to the email that you sent

22   of to Mr. McFeeters on -- I'm sorry.  Different email.

23           So this an email you sent to Mr. McFeeters on

24   June 2nd.

25           Do you see that?

1      A    Yes.

2      Q    Now, I want to focus your attention on the second

3 paragraph.

4           THE COURT:  I'm sorry, Counsel.  What exhibit was

5 this again?

6           MR. SCHAEFER:  Joint Exhibit 9.

7           THE COURT:  Okay.

8 BY MR. SCHAEFER:

9      Q    And do you see in the second paragraph, you wrote

10 to Deputy Chief of Mission McFeeters on June 2nd:

11 "I've been assigned other agents' work and four times more

12 duty week than others since my complaint."

13           Do you see that?

14      A    Yes.

15           MR. SCHAEFER:  So let's take a look at

16 Joint Exhibit 11.

17 BY MR. SCHAEFER:

18      Q    And do you recall, Ms. Chien, that this is the RSO

19 duty schedule that your counsel showed you during your

20 direct examination?

21      A    Yes.

22      Q    And it shows an updated day of April 14th of 2016.

23           Do you see that?

24      A    Yes.

25      Q    And the time frame for this RSO duty schedule was

1    April to August of 2016, right?

2        A    For this one, yes.

3        Q    And your complaint to Mr. McFeeters was in June

4    of -- I'm sorry, not complaint, but the email we were just

5    looking at that you sent to Mr. McFeeters on June 2nd,

6    I believe it was, falls right in the middle of this time

7    frame we're looking at here, right?

8        A    Yes.

9        Q    And you wrote to him, as you recall, you'd been

10   assigned to four times more for duty weeks than others since

11   your complaint, right?

12       A    Yes.

13       Q    Okay.  So in your testimony on direct, based on

14   your review of this version of the duty schedule, you

15   testified that you served four separate duty weeks in a

16   12-week period, right?

17           MR. SIMPSON:  Objection; misstates prior

18   testimony.

19           THE COURT:  She can confirm or refute that.

20   It's overruled.

21   BY MR. SCHAEFER:

22       Q    Do you want me to say the question again?  You're

23   allowed to answer.

24       A    Yes.  As I have already said, yes.

25       Q    Now, this copy of the RSO duty schedule that your

1    counsel showed you has an updated date of April 14 of 2016,

2    right?

3         A    As I have already answered, yes.

4         Q    And so this version of the RSO duty schedule was

5    at the front end of this time frame we're looking at here of

6    April to August of 2016, right?

7         A    I'm sorry.  I don't understand.  What do you mean

8    at "the front"?

9         Q    Right.

10            April 14th, when this version of the RSO duty

11   schedule, is only two weeks into this time period that's

12   covered by this schedule, right?

13        A    Oh, two weeks into April?

14        Q    Yeah.  And the schedule covers April to August,

15   right?

16        A    Yes.

17        Q    And you recall that schedule often changed, right?

18        A    I don't understand.  What do you mean "schedule

19   often changed"?

20        Q    Well, as you said, I believe, during your direct

21   exam, agents would sometimes switch schedules.  I'll cover

22   your week; you take mine, that sort of thing?

23        A    We would to swaps, yes.  It would be updated.

24        Q    Isn't it true that you did not actually work all

25   of those duty weeks that are reflected on this April 14

1    version of the duty schedule?

2        A    If you want to be more specific?

3        Q    You don't remember?

4        A    If you want to be more specific, like which one?

5    What do you mean I did not work all?

6        Q    Okay.  Well, there are four -- your name appears

7    on this schedule four times, and that's what you testified

8    previously, right?

9        A    Yes.

10       Q    You didn't actually serve all four of those duty

11   weeks, right?

12       A    I believe that's correct.  Or not full four.

13       Q    Okay.

14            MR. SCHAEFER:  Let's take a look at

15   Joint Exhibit 14, please.

16   BY COURTROOM DEPUTY:

17       Q    Okay.  Ms. Chien, do you see that this is the RSO

18   duty schedule, same period of time, April to August 2016?

19       A    Yes.

20       Q    And this one shows an updated date of August 15 of

21   2016?

22       A    Yes, that was already after I left the post.

23   I was no longer in Jakarta.

24       Q    Hang on.  Hang on.

25            MR. SCHAEFER:  Defendant moves to admit.

1          THE COURT:  Joint 14 will be admitted.

2                              (Defendant Exhibit 14
                               received into evidence.)
3

4    BY MR. SCHAEFER:

5          Q    Okay.  So this version of RSO duty schedule shows

6    an updated date of August 15 of 2016.

7               Do you see that?

8          A    Yes, after I have already left Jakarta.

9          Q    And you left Jakarta exactly when?

10         A    I don't know exactly, but it was, I would say, end

11   of the first week or beginning of second week of August.

12         Q    Okay.  So end of the first week or the second week

13   of August.  So right at about the time that this -- or

14   possibly just before this RSO duty schedule was updated,

15   right?

16         A    It was definitely before this duty week was

17   updated.

18         Q    Okay.

19              But you were there from April until the end of the

20   first or second week of August, right?

21         A    That's correct.

22         Q    Okay.

23              So if we look at this --

24              MR. SCHAEFER:  Let's scroll down a little bit.

25

BY MR. SCHAEFER:

Q    Do you see that you were assigned here for the week of May 9 through 16?

A    Yes.

Q    Now, in the earlier version of the RSO schedule we can go back and look at it, you were shown to have covered the week of June 13.

Do you recall that?

A    Yes, I do.

Q    And do you see --

MR. SCHAEFER:  If we scroll down a little bit here.

BY MR. SCHAEFER:

Q    -- that you were not assigned to the June 13 week, according to the version of this that was updated in August?

A    According to the updated version, no.

Q    And you see that that week was, in fact, covered by a different agent, David Scholtes?

A    According to the post date version, that's correct.

Q    So you see that in the next week there, June 27, shows your name for that week?

A    Yes, in this version.  But in your previous version, you will see my name for June 13th and my name for June 27th.

1      Q    Right.  The version that was prepared in April,

2  right?

3      A    That was the timely prepared version, yes.

4      Q    And let's take our time and scroll up this list of

5  names one more time here.  And you see -- do you see your

6  name on any other weeks here on this first page?

7      A    May 9th, 16th.

8      Q    Yeah, we talked about that?

9      A    Uh-huh.

10     Q    That's one.  And then the second week is the one

11 at the bottom?

12     A    Yes.

13     Q    That was June 27th.  So that's two?

14     A    Yes.

15          And then you go down to the second page, you'll

16 see my name again.

17          MR. SCHAEFER:  All right.  So let's go to the next

18 page.

19 BY MR. SCHAEFER:

20     Q    So do you see under July 18, the week of July 18

21 through 25, it says, "Josephine Chien"?

22     A    Yes.  I do not remember this version, though.

23     Q    Okay.  Switched for Todd Wallace.

24          Do you see that?

25     A    I see that.  But, again, I do not remember this

1   version because it's made after I already left post.

2        Q    Okay.

3             So do you recall working the duty schedule the

4   week of July 18?

5        A    If you show me the older version, the timely

6   created version, then, yes, I can corroborate the date for

7   you.

8        Q    Do you have any recollection, based on your own

9   recollection, in looking at this, of whether or not you

10  covered the duty schedule the week of July 18?

11       A    I remember I have covered the duty weeks after the

12  June 27th, yes.  Exact date, I don't know.

13       Q    Okay.  So do you see for the week of July 25, it

14  lists a different agent, Joe Williams?

15       A    Yes.

16       Q    Switched for Josephine Chien.

17            Do you see that?

18       A    Yes.

19       Q    And do you recall in the earlier version of this

20  RSO schedule from April, you were listed as the agent for

21  that week?

22       A    For which week?  For the 18th?

23       Q    For the week of July 25.

24       A    I do not remember.  Can you please -- you didn't

25  go to the second page of the first version.

1          MR. SCHAEFER:  Let's do that just for a moment,

2     please.  Can you go back to JX11.

3          So keep going down.

4     BY MR. SCHAEFER:

5     Q    You see on the week of July 25, your name is

6     there?

7     A    Yes.

8     Q    But on the August version, it's no longer your

9     week, right?

10    A    Yeah.  I move up.

11    Q    So let's go back to JX14.

12         All right.  So you recall there were two weeks you

13    cover on the first page.

14         MR. SCHAEFER:  Let's go back to the second page.

15         Let's go slow here.  Go ahead down.  Okay.

16    BY MR. SCHAEFER:

17    Q    And so one additional week on page 2, right?

18    A    Is it one additional what?

19    Q    One additional week, plus the first two, makes a

20    total of three weeks, according to the August version that

21    you covered the duty schedule, right?

22    A    According to the post-dated version, yes.

23    Q    Now, we're not going to have time to do this for

24    every one, but let me ask you --

25         THE COURT:  Counsel, can I interrupt you?

1          Do you have a sense of how much longer you're

2    going to be?

3          MR. SCHAEFER:  I'm coming to it.

4          THE COURT:  I'm sorry?

5          MR. SCHAEFER:  I'm nearly at the end.

6          THE COURT:  You're nearly at the end.  How much

7    longer do you think you'll be?  Because it's now 12:30, and

8    I'm wondering whether we should wait until you're done.

9          MR. SCHAEFER:  I can finish up in the next five

10   minutes.

11         THE COURT:  All right.  Great.

12   BY MR. SCHAEFER:

13     Q    So we're not going to do this for every agent on

14   here, but I'm going to ask you to walk us through just one

15   or two.

16         So let's go back to page 1.

17         And I'm going to ask you, Ms. Chien, to count the

18   number of times you see Mike Bjelacac's name on the duty

19   schedule in this August version of the schedule, okay?

20         So you see him on April 25?

21     A    Uh-huh.

22     Q    Yes?

23     A    Yes.

24         MR. SCHAEFER:  Okay.  Let's scroll down.

25

1    BY MR. SCHAEFER:

2        Q    You see him a second time on June 6th?

3        A    Uh-huh.

4        Q    Let's keep going.

5             Okay.  You see him a third time on August 1?

6        A    Yes.  Three times.

7        Q    Let's keep going.

8             And a fourth time on August 22nd.

9             Do you see that?

10       A    Uh-huh.

11       Q    Yes?

12       A    Yes.

13       Q    And I understand that the last one was after you

14  left.  I understand that.

15            But am I correct that he's on the schedule for

16  this period a total of four times?

17       A    Over, like, 18 weeks.  Maybe 16 weeks.

18       Q    Over the entire --

19       A    Yeah, the entire --

20       Q    Over the entire period?

21       A    Yeah, four times over the entire, if I calculate

22  it correct, was that 17 or 18 weeks?

23       Q    Right.  So one more time than you were, right?

24       A    Well, one more time for me is 12 weeks and for him

25  is like 17 or 18 weeks.  So that would still be sort of

1 within that seven-agent rotation.

2     Q    Well, let's even -- let's take off the last one

3 from August 22nd because that was when you were out of the

4 embassy.

5     A    All right.

6     Q    So excluding that one, let me ask the question.

7     So for the entire period of April through August,

8 excluding the August 22nd week, Mr. Bjelacac was on there

9 three times?

10     A    Three times.

11     Q    And you were on there three times as well, right?

12     A    No, because he was on three times. If you

13 calculate that, that's week one, him; week seven, him; and

14 week 15 or 16, him. So that's still about the same rotation

15 gap.

16     Q    You're both on there three times, right?

17     A    Yeah, during different time periods. For me, it's

18 three times in 12 weeks. For him, it's three times in 15 or

19 16 weeks.

20     Q    Well, I don't mean to belabor the point,

21 Ms. Chien, but it's not just 12 weeks. It's April through

22 August, isn't it?

23     A    Yes, but that's the relevancy, though. It is

24 during the time frame and how many times they are being

25 assigned, whether it is rotational, whether it was, you

1  know, fair and equal.  So, yes, the time frame is relevant.

2      Q    Do you agree with me, Ms. Chien, that according to

3  this August version of the RSO duty schedule, you were not

4  assigned more duty weeks than any other ARSO for the period

5  of April through August of 2016?

6      A    I do not agree.

7      Q    Okay.  Please tell me which of the agents on here

8  you served more duty weeks than?

9      A    Well, again, if we look at the same set of time

10 frame, 12 weeks, if I took four weeks, that leaves eight of

11 the weeks for the six male agents to share.  And I think

12 that's quite simple math.

13          I get four, and most of them get one.  And only

14 two of them, two of the six, get two.

15     Q    All right.  According to this August version, you

16 didn't actually work all those weeks, right?

17     A    Because I was not here after August.  So if you're

18 going to include the time I was not in Jakarta, that would

19 not be a fair calculation of why I wasn't there to serve the

20 duty weeks, because I was not there.  I already left post.

21          MR. SCHAEFER:  Okay.  Nothing further.  Thank you.

22 Thank you.

23          THE COURT:  Okay.

24          Ladies and gentlemen, we've reached our lunch

25 hour.  It's now 12:35.  So why don't we resume around 1:40.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
JOSEPHINE CHIEN,                 )  Civil Action
             Plaintiff,          )  No. 16-1583
vs.                              )
                                 )
ANTONY BLINKEN, et al.           )  March 2, 2022
             Defendant.          )  1:48 p.m.
                                 )  Washington, D.C.
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**DAY 3**
**AFTERNOON SESSION**

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE AMIT P. MEHTA,**
**UNITED STATES DISTRICT COURT JUDGE**

**APPEARANCES**:

FOR PLAINTIFF:
        BRUCE A. FREDRICKSON
        Webster & Fredrickson, PLLC
        1101 Connecticut Avenue, NW, Suite 402
        Washington, DC 20036
        (202) 659-8510
        Email:  bfredrickson@websterfredrickson.com


        GEOFFREY H. SIMPSON
        Webster & Fredrickson
        1775 K Street, NW, Suite 290
        Washington, D.C. 20006
        (202) 659-8510
        Email: gsimpson@websterfredrickson.com


        KEL McCLANAHAN
        National Security Counselors
        4702 Levada Terrace,
        Rockville, MD 20853
        (301) 728-5908
        Email:  kel@nationalsecuritylaw.org

***(Appearances continued)***

**<u>APPEARANCES (continued)</u>:**

FOR DEFENSE:   DANIEL P. SCHAEFER
               CHRISTOPHER C. HAIR
               Assistant United States Attorneys
               555 Fourth Street, NW
               Washington, DC 20530
               (202) 252-2531
               Email: daniel.schaefer@usdoj.gov
               Email: christopher.hair@usdoj.gov

               RAFAEL J. GALLARDO HEVIA
               U.S. Department of State
               Office of the Legal Adviser, L/EMP
               2201 C Street N.W.
               Washington, DC 20520
               (954) 303-8958
               Email:  gallardo-heviarj@state.gov

ALSO PRESENT:  SU MI PARK
               SAMUEL BIRNBAUM

               SHADAE BEAVER, Paralegal Specialist
               U.S. Attorney's Office

Court Reporter: Elizabeth Saint-Loth, RPR, FCRR
               Official Court Reporter
               U.S. Courthouse
               Washington, D.C.  20001

            Proceedings reported by machine shorthand,
         transcript produced by computer-aided transcription.

                 *  *  *  *  *  *  *  *  *  *  *

                              <u>INDEX</u>

<u>WITNESS</u>                              <u>PAGE</u>

GEORGE TERTERIAN                       5, 28, 45
ANDREW DOUGLAS LARGE                   52, 70, 80
MARCELLA M. MARCEY                     83
WHITNEY SAVAGEAU                       94

                            <u>EXHIBITS</u>

Plaintiff's Exhibit 11                 64

1    A.  I am a clinical psychologist.

2    Q.  Do you know Josephine Chien?

3    A.  Yes.

4    Q.  How do you know her?  What caused you --

5    A.  I have had her as a client since 2016; on and off.

6    Q.  And just briefly, can you tell the jury what

7    qualifications you have to have to be a licensed

8    psychotherapist?

9    A.  Well, to be a licensed clinical psychologist is a little

10   different than a psychotherapist.  But, in Virginia, you

11   need a Ph.D. in psychology, which usually takes an average

12   of seven years after your undergraduate degree.

13          You have to serve an internship, do a residency,

14   and then also do an additional residency after you have

15   gotten qualified academically and, then, take exams -- both

16   national and state exams.

17   Q.  Did you do all of those things?

18   A.  Yes.

19   Q.  When did you first meet Josephine Chien?

20   A.  In April of 2016.

21   Q.  And did she become your patient?

22   A.  Yes, sir.

23   Q.  When you first met her, was it via a Zoom connection?

24   A.  It was -- yes.  It was virtual.  She was in Indonesia at

25   the time and her insurance led her to me as a possible

1    provider.

2    Q.  Now, when you first meet a potential patient, do you

3    normally take a history?

4    A.  I usually take a history, although she was in very

5    difficult straits at that time.  And so I delayed taking the

6    history with the goal of getting things calmed down, giving

7    her recommendations on how to handle things.  So I took a

8    history much later and then -- you do have to make a

9    diagnosis for insurance after the first appointment.  So it

10   was clear that she was depressed, and so that was what I

11   diagnosed her with initially.

12   Q.  And what diagnosis did you make initially?

13   A.  The initial diagnosis was major depression, first

14   episode, moderate.

15   Q.  Is that recognized in the Diagnostic and Statistical

16   Manual?

17   A.  Yes, it is.

18   Q.  Did you ever change the diagnosis from the major

19   depression?

20   A.  I did.  I did not feel that I needed to change it with

21   the insurance company because she remained going into

22   episodic depressions; but as I got to understand what was

23   happening with her, I changed the diagnosis to

24   post-traumatic stress disorder which I reflected in my

25   notes.

1    Q.  What is post-traumatic stress disorder?

2    A.  It's a very complicated --

3           THE COURT:  Counsel, excuse me.

4           Doctor, I should have -- I didn't realize.  If you

5    are unvaccinated -- excuse me.  If you are vaccinated, you

6    can feel free to take your mask off to testify.

7           THE WITNESS:  That would be lovely.

8           THE COURT:  If you prefer to keep a mask on, I was

9    going to switch you into a clear mask.  I'm sorry.  I should

10   have said that when you started.

11          THE WITNESS:  That's okay.  I promise not to

12   breathe heavily.

13          MR. McCLANAHAN:  You are like a member of Congress

14   now.

15          THE WITNESS:  Although, then I might have worn

16   lipstick.

17   BY MR. FREDRICKSON:

18   Q.  Okay.  Could you --

19   A.  Yes.  PTSD, post-traumatic stress disorder, has a fairly

20   short history; first recognized after World War I, and we've

21   gotten more and more refined in how we understand it.

22          At this point, it is its own diagnostic category

23   in the diagnostic manual because it is such a complex

24   disorder.  It affects the cognitive functioning; people have

25   problems being able to pay attention, to sustain

1  concentration, they become very forgetful of many ongoing

2  events in their life, and even historical events.

3           There are physical issues with it; the heart rate

4  is elevated over a long time; so we see a lot of issues with

5  blood pressure problems, nausea, irritable bowel syndrome,

6  et cetera.

7           We also see a lot of emotional volatility with

8  post-traumatic stress disorder; so people can get -- either

9  get shut down emotionally or they can kind of go from zero

10  to 60 with their anger or their fear even in situations that

11  might not spark that in other people.

12           And then there is also the energy level.  Because

13  you are in a constant state of arousal when you have PTSD,

14  you tend to be easily fatigued and you also have problems

15  with sleeping.

16           So we look for a long list of symptoms before we

17  make that kind of diagnosis.

18  Q.  And did you observe any of these symptoms in Ms. Chien?

19  A.  I observed all of the above; and it became very clear

20  once she was in a situation where she had more time to, kind

21  of, reflect on what had been happening in her life, so

22  that's not unusual with trauma.

23           While you're handling the traumatic incident or

24  traumatic problems, you tend to function in overdrive, but

25  you may not display all of the symptoms of PTSD until you

1    kind of come through the rapids and you're in a calmer kind

2    of environment and then all of them come out very strongly,

3    which is exactly what happened with Ms. Chien.

4    Q.  And did you engage in a course of therapy with

5    Ms. Chien?

6    A.  Yes.

7    Q.  And when did that begin?

8    A.  It began in April 2016.

9         At that time, I was dealing with what was

10   happening in her life at the moment, trying to get her

11   through that.  I continued to work with her on and off.

12        So, I mean, I've had 20 -- I mean, 74 sessions

13   with her since 2016, but -- like in 2019, I only saw her

14   twice, you know, so it was over a long period of time; and

15   that's not an unusual course of treatment.

16        Many of my trauma patients will get better and

17   then come back when something triggers off the trauma again

18   and then they get -- you know, we handle that, and they come

19   back.  I have had some that I've seen since the age of four

20   that are now in their late 30s and that constant replaying

21   of the trauma to be addressed.  So it's a long-term kind of

22   treatment.

23   Q.  Is she still in therapy with you?

24   A.  She is.  She's actually scheduled for an appointment I

25   think sometime, but I don't know when.  My office manager

1    handles that.

2    Q.  I don't need that exact detail.  Thank you, Doctor.

3            Are you in a position to describe her mental

4    health as you observed it over the course of your treatment?

5    A.  Yes.  It's been very up and down in the sense that --

6    when I first started treating her, she was doing what we

7    call somatizing.  She had shingles; she had multiple

8    physical ailments that were making her life a misery.  And

9    so although I diagnosed her with depression, the handling of

10   those symptoms was largely through her body.

11           So we were working on that.  And as I addressed

12   the depression, her physical symptoms improved.

13           She then -- the geographic location she was in

14   then changed and, at that point, the PTSD symptomatology

15   became very clear.  And so I moved from just trying to keep

16   her functioning and doing as well as possibly physically to

17   recognizing the PTSD and then begin to work on those

18   traumatic experiences that she was dealing with.

19           Things calmed down for a while, and then she

20   returned to much more regular therapy in 2020 when, once

21   again, her environment changed and the symptomatology

22   resurfaced now that she was being exposed to some -- I hate

23   to use the word "trigger" because everybody uses it -- but

24   she was being triggered by the environment she was in.  And

25   I have seen her pretty consistently since 2020, 2021, and

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
JOSEPHINE CHIEN,               )  Civil Action
          Plaintiff,      )  No. 16-1583
vs.                         )
                            )
ANTONY BLINKEN, et al.     )  March 3, 2022
          Defendant.     )  9:51 a.m.
                            )  Washington, D.C.

  \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DAY 4**
**MORNING SESSION**

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE AMIT P. MEHTA,**
**UNITED STATES DISTRICT COURT JUDGE**

**APPEARANCES:**

FOR PLAINTIFF:
          BRUCE A. FREDRICKSON
          Webster & Fredrickson, PLLC
          1101 Connecticut Avenue, NW, Suite 402
          Washington, DC 20036
          (202) 659-8510
          Email:  bfredrickson@websterfredrickson.com


          GEOFFREY H. SIMPSON
          Webster & Fredrickson
          1775 K Street, NW, Suite 290
          Washington, D.C. 20006
          (202) 659-8510
          Email: gsimpson@websterfredrickson.com


          KEL MCCLANAHAN
          National Security Counselors
          4702 Levada Terrace,
          Rockville, MD 20853
          (301) 728-5908
          Email:  kel@nationalsecuritylaw.org

***(Appearances continued)***

<u>APPEARANCES (continued)</u>:

FOR DEFENSE:    DANIEL P. SCHAEFER
                CHRISTOPHER C. HAIR
                Assistant United States Attorneys
                555 Fourth Street, NW
                Washington, DC 20530
                (202) 252-2531
                Email: daniel.schaefer@usdoj.gov
                Email: christopher.hair@usdoj.gov

                RAFAEL J. GALLARDO HEVIA
                U.S. Department of State
                Office of the Legal Adviser, L/EMP
                2201 C Street N.W.
                Washington, DC 20520
                (954) 303-8958
                Email:  gallardo-heviarj@state.gov

ALSO PRESENT:   SU MI PARK
                SAMUEL BIRNBAUM

                SHADAE BEAVER, Paralegal Specialist
                U.S. Attorney's Office

Court Reporter: Elizabeth Saint-Loth, RPR, FCRR
                Official Court Reporter
                U.S. Courthouse
                Washington, D.C.  20001

              Proceedings reported by machine shorthand,
        transcript produced by computer-aided transcription.

                    *  *  *  *  *  *  *  *  *  *  *

**P R O C E E D I N G S**

1  THE COURTROOM DEPUTY:  Your Honor, this is Civil

2  Action 16-1583, Josephine Chien versus Antony Blinken.

3  Geoffrey Simpson and Bruce Fredrickson for the

4  plaintiff.  Christopher Hair, Daniel Schaefer, Samuel

5  Birnbaum, and Raphael Gallardo for the defendant.

6  THE COURT:  Okay.  Good morning, everybody.

7  We don't have Mr. McClanahan here yet, but I'd

8  just as well propose that we move forward.  I know that he

9  wanted to see if we could push the security clearance toward

10  the back, so why don't we do that and see if he will arrive

11  before then.

12  The government wants to make a motion, so why

13  don't we hear from counsel.

14  MR. SCHAEFER:  Thank you, Your Honor.

15  May I remove my mask?

16  THE COURT:  Sure.

17  MR. SCHAEFER:  Defendant moves for a judgment as a

18  matter of law under Rule 50(a).  No reasonable jury could

19  conclude based on the evidence presented in plaintiff's case

20  in chief that plaintiff has presented -- has carried her

21  burden of proof to establish the elements of her claims that

22  the Department intentionally discriminated or intentionally

23  retaliated against her.

24  And, Your Honor, I plan to touch on each of the

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  Your Honor, this is Civil
Action 16-1583, Josephine Chien versus Antony Blinken.

Geoffrey Simpson and Bruce Fredrickson for the
plaintiff.  Christopher Hair, Daniel Schaefer, Samuel
Birnbaum, and Raphael Gallardo for the defendant.

THE COURT:  Okay.  Good morning, everybody.

We don't have Mr. McClanahan here yet, but I'd
just as well propose that we move forward.  I know that he
wanted to see if we could push the security clearance toward
the back, so why don't we do that and see if he will arrive
before then.

The government wants to make a motion, so why
don't we hear from counsel.

MR. SCHAEFER:  Thank you, Your Honor.

May I remove my mask?

THE COURT:  Sure.

MR. SCHAEFER:  Defendant moves for a judgment as a
matter of law under Rule 50(a).  No reasonable jury could
conclude based on the evidence presented in plaintiff's case
in chief that plaintiff has presented -- has carried her
burden of proof to establish the elements of her claims that
the Department intentionally discriminated or intentionally
retaliated against her.

And, Your Honor, I plan to touch on each of the

1     claims in some form or fashion.  These are in no particular

2     order.  I was planning to start with the discrimination

3     claims and then proceed to the retaliation claims, if that

4     pleases the Court.

5              THE COURT:  That's fine.  Yeah.

6              So why don't we start with the foreign

7     placement --

8              Mr. McClanahan has just arrived.  You haven't

9     missed anything, Mr. McClanahan, we literally just got

10    started.

11             -- the foreign placements from 2012 to 2013, and

12    then Jakarta, the denial of the TDY; that's the other sex,

13    race, discrimination claim, correct?

14             MR. SCHAEFER:  Sure.  Let's -- so to begin with

15    the domestic assignment placement in 2013 -- beginning first

16    with the Department's explanation for the reason why she

17    didn't get it, just very briefly.

18             The Department's evidence established that she did

19    not get the overseas assignment because she broke the

20    handshake, lost her preferential bidding status, and then

21    placed a series of bids on unsuitable assignments for

22    various reasons while ignoring her CDOs' attempts to find

23    her an acceptable overseas post.  So that's what -- that's a

24    summary of what the defendant's explanation for what

25    happened is.

In her case in chief, plaintiff offered as evidence of pretext her own testimony that her supervisor, Ollie Ellison, told her that he spoke with her Career Development Officer, Michael Kerns.

Plaintiff testified that Mr. Ellison told her that Mr. Kerns told him that the reason her bids for foreign assignments were being denied was because of something out of L.A. No reasonable jury could find that evidence of pretext sufficiently probative of discrimination on account of race or gender. And bear in mind, this is not -- the 2013 domestic assignment claim is not a retaliation claim; that's a discrimination claim.

So evidently Ms. Chien believes that Mr. Kerns was referring to a discrimination complaint that she had filed during a previous assignment in the Los Angeles field office; but there is no evidence about something out of L.A. -- what that even means.

There is no evidence in the plaintiff's case in chief about what happened in L.A. so that the jury is left with -- only to speculate about what that could possibly have referred to. "Something out of L.A." could have been some issue with performance, some disciplinary action -- you know, nobody knows; it could mean anything.

THE COURT: I guess the question -- I might agree with you if that were the only evidence that she's relying

1  on.  But she's also relying on -- or at least I'm sure they

2  will say -- for example, Ms. Savageau's -- I'm pronouncing

3  her name incorrectly --

4       MR. SCHAEFER:  Savageau.

5       THE COURT:  -- Savageau's deposition testimony in

6  which she, sort of, flatly says:  Look, a broken handshake

7  shouldn't have any effect on a person's career prospects.

8       I'm paraphrasing.

9       MR. SCHAEFER:  Yes.

10      THE COURT:  And, you know, in the summary judgment

11  order that's why I sort of let this claim go forward,

12  because there was some inconsistency in the State

13  Department's explanation -- it seemed to me -- about why she

14  was not identified or accepted for a foreign placement.

15      MR. SCHAEFER:  Sure.  And so what -- again, what

16  that leaves the jury with is that, you know, one person from

17  the State Department said that handshakes should -- broken

18  handshakes should not factor into foreign assignments and

19  others are saying that it did.  But, again, the issue in my

20  mind is that -- the pretext for what?

21      There is no evidence of any discrimination.  It's

22  not even clear, from the plaintiff's case in chief, who she

23  believes discriminated against her or at what point in the

24  process or -- I mean, none of these witnesses -- her CDOs,

25  not a single member of the DS panel were ever called.  So

1    there is no evidence in the record that race or gender

2    factored into this process in any way.

3              THE COURT:  Well, look, I think you'd agree with

4    me that she doesn't need to come forward with any

5    explicit -- or direct evidence, I should say, of

6    discrimination, right?  I mean, she doesn't need to do that;

7    that's not required.  You know, her case is circumstantial.

8              So the question is:  What more she would need to

9    do?  I mean, the Circuit has said that, sort of, shifting

10   explanations could be in theory a pretext for

11   discrimination.  It's not clear to me that that then has to

12   be paired with anything else like a discriminatory statement

13   to get to the jury; so that's one.

14             Two, I think your other point is perhaps a better,

15   if not stronger one, because I don't know who the

16   discriminator is.  I mean, it's not clear to me what their

17   theory is on who the discriminator is.

18             I mean, my understanding is that the panel makes

19   these decisions.  I mean, there wasn't much evidence in the

20   way of how these decisions get made and by whom; that's one.

21             And two, it's not clear to me that the folks who

22   provided these different explanations were on the panel or

23   were even speaking on behalf of the panel.  So I am a little

24   bit unclear as to what to do with that.

25             MR. SCHAEFER:  Right.

1          THE COURT:  I mean, it can't just be that because

2     a bunch of people said different things that, well, that's

3     discrimination.  I mean, there has to be a discriminator,

4     someone who is actually doing the discriminating; that's the

5     decision-maker.

6          MR. SCHAEFER:  Yes.

7          THE COURT:  And if that's the panel, it's not

8     clear to me what evidence you have that the panel

9     discriminated against her either directly or through, sort

10    of, a -- you know, I have never liked this term -- the

11    "cat's paw theory"; that there was some person who provided

12    information to the panel who was a discriminator, and that

13    the panel -- even if the panel wasn't acting in a

14    discriminatory manner, had information before it and acted

15    on information that was, sort of, causal, if you will.

16          So I am left a little bit -- I am left with my

17    head scratching as to who the discriminator is here.

18          MR. SCHAEFER:  Yes.  And that is a legitimate

19    grounds for granting the Rule 50 on this because, at the end

20    of the day, the jury will be instructed that:  To prevail on

21    the discrimination claim, plaintiff must show that her race

22    or gender was a determining factor in the decision to place

23    her in a domestic assignment and where -- and that decision

24    was because of her race or gender.  And if -- the jury

25    doesn't even know who was making these decisions, who is

1    even accused of discriminating against her, at what point in

2    the process.  The jury would be left only to speculate on

3    those -- those sorts of issues.

4         So on the domestic assignment claim -- you know,

5    that's essentially our argument on that one.  I mean, we

6    have other arguments as well but that is, I think,

7    the main --

8         THE COURT:  What are your other arguments?

9         MR. SCHAEFER:  Well, there is also an issue

10   with respect to whether that even rises to the level of an

11   adverse action.  And I'm happy to discuss that further

12   if that would be helpful.

13        THE COURT:  No.  Put it on the record because, I

14   mean -- look, I don't want to -- I'm not making any

15   arguments for the government so -- because you have

16   identified them; but I have given this thought as the

17   evidence has been coming in.

18        You know, it's not clear to me how the denial of

19   the foreign placement, at that stage of her career,

20   constitutes an adverse action in the construct of disparate

21   treatment.

22        MR. SCHAEFER:  Yeah.  I agree, Your Honor.

23        THE COURT:  I mean, if I remember correctly -- I

24   won't get the exact terms right -- but for an action to be

25   adverse in the disparate treatment context, it has to

1    affect, you know, the terms, conditions, et cetera, of

2    employment.

3            MR. SCHAEFER:  Yes.  In this context -- in

4    discrimination context, specifically, you need to have some

5    sort of objectively tangible harm that leads to materially

6    adverse consequences affecting the terms, conditions or

7    privileges of either the employee's employment opportunities

8    or, you know, his or her future employment opportunities.

9            And, you know, there is -- there are a lot of

10   cases in the circuit that discuss assignments and adverse

11   action and whether they are or they're not; but a -- you

12   know, an assignment that does not have any effect on an

13   employee's pay or benefits -- and Ms. Chien has offered no

14   evidence in this case that it had any effect -- you know, it

15   can possibly still constitute an adverse action if it

16   affects -- negatively affects future advancement

17   opportunities; but there is no evidence in this case that it

18   did.

19           The only evidence that Ms. Chien presented in her

20   case in chief about what happened to her as her career went

21   forward is that her next assignment was the Jakarta

22   assignment which was an overseas assignment; that's what she

23   wanted.

24           But there is no evidence in the record about -- I

25   mean, she doesn't allege or offer any evidence that this

assignment somehow held her back from a promotion or from getting other assignments that she wanted down the road.

You know, the only evidence that she presented about what happened later is something that was advantageous to her in the respect that it was another overseas assignment, which is what she wanted.

So there is no evidence of a significant change in her employment status or that it caused any significant change in benefits that resulted in objectively tangible harm.

So under -- you know, *Stuart v. Ashcroft* is one case that discusses this, D.C. Circuit case 352 F.3d, 422. Another D.C. Circuit case is *Czekalski v. Peters,* and that's 475 F.3d 360.

And the *Czekalski* case talks about how if an employee gets a reassignment -- it only may constitute an adverse action if there is a significantly different and diminished programmatic responsibilities. And in this case the domestic assignment that Ms. Chien received was -- the evidence showed it was at a level above her current grade; it was a mid-level assignment, whereas she was a junior agent. So quite to the contrary of it being a diminished amount of responsibilities; it was an enhanced level of responsibilities relative to where she was currently.

THE COURT: Can I ask, because it's not -- I'm not

1    sure it's in the record, so I need to be careful here.  But

2    there was a lot of talk about F-3 -- or F-03, I think,

3    versus F-04.

4              MR. SCHAEFER:  Yeah.

5              THE COURT:  And I don't think there's anything on

6    the record that really tells the jury what the difference

7    between that is.

8              I mean, there is some difference.  What the jury

9    was told is that F-3 is higher than F-4; but it's not clear

10   to me whether that means you get higher pay or it's just,

11   sort of, a seniority designation.

12             I mean, is it like the GS scale?  You know, the

13   higher GS you are, the more your pay is?  I don't think

14   that's been put in the record.  Maybe I missed it.

15             MR. SCHAEFER:  It has not.  It has not been put on

16   the record, that is correct.

17             THE COURT:  Okay.

18             MR. SCHAEFER:  So on the domestic assignment in

19   2013, you know, that's pretty much what I wanted to present

20   to Your Honor on that particular claim.

21             We can pause here, and if --

22             THE COURT:  Yes.  Let's pause here because I think

23   it makes sense to do it that way, rather than have you make

24   your entire argument and then hear from plaintiff's counsel.

25             So why don't we turn to plaintiff's counsel and

1  cited.  And the other case I cited was the *Stuart* case; I am

2  happy to provide that citation as well.

3          THE COURT:  Just give me a second.

4          Do you know what the pin cite is for *Stuart v.*

5  *Ashcroft*?

6          MR. SCHAEFER:  Yes.  Page 427.

7          THE COURT:  Look, folks, this is not something I

8  like to do.  But Government has made a motion, I have

9  listened to the evidence carefully.  And I just don't think

10  the plaintiff has made out her case with respect to this

11  claim for the reasons that we have just been discussing.

12          You know, the Government has come forward with a

13  nondiscriminatory reason, so the question under *Czekalski*

14  with respect to the prima facie case, sort of, drops out

15  but, nevertheless, is relevant to whether plaintiff has

16  carried her burden of proof.  As part of that, she has to

17  establish adversity -- that is, she experienced adversity,

18  an adverse action and, two, that it was because of her race

19  or her sex.

20          There is just no evidence that she experienced a

21  tangible harm as a result of the denial of a foreign

22  assignment in 2012, 2013 -- none.  I mean, no testimony

23  about effect on pay, benefits, responsibility -- nothing.

24  Nothing.  Nothing at all.

25          And one would think -- and it's a logical

1    inference -- that the State Department has domestic

2    assignments because domestic assignments are important.

3    There is no testimony at all that Ms. Chien's career

4    prospects were affected or had been affected by -- by the

5    fact that she didn't get this domestic assignment -- none.

6    Even she hasn't said that:  I was --

7           Ms. Chien, I know this isn't -- this is unwelcome

8    news.

9           -- but there is no testimony even from her that

10    her career has been impeded or affected in any way; there is

11    just none.

12           She certainly desired to have an overseas

13    assignment -- and one can understand that because that's

14    what she signed up for -- but that's not the same as

15    establishing a tangible harm as a result of the denial.  And

16    there's been no testimony --

17           Ms. Chien, put your hand down; this is not the

18    time for you to testify or respond.

19           -- you know, there is no testimony that -- as I

20    said, that her career was impacted, either by her or any

21    other individual.  Nobody has come in and said:  The two

22    years that I spent domestically prevented me from doing the

23    following things and rendered me ineligible from the

24    following positions.

25           There is nothing like that.

1          There is nothing to the effect of, you know:  As a

2     result, my grade decreased.  Or:  I wasn't eligible for a

3     grade increase at an earlier time.

4          I mean, there is no testimony at all about

5     tangible harm arising from the denial of foreign assignment

6     except Ms. Chien's desire to have one.  And regrettably, you

7     know, the standard is higher when it comes to adversity for

8     retaliation -- excuse me -- for discrimination and disparate

9     treatment, so, for that reason, I will grant the

10    Government's motion.

11         On the other -- as well, alternatively, or I

12    should say in addition to, I don't think that any reasonable

13    jury could find that she was subject to discrimination here

14    based on her race or sex.

15         The plaintiff has taken the position that a panel

16    of individuals -- it's not clear to us -- there was no

17    testimony that's been provided as to who is on that panel;

18    how that panel operates; who provides information to the

19    panel; what information was provided to the panel about

20    Ms. Chien, other than she broke the handshake.  The bottom

21    line is we weren't provided much information at all about

22    the panel's working and how it operates.

23         But even if there are some inferences that can be

24    drawn about the panel's work and conduct, there's really no

25    evidence short of speculation that would allow a jury to

conclude that the reason she didn't get an overseas

assignment was because of her race and sex.

I already ruled on summary judgment that she

hadn't established any sufficient comparators; so there is

not that evidence here.  There is no direct evidence of

discrimination; there are no comments about either her race

or her sex in connection with this decision.

What we do have are these different statements.

But even those statements -- there is no evidence to link

them to the panel's decision-making at all.  It's not clear

to me -- in fact, there is no evidence that any of the

statements that the plaintiff has identified can be viewed

as explanations of a decision-maker; and that's the key.

It has to be different statements or different

explanations from people either who are decision-makers or

people who have reason to establish that they had a basis

for explaining the decision-maker's thinking.  I mean, it

can't be that just somebody is speculating about why

Ms. Chien didn't get the domestic -- the foreign

assignments, and so -- you know, that's all we have got.

And as I said, while at summary judgment it was

enough to get here; for purposes of trial, you had to prove

more than that and specifically identify who the

decision-maker was and why that decision-maker engaged in

discriminatory acts; but we just weren't given any evidence

1    of that, and certainly not sufficient enough for a jury to

2    determine by a preponderance of the evidence that the reason

3    that she was denied the overseas assignment in 2012, 2013

4    was due to her race or her gender.

5          So I will grant the Government's Rule 50 motion on

6    that claim.

7          All right.  What's next?

8          MR. SCHAEFER:  Okay.  There is one other

9    discrimination claim that I would like to address before we

10    move forward to the retaliation claims, and that's the

11    denial of the temporary duty assignment in Kuala Lumpur in

12    2015.  And the two grounds for the Rule 50 motion are the

13    same as they were for the domestic assignment; namely that

14    it doesn't rise to an adverse action, and there is no

15    evidence of discrimination.

16          Beginning with the adverse action aspect of

17    this -- I mean, it's all of the things that Your Honor just

18    said, but even much more.  We are talking here about a

19    single ten-day temporary duty assignment while Ms. Chien

20    was --

21          THE COURT:  But why isn't there at least more

22    evidence of that here?  In other words, we've got one email

23    that says:  This is a career-enhancing opportunity.

24          MR. SCHAEFER:  Yes.

25          THE COURT:  According to Ms. Chien's testimony,

least she had as much, if not greater, bodyguard experience
than he did.

And so, you know, it seems to me if I were to
review the evidence in the light most favorable to her, you
know, a reasonable jury could infer that, you know, she had
superior credentials and was more senior.

Now, I understand that the standard is one of --
you know, when you're talking about comparison of
credentials as being the reason for establishing pretext;
you know, the Circuit has said you have to show essentially
a substantial disparity, or something to that effect.

MR. SCHAEFER:  Yes.

THE COURT:  But it seems to me, at least at this
stage, the jury should at least be able to consider that
based on the evidence that's before it right now.

MR. SCHAEFER:  Yeah --

THE COURT:  But back to -- but back to your
original -- let me turn to plaintiff's counsel and hear from
them on this issue because -- I mean, I am not inclined to
grant the motion on the absence of discriminatory intent
ground.

I do think viewing the evidence in the light most
favorable to the plaintiff at this stage that a reasonable
jury could find that she was, A, senior to Mr. Bjelajac and,
B, had superior credentials to him.  It may not turn out

1    that way if we hear from Mr. Castro, but at least at this

2    stage I think it gets past Rule 50.

3            MR. SCHAEFER:  May I -- I didn't really have a

4    chance to address that point; may I just do that very

5    briefly?

6            THE COURT:  Sure.

7            MR. SCHAEFER:  Okay.  So the government asserts

8    that that's not a reasonable inference on this trial record

9    because it is a significant disparity gap that's required.

10           Ms. Chien testified on cross-examination that she

11   didn't know how long Mr. Bjelajac had been with the State

12   Department.  She didn't know his previous assignments except

13   for -- she was aware that his previous assignment just

14   before coming to Jakarta was as the Secretary of State's

15   personal security guard; she admitted that she didn't have

16   that experience.  Ms. Chien admitted that she didn't know

17   what grade he was; she didn't know many details at all about

18   his prior experience.

19           And so -- she also admitted, however, that he was

20   in charge of the bodyguard program at Jakarta, which is also

21   experience that she did not have.  So on this -- on this

22   trial record, we don't think that the evidence of

23   comparative qualifications that she's trying to put forward

24   to demonstrate pretext is sufficient to satisfy the

25   circuit's standard on significant disparity gap.

1          Thank you.

2          THE COURT:  Okay.  Thank you.

3          As I said, I think it's -- truthfully, I think

4     it's a somewhat close call.  But I think at this stage of

5     the proceedings -- you know, again, viewing all of the

6     evidence in the light most favorable to her or drawing all

7     reasonable inference in her favor, there is testimony, at

8     least a suggestion, that she was senior to him; that he was

9     a junior officer; he was considered a junior officer by

10    others; and that even though he had some bodyguard

11    experience so, too, did she -- and, in fact, had significant

12    bodyguard experience because she was in charge of the

13    program at -- while she was in Islamabad.

14          So I think, on that ground, it survives Rule 50.

15          So why don't we talk about the adverse employment

16    action.

17          Let me just read the following to you, Counsel.

18    This comes from -- plaintiff cited this case, *Gilliard*,

19    which cites to a D.C. Circuit case called *Maramark versus

20    Spellings*; it's a slip opinion per curiam, unpublished, 2007

21    Westlaw 1935411.

22          The court says:  On the discrimination claim, the

23    district court correctly concluded that the appellee's

24    failure to grant *Maramark* -- who was an excepted service

25    term employee at the Department of Education -- a temporary

1    detail to the National Library of Education did not

2    constitute an adverse employment action; citing a case

3    called *Brown versus Brody*, 199 F.3d 446.

4    The harm alleged here, i.e., the denial of a

5    five-month detail that might have allowed *Maramark* to secure

6    a permanent position at DOE is too speculative to constitute

7    an objectively tangible harm, quoting *Stuart versus Evans*,

8    275 F.3d 1126, 1135.  And the parenthetical is:  Denial of a

9    temporary lateral transfer is not an adverse employment

10   action and cannot be cognizable harm under Title VII.

11   The court there concludes:  Accordingly, *Maramark*

12   failed to make a showing on an essential element of her

13   claim, and the district court's granting summary judgment to

14   the appellee was appropriate.

15   So what do I do with that?

16   MR. SIMPSON:  Your Honor, I would direct you to

17   case *Ortiz versus HUD*, 867 F.3d 70.

18   THE COURT:  I'm sorry.  You're going to have to

19   say that again.  What's it called?

20   MR. SIMPSON:  I'm sorry.  *Ortiz versus HUD*,

21   Housing and Urban Development, 867 F.3d 70.

22   THE COURT:  867 F.3d 70?

23   MR. SIMPSON:  Yeah.  F.3d 70, yes.

24   THE COURT:  *Ortiz-Diaz versus HUD*, 867 -- okay.

25   And what page?

1        MR. SIMPSON:  79?  88, I'm sorry, Your Honor.  And

2   it gives examples of adverse employment actions, including

3   loss of opportunity for training associated with temporary

4   assignments.

5        THE COURT:  Okay.  Look, I guess what I will do is

6   I'm going to defer on this issue.  Let me study the question

7   a little bit more carefully.

8        I appreciate the parties citing these cases

9   because there seems to be some tension between this

10  *Ortiz-Diaz* case and the case that I cited to, which is

11  *Maramark,* and the *Ortiz-Diaz* case is a published opinion

12  from 2017.  *Maramark* is a per curiam decision that's

13  unpublished, from 2007.  So, arguably, the latter is binding

14  upon me, and the former is really not.  But let me take a

15  closer look at this, and I will just defer on the question.

16       MR. SIMPSON:  Okay.  Thank you, Your Honor.

17       I did want to point back -- and just to go back to

18  the first point very briefly just to make the record.

19       Ms. Chien, regarding the overseas assignment, did

20  also testify about the 5/8 rule that mandates that foreign

21  service officers are limited to the amount of domestic

22  assignments that they can serve overseas and the promotion

23  system is built on foreign assignments, and so that's why

24  that is a tangible employment action.  And she also

25  testified that overseas assignments can have free housing

1    and free healthcare.

2         THE COURT:  Okay.  I don't think the denial of

3    free housing and free healthcare rises to a tangible harm.

4    I can't imagine that that sort of benefit does; maybe I am

5    wrong.

6         But in any event, you know, the fact that there is

7    this 5/8 rule -- she did testify about it.  But she never

8    testified that the two years she spent on this domestic

9    detail impacted her ability to meet the 5/8 rule or it

10   otherwise disqualified her for promotion to either -- for

11   any specific position or be eligible for a promotion at any

12   specific time.

13        So, yes, there is a rule; but she hasn't

14   identified any consequence as a result of the domestic

15   detail that had any tangible consequence for her.  Okay?

16   I mean, it just hasn't.

17        Okay.  What's next?

18        MR. SCHAEFER:  All right.  So, Your Honor, that

19   brings us to the retaliation claims.

20        To summarize very briefly, there are three

21   retaliation claims.  There is the -- two of the claims are

22   from the Jakarta period, the change of the start time from

23   8:30 a.m. to 7:30 a.m. -- or the alleged change of start

24   time; there is the extra duty weeks on the emergency duty

25   schedule, also from the Jakarta period.  And then the third

1      claim is the alleged extra scrutiny from the security

2      clearance investigation that began in 2012.

3              So to begin, again, with the question of whether

4      there is an adverse action, in the retaliation context, an

5      adverse action is different than in the discrimination

6      context.  An adverse action must still, however, produce an

7      injury or harm that is material in nature; that's the

8      *Burlington Northern* Supreme Court case.  An adverse action

9      must do more than merely make an employee unhappy; and

10     that's the D.C. Circuit's position in *Bridgeforth*.

11             So context matters here, and it's the line between

12     what's materially adverse and what's a trivial harm.  The

13     question is:  Does the injury rise to a level that is

14     sufficient enough to dissuade a reasonable employee from

15     engaging in protected activity based on an objective

16     standard; and if it does not, then it's not an adverse

17     action for purposes of a retaliation claim.  Again, that's

18     the *Burlington Northern* case.

19             So I want to begin with the Jakarta schedule

20     change.  And on the trial record the jury could not find

21     from the evidence that any schedule change that required

22     Ms. Chien to move up her start time by one hour from 8:30 to

23     7:30 was a materially adverse action that would have

24     dissuaded a reasonable worker from making or supporting a

25     charge of discrimination.

1          So at the time of the events, Ms. Chien --

2          THE COURT:  Can I just ask because -- I'm not

3     going to ask you to make further argument on this other than

4     to -- if you have got a case that you have identified for

5     the proposition -- the specific proposition about change in

6     work hours is not adverse in the context of a retaliation

7     claim, that would be helpful.

8          MR. SCHAEFER:  I don't at the moment.  My

9     colleague is going to see if he can pull one as I am --

10          THE COURT:  That's okay.  Let me -- why don't

11     you -- let me just turn to plaintiff's counsel on this one

12     because, I mean, this has been at the forefront of my mind

13     as well.  This wasn't an argument that was raised on summary

14     judgment, I think, as far as adversity goes, but it's not

15     one that they're foreclosed from raising at trial.

16          MR. SCHAEFER:  I'm sorry.  Your Honor, I'm having

17     a little trouble hearing.

18          THE COURT:  I'm sorry.  I said that I don't think

19     the adverse -- the time change was an adverse action, that

20     that argument was raised on summary judgment.  If memory

21     serves, I think the only argument you made was that she

22     hadn't come forward with a nondiscriminatory -- or that she

23     had not rebutted your nondiscriminatory reason.  And my

24     response was I didn't think you had provided a

25     nondiscriminatory reason on summary judgment.  I don't think

there was an issue of adversity raised on summary judgment,

at least the opinion doesn't reflect it.

In any event, I don't think that's anything that

is waived is my point, which I think you -- that is still

something that remains her burden at trial and is not

waivable by your failure to assert that as an affirmative

defense.

But the way, I should just -- I wish I had the

case in front of me. Just to, sort of, put a pin on this --

close the loop on this *Egan* issue -- we keep going back to

it. But there is case law for the proposition that if a

defendant fails to raise an affirmative defense on summary

judgment, that that is waiver for purposes of trial.

I didn't cite any case to that effect. And I will

find it at a break, but there is case law to that effect in

the circuit. And I do think *Egan* is an affirmative defense

that has to be raised, and it wasn't raised at summary

judgment, in other words.

Anyway, let's talk to plaintiff's counsel about

the change in hours and why that's an adverse action. I

mean, do you have any -- any case law that would support

that proposition, that she had to come in a half hour

earlier than she usually did?

MR. SIMPSON: The first case that I would suggest

the Court look at, off the top of my head, is a case from

1          *Burlington Northern* says:  The anti-retaliation

2     provision protects an individual not from all retaliation

3     but from retaliation that produces an injury or harm.  And

4     then the Court goes on to explain, well, what does that

5     mean?  It means, you know, in this context, what would

6     dissuade a reasonable worker from making a complaint.

7          And then the Supreme Court goes on to discuss the

8     distinction between material adversity and trivial harm, and

9     that's where we are.  I just felt the need to respond to the

10     plaintiff's argument that we misrepresented the standard;

11     that's not correct.

12          THE COURT:  Yes.  I know.  I mean, look, I

13     understand, trust me.

14          You know, what *Burlington Northern* says is that

15     petty slights or minor annoyances that often take place at

16     work, you know, aren't adverse.  And the Circuit has said --

17     stated in another way, quote:  Not everything that makes an

18     employee unhappy is an actual adverse action.  Minor and

19     even trivial employment actions that an irritable

20     chip-on-the-shoulder employee did not like would otherwise

21     form the basis of a discrimination suit.

22          So, anyway, there is a floor; that's my point.

23          MR. SCHAEFER:  Okay.  So to just very briefly

24     address the duty schedule claim -- I don't think this will

25     require too much further discussion but, again, it's an

1  adverse action question.

2  And the issue here -- well, Ms. Chien testified

3  that it's bad to be on the duty schedule -- extra duties,

4  you have to be on call all day.  You know, I think it's a --

5  she said at one point that -- you know, although she doesn't

6  drink, you can't go out and drink because you need to be

7  ready.

8  So she testified that being on a duty week

9  requires extra work of that agent, and that's understood.

10  But what the evidence did not show is that there was any

11  change, following the making of the EEO complaint from

12  Ms. Chien, to the deputy chief mission [sic].

13  Even under the earlier version of the duty

14  schedule that plaintiff was insisting was the more accurate

15  version, it shows a rotation among all of the agents.  You

16  know, at the most it showed that Ms. Chien was on there like

17  one more time over, like, a four or five-month period, from

18  April to August.

19  So there is no materially adverse change in that

20  duty schedule that would dissuade a reasonable worker from

21  making an EEO complaint in the period following the

22  complaints that Ms. Chien made in early March of 2016.

23  So I don't think -- the standard is the same as

24  what we were discussing before; I don't think we need to

25  further belabor that point.

1          But with a limited amount of time --

2          THE COURT:  Well, let me -- if you're going to

3     move on to the scrutiny, then why don't we at least give

4     plaintiff an opportunity to respond.

5          MR. SCHAEFER:  Sure.

6          MR. SIMPSON:  Your Honor, for the -- you know,

7     whether there is an adverse action -- and the duty week

8     issue is a materially different change to one's schedule

9     than opportunity, and so it is not a trivial, slight, or

10    minor annoyance.  It is an additional requirement imposed on

11    Ms. Chien.  And so the -- you know, the -- it's not just the

12    imposition of one additional duty weeks; it's multiple duty

13    weeks --

14         THE COURT:  What's the -- can I just ask, what's

15    the evidence of that?  I mean, I -- this may just ultimately

16    be something for the jury to resolve.

17         But, I mean, do you dispute what those schedules

18    say?  In other words, the schedules don't seem to show that

19    after -- if I remember correctly, the evidence was that she

20    made her complaint in June.  Am I right about that, early

21    June?

22         MR. SIMPSON:  No.  Your Honor, the --

23         THE COURT:  When did the complaint happen?

24         MR. SIMPSON:  So the complaint of discrimination

25    was March 8th.

1          THE COURT:  To McFeeters was March 8th, okay.

2     Right, March.

3          MR. SIMPSON:  Yeah.  And then April 14th there is

4     a new duty schedule; it's just about a month after.  There's

5     temporal proximity under all of the cases that you will

6     find.

7          And on the April 14th, Ms. Chien had 4 duty weeks

8     out of 12 weeks.  So if you start from the first day of her

9     rotation to the last, it's 4 and 12; and there is nobody

10     else that comes close to that if that -- with

11     that accounting.

12          So the Government is counting, kind of, for the

13     entire period but not accounting for the fact that, you

14     know, you have duty weeks just before and just after --

15          THE COURT:  So here is a question -- and maybe

16     this will just go to the weight of the evidence:  But how is

17     one to know that those weren't the weeks assigned to her

18     prior to March?

19          MR. SIMPSON:  I'm sorry?  I didn't hear you.

20          THE COURT:  How is one to -- how is one to know

21     that those weren't the same weeks assigned to her prior to

22     the complaint of discrimination on March 8th?

23          MR. SIMPSON:  The schedule for April through

24     August -- the first schedule that we have for that time

25     period was the April 14th schedule.  And the testimony so

1    far has been that there was a rotation once every seven

2    weeks, that's when you have your duty.

3         There is no evidence that sometime -- that there

4    was any schedule for April to August before March 8th that

5    would have had Ms. Chien working those additional duty weeks

6    already on the calendar.  So --

7         THE COURT:  Well, I know.  That's the problem, it

8    seems to me.  I mean, you know --

9         MR. SIMPSON:  Well, the --

10        THE COURT:  The bottom line is your -- her theory

11   is:  I made my complaint on March the 8th.  30 days later,

12   the duty schedule comes out.

13        And the contention is that:  I got more duty weeks

14   as a result of my protected activity.

15        MR. SIMPSON:  Correct.

16        THE COURT:  But it seems to me the way to know

17   that is to compare what the schedule was before the

18   protected activity occurred so one could determine whether,

19   after March the 8th, she received an increase of duty weeks.

20        But right now we're just, sort of, told, all

21   right, you have got four weeks; she only really did three.

22   And according to the second schedule, she at least switched

23   up one of her weeks to move it up a week early.

24        MR. SIMPSON:  So, Your Honor, a couple of points

25   about that.  So the evidence about what the schedule would

1   have been is the evidence that there was a rotation; that

2   there was always a rotation for how duty weeks worked and

3   operated; that it is once every seven weeks.  The 4 and 12

4   weeks is a change from that process and practice, and so --

5   and that change happened after Ms. Chien made her complaint.

6           So the jury can -- you know, facts most favorable

7   to Ms. Chien under the standard, the jury can easily

8   determine that absent her protected conduct she would have

9   had one duty schedule -- been assigned one duty week every 7

10  weeks, instead of 4 and 12.  So the argument about what she

11  actually wound up doing -- I don't think that's well-taken

12  because she did complain about being loaded up with

13  additional duty weeks to Mr. McFeeters on April 28th --

14          THE COURT:  Okay.  All right.  Look, I will let

15  this go.  I will deny the motion at this point.

16          You know, I had cited in the motion to dismiss the

17  case *Mogenhan versus Napolitano*, 613 F.3d 1162, at 1166,

18  from the Circuit in 2010 that, "A reasonable employee might

19  well be dissuaded from filing an EEOC complaint if she

20  thought her employer would retaliate by burying her in

21  work."

22          So, you know, look, I mean, you-all can argue

23  whether she was buried or not buried, and the jury will make

24  that determination.  So I think, again, the standard is such

25  that I have got to view it in the light most favorable to

her.  The Circuit has recognized that an increase of workload can constitute adversity for purposes of retaliation claims.  So, you know, the jury will just have to work its way through how that schedule worked and what to make of it.

Okay.  Let's talk about the extra scrutiny claim, and go from there.

MR. SCHAEFER:  Thank you.

The deficiency in the evidence for the extra scrutiny for the security clearance retaliation claim is causation.  So temporal proximity alone is insufficient if you can't show that the alleged retaliator or retaliators had any contemporaneous knowledge of the prior EEO activity that is the basis for that claim.

So Ms. Chien's theory of the case seems to be that the investigators had knowledge of some sort of prior EEO activity that she filed at some point along the way, and that that was the reason that she got this extra scrutiny.

She assumes but did not offer any evidence that the -- anyone involved in this investigation, the investigators -- any of the investigators, the case manager had any knowledge of her 2012 EEO complaint in late December against the State Department; and that's the basis for this retaliation claim.

A couple of quick citations on this before I move

1    plaintiff's side.

2         The notes say that there was an incident while

3    Ms. Chien was previously employed in the Secret Service.

4    And I understand that Mr. Terterian caveated that during his

5    testimony and said it could have been either.  But what the

6    notes refer to was an incident that, you know, Ms. Chien was

7    subjected to, you know, a racially motivated --

8         THE COURT:  No, I understand that.

9         MR. SCHAEFER:  But there is no discussion of the

10   EEO activity, it's just that something happened at work that

11   Ms. Chien felt was racially discriminatory; that's

12   not having filed a complaint.

13        In fact, Mr. Terterian -- I think he testified to

14   the contrary, that she didn't get into those sorts of

15   things.

16        THE COURT:  Counsel, look, I think you -- I don't

17   think your argument is frivolous; it's far from it, in fact.

18   I think it's quite reasonable and is rooted in the evidence.

19        But, again, I do feel that at this point, given

20   the standard and the reasonable inferences that one could

21   draw based upon the fact that they did ask her about it -- I

22   understand it was CBP specifically; but Ms. Chien's

23   testimony is that, in her view, any questions about EEO

24   activity were out of bounds and that these investigators

25   clearly had done their homework about her prior to those

1    interviews -- that a reasonable jury could conclude that

2    they were aware of the 2012 -- and I -- and don't take my

3    rejection as a view that your argument is not a fair one; I

4    think it is.  But I think that's where I come out on this at

5    this point.  Okay?

6                MR. SCHAEFER:  Okay.  Thank you, Your Honor.

7                THE COURT:  Thank you.

8                Okay.  Just one more matter -- really, two matters

9    before we conclude.

10               I received -- or I shouldn't say "I" -- the

11   courtroom deputy has received a couple of notes from two

12   jurors; one is from Juror 0659.

13               Question 1 is:  Will Judge Mehta instruct the

14   jurors on the following:  Discrimination law, retaliation

15   law, and harassment law.

16               I will -- I think I can fairly say to them when

17   they return that, yes, you will get those instructions.

18               The second question is:  What happened to

19   Ms. Chien's EEO claims?

20               I obviously cannot answer that, nor would I.  But

21   what I plan to say is that, you know, you are limited to the

22   record evidence as it's presented by the parties and you

23   shouldn't speculate about anything that may or may not have

24   occurred outside the record evidence, if that is acceptable

25   to everyone.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
JOSEPHINE CHIEN,                    )
                                    )
          Plaintiff,                )
                                    )    CV No. 16-1583
        vs.                         )    Washington, D.C.
                                    )    March 3, 2022
ANTONY J. BLINKEN,                  )    12:55 p.m.
                                    )
          Defendant.                )    Afternoon Session
_____)    Day 4
```

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:             Bruce Allen Fredrickson
                               WEBSTER & FREDRICKSON, PLLC
                               1101 Connecticut Avenue, NW
                               Suite 402
                               Washington, D.C. 20036
                               (202) 659-8510
                               Email:
                               bfredrickson@
                               websterfredrickson.com

                               Geoffrey H. Simpson
                               WEBSTER & FREDRICKSON
                               1775 K Street, NW
                               Suite 290
                               Washington, D.C. 20006
                               (202) 659-8510
                               Email: gsimpson
                               @websterfredrickson.com

                               Kelly Brian McClanahan
                               NATIONAL SECURITY COUNSELORS
                               4702 Levada Terrace
                               Rockville, MD 20853
                               (301) 728-5908
                               Email:
                               kel@nationalsecuritylaw.org

APPEARANCES CONTINUED:

For the Defendant:                Daniel Patrick Schaefer
                                  Christopher Hair
                                  U.S. ATTORNEY'S OFFICE
                                  FOR THE DISTRICT OF COLUMBIA
                                  555 Fourth Street, NW
                                  Washington, D.C. 20530
                                  (202) 252-2531
                                  Email:
                                  Daniel.Schaefer@usdoj.gov
                                  Email:
                                  christopher.hair@usdoj.gov

Also Present:                     Samuel Birnbaum
                                  Rafael Gallardo

Court Reporter:                   William P. Zaremba
                                  Registered Merit Reporter
                                  Certified Realtime Reporter
                                  Official Court Reporter
                                  E. Barrett Prettyman CH
                                  333 Constitution Avenue, NW
                                  Washington, D.C. 20001
                                  (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

- - -

WITNESS INDEX

- - -

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEFENDANT'S: | | | | |
| PATRICIA GUNNING | 29 | 90 | 139 | |
| ALBERT ANDERSON | 142 | | | |

1    March 10th, there was -- was the date of the

2 hostile phone call from Mr. Castro to Ms. Chien, which

3 prompted Ms. Chien to follow up with an email.

4    Then Castro had a hostile and angry response to

5 that later on March 10th.

6    And then on March 17th, Ms. Chien had a follow-up

7 email to Mr. McFeeters registering the complaint and

8 including the duty-hour issue in that email.

9    THE COURT:  Okay.  Thank you.

10    All right.  So let me sort of formally do what I

11 sort of hinted I was going to do prior to lunch.

12    I do think I'm going to dismiss the claim or grant

13 the government's motion, I should say, with respect to the

14 change in Ms. Chien's work hours in Jakarta.  Let me just

15 read a couple of cases or from a few cases from the

16 D.C. Circuit.

17    I didn't find anything directly on point, but

18 I think there are a number of cases that support the

19 proposition.

20    The first is *Wiley v. Glassman*.  It's

21 511 F.3rd 151 from 2007.  It's a case that involves somebody

22 who's a broadcaster.  And her complaint about retaliation

23 was that her broadcast time had been reduced from 17 minutes

24 to 13 minutes.  And the Court held that the appellant had

25 failed to establish -- meet the *Burlington* standard.  This

1    is on page 161.

2              "Without such proof, there can be no finding of

3    unlawful retaliation.  Actionable retaliation claims are

4    limited to those where an employer causes material

5    adversity, not trivial harms.  Appellant has failed to shown

6    that the disputed reduction in airtime production was

7    anything other than a trivial harm, if that."

8              So I think that's certainly supports the position

9    here.

10             Then there's *Taylor v. Solis*, which is

11   571 F.3d 1313 from 2009.  That case actually involved a

12   number of claimed adverse actions, a number of which the

13   Circuit determined in the retaliation context did not rise

14   to the level of adversity.

15             As relevant here, one of the allegations was that

16   that the employers had slowed the processing -- this is at

17   page 1321 -- slowed the processing of the plaintiff's cases

18   after she filed her complaint and the employers required

19   her, as they had some other auditors, to submit bi-weekly

20   reports on the status of her work.

21             The Court says, "Such minor inconveniences and

22   alteration of job responsibilities do not rise to the level

23   of adverse action necessary to support a claim."

24             Then I'll just note in that same case, the Court

25   said that "The lowering of a performance evaluation was not

1   materially adverse as it must affect the employee's

2   position, grade level, salary, or promotion opportunities."

3          This is also in the context of retaliation.  The

4   Court seems to have carved out or tied the standard to the

5   disparate treatment standard a little bit more closely.

6          And then finally, I'll just note, there's a case

7   called *Gray v. Foxx* -- and this is the reason why I asked

8   the factual question -- 637 F. App'x 603, 2015, in which the

9   alleged adverse action was the removal from a presentation,

10  exclusion from the meeting, and email critical of her

11  performance.

12         And what the Court said is that the plaintiff,

13  whose name is Gray, "Gray's removal from the presentation

14  does not qualify as materially adverse action because Gray

15  offers no evidence that her removal might have dissuaded a

16  reasonable worker from making or supporting a charge of

17  discrimination.  Gray has submitted no evidence that her

18  removal was anything other than a trivial harm, if that.

19         "Furthermore, her filing of her formal EEO

20  complaint after being removed from the presentation

21  undercuts any argument that a reasonable worker would be

22  dissuaded from filing a charge of discrimination after

23  removal from the presentation.

24         "Likewise, she offers no evidence that her

25  exclusion from meeting the new director amounted to anything

more than a trivial harm and cannot show that emails were

materially adverse."

And interestingly, this is sort of inconsistent

with what we were talking about earlier, Mr. Frederickson.

"Although we do not appear to have addressed this

precise circumstance in the past, emails critical of an

employee's performance are 'akin to the sort of public

humiliation or loss of reputation that we have consistently

classified as falling below the requirements for an adverse

employment action.'" We don't have that here, but I just

thought that was interesting.

In any event, I think all of those cases sort of

support the proposition that Ms. Chien being required to

move up her start time by a half an hour amounts to a

trivial harm.  She herself testified that, you know, it

imposed no personal burden or harm on her.  So I think it is

very much of the kind of trivial harm and the inconvenience

or alteration of job responsibility that doesn't rise to the

level of adverse action.

To support that even further is what *Gray* says,

which is that the filing of an EEO complaint after the

purported retaliatory act undercuts any argument that the

reasonable worker would be dissuaded from filing a charge of

discrimination after removal.

And that's exactly what we have here, which is

1    that Ms. Chien on March the 8th registered her initial

2    complaint with Mr. McFeeters. She then has this contentious

3    call about the hours with Mr. Castro.

4           And then on the 17th, about a week later, she

5    e-mails McFeeters again to make further complaints and

6    protected activity.

7           So even Ms. Chien was not dissuaded by the change

8    in the work hours from furthering her protected activity.

9           Yes, Counsel.

10           MR. SIMPSON: Your Honor, I don't believe the

11    standard can be that the employee must have been dissuaded

12    and that that would be evidence.

13           THE COURT: I'm not saying it is. I'm not saying

14    it's a subjective standard at all. I'm just repeating what

15    the Court said, the Circuit said, *in Gray v. Fox*.

16           MR. SIMPSON: I understand.

17           And I would say to the extent that the Court has

18    discretion to not rely on that, I don't think that that is

19    the standard, and I think that there's going to be a number

20    of cases that say contrary.

21           THE COURT: Well, you can say that, but I'm just

22    reading what the D.C. Circuit has said.

23           MR. SIMPSON: I understand that.

24           THE COURT: And I will tell you that I think it's

25    in a footnote -- and I read this and I think it was in

1  *Ciralsky* in which the Court actually did sort of criticize a

2  trial court decision for dismissing a retaliation case

3  because the plaintiff herself had not been subjectively

4  dissuaded.

5          That's not what I'm ruling here.  I'm ruling two

6  things.  One is that it's a trivial harm; and, two, that

7  conclusion that a reasonable person would not be dissuaded

8  is corroborated by the fact that she herself was not

9  corroborated -- you know, harmed.  And I think that seems to

10  be appropriate under the analysis that this Circuit did in

11  *Gray v. Foxx.*

12          MR. SIMPSON:  And I would also just for the record

13  point out that the Castro email was not just to Ms. Chien;

14  it was also to Mr. Castro's direct supervisor, Jim Murphy,

15  so that increased -- just increases the harm and the

16  notoriety of it.

17          THE COURT:  Okay.

18          I don't think that changes the analysis.

19  I'm not sure what email you're referring to.  But, you know,

20  we were talking about the phone call in which he yelled at

21  her about the change in hours.

22          So I'm not sure what the email is and what that

23  has to do with anything.  And even if it is relevant, the

24  fact that her -- another person was copied on it doesn't

25  really change the analysis.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 * * * * * * * * * * * * * * * *
JOSEPHINE CHIEN,                 )  Civil Action
              Plaintiff,         )  No. 16-1583
vs.                              )
                                 )
ANTONY BLINKEN, et al.           )  March 7, 2022
              Defendant.         )  2:08 p.m.
                                 )  Washington, D.C.
   * * * * * * * * * * * * * * * *
```

**DAY 6**
**AFTERNOON SESSION**

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE AMIT P. MEHTA,**
**UNITED STATES DISTRICT COURT JUDGE**

**APPEARANCES:**

FOR PLAINTIFF:
                    GEOFFREY H. SIMPSON
                    Webster & Fredrickson
                    1775 K Street, NW, Suite 290
                    Washington, D.C. 20006
                    (202) 659-8510
                    Email: gsimpson@websterfredrickson.com

                    KEL MCCLANAHAN
                    National Security Counselors
                    4702 Levada Terrace,
                    Rockville, MD 20853
                    (301) 728-5908
                    Email:  kel@nationalsecuritylaw.org


FOR DEFENSE:   DANIEL P. SCHAEFER
                    CHRISTOPHER C. HAIR
                    Assistant United States Attorneys
                    555 Fourth Street, NW
                    Washington, DC 20530
                    (202) 252-2531
                    Email: daniel.schaefer@usdoj.gov
                    Email: christopher.hair@usdoj.gov


*(Appearances continued)*

**APPEARANCES (continued)**:

                    RAFAEL J. GALLARDO HEVIA
                    U.S. Department of State
                    Office of the Legal Adviser, L/EMP
                    2201 C Street N.W.
                    Washington, DC 20520
                    (954) 303-8958
                    Email: gallardo-heviarj@state.gov


ALSO PRESENT: SU MI PARK
              SAMUEL BIRNBAUM

              SHADAE BEAVER, Paralegal Specialist
              U.S. Attorney's Office

Court Reporter: Elizabeth Saint-Loth, RPR, FCRR
                Official Court Reporter
                Washington, D.C. 20001


            Proceedings reported by machine shorthand,
        transcript produced by computer-aided transcription.

                * * * * * * * * * * *

                          **INDEX**

**WITNESS**                          **PAGE**

ROBERT CASTRO                        3, 38, 77

JOSEPHINE CHIEN                      84, 102



**EXHIBITS**

Government's Exhibit 37              8

Plaintiff's Exhibit 20              57

Joint Exhibit 12                    60

1    promotion panel.

2    Q.  I'd like to ask you -- switch topics here, and ask you

3    about the RSO duty schedule at Jakarta.

4           Do you recall that there was an RSO duty schedule

5    in Jakarta?

6    A.  Yes, I do.

7    Q.  All right.  Can you please just describe -- explain what

8    that was, how it works?

9    A.  So -- sure.  So the RSO duty schedule is essentially --

10   it could be a month in advance schedule of which ARSOs, or

11   Assistant Regional Security Officers, would be on the

12   schedule.

13          Normally, each ARSO would serve for one week at a

14   time.  There would be a list of all ARSOs and which week

15   they would be serving; and, essentially, they would be on

16   duty for that time period.  And we would essentially go

17   through the whole list of folks at the office, and then we

18   would start over again once we got to the bottom; back --

19   start back at the top.

20          So, again, it was essentially for about a week,

21   each agent.  And they were to be available essentially in

22   the event of an emergency or an American citizen in need;

23   that duty agent ARSO would answer that need and handle that

24   emergency.

25   Q.  What types of emergencies are you referring to?

1    A.   All kinds.  They would -- for example, a severe vehicle

2    accident, a kidnapping -- you know, a missing American

3    citizen, things of that sort, domestic violence.  These

4    things are quite common.  And we have to be -- our people

5    need to be there to be able to answer those needs of our

6    American citizens in country.

7    Q.   How frequent were those types of emergencies in Jakarta

8    for somebody serving on the duty schedule that week?

9    A.   Quite frequent.  In fact, there were -- Jakarta, as I

10   remembered, was -- for some reason that escapes me -- was

11   quite high on the scale of the domestic violence episodes

12   that we were required to answer and attend to and ensure the

13   safety of those folks involved.  So, again, those.

14          We would also have instances of vehicle accidents;

15   people not being where they needed to be, they had gone

16   missing; we'd need to liaise with local police to be able to

17   locate those individuals; so quite a cornucopia of different

18   types of events.  But, again, it was -- with as large of an

19   embassy and that many American citizens there, it was quite

20   overwhelming, quite busy.

21   Q.   And so whoever is on the duty schedule that week, it's

22   their responsibility to be the first responder -- the first

23   person on-call?

24   A.   That's correct.

25   Q.   How did the RSO office decide which agents were going to

1    cover which weeks?

2    A.   Pardon me.  Can you repeat?

3    Q.   Yes.  How did the RSO office decide which agents were

4    going to be covering which weeks on the schedule?

5    A.   So, essentially, we just made a list.  There was no

6    particular -- one agent didn't get more consideration than

7    the other.  It was essentially just going down the list of

8    ARSOs, one after another.  When we got to the bottom, again,

9    we would just rotate back to the top in the interest of

10   equity.  Again, it would be one weekend per agent.

11   Q.   Is it fair to say it's kind of like a big wheel that

12   goes around?

13   A.   That is correct, right.  We would just rotate back to

14   the top once we got through the list.

15   Q.   And what was your own personal involvement, Mr. Castro,

16   in assigning individual agents to individual weeks on the

17   duty schedule?

18   A.   Right.  So I would essentially -- working with our OMA,

19   Office Management Assistant, and our OMS, Office Management

20   Specialist -- would put together a list of available ARSOs

21   or ARSOs that were -- that had not departed, that were

22   there, our current list of ARSOs.  And we would put them

23   down and assign one agent per week and, again, just go

24   through the list; and that list would also include myself as

25   being part of that duty schedule.

1   Q.  And did you say "OMS"?  Did I hear you say that?

2   A.  That's correct.

3   Q.  What's that?

4   A.  Our Office Management Specialist, OMS.  And quite often,

5   what she would do at the time, I distinctly remember, was --

6   she would rotate the list herself without having to come to

7   me to do it; that was part of her job as the Office

8   Management Assistant and, essentially, an office manager.

9   She would ensure that list kept going and would assign those

10  names back to the top once we finished one rotation.

11  Q.  And how did you communicate to your team the schedule --

12  or the upcoming schedule?

13  A.  Sure.  So it was essentially put out in our staff

14  meetings, as well as our OMS and our OMA would advise via

15  email and ensure that everybody saw the new list -- would

16  put that out and copy the entire office to include myself

17  and the Senior RSO.

18  Q.  If two of your agents wanted to trade weeks, were they

19  allowed to do that?

20  A.  Absolutely, and I encouraged that.

21          I would mention quite frequently that I would

22  leave it up to them to rotate or exchange if need be.  Quite

23  often there were instances where one agent wasn't able to do

24  his or her duty, whether it be a family emergency, a medical

25  emergency, a training, whatever the case may be.  It was

1     well understood and put out in our staff meetings that folks

2     would work amongst each other; and it worked quite well when

3     one needed to supplement for the other.

4     Q.  So if it happened where one of your agents were supposed

5     to be covering one of the upcoming weeks and they had some

6     sort of a conflict that they couldn't cover that week, what

7     were they supposed to do in that event?

8     A.  So, essentially, they would work that out with one of

9     their colleagues and let myself and/or the OMS or OMA know

10    so they could adjust the schedule.  Typically, they would

11    alert our OMS; and she would adjust the duty schedule and

12    put it out, again, for everybody to see.

13    Q.  And did you cover the duty schedule as well?

14    A.  I did.  I covered many positions for agents that were

15    not able to do theirs as well, including my own.  So it was

16    understood that that was part of the duty.

17         Again, it's a living, organic document; it changes

18    daily.  And I encourage, as did the RSO, the OMS and the OMA

19    for everyone to continuously look at this document because,

20    again, it's organic; it changes sometimes daily.

21         You know, there are instances where people --

22    things happen, we understand that; we are not immune to

23    that.  We understand it, and we're sensitive to that.  So we

24    try and accommodate the best we can; but, at the same time,

25    we have a job to do, and we need to make sure that those

1    positions are covered.

2    Q.  So was this a -- if you are -- an agent or yourself, and

3    you have a week coming up, for lack of a better term, is

4    this like a big deal being on the duty week?  Like, are

5    you looking at you're on the schedule next week and going:

6    Oh, my God, another duty week?

7              I mean, is it an onerous thing to be on the

8    schedule?

9    A.  No, not at all.  In fact, I just finished two and a half

10   weeks of duty in a five-week period; it happens.  We had to

11   move nine agents forward on the schedule currently where I

12   am at.  It happens; we understand it.  It's part of our

13   duty.  That's what we're here to do.  We're here to provide

14   for, you know, the safe environment for the conduct of

15   diplomacy; that is our job, we take it very seriously.  It's

16   our core competency and our core responsibility to do so.

17             MR. SCHAEFER:  I'd like you to take a look,

18   Mr. Castro, at Joint Exhibit 14.

19             Okay.  That's good.

20   BY MR. SCHAEFER:

21   Q.  And, Mr. Castro, what are we looking at here?

22   A.  This is an RSO duty schedule that lists the ARSOs and

23   their duty assignments.

24   Q.  And do you see that this version of the duty schedule

25   has an updated date of August 15 of 2016?

1    A.  Yes, I do.

2    Q.  And who prepared this document, just in general, in your

3    office?

4    A.  Right.  Normally, like I said, it could be myself or the

5    OMA or the OMS, the two administrative support staff.  So it

6    can be either of us three.

7    Q.  And do you see that -- I just asked you before that --

8    this was the August 15 version.  How often did this duty

9    schedule get revised or updated with changes?

10    A.  Quite often weekly.  Again, it's a living document.

11    We have to update it based on events in country,

12    events with families, medical emergencies, training, you

13    know, medevacs -- things of that sort, where our ARSOs or

14    our folks have other things with their personal lives that

15    we have to work around.

16    So, consequently, we have to ensure that those

17    positions are covered when the assigned agent is not able to

18    handle it or be in that position, should I say, for other

19    reasons.  We understand that, and we -- we'll have to

20    accommodate as best we can by filling it with another agent.

21    Q.  I am going to be asking you some questions about how the

22    number of duty weeks that Agent Chien was assigned during

23    these months compared to the number of duty weeks that other

24    agents were assigned.  Okay?

25    Would it assist you in your testimony if I show

1    you a chart that summarizes the total number of weeks

2    assigned for this period?

3    A.  Sure.  Sure.

4    Q.  Yes?

5    A.  That would be fine, sure.

6          MR. SCHAEFER:  Okay.  Let's pull up the RSO duty

7    schedule demonstrative, please.

8          Okay.  You can scroll down a little bit.  Let's

9    keep the top there as well.  You can go up a little bit.

10         THE COURT:  Is there any objection to showing this

11   to the jury?

12         MR. SIMPSON:  No objection.

13   BY MR. SCHAEFER:

14   Q.  So, Mr. Castro, what we have done here to simplify this

15   presentation a little bit is we've taken the other document

16   that we were just looking at and we have totaled the number

17   of weeks for each of the agents assigned during that period.

18         Do you follow me?

19   A.  Yes, I do.

20   Q.  Okay.  And can you please state for the record -- and

21   can you just go down the list and tell me -- you know, tell

22   the jury how many weeks each of those agents were assigned

23   for this period.

24   A.  Sure.  Again, this is an RSO duty schedule with ARSO

25   assignments on a weekly basis.  It was updated August 15,

1     2016, and the number of duty weeks assigned between

2     April 11th, 2016, through August 29th, 2016.  And we start

3     with ARSO Mike Bjelajac, the number of weeks assigned during

4     that time period were four duty weeks; below that, ARSO

5     Josephine Chien, three; below that Todd Wallace, three; Curt

6     Spindler, three; Joe Williams, three; below that, David

7     Scholtes, two; and myself, Robert Castro, two.

8     Q.  Mr. Scholtes only had two duty weeks assigned during

9     this period; why is that?

10     A.  That's a good question.

11          Now, again, Mr. David Scholtes was an ARSO-I.  We

12     are -- per the agreement with our consular colleagues, who

13     the ARSO-Is work with in investigating visa fraud, we only

14     get the ARSO-Is 20 percent of the time.

15          In other words, I don't get to utilize the skills

16     of an "I," as a traditional ARSO, no more than 20 percent of

17     the time; and, in fact, they are not even required to be on

18     the duty schedule.  But in this case we were able to somehow

19     get -- fit Mr. Scholtes into this particular duty rotation

20     here.

21     Q.  And you're only on the schedule there two times as well;

22     why is that?

23     A.  That could be for a number of reasons.  It could be for

24     required training; oversight.  It could -- there's a number

25     of reasons why it could have been.  I could have been on

1    availability for duty weeks, aren't there?

2    A.  I'm not sure I understand what you're asking.

3         Can you please ask that again and help me with it?

4    Q.  Sure.

5         There are documents, there are calendars, there

6    are things that we could look at, if they supported the

7    Department of State, that would say that Ms. Chien had these

8    duty weeks because such and such agent was out or

9    unavailable or traveling, right?  Those documents should

10   exist, right?

11   A.  I think I know what you're asking here.  That would be

12   up to the agents to work out amongst themselves.

13        Are you talking about duty switches?  Is that what

14   you're asking?

15   Q.  No.  I'm --

16   A.  I'm a little confused.  I'm sorry.

17   Q.  There is -- so you have no reason to believe that

18   Ms. Chien asked for the -- to switch into these duty weeks

19   that are shown on Joint Exhibit 11, right?

20   A.  Correct.  I am not aware.  I can't recall.

21   Q.  And, in fact, Ms. Chien protested at being assigned

22   these duty weeks, right?

23   A.  I can't recall.

24        MR. SIMPSON:  So if we can pull up Plaintiff's

25   Exhibit 20, and if we could go to the bottom of that

1    exhibit.

2    BY MR. SIMPSON:

3    Q.  And so this is an email from Josephine Chien to Sheree

4    Hall.  Do you see that?

5    A.  I do.

6    Q.  Who is Sheree Hall?

7    A.  Sheree Hall is the OMS, the Office Management

8    Specialist.

9    Q.  Okay.  And Ms. Chien reports here that she received a

10   phone call at five --

11           THE COURT:  Counsel, I don't think this is in

12   evidence yet.

13           MR. SIMPSON:  Oh, I'm sorry.  If we can go back up

14   to the top of the exhibit.

15           THE COURT:  Well, let me just ask:  Is there any

16   objection --

17           MR. SCHAEFER:  I'm sorry.  What was the number one

18   more time?

19           THE COURT:  Plaintiff's 20.

20           MR. SIMPSON:  Exhibit 20.

21           MR. SCHAEFER:  20?

22           MR. SIMPSON:  Yes.

23           MR. SCHAEFER:  Okay.  No objection.

24           MR. SIMPSON:  All right.  Thank you.

25           Move to admit Plaintiff's Exhibit 20.

1          THE COURT:  Plaintiff's 20 is admitted.

2          (Whereupon, Plaintiff's Exhibit 20, admitted.)

3  BY MR. SIMPSON:

4  Q.  So going back here, it says:  Ms. Chien reports that she

5  got a call at five o'clock in the morning, right?

6  A.  Yes.

7  Q.  That's what she reports?

8  A.  Correct.

9  Q.  And so is receiving a 5 a.m. phone call -- that's

10  something that would be something for the duty agent or the

11  agent on duty, right?

12  A.  Normally, yes.

13          MR. SIMPSON:  Okay.  And so if we could scroll up;

14  a little bit more.

15  BY MR. SIMPSON:

16  Q.  And so Ms. Chien writes --

17          MR. SIMPSON:  If we can scroll up just a little

18  bit more so we can see the top of the email at the top.

19  Thank you.

20  BY MR. SIMPSON:

21  Q.  Ms. Chien writes:  How can I be scheduled to work

22  June 13 and, again, a week later?  That's four duty weeks in

23  a 12-week time.  We have seven agents.

24          Do you see that?

25  A.  I do, yes.

1    Q.  And so Ms. Chien protested the number of duty-week

2    assignments that she was being assigned, right?

3    A.  It appears so in the email, yes.

4    Q.  And, in fact, Ms. Chien had raised this as part of her

5    discrimination complaint previously to Mr. McFeeters.

6              Do you know if that happened?

7              MR. SCHAEFER:  Objection to form.  Foundation.

8              THE WITNESS:  I can't recall.

9              THE COURT:  Hang on.

10             He can answer whether he remembers or not.

11             MR. SIMPSON:  And so if we can go to Joint

12   Exhibit 12.

13             So -- the Court's indulgence.

14             Before we look at this, if we can go to

15   Plaintiff's Exhibit 18.

16   BY MR. SIMPSON:

17   Q.  And so this is not an email to you, is it?

18   A.  I don't see that I am included in this email, correct.

19   Q.  Okay.  And, in fact, we're -- let me --

20             MR. SIMPSON:  Actually, I don't believe that this

21   one is in evidence either, but there is one that is.

22             THE COURT:  18 is in evidence.

23             MR. SIMPSON:  18 is in evidence?

24             Thank you, Your Honor.

25             So if we can go to the paragraph -- the second to

1    A.  Yes, I do.

2    Q.  And what happened with that?

3    A.  It was allegedly changed, but it was not in reality or

4    actuality.

5    Q.  Why do you say that?

6    A.  Because in my email to Ms. Sheree Hall that -- I

7    clearly, on June 20th, the last day of the week -- duty week

8    that I was still getting calls; that means the Marines, and

9    every other section for them -- the duty agent for that week

10   was still me; that's why they would still call me on the

11   last day of the week.  That means when -- in actuality, I

12   was still the duty agent for that week.

13   Q.  Okay.  I have one last question for you:  Did you ever

14   learn that your security allegations were reported to human

15   resources?

16           THE COURT:  What do you mean --

17           MR. SCHAEFER:  Objection to form.

18   BY MR. SIMPSON:

19   Q.  Did you ever learn if any of the concerns that you had

20   about your clearance process were reported to HR?

21   A.  Yes, I had concern.

22   Q.  Did you learn that?

23   A.  Is there more specific, like a document?

24   Q.  No.  We're not going to look at a document.

25           So during this trial there were a -- you have

```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA


JOSEPHINE CHIEN,                      )
                                     )
          Plaintiff,                  )
                                     )       CV No. 16-1583
       vs.                            )       Washington, D.C.
                                     )       March 8, 2022
ANTONY J. BLINKEN,                    )       9:30 a.m.
                                     )
          Defendant.                  )
_____)       Day 7



               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
              BEFORE THE HONORABLE AMIT P. MEHTA
                  UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:             Geoffrey H. Simpson
                               WEBSTER & FREDRICKSON
                               1775 K Street, NW
                               Suite 290
                               Washington, D.C. 20006
                               (202) 659-8510
                               Email: gsimpson
                               @websterfredrickson.com

                               Kelly Brian McClanahan
                               NATIONAL SECURITY COUNSELORS
                               4702 Levada Terrace
                               Rockville, MD 20853
                               (301) 728-5908
                               Email:
                               kel@nationalsecuritylaw.org
```

APPEARANCES CONTINUED:

For the Defendant:              Daniel Patrick Schaefer
                                Christopher Hair
                                U.S. ATTORNEY'S OFFICE
                                FOR THE DISTRICT OF COLUMBIA
                                555 Fourth Street, NW
                                Washington, D.C. 20530
                                (202) 252-2531
                                Email:
                                Daniel.Schaefer@usdoj.gov
                                Email:
                                christopher.hair@usdoj.gov

Also Present:                   Samuel Birnbaum
                                Rafael Gallardo

Court Reporter:                 William P. Zaremba
                                Registered Merit Reporter
                                Certified Realtime Reporter
                                Official Court Reporter
                                E. Barrett Prettyman CH
                                333 Constitution Avenue, NW
                                Washington, D.C. 20001
                                (202) 354-3249

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1 about the 2012 EEO activity, not once.

2        Am I right about that?  Do you concede that, that

3 Ms. Chien did not testify at all that she was asked

4 specifically about the 2012 EEO activity?

5        MR. SIMPSON:  She did not testify that she was

6 asked specifically about the 2012 ROI.

7        THE COURT:  Right.

8        And there's no other evidence to show that

9 she was.

10        MR. SIMPSON:  No, not that I'm aware of.

11        But the place that I was going was that the jury

12 does not have to believe the denials about what they knew.

13        THE COURT:  You should have said that first.

14        MR. SIMPSON:  Oh.

15        THE COURT:  Okay.

16        Look, here's where I am.  I think it's a pretty

17 thin read, but the plaintiff gets the benefit of the doubt

18 here.  And all the inferences have to be viewed in a light

19 most favorable to her.

20        I will look at these other cases and all of this

21 can still be reserved for a motion notwithstanding -- a

22 motion notwithstanding the verdict.

23        But at this point, it seems to me they can get up

24 and say to the ladies and gentlemen of the jury and -- to

25 the ladies of the jury, Yes, these investigators came in and

said they weren't aware of the 2012 activity, but that's not

credible testimony.  And, of course, they knew.  Of course,

they knew about her 2012 activity, because people had told

her about EEO -- had told them about EEO.  They asked her

about EEO.  And you can reasonably conclude from that that

absolutely they knew and they weren't credible in denying

it.

I mean, I think that's the best they can do.

MR. SCHAEFER:  Well, Your Honor, I agree it's the

best they can do; but it's -- as matter of law, it's not

enough.

THE COURT:  Why not?

MR. SCHAEFER:  Having knowledge of prior EEO --

THE COURT:  Why isn't it enough to get to a jury

for the jury to assess the credibility of a denial?

MR. SCHAEFER:  Because how does having knowledge

of a prior EEO complaint against a previous employer, how

can you impute knowledge or infer knowledge about a

different complaint.  I mean, it's two different --

THE COURT:  Well, I agree with you that there

was -- her testimony was limited to one -- she said one

thing.  That was her EEO at the time of the CBP.

MR. SCHAEFER:  Yes.

THE COURT:  But then in your case, there was sort

of generic discussion of EEO.

1          MR. SCHAEFER:  Yes.

2          THE COURT:  And, yes, none of it was specific to

3     2012.

4          And my point is simply, why can't they argue that

5     the denials were not credible based upon the thoroughness of

6     the investigation, the fact that others had reported some

7     EEO, and you'll have to argue to the jury that they haven't

8     established by a preponderance of the evidence that these

9     investigators were aware of the 2012 activity.  That's the

10    basis of the retaliation claim.

11         MR. SCHAEFER:  Well, the reason is, Your Honor, is

12    because they provided a legitimate reason for asking those

13    questions or that question.

14         THE COURT:  But that --

15         MR. SCHAEFER:  But if -- so then to do sufficient

16    evidence in the trial record to -- for a reasonable jury to

17    infer retaliation or pretext, that component of knowledge is

18    required.  And it's knowledge of the 2012 EEO complaint.

19         THE COURT:  I agree.

20         MR. SCHAEFER:  But there's no evidence in the

21    record.

22         THE COURT:  You and I are having a vigorous

23    agreement about that.

24         MR. SCHAEFER:  Yeah.

25         THE COURT:  You cannot retaliate absent the

1  decision-maker having knowledge.

2          And my point to you, and I think it's about the

3  only point that can be made, which is, they need to argue

4  and convince this jury that Gunning was not credible, that

5  Anderson was not credible, and Crampton was not credible.

6  All three of them were not credible in denying that they

7  were aware of any specific EEO activity and filings by her.

8          I don't think they have a lot to make that

9  argument, but we'll see.  I mean, I just -- you know, it's a

10 little bit dangerous to take the question of credibility of

11 a denial away from the jury, it seems to me.

12         MR. SCHAEFER:  Okay.

13         THE COURT:  All right.  Let's talk about the next

14 issue.

15         MR. SCHAEFER:  Okay.  So the next issue I have is

16 for the duty schedule, the emergency duty schedule in

17 Jakarta.

18         And, you know this comes back to the issue of

19 whether there is a materially adverse action here that

20 would -- that was -- an injury or harm is material in nature

21 that would have been severe enough to dissuade a reasonable

22 worker in Ms. Chien's position from engaging in protected

23 activity.

24         And, you know, really, I think -- I think the most

25 analogous -- it's not really a scheduling issue.  It's not

when you're looking at these cases that talk about whether

the heavier workload rises to the level of being an

actionable retaliation claim, it's got to be a significant

increase.

And, you know, covering an extra duty week or two

under the most generous possible reading, that type of

short-term, temporary increased workload, as a matter of

law, does not constitute an action that's materially adverse

to a degree that would dissuade somebody from filing an EEO

complaint.

In other words, even if you take the most liberal

reading of it --

THE COURT:  She complained about it, so it's not

like she was dissuaded.

MR. SCHAEFER:  Sure.  Sure.  That's true.

So, I mean, I disagree that this is a severe

enough -- this caused anything more than trivial harm, even

under the most liberal reading of the evidence that you can

give the plaintiff to constitute a material action at the

end of the day.

THE COURT:  And what if the jury is instructed

specifically about this theory?  Right now, the instructions

are fairly generic when it comes to adversity.  But, you

know, we could craft an instruction that says the

plaintiff's theory of adversity with respect to Jakarta is

1    that she received an increase in duty weeks.

2           And then we could say, you know, a reasonable

3    employee might well be -- I'm reading from *Mogenhan*.

4    "A reasonable employee might well be dissuaded from filing

5    an EEO complaint if she thought her employer would retaliate

6    by burying her in work."

7           And then we let the jury decide whether she was

8    buried in work.

9           MR. SCHAEFER:  I think as a separate question --

10          THE COURT:  I don't think she -- I mean, I'm not

11   so sure she was buried in work, but why can't the jury

12   decide that?

13          MR. SCHAEFER:  Well, I think it's got to be a --

14   I think the trial evidence has to at least support a

15   reasonable inference for that to become a jury question.

16   And so if the investigator --

17          THE COURT:  I'm sorry to interrupt, but the

18   best-case scenario for her is the following.

19          She complains about Castro in March, I think it

20   was, early March.  Castro knows about it, despite his

21   denials here, which didn't come off so well, I thought.

22          A month later a new duty schedule comes out, and

23   she is now on that duty schedule with greater frequency than

24   she was -- well, we don't know.  I mean, that's the thing

25   that I find --

1          MR. SCHAEFER:  That's true.

2          THE COURT:  -- sort of mystifying about all of

3     this, which is that maybe the document didn't exist.

4     I don't know.

5          But nobody produced the schedule prior to March,

6     right?

7          The real question would have been, it seems to me,

8     the real way to show that he retaliated against her would be

9     to produce a duty schedule from January, for example, which

10    showed, while Ms. Chien didn't have -- she had one duty week

11    in -- over the course of April, May, June, July, and all of

12    a sudden, that became four duty weeks.  But that evidence

13    wasn't presented, and nobody is going to be able to argue

14    that.

15         MR. SCHAEFER:  I agree.

16         THE COURT:  At most, they're going to be able to

17    argue is that, Look, you can look at the April schedule.

18    She had four duty weeks over 12 weeks.  That's a lot more

19    than what you heard Mr. Castro testify he ordinarily would

20    have assigned somebody to.

21         I mean, it's the best they can do, because they

22    don't have anything to compare it to.

23         I mean, if I'm a juror, I'm wondering, well, what

24    was the schedule before March?  Nobody knows, because

25    there's no evidence about it.

1          So they can't come in, I think, reasonably,

2     frankly, and say, you know, You know he retaliated against

3     her because he increased her duty weeks.  There's no

4     evidence he increased her duty weeks.

5          The only evidence is that she had more duty weeks

6     than somebody would frequently have.  It's not -- I mean,

7     there's no evidence as to what the duty schedule was before

8     March, none.  So I don't know how you come in and say, Well,

9     he changed the schedule.

10          We don't know that, right?  Am I wrong about that?

11          MR. SCHAEFER:  Do you want me to step aside?

12          THE COURT:  Yeah.

13          MR. SIMPSON:  Your Honor, the testimony was that

14     the duty week schedule would progress through like spokes on

15     a wheel and that you would just cycle through.  And we do

16     not have --

17          THE COURT:  A little bit, yeah.  I mean, generally

18     speaking.

19          MR. SIMPSON:  Yeah.

20          THE COURT:  But he said there was some give in

21     that.

22          MR. SIMPSON:  Yes, there is some give in that.

23          So that's what the testimony was, and that's what

24     the jury can understand what the frequency of --

25          THE COURT:  Right.  But you can't argue -- I mean,

1    I guess maybe -- I don't know, but you can't during argue --

2    well, let's put it this way.

3            I mean, if your theory is that he changed that

4    duty schedule in April to give her more duty weeks, it can

5    only be based upon the fact that it's more frequent than

6    once every six or seven weeks.

7            MR. SIMPSON:  Yes.

8            THE COURT:  It can't be based upon, well, you

9    knew -- you know, you saw something in January that showed

10   she only had one duty week during that time period, and all

11   of a sudden it became four.

12           MR. SIMPSON:  Yes, Your Honor.

13           So there isn't a document that says that prior to

14   March -- that the schedule for April was -- and through

15   August was going to be this and that she complained and then

16   it was changed.  That's true.

17           THE COURT:  Even she didn't testify to that.

18           MR. SIMPSON:  Yeah, no.

19           And because that doesn't appear to be how that

20   worked, that there was a schedule in place for the time

21   period before that, that there was a new schedule that was

22   created for April to August, and that Ms. Chien was placed

23   on the duty schedule more frequently than an ordinary

24   rotation would allow, and that that was unusual and that

25   that was loading her up with work.  That's what the evidence

1     is.

2           THE COURT: Okay.

3           Well, here's what I think on this, and it's what I

4     said earlier, which is, again, this is all about viewing the

5     evidence in the light most favorable to the plaintiff. And

6     as I said, you know, Castro's testimony was that, you know,

7     this thing worked like a wheel. He sort of started at the

8     top, went through all the ARSOs and him and then started

9     from -- you know, started from the top again, at least that

10    was his general testimony about how the schedule was set up,

11    with exceptions. I mean, he sort of said things change,

12    sure.

13          He also testified that she didn't have the ARSOIs

14    on a full-time basis. But -- so, you know, maybe it's not

15    quite as straightforward as we've got seven people and you

16    get a duty week once every seven weeks.

17          But leaving that to the side, you know, the

18    schedule from April reflects a frequency of duty weeks

19    that's greater than once every six or seven weeks, which it

20    does. It's once every three weeks -- if it's to be believed

21    that she did all of those three weeks.

22          And then there was some suggestion that maybe the

23    one week was a mistake, that the schedule should have

24    been -- nobody seemed -- there was something in an email

25    about a mistake, but nobody focused not that. Sort of

1  zipped by very quickly in the email where she complained

2  about her phone call at 5:00 a.m. and the HR person said,

3  you know, Sorry.  I was supposed to make a change.  People

4  sort of skimmed over that.  I don't know what that's all

5  about.

6       But anyway, bottom line is, here's what I'm

7  inclined to do.  I'll let it go to the jury, but I do think

8  it's important, now that we've thought and talked about

9  this, that the jury have a specific instruction here about

10 the theory of adversity and that we quote the language from

11 *Mogenhan* that the Court says can rise to adversity; that is,

12 burying a person in work.  And the jury will have to decide

13 whether this constitutes burying somebody in work.

14       MR. SIMPSON:  Thank you.

15       THE COURT:  Okay?

16       MR. SCHAEFER:  Yes, sir.

17       Okay.  So on the third and final claim, which is

18 the discrimination claim, we want to also renew our argument

19 that that denial of the temporary duty assignment in

20 Kuala Lumpur did not rise to an adverse action for purposes

21 of a discrimination claim because it did not cause a

22 significant change in her employment status, you know,

23 something like -- a big thing, like a hiring, a promotion,

24 or a reassignment that would result in significantly

25 different responsibilities.

1    didn't suggest that it was.

2          So, look, I guess the bottom line for me right now

3    is, I'm willing to consider tweaks to the jury instructions

4    to ensure the jury is clear that just any ordinary TDY can't

5    rise to the level of an adverse action.

6          But I think right now -- and I'll look at these

7    cases more carefully.  But right now I'm inclined to let it

8    go to the jury and see what they do, because I do think, you

9    know, at a minimum, I think you would even concede that

10   viewing the evidence in a light most favorable to her, this

11   was a big-deal TDY, and it was one that was

12   career-enhancing.  Those are the words in the email, not

13   mine.

14          MR. SCHAEFER:  Yeah.

15          THE COURT:  And if you view that in the light most

16   favorable to the plaintiff, you know, it might be

17   significant enough that it does affect future employment

18   opportunities, which is the language that the Circuit used

19   in *Ortiz-Diaz*.

20          MR. SCHAEFER:  And just to preserve the argument,

21   I mean, I did raise it last time, but we also do contend

22   that there's insufficient evidence of discrimination and

23   pretext for the TDY; that any disparity -- I mean, just

24   stating it for the record that we --

25          THE COURT:  Yeah, I understand.  That one seems to

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOSEPHINE CHIEN,                  )
                                     )
        Plaintiff,         )
                                     )   CV No. 16-1583
      vs.                 )   Washington, D.C.
                                     )   March 10, 2022
ANTONY J. BLINKEN,           )   11:13 a.m.
                                     )
        Defendant.        )
_____)   Day 9


TRANSCRIPT OF JURY DELIBERATIONS AND VERDICT PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          Geoffrey H. Simpson
                            WEBSTER & FREDRICKSON
                            1775 K Street, NW
                            Suite 290
                            Washington, D.C. 20006
                            (202) 659-8510
                            Email: gsimpson
                            @websterfredrickson.com

                            Kelly Brian McClanahan
                            NATIONAL SECURITY COUNSELORS
                            4702 Levada Terrace
                            Rockville, MD 20853
                            (301) 728-5908
                            Email:
                            kel@nationalsecuritylaw.org

APPEARANCES CONTINUED:

For the Defendant:            Daniel Patrick Schaefer
                             Christopher Hair
                             U.S. ATTORNEY'S OFFICE
                             FOR THE DISTRICT OF COLUMBIA
                             555 Fourth Street, NW
                             Washington, D.C. 20530
                             (202) 252-2531
                             Email:
                             Daniel.Schaefer@usdoj.gov
                             Email:
                             christopher.hair@usdoj.gov

Also Present:                Samuel Birnbaum
                             Rafael Gallardo

Court Reporter:              William P. Zaremba
                             Registered Merit Reporter
                             Certified Realtime Reporter
                             Official Court Reporter
                             E. Barrett Prettyman CH
                             333 Constitution Avenue, NW
                             Washington, D.C. 20001
                             (202) 354-3249

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1  plaintiff, what do you award as damages?

2          MADAM FOREPERSON:  $650,000.

3          THE COURT:  Okay.

4          Ladies and gentlemen, thank you very much --

5  members of the jury, thank you very much for your service.

6  I know this has been a number of days.  It's obviously been

7  an inconvenience for your lives.  But we thank you, the

8  parties thank you, on behalf of the Court we thank you.  And

9  thank you.

10          I hope everybody found something to take from this

11  experience.  It really is one of the most, I think,

12  extraordinary features of our democracy, that we rely on

13  citizens like yourself to come in and consider evidence and

14  return verdicts, and so we are very much grateful for all of

15  your efforts.

16          Thank you, everyone.

17          (Jury exited the courtroom.)

18          THE COURT:  Okay.  Have a seat, everybody.

19          So let me just ask the question which is:

20  Does the government intend to file a motion?

21          MR. SCHAEFER:  Yes.

22          THE COURT:  All right.

23          I'd like something in writing.

24          What this means, Ms. Chien, is the way the rules

25  work, and your lawyer will explain this to you more fully,

1  after a trial is over, notwithstanding what the jury has

2  done, both parties can file motions with the Court for the

3  Court to consider any legal issues and also consider the

4  jury's verdict.

5          So that's why I asked the government.  And maybe

6  the plaintiff also wants to file a motion; I'm certainly not

7  foreclosing that.

8          So let me just ask:  How long does government

9  think it will need before it can get something on file?

10         MR. SCHAEFER:  Sure.

11         I believe under the rule, it's 28 days, and so we

12  ask that we be permitted to have the full 28 days to file

13  our motion.

14         THE COURT:  That's fine.

15         And then what I'll just ask -- if you all would

16  just stipulate amongst yourselves how long it will take for

17  the opposition and the reply; in other words, just stipulate

18  to a schedule and let me know what it is and it will be

19  certainly fine with me.

20         So job well done to both sides, something for each

21  side to be happy about.

22         And thank you, all, very much; we'll look forward

23  to receiving your papers.

24         MR. SIMPSON:  Thank you, Your Honor.

25         (Proceedings concluded at 3:06 p.m.)