# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOSEPHINE CHIEN,                          )
                                          )
       *Plaintiff*,                 )
   v.                                   )        Civil Action No. 16-1583 (APM)
                                          )
ANTONY J. BLINKEN,                        )
SECRETARY OF STATE                        )
                                          )
       *Defendant*.                 )


## OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL


DATE: May 5, 2022                    Respectfully Submitted,


     Bruce A. Fredrickson, D.C. Bar #933044
     Geoffrey H. Simpson, D.C. Bar #988437
     Webster & Fredrickson, PLLC
     1101 Connecticut Avenue, NW, Suite 402
     Washington, DC 20036
     (202) 659-8510
     gsimpson@websterfredrickson.com

     Kel McClanahan, D.C. Bar #984704
     National Security Counselors
     4702 Levada Terrace,
     Rockville, MD 20853
     Kel@NationalSecurityLaw.org
     (301) 728-59
     *Counsel for Plaintiff*

# TABLE OF CONTENTS

**FACTUAL BACKGROUND** …………………................................................................... **1**

**STANDARD OF REVIEW**…………………..……………………………………….. **11**

**ARGUMENT**…………………….................................................................................**13**

**I.**   **THE JURY PROPERLY FOUND THAT MS. CHIEN**
     **SUFFERED A MATERIALLY ADVERSE ACTION UNDER**
     **TITLE VII'S ANTI-RETALIATION PROVISIONS** …………….......................... **13**

**II.**  **THE COURT MAY AWARD DAMAGES IN THE**
     **AMOUNT OF TITLE VII'S $300,000 CAP** …………….................................... **26**

  **CONCLUSION** …………………………………….................................................. **35**

# TABLE OF AUTHORITIES

**Cases**

*Achagzai v. Broad. Bd. of Governors*,
Civ. A No. 17-0612 (RDM), 2018 WL 4705799,
2018 U.S. Dist. LEXIS 168531 (D.D.C. Sept. 30, 2018) ............................................... 20

*Allen v. Napolitano*,
774 F. Supp. 2d 186 (D.D.C. 2011) ……………................................................... 20

*Ames v. Nielsen*,
No. 13-cv-01054 (APM) (D.D.C. Nov. 2, 2018) ……........................ 11, 12, 14, 16, 17, 28

*Baloch v. Kempthorne*,
550 F.3d 1191 (D.C. Cir. 2008) ……………................................................... 18

*Bridgeforth v. Jewell*,
721 F.3d 661 (D.C. Cir. 2013) ……………................................................... 19, 20

*Brodetski v. Duffey*,
141 F. Supp. 2d 35 (D.D.C. 2001) ……………................................................... 20

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 US 53 (2006) ……………................................................... 18, 19, 20, 21, 22

*Chambers v. District of Columbia*,
No. 19-7098, 2021 U.S. App. LEXIS 13387 (D.C. Cir. May 5, 2021) …………….... 25

*Chien v. Sullivan*,
313 F. Supp. 3d 1 (D.D.C. 2018) ……………................................................... 17, 18

*Ginger v. District of Columbia*,
527 F.3d 1340 (D.C. Cir. 2008) …………………………………………………………19

*Greer v. Miller*,
483 U.S. 756 (1987) ……………................................................... 14

*Grunenthal v. Long Island R. Co.*,
393 U.S. 156 (1968) ……………................................................... 31

*Guzman v. Boeing Co.*,
366 F. Supp. 3d 219 (D. Mass. 2019) ……………................................................... 32, 34

*Hoback v. City of Chattanooga*,
550 F. App'x 257 (6th Cir. 2013) ……………................................................... 32

*Ibanez v. Velasco,*
　　No. 96 C 5990, 2002 WL 731778 (N.D. Ill. Apr. 25, 2002) ……………...................... 32

*Int'l Bhd. of Teamsters v. United States,*
　　431 U.S. 324 (1977) ……………................................................................... 24

*Jean-Baptiste v. District of Columbia,*
　　931 F. Supp. 2d 1 (D.D.C. 2013) ……………........................................... 33, 34

*Jeffries v. Potomac Dev. Corp.,*
　　822 F.2d 87 (D.C. Cir. 1987) ……………................................................... 29

*Johnson v. Long Island Univ.,*
　　58 F. Supp. 3d 211 (E.D.N.Y. 2014) ……………........................................... 19

*Jouanny v. Embassy of France in the U.S.,*
　　No. 16-cv-135, 2017 WL 2455023 (D.D.C. 2017) ……………........................... 18

*Lewis v. District of Columbia,*
　　315 F. Supp. 3d 571 (D.D.C. 2018) ……………................................... 12, 13

*Lloyd v. Am. Airlines (In re Air Crash at Little Rock Ark.),*
　　291 F.3d 503 (8th Cir. 2002) ……………................................................... 32

*Luedecke v. Tenet Healthcare Corp.,*
　　CIVIL ACTION No. 3:14-CV-1582-B (N.D. Tex. June 23, 2015) .............................. 19

*Martinez v. Thompson,*
　　2008 WL 5157395 (N.D.N.Y. Dec. 8, 2008) ……………............................... 32

*Mathie v. Fries,*
　　121 F.3d 808 (2d Cir. 1997) ……………................................................... 31

*McGill v. Munoz,*
　　203 F.3d 843 (D.C. Cir. 2000) ……………................................................. 13

*McKinnon v. Kwong Wah Rest.,*
　　83 F.3d 498 (1st Cir. 1996) ……………................................................... 31

*Menghi v. Hart,*
　　745 F. Supp. 2d 89 (E.D.N.Y. 2010) ……………................................... 30, 31

*Mogenhan v. Napolitano,*
　　613 F.3d 1162 (D.C. Cir. 2010) ……………........................... 18, 19, 20, 24, 25

*Morales v. Gotbaum*,
    42 F. Supp. 3d 175 (D.D.C. 2014) …………….................................................... 21

*Muldrow v. Re–Direct, Inc.*,
    493 F.3d 160 (D.C. Cir. 2007) …………….......................................................... 12

*Nyman v. FDIC*,
    967 F. Supp. 1562 (D.D.C. 1997) …………….............................................. 33, 34

*Pardo-Kronemann v. Donovan*,
    601 F.3d 599 (D.C. Cir. 2010) …………….................................................. 13, 19

*Penry v. Johnson*,
    532 U.S. 782 (2001) …………….......................................................................... 14

*Peyton v. DiMario*,
    287 F.3d 1121 (D.C. Cir. 2002) ……………............................. 29, 30, 31, 33, 34

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) …………….......................................................................... 11

*Sequa Corp. v. GBJ Corp.*,
    156 F.3d 136 (2d Cir. 1998) ……………............................................................. 12

*Stender v. Lucky Stores, Inc.*,
    C 88-1467 MHP, 1991 U.S. Dist. LEXIS 16316 (N.D. Cal. Apr. 4, 1991) ………........ 24

*United States v. Crews*,
    856 F.3d 91 (D.C. Cir. 2017) …………….......................................................... 14

*Webb v. TECO Barge Line, Inc.*,
    No. 07-514-DRH, 2012 WL 780851 (S.D. Ill. Mar. 7, 2012) ........................ 32

*Williams v. Johnson*,
    870 F. Supp. 2d 158 (D.D.C. 2012) …………….......................................... 11, 12

*Williams v. Steuart Motor Co.*,
    494 F.2d 1074 (D.C. Cir. 1974) …………….................................................... 29

*Youssef v. F.B.I.*,
    687 F.3d 397 (D.C. Cir. 2012) ……………………………..……………………..…… 23

**Statutes, Rules, and Regulations**

42 U.S.C. § 1981a(b)(3) …………….................................................................... 29

42 U.S.C. § 2000e-2(a)(1) ……………................................................................................ 25

42 U.S.C. § 2000e-3(a) ……………........................................................................... 19, 25

FED. R. CIV. P. 50(a)(1) ……………................................................................................. 11

FED. R. CIV. P. 59(a)(1)(A) ……………........................................................................... 12

## Secondary Sources

2 EEOC 1991 Manual § 614.7 ……………....................................................................... 19

Defendant Department of State's post trial motion for a new trial or for remittitur should be denied. The Defendant's motion amounts to nothing more than a quarrel with the jury's findings and verdict. The jury rejected all of the |Defendant's liability arguments made during the trial on this claim. The jury also considered the evidence of harm and damage and expressed the community's assessment of the cost of the harm done to the plaintiff. Defendant cannot substitute its interpretation of the evidence of that of the jury just because Defendant lost this count. The statutory cap addresses any concern regarding excessive compensatory damages, and a $300,000 award falls squarely within the run of cases on similar harm.

## FACTUAL BACKGROUND

This Title VII cases arises from Plaintiff Josephine Chien's experience working as an Assistant Regional Security Officer ("ARSO") for the Department of State's Bureau of Diplomatic Security Service. (Docket Entry ("DE") 19, Sec. Am. Compl. (8/8/2017) at ¶9.) Ms. Chien's initial complaints included a hostile work environment claim spanning her experience from her time in the Los Angeles office, her temporary duty assignment in Benghazi, and her time in Pakistan. (*Id.* at ¶¶10-25.) She further brought discrimination claims for abuse she encountered in her 2012 and 2013 security clearance review, job selections in the 2013 and 2016 bidding cycles, and for an assignment in Kuala Lumpur denied to her while she was the ARSO in Jakarta and given to a junior white, male agent, Mike Bjelajac. (*See id. generally.*) Ms. Chien brought retaliation claims for a change in her schedule in March 2016 and for having additional duty weeks assigned to her in the wake of her discrimination complaint to the Embassy's deputy chief of mission. (*Id.* at ¶¶72-88.) The Court dismissed Ms. Chien's hostile work environment claim and her discrimination claim for the 2016 bidding cycle and permitted five claims to

proceed to trial. (DE 50 (Order Granting in Part and Denying in Part Motion for Summary Judgment (12/7/2020)).)

Trial commenced on February 28, 2022. At the close of Plaintiff's case, the Court dismissed Ms. Chien's discrimination claim related to the 2013 bidding cycle and her retaliation claim related to her change in schedule in March 2016 upon the Defendant's Rule 50 oral motion. (Afternoon, 3/3/2022, Tr. at 10:10-17:16.)[1] Ultimately, after Defendant put on its defense and Ms. Chien presented her rebuttal, and the Defendant again moved for a judgment as a matter of law, the case went to the jury on three counts (1) the discriminatorily abusive security clearance; (2) discrimination for the denial of an assignment to Kuala Lumpur; and (3) retaliation by assigning her unjustified extra duty weeks in April 2016. The jury took with them jury instructions to which the Defendant lodged no objections (DE 95, Final Jury Instructions (3/8/2022)) and came back with a discerning verdict finding retaliation on Ms. Chien's duty week claim. (DE 101, Verdict (3/10/2022).) In so doing, the jury specifically found that Ms. Chien found that the additional duty weeks was a materially adverse action. (*Id.*)

*The Jury Reasonably Found Retaliation*

The jury deliberated with the following instructions on whether the duty schedule was retaliation:

### Elements of a Retaliation Claim & Retaliation, Generally

I will now instruct you on the elements of Ms. Chien's retaliation claims.

To prove retaliation, Ms. Chien must show by a preponderance of the evidence:

First, she engaged in a prior protected activity;

Second, she was subjected to a **materially adverse** employment action; and

---

[1] The full trial transcript is attached as Exhibit 1. Trial exhibits referenced in this brief at attached as Exhibit 2.

Third, but for her prior protected activity, Ms. Chien would not have been subjected to a materially adverse action.

. . .

The parties dispute, however, whether the amount of scrutiny she received during the 2013 security clearance investigation or the assignment of multiple duty weeks was a materially adverse employment action.

(DE 95 at 15 (emphasis added).) Modifying proposed instructions to track Circuit precedent closely, the Court gave the following instruction on the definition of an adverse action:

## Adverse Action

The parties dispute whether Ms. Chien suffered a materially adverse action. A materially adverse action is one that might well have dissuaded or discouraged a reasonable person in the plaintiff's position from complaining about discrimination or retaliation. A reasonable employee might well be dissuaded from filing an EEO complaint if she thought that her employer would retaliate by **burying her in work. Petty slights, minor annoyances, and simple lack of good manners will not create such deterrence**.

If you find that the amount of scrutiny that Ms. Chien received during the security clearance investigation in 2013 and the number of times she was placed on the duty schedule while assigned to the U.S. Embassy in Jakarta were not materially adverse actions, you must find for the defendant on the retaliation claim. On the other hand, if you conclude that one or both of those decisions constituted a materially adverse employment action, then you must consider whether Ms. Chien has proven by a preponderance of the evidence that there was a causal connection between that decision and her protected activities.

(DE 95 at 15-16 (emphasis added).)

With those instructions setting forth controlling Circuit standards for a materially adverse employment action, the jury considered Ms. Chien's and Robert Castro's testimony and the exhibits presented on the duty weeks claim. The parties stipulated that Ms. Chien engaged in protected activity on or about March 8, 2016. (DE 83, Joint Pretrial Statement (2/11/2022), at 3-4; DE 95 at 17.) The jury could have reasonably found that Mr. Castro was angry with Ms.

Chien for raising concerns of discrimination in her March 8, 2016, conversation with Deputy Chief of Mission Brian McFeeters. (*See* Joint Exhibit 12; Morning, 3/1/22, Tr. at 56:21-57:19; 58:13-23; 64:9-15; Joint Exhibit 7.) Further, Mr. Castro was responsible for the duty week schedule. (Afternoon, 3/7/2022, Tr. at 51:22-24.)

Ms. Chien explained that duty weeks were a significant imposition on an ARSO, limiting their movement and requiring them to be ready to move any time of day:

> Q . . What are duty weeks?
> A Duty weeks are assigned to the officers in each respective offices in the RSO. One agent would be the duty agent for that week. And he or she would be on call 24/7 for all kinds of responses, emergency or nonemergency.
>
> Q And was it desirable to be put on duty weeks?
> A It's not.
>
> Q And how does an assignment on being placed on a duty week affect or limit an agent?
> A That means extra work because you -- if you have calls that you need to take either within or outside of the office hours that's extra work on top of your assigned programs already. Also, if you're the duty agent, you cannot leave, not just the District, but you cannot leave the city. So -- because you need respond within one hour. And in Jakarta, that basically means you cannot go anywhere. Jakarta, officers in Jakarta, including me, we take frequent trips outside of the city for morale purposes. And if you're on duty, you cannot go anywhere. And also, you don't really have the liberty to drink, because if you need to respond to any situations in an hour, you need to be legally sober. You need to be aware. That was not a problem for me because I'm not a drinker anyways; however, just the fact that you are limited of what you can do outside of your office hours is not very desirable for everybody.

(Morning, 3/1/22, Tr. at 67:17-68:15.) Despite seeking to minimize the additional burden elsewhere, Supervisor Castro largely agreed with the additional responsibilities and limitations imposed on employees on duty week schedules. (Afternoon, 3/7/2022, at 50:1-21.) Indeed, Jakarta is a high-threat post (Morning, 2/28/2022, at 41:14-15) which a jury can surmise added to the burden of being on call and which explains why time off is important.

4

Ms. Chien further explained that, prior to April 2016, the duty week schedule was always assigned on a rotational basis, and that her four assignments in a twelve-week period was out of the ordinary:

Q And did you have a concern over the assignments of duty weeks to you in 2016?

A Yes.

Q And what was your concern?

A I think one day it came to my attention that suddenly I noticed I have -- my duty weeks assignments grew. And it went from -- on a rotational basis. So we have seven agents rotating each week. That means I would get duty once every eighth week, I would get another one. So once every seven weeks. But it came to my attention that within a 12-week span, I was assigned four duty weeks. So that leaves the eight remaining weeks for six agents to share. That's definitely not on a rotational basis.

(Morning, 3/1/2022, Tr. at 68:20-69:8; Joint Exhibit 11 (April 14, 2016 Duty Week Assignments); Afternoon, 3/7/2022, Tr. at 30:2-25; 61:7-8.)  Ms. Chien was assigned for the weeks of May 9, June 13, June 27, and July 25, 2016:

Q And this document says, "Updated April 14th, 2016." Do you see that?
A Yes.

Q And generally speaking, what's your recollection of whether you saw this document or one like it?
A I'm sorry. I don't understand.

Q Yeah. I said, when did you first see this document? Or did you see this document?
A After April 14th.

Q Okay. And I just want to go through if we can see, start counting what you mean by four weeks -- four duty weeks in a 12-week span.  So when do you see your name first appear on the list?
A First one is May 9th, 2016. That's me.

Q And the second time you see it?
A And then you go down to June 13th; that's me again.

Q And when did you see you next?
A And then you go down one week later; June 27th, that's me again.

Q And if we can go to the next page.
A And then here is me again, July 25th. So four weeks -- three weeks later.

(Morning, 3/1/2022, Tr. at 70:2-71:2; Joint Exhibit 11.)

Ms. Chien raised concerns about the duty week assignments precisely because this was an out of the ordinary addition to her responsibilities and that no one had asked her to switch weeks:

> Q And did you complain about being assigned extra duty weeks?
> A I wouldn't say complained, but I raised concern and objection because this is not how it has always been -- and not just at this post. It's at every post, domestic or overseas. Duty roster is on a rotational basis, and no one had come to me and asked me if that -- I can swap my duty week with them or if I can cover them for their duty weeks, because this is how it works. You're assigned duty weeks -- a duty week months ahead. So these duty schedules, rosters were made months ahead. If you need to go out of town -- if, for some other personal or official reason, you cannot be a duty agent during your assigned duty week, you swap with someone. And this is, you know, how it was done to me. For example, I had to go back to L.A. for my sister's funeral, and I -- someone swapped that week with me. So it's always how it's worked. No one asked me to swap with them. No one asked me if I can cover for them.

(Morning, 3/1/2022, Tr. at 71:3-23; *see* Afternoon, 3/7/2022, Tr. at 52:23-53:2.) Mr. Castro could not explain why Ms. Chien had these additional weeks assigned to her. (Afternoon, 3/7/22, Tr. at 54:8-55:20.)

These were additional weeks outside of the ordinary rotation without any legitimate business justification. As Ms. Chien's communications with Deputy Chief of Mission Brian McFeeters demonstrated, the extra duty weeks contributed to her contemporaneous belief that Castro was bent on making her regret the fact that she filed a discrimination complaint. (Morning, 3/1/2022, Tr. at 72:22-73:24; 74:7-18; Joint Exhibit 9 ("I've been assigned other agents' work and 4 times more for duty weeks than others since my complaint.").)

6

After Ms. Chien repeatedly raised concerns of retaliation to management, Defendant on June 13, 2016, purportedly issued a revised duty week schedule which purported to remove Ms. Chien's duty week set to start June 13, 2016.  (Joint Exhibit 12; Pl. Exhibit 18.)  But in reality, Ms. Chien still served as the duty agent for that week; Ms. Chien still received the 5:00 a.m. call from the Marine Security Guard, and she still showed up on the duty roster as the duty agent that week.  (Pl. Exhibit 20; Afternoon, 3/7/2022, Tr. at 100:21-101:12; *see also id*. at 57:9-12.)  Ms. Chien, the jury could have reasonably found, served four duty weeks in a 12-week span.

The Defendant purportedly altered the duty week schedule again in August 2016, this time reflecting that Mike Bjelajac switched with Robert Castro to a duty week in late August.  (Joint Exhibit 14.)  This change came after Ms. Chien left the post (Morning, 3/2/2022, Tr. at 104:20-23); the weeks Bjelajac was on schedule four times came in an 18-week span (versus in a 12-week span for Ms. Chien); unlike Ms. Chien, Bjelajac intentionally *switched* in to the last date in August, which means he would have had a longer break in the rotation moving into September (Joint Exhibit 14 at 2); and that the changes to the schedule came after Ms. Chien complained of retaliation in the duty week schedule, meaning this could have been viewed as a cover-up.

The jury had ample evidence to conclude that (1) Ms. Chien engaged in protected activity; (2) the additional assigned duty weeks were materially adverse; and (3) Ms. Chien would not have been subjected to a materially adverse action but for her prior protected activity. The jury did so conclude and awarded damages.

*The damages award is supported by the record*

As a result of the Defendant's retaliation, Ms. Chien suffered extremely serious emotional distress, as the jury reasonably found by awarded $650,000 in damages.  This

damages award is supported by Ms. Chien's testimony concerning her own experience, Dr. Marcella Marcey's descriptions of her diagnoses of Ms. Chien bolstering and confirming Ms. Chien's testimony, and Mr. George Terterian's description of how Ms. Chien changed over the course of their friendship.

The Court's instructions to the jury on compensatory damages as follows required the jury not to base its decision on sympathy and to ensure that damages were only awarded for the harm caused by successful claims:

> . . . Ms. Chien must prove her damages with reasonable certainty. An injury or damage is caused by an act when the act was a substantial contributing factor in causing the injury or damage. Only an act that you find to have been discriminatory or retaliatory can support an award of damages. This does not require mathematical precision. Therefore, you may not award damages that were caused by any other action or inaction by the State Department or otherwise.

> You may award money damages for mental pain, emotional distress, or loss of reputation, and other non-monetary losses, but only if you find, by a preponderance of the evidence, that those losses were caused because . . . [of] her placement on the duty schedule in 2016 in retaliation for her prior protected activities.

(DE 95 at 20-22.) The instructions specifically called upon the jury to distinguish between harms caused by the unlawful conduct and other sources and to only award damages for harms caused by unlawful conduct:

> Conduct causes harm if it plays a substantial part in bringing about the harm. In addition, the harm must be either a direct result or a reasonably probable consequence of the conduct. You may award damages for future harm so long as Ms. Chien shows that her injuries will probably continue. **If you find that the Department of State's conduct caused only part of Ms. Chien's detriment or harms, then the Department of State is liable to pay compensation only for that part of her detriment or harms**.

(*Id.* (*emphasis added*).) And the instructions required the jury not to rely upon "sympathy, prejudice, speculation, or guesswork." (*Id.*) The Defendant did not object to this instruction.

Ms. Chien described the harm caused by the Agency's retaliation against her. She described the helplessness she felt:

> Q. And so how did it affect you?
> A. I was reaching out to people, several people, people within the Embassy, outside of the Embassy, in Washington, D.C. -- I received no help, no support. I was isolated. I was, basically, very clearly told that no one is coming to your aid. I felt helpless, hopeless. I did not know how -- how I am going to do next day? What is going to happen now the next day? It seems like every day there is something new.

(Afternoon, 3/1/2022, 23:12-20.) Ms. Chien had physical symptoms from the stress and anxiety, which, a jury could conclude destroyed her life:

> Q. And so how did it affect your sleep?
> A. I couldn't sleep. I had anxieties episodes. I started experiencing acute symptomatic heart palpitation and irregular beats. Also, other physical symptoms started showing. I had shingles, you know, and stress hives that -- I would just break out in hives; that the Embassy doctor would give me medicines, coatings that would not work. I would wake up in the middle of the night with my brain still wired thinking about what happened today, what happened two days ago. What is going to happen to me today, this morning, when I go into the office? I would wake up with anxiety just out of nowhere. I would just wake up with anxiety, and I couldn't go back to sleep; my brain would not stop. I had eating problems; I had sleeping problems anxiety problems; heart palpitation. I was afraid to even go to my bedroom -- to a point that I knew I had to seek professional help, so I did. I reached out to the Department of State's Employee Service Center. They have social workers to help employees, so I reached out. I mainly asked about curtailment. I don't – I didn't know how long I could last in Indonesia. I had no hope, nothing to look forward to.
>
> Tomorrow, what is going to happen to me? Who is coming to my aid? Nobody. No one. And so I was contemplating curtailment, and I was talking to the social worker at the Department; and then I was talking to a new therapist that I found, Dr. Marcella Marcey.
> . . . . And I was very grateful when Dr. Marcey replied and said, yes, I can take you in. At that moment, I felt that I have grabbed to a piece of wood as I was drowning, like, finally someone can listen to me and -- and I can just try to understand what is happening to me.
>
> Q. How have these effects changed over time, since 2016?
> A. Mentally and physically. Physically, there are several things. I later went to -- the heart condition, even after I left Jakarta, it did not improve; it got worse.

(Afternoon, 3/1/2022, Tr. at 23:25-25:21.)

Dr. Marcey is a clinical psychologist who started treating Ms. Chien in April 2016. (Afternoon, 3/2/2022, Tr. at 83:23-84:22.) Dr. Marcey took Ms. Chien's history and diagnosed her with "major depression, first episode, moderate." (Afternoon, 3/2/2022, Tr. at 85:2-86:2.) Upon further interactions with Ms. Chien, Dr. Marcey changed the diagnosis and determined that Ms. Chien suffered from Post-Traumatic Stress Disorder. (Afternoon, 3/2/2022, Tr. at 85:18-25.) Dr. Marcey explained what individuals who suffer from PTSD experience, and that Ms. Chien displayed "all" the symptoms. (Afternoon, 3/2/2022, Tr. at 86:22-88:3.) As a result of these serious symptoms, Ms. Chien continued treatment with Dr. Marcey for the next six years and remains in treatment. (Afternoon, 3/2/2022, Tr. at 88:4-89:1.) Dr. Marcey corroborated Ms. Chien's testimony as to the seriousness of the harm and gave a picture of Ms. Chien's continued mental health from over the course of her treatment, which included physical symptoms which made her miserable:

> Q. …. Are you in a position to describe her mental health as you observed it over the course of your treatment?
> A. Yes. It's been very up and down in the sense that --when I first started treating her, she was doing what we call somatizing. **She had shingles; she had multiple physical ailments that were making her life a misery**. And so although I diagnosed her with depression, the handling of those symptoms was largely through her body. So we were working on that. And as I addressed the depression, her physical symptoms improved. She then -- the geographic location she was in then changed and, at that point, the PTSD symptomatology became very clear. And so I moved from just trying to keep her functioning and doing as well as possibly physically to recognizing the PTSD and then begin to work on those traumatic experiences that she was dealing with. Things calmed down for a while, and then she returned to much more regular therapy in 2020 when, once again, her environment changed and the symptomatology resurfaced now that she was being exposed to some -- I hate to use the word "trigger" because everybody uses it – but she was being triggered by the environment she was in. And I have seen her pretty consistently since 2020, 2021, and then a few times this year.

(Afternoon, 3/2/2022, Tr. at 89:2-90:1 (emphasis added).) The Defendant had no cross-examination of Dr. Marcey. (Afternoon, 3/2/2022, Tr. at 90:5-7.) Lastly, George Terterian corroborated the harm to Ms. Chien, observing Ms. Chien suffering from panic attacks, and that she seemed emotionally spent. (Afternoon, 3/2/2022, Tr. at 27:3-25.)

Thus, a jury can find, because of the duty week retaliation, and continuing for years thereafter, Ms. Chien suffered for years serious emotional damages, including PTSD or exacerbation of PTSD and its associated symptoms of that condition. She had anxiety and panic attacks, difficulty sleeping, feelings of profound hopelessness, stress hives, shingles, eating problems, and migraine headaches. All these conditions continued for years on an intermittent basis. This was the record on which the jury reasonably awarded $650,000 in damages.

## STANDARD OF REVIEW

Defendant Department of State's first argument is that the Court should grant its motion for a new trial because a reasonable jury could not find that Ms. Chien suffered an adverse action or that the additional assignment of duty weeks was retaliatory. "Under Rule 50, a court may grant a motion for judgment as a matter of law after a jury trial if it finds that 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the nonmoving party on the issue.'" *Ames v. Nielsen*, No. 13-cv-01054 (APM), at *2-3 (D.D.C. Nov. 2, 2018) (quoting FED. R. CIV. P. 50(a)(1) (cleaned up)). "To determine whether this standard is met, the court 'should review all of the evidence in the record' and ;must draw all reasonable inferences in favor of the nonmoving party. *Id.* (*quoting Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

It is within the province of the jury to assess the credibility of the witnesses and to determine how much weight to give their testimony. *Id.* (*citing Williams v. Johnson*, 870 F.

Supp. 2d 158, 162 (D.D.C. 2012) ("[B]ecause the fundamental function of the jury is 'to select, from among conflicting inferences and conclusions, that which it finds most reasonable,' 'the court cannot substitute its view for that of the jury, and can assess neither the credibility nor weight of the evidence.'").  In evaluating such a motion brought under Rule 50, "the court cannot lightly disturb a jury verdict. Judgment as a matter of law is appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor." *Lewis v. District of Columbia*, 315 F. Supp. 3d 571, 576-77 (D.D.C. 2018) (*quoting Muldrow v. Re–Direct, Inc.*, 493 F.3d 160, 165 (D.C. Cir. 2007) (internal quotation marks and citation omitted).

Rule 59 has a similar heavy standard for a movant to meet: "Rule 59 allows a court to grant a new trial after a jury verdict 'for any reason for which a new trial has heretofore been granted in an action at law in federal court.'" *Ames v. Nielsen*, No. 13-cv-01054 (APM), at *3-4 (D.D.C. Nov. 2, 2018) (*quoting* FED. R. CIV. P. 59(a)(1) (A)). While the trial court is entrusted with the exercise of discretion, "a new trial should be granted only where the court is convinced that the jury verdict was a seriously erroneous result and where denial of the motion will result in a clear miscarriage of justice." *Id.* (quoting *Lee v. District of Columbia*, 19 F. Supp. 3d 281, 286 (D.D.C. 2014) (cleaned up)). "In all cases, Rule 59 'is not a vehicle for relitigating old issues, presenting the case under new theories, or securing a rehearing on the merits.'" *Id.* (*quoting Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)).

**ARGUMENT**

I. **THE JURY PROPERLY FOUND THAT MS. CHIEN SUFFERED A MATERIALLY ADVERSE ACTION UNDER TITLE VII'S ANTI-RETALIATION PROVISIONS**

The jury reasonably determined that Robert Castro and the Department of State retaliated against Ms. Chien when he assigned Ms. Chien additional duty weeks shortly after Ms. Chien complained of discrimination to Deputy Chief of Mission Brian McFeeters. The jury was instructed on the elements of a retaliation claim and were specifically instructed on the definition of a "materially adverse" action. And the jury was specifically asked if the imposition of additional duty weeks met that threshold. The jury responded "Yes." This is a quintessential factual question. *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010) (describing why "[w]hether a particular reassignment of duties constitutes an adverse action ... is generally a jury question."). "Ordinarily, the jury has the final word at trial; indeed, this is an integral part of having juries adjudicate disputes in the first place. If the losing party hopes for a different result, it faces a heavy burden, as the Court is not prone to 'lightly disturb a jury verdict.'" *Lewis*, 315 F. Supp. 3d at 577 (quoting *McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000)). The jury's determination that the additional duty weeks was a materially adverse action is the final word. Plaintiff Chien respectfully requests that the Defendant's motion seeking to invade the jury's fact-finding be denied.

The sole predicate of the Defendant's motion is to invade the province of the jury's factfinding function. The Defendant claims that Ms. Chien failed to prove that the duty week assignments were more than trivial. The Defendant explicitly raised this very argument in almost exactly the same way at trial, in the same way, and the jury plainly rejected it. The Defendant essentially rehashes its closing argument in its brief with the hope for a "do-over" in the form of a new trial. Defendant's quarrel is with the jury's interpretation of the evidence.

13

Defendant's dissatisfaction with the factual determination and outcome does not justify setting the verdict aside and giving the Defendant another chance to persuade another jury.

Before deliberations, the court instructed the jury that Plaintiff must prove as an element of her retaliation claim that "she was subjected to a materially adverse employment action." (DE 95 at 15; *see id.* at 15-17.) The court further elaborated that "[a] materially adverse action is one that might well have dissuaded or discouraged a reasonable person in the plaintiff's position from complaining about discrimination or retaliation. A reasonable employee might well be dissuaded from filing an EEO complaint she thought that her employer would retaliate by burying her in work. Petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." (*Id.* at 16.) The jury was properly instructed as to the current state of the law, and Defendant raised no objection.

Having been properly instructed, the jury is presumed to have followed the court's instructions. *Ames*, No. 13-cv-01054, 2018 U.S. Dist. LEXIS 187822, at *14-15 (*citing Penry v. Johnson*, 532 U.S. 782, 799 (2001) ("We generally presume that jurors follow their instructions."); *United States v. Crews*, 856 F.3d 91, 97 (D.C. Cir. 2017) ("We generally presume that 'a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it' absent 'an overwhelming probability that the jury will be unable to follow the court's instructions.'") (*quoting in turn Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)).) The jury necessarily found as a matter of fact that the duty weeks assignments were retaliatory and more than trivial – it was a "materially adverse actions." Defendant cannot insist upon its interpretation of the evidence, however strongly it believes it did not retaliate. That was and is for the jury to decide.

The jury here carefully weighed the evidence presented. The jury spent parts of three days deliberating and drafted two notes seeking additional guidance on deciding the claims. (*See* 3/8/2022 Tr. at 211:9-17:12 (case submitted to Jury); DE 97, 98 (Jury Notes); 101 (Verdict on 3/10/2022).) The product of the jury's deliberations was a mixed verdict on Plaintiff's three claims, wherein the jury made specific factual determinations: that the temporary duty assignment to Kuala Lumpur was not an adverse action but found that Ms. Chien was denied that opportunity for discriminatory reasons; the extra scrutiny she received in the security clearance process was an adverse action but that Ms. Chien had not proved retaliation; and, most importantly here, the jury found that the additional duty week assignments were a materially adverse action and that these assignments were retaliatory. (DE 101.) The length of the deliberations, the jury notes, and the specific findings with the mixed results all point to a jury which took its responsibilities seriously and which reviewed and considered the evidence in detail.

Looking more specifically at Defendant's arguments confirms the Defendant simply re-hashes factual assertions properly rejected by the jury. In its motion. Defendant argues that the assignment of additional duty weeks after Ms. Chien had complained about Castro's discrimination did not amount to materially adverse action that would dissuade a reasonable person to file an EEO complaint. (DE 106-1 (Def. Mem.) at 3-4.) Defendant made these same arguments at trial (see Defendant's closing argument (3/8/2022, Tr. at 197:8-99:11.) Defendant urged the jury to find: "She fundamentally failed to prove that an extra duty week here or there, to the extent she ever even served an extra duty week, was a materially adverse action." (*Id.* at 197:22-25.)

These claims relied on Castro's testimony. Castro was asked point blank if he retaliated or discriminated against Ms. Chien:

> Q. And so do you admit that you discriminated against Ms. Chien on the basis of her sex?
> A. No.
>
> Q. And so do you admit that you discriminated against Ms. Chien on the basis of her sex?
> A. No.
>
> Q. Do you admit that you discriminated against Ms. Chien on the basis of her race?
> A. No.
>
> Q. Do you admit that you retaliated against Ms. Chien?
> A. No.
>
> Q. So you say that Ms. Chien's allegations are false?
> A. Correct.
>
> Q. And you say that you have been wrongly accused of discrimination, right?
> A. That would be correct.

(Afternoon, 3/7/2022, Tr. at 39:18-40:5.) The jury disagreed. It found that Castro and the Department of State did retaliate against Ms. Chien and did discriminate against Ms. Chien (but found that the Kuala Lumpur TDY was not materially adverse). (DE 101.)

The jury was there to see Mr. Castro's demeanor, how he responded to questions on cross examination, his tone, his body language, and the inflections he used when answering question. The jury plainly did not believe Mr. Castro when he denied discriminating or retaliating against Ms. Chien, otherwise the verdict would have come out differently. It was the jury's job to make credibility determinations and to select, from among conflicting inferences and conclusions, that which it finds most reasonable. *Ames*, No. 13-cv-01054 (APM), at *2-3 (quotation omitted). The jury was instructed, "You should give the testimony of each witness as much weight as in

your judgment it is fairly entitled to receive." (DE 95 at 7 (credibility determinations made by the jury).). And the jury did so.

It is fair to conclude that the jury did not accept the facts Mr. Castro asserted. Defendant's assertion that the jury was wrong to disbelieve a witness challenges the entire basis for jury trials, since it would mean that any losing party could say that the jury was wrong to doubt any witness. Neither party gets a presumption of veracity in a jury trial. Thus, where the Defendant leans on Mr. Castro's testimony to try to minimize the burden the additional duty weeks would place on Ms. Chien or to suggest the additional burden was not tangible or was somehow trivial, the Court should conclude that the jury considered, and rejected those claims. *See Ames*, No. 13-cv-01054 (APM), at *2-3.

So too the jury heard, considered, and rejected, the arguments the Defendant raises in its motion. The Defendant made the same or similar arguments at trial.

- In closing the Defendant claimed Ms. Chien was not assigned any increased workload in any additional duty weeks while arguing "trivial harms are not enough: to sustain a retaliation claim. (3/8/2022 Tr. at 198:3-11.) The Defendant introduced a demonstrative exhibit to that effect and claimed Ms. Chien did not actually work much more than other ARSOs. (*Id.* at 199:3-201:4.) The Defendant's motion says the same and replicates that demonstrative exhibit.

- In closing, leaning on Castro's testimony, the Defendant claimed that duty weeks were simply an ordinary part of the job and that did not amount to much of an additional burden at all. (*Id.* at 198:19-99:2.) The Defendant's motion says the same.

The jury looked at the very facts and arguments the Defendant uses to support its motion and rejected them. The Defendant must abide by the facts as found by the jury. Wishing for a different result is no grounds to set aside the award. *See Ames*, No. 13-cv-01054 (APM), at *2-3.

A reasonable jury could reach the conclusions reached by the jury here. A plaintiff alleging retaliation prevails if she establishes that she (1) engaged in protected activity; (2)

suffered an adverse action; and (3) there is a causal connection between the protected activity and the adverse action. *Chien v. Sullivan*, 313 F. Supp. 3d 1, 14 (D.D.C. 2018) (*citing Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008)). The parties stipulated that Ms. Chien engaged in protected activity on or about March 8, 2016, and the point was not disputed at trial and the Defendant does not claim. The Defendant mounts no challenge on causation grounds.

In denying Defendant's motion to dismiss (DE 24), the Court announced and applied the standard applied by the D.C. Circuit for what constitutes an adverse action for Ms. Chien's retaliation claim:

> Applying that standard, the D.C. Circuit has held that "[a] reasonable employee might well be dissuaded from filing an EEOC complaint if she thought her employer would retaliate by burying her in work." *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010); *see Jouanny v. Embassy of France in the U.S.*, No. 16-cv-135, 2017 WL 2455023, at *6 (D.D.C. 2017) (holding that allegations concerning the defendant nearly doubling the plaintiff's workload to pressure her to quit "satisifie[d] the adversity requirement for a retaliation claim" (citing *Mogenhan*, 613 F.3d at 1166)).

*Chien*, 313 F. Supp. 3d at 17. *Mongenhan,* provides controlling guideposts for what counts as an adverse action under the *Burlington Northern* standard. The Circuit explained that the "language of the substantive anti-discrimination provision differs from that of the anti-retaliation provision in important ways Title VII's substantive provision and its anti-retaliation provision are not coterminous." *Mogenhan*, 613 F.3d at 1166 (cleaned up, quotation omitted). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (*Burlington N. & Santa Fe Ry. Co. v. White*, 548 US 53, 68 (2006)). This closely matches the language in the jury instruction. (DE 95 at 16-17.)

Giving the plaintiff additional work (characterized by the *Mogenhan* Court and in the jury instructions as burying her in work) amounted to an adverse action as the Court correctly

found in its decision at the motion to dismiss stage and in denying Defendant's Rule 50 motions during trial. *Mogenhan*, 613 F.3d at 1166; *see also Ginger v. District of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008) (adverse schedule change an adverse employment action even under narrow discrimination standard). Because "almost every job category involves some responsibilities and duties that are less desirable than others" the EEOC has "consistently found "retaliatory work assignments to be a classic and widely recognized example of forbidden retaliation." *Burlington N.*, 548 U.S. at 70-71 (quoting 2 EEOC 1991 Manual § 614.7, pp. 614-31 to 614-32); *see also Pardo-Kronemann*, 601 F.3d at 607. Given that employees' job assignments are fundamental to their workplace experience, additional assignments like the duty week assignments here cannot be equated with the "petty slights or minor annoyances that often take place at work," *Burlington N.*, 548 U.S. at 68, that are nonactionable under 42 U.S.C. § 2000e-3(a).

Courts which have considered similar issues agree that adding on call time is additional work which can amount to an adverse action for a retaliation claim. In *Johnson v. Long Island Univ.*, 58 F. Supp. 3d 211, 224 (E.D.N.Y. 2014), the district court found that the assignment of additional weeks of duty materially adverse for retaliation claim. *Id.* (citing *Feingold v. New York*,366 F.3d 138, 152–53 (2d Cir. 2004)). Similarly, in *Luedecke v. Tenet Healthcare Corp.*, CIVIL ACTION No. 3:14-CV-1582-B, at *12-13 (N.D. Tex. June 23, 2015), the Texas district court found that an increase in the frequency of "on call responsibilities" "to about 6 per year" sufficed to make out an adverse action under the Americans with Disabilities Act. Adding on call time, or duty weeks can be a materially adverse action under the law.

Cases cited by the Defendant do not say otherwise. For example, Defendant relies on *Bridgeforth v. Jewell*, 721 F.3d 661 (D.C. Cir. 2013), where the issue was the speculative nature

of subjective awards. That decision says nothing whether the very concrete additional work which was certainly assigned to Ms. Chien is materially adverse. Defendant then relies on *Achagzai v. Broad. Bd. of Governors*, Civ. A. No. 17-0612 (RDM), 2018 WL 4705799, 2018 U.S. Dist. LEXIS 168531 (D.D.C. Sept. 30, 2018), for the notion that additional work is not an adverse action. But *Achagzai* was evaluating a discrimination claim, not a retaliation claim, which, as *Mogenhan* holds, covers additional acts—*Achagzai*, an unreported case, does not discuss whether such additional work would dissuade a reasonable person from making a complaint at all.

Defendant's reliance on *Brodetski v. Duffey*, 141 F. Supp. 2d 35, 45 (D.D.C. 2001), is similarly misplaced. *Brodetski* predates *Burlington Northern* and did not discuss at all whether the alleged changes in workload could dissuade an employee from filing a discrimination complaint. Instead, the Court focused on the incorrect standard of whether such changes were materially adverse. As this Court has recognized, this standard was clarified in 2006 in *Burlington Northern* and courts thereafter recognized that the anti-retaliation provision is more expansive than the anti-discrimination provision when it comes to what constitutes an adverse action. *Mogenhan*, 613 F.3d at 1166.

*Allen v. Napolitano*, 774 F. Supp. 2d 186, 203 (D.D.C. 2011), also cited by the Defendant at least does address the retaliation standard. However, in *Allen*, the alleged adverse action was that the plaintiff identified "a few instances when she received same-day requests and could have benefitted from additional resources and support." *Allen v. Napolitano*, 774 F. Supp. 2d 186, 203 (D.D.C. 2011). This is a far cry from the additional burden imposed additional duty weeks as described by Ms. Chien and which the properly instructed jury found was more than trivial.

Lastly, Defendant relies heavily on *Morales v. Gotbaum*, 42 F. Supp. 3d 175, 198 (D.D.C. 2014). There, the Court found that the plaintiff had not demonstrated that requiring the plaintiff to infrequently take on demanding goals (especially when co-workers were out of the office) was not retaliation. The Court observed that the "infrequent imposition of demanding goals and increased oversight is unlikely to prevent a reasonable employee from engaging in protected activity. *Id.* The Court in *Morales* evaluated very different facts from those in Ms. Chien's case where it found "the Court is hard-pressed to conclude that plaintiff was unreasonably burdened by these requirements since, according to his own testimony, in at least one of the situations he simply ignored them and was not sanctioned for his noncompliance." *Id*, at 198. No similar testimony was presented in this case, and the jury could reasonably find that if Ms. Chien blew off her duty week assignment—which Castro expressed was a critical responsibility—severe consequences would surely follow.

As *Burlington Northern* observed, whether some adverse action is material should be found on a case-by-case basis. Neither *Morales* nor any case cited by the Defendant holds that the assignments of additional duty weeks (or other temporary assignment) cannot be retaliatory. None of the cases cited by the Defendant required the respective plaintiffs to be ready to respond to a threat in the dead of the night in a high-threat country without the ability for the plaintiff to have adequate respite between on-call weeks. The additional duty week assignment is different in kind to additional work in any of the cases cited by the Defendant.

*Burlington Northern* confirms that additional or changed duties can support a retaliation claim. In *Burlington Northern*, "[t]he jury found that two of Burlington's actions amounted to retaliation: the reassignment of White from forklift duty to standard track laborer tasks and the 37-day suspension without pay." *Burlington N.*, 548 U.S. at 70. Mirroring Defendant

Department of State's argument that the fact ARSO's ordinarily are assigned duty weeks, the defendant in *Burlington Northern* argued that the reassignment of duties which fall within the employee's job description cannot be retaliatory. *Id.* The Court rejected that argument finding that the imposition of undesirable duties could be actionable. *Id.* at 70-71. The jury was presented with the details of the duty week assignments it specifically determined that those assignments were materially adverse.

In light of *Burlington Northern* and its progeny, and based on record evidence, the jury was entitled to find that additional duty weeks were a significant imposition on ARSOs beyond a petty slight or minor annoyance:

- The duty agent is on call 24/7
- The duty agent has extra work outside of assigned hours
- The duty agent has to take additional calls outside of ordinary working hours in addition to ordinarily assigned programs or tasks
- The duty agent is limited in her ability to travel
- The duty agent is limited in her ability to socialize outside of work (and cannot drink)

(Morning, 3/1/22, Tr. at 67:15-68:19; *see also* Afternoon, 3/7/22, Tr. at 50:1-21.) Where the Defendant tries to paint a picture of minimal burden, the jury heard testimony about the seriousness of the responsibilities of the duty agent, including being ready to respond to "kidnappings," "missing citizens," domestic violence, fires, and "severe" car accidents in the dead of night, regardless of how often the calls came. (Afternoon, 3/7/2022, Tr. at 29:1-6.) This, the jury reasonably found, are materially adverse and could dissuade a reasonable person from lodging a discrimination complaint.

Joint Exhibit 11 establishes plainly that Ms. Chien was assigned four duty weeks in a 12-week span and this assignment of duty weeks was outside the ordinary rotation. The jury can presumably count and see that Ms. Chien was assigned more duty weeks than any other ARSO

in that time. (Morning, 3/1/22, Tr. at 68:17-69:12; Joint Exhibit 11 (April 14, 2016, Duty Week Assignments); Afternoon, 3/7/22, Tr. at 30:2-25; 61:7-8.) Ms. Chien was assigned for the weeks of May 9, June 13, June 27, and July 25, 2016. (Morning, 3/1/22, Tr. at 70:2-71:2; Joint Exhibit 11.) And the jury can count fewer than seven weeks between assigned duty weeks assigned to Ms. Chien as would be expected in a normal rotation—and that Ms. Chien did not switch weeks with anyone else which could explain this. There is ample basis for the jury to conclude Ms. Chien was assigned more duty weeks than the other ARSOs.

Defendant Department of State points to later changes to the duty week schedule in the hope of showing that Ms. Chien did not serve an outsize number of times on call. But the jury could easily reject that conclusion and did so. The Defendant, on June 13, 2016, purportedly issued a revised duty week schedule which purported to remove Ms. Chien's duty week set to start June 13, 2016. (Joint Exhibit 12.) But Ms. Chien still received 5:00 a.m. call in the week for which she was assigned and remained on the duty roster. (Pl. Exhibit 20; Afternoon, 3/7/22, Tr. at 100:21-101:12; *see also id*. at 57:4-11.) Ms. Chien, the jury could have reasonably found, did serve four duty weeks in a 12-week span no matter what later schedules suggested.

The Defendant seemingly altered the duty week schedule again in August 2016, this time reflecting that Mike Bjelajac switched with Robert Castro to a duty week in late August. (Joint Exhibit 14; supported by Castro's testimony which could be disregarded.) Switching a week is not taking on an additional assignment. That the last duty week schedule reflected four duty weeks for Bjelajac for the entire period—where the first three were part of the ordinary rotation and the last one was one where he switched places with Castro--does not negate the retaliation Ms. Chien suffered. *Youssef v. F.B.I.*, 687 F.3d 397, 402 (D.C. Cir. 2012) (later acts by employer does not retroactively immunize it from a prior adverse action nor does it render the

prior act as non-adverse). First, conduct by an employer in the face of litigation—Ms. Chien had lodged multiple complaints of discrimination and retaliation by this point--is inherently suspect because the employer may act to minimize damages. *See, e.g., Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 341-42 (1977); *Stender v. Lucky Stores, Inc.*, C 88-1467 MHP, 1991 U.S. Dist. LEXIS 16316, at *4 (N.D. Cal. Apr. 4, 1991) ("The court agrees that actions taken in the face of litigation are equivocal in purpose, motive and permanence.")

Second, considering Defendant's position, the jury may have been impressed by at least four additional facts: (1) this change came after Ms. Chien left the post (Morning, 3/2/2022, Tr. at 104:20-23) and the circumstances of the change and reasons therefor are unknown; (2) the weeks Bjelajac was on schedule four times came in an 18-week span (versus in a 12-week span for Ms. Chien), the first three were part of the ordinary rotation; (3) unlike Ms. Chien, Bjelajac intentionally *switched* in to the last date in August, which means he would have had a longer break in the rotation moving into September and the number of duty weeks he served was voluntary and not imposed without reason by diktat (Joint Exhibit 14 at 2); and (4) that the changes to the schedule came after Ms. Chien complained of retaliation in the duty week schedule, meaning the jury could have viewed it as a cover-up.

The argument that Defendant now makes was the centerpiece of its closing argument on the duty weeks retaliation claim. The jury presumably considered and rejected the very contentions that the Defendant asks the Court to adopt. There is, the jury could reasonably have found, *no* comparison between Ms. Chien and Mr. Bjelajac when it came to counting duty weeks and that Ms. Chien served more duty weeks than him or any other ARSO in a shorter span.

Apart from the above, and to preserve this argument, Plaintiff observes that the standard for discrimination claims, and retaliation claims is currently pending *en banc* at the D.C. Circuit.

*Chambers v. District of Columbia*, No. 19-7098, 2021 U.S. App. LEXIS 13387, at *1 (D.C. Cir. May 5, 2021). At issue is whether that statutory text of Title VII imposes a materiality standard for adverse employment actions for discrimination claims. It does not. Section 703(a)(1) of the Civil Rights Act of 1964 forbids sex discrimination by an employer "with respect to" an employee's "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). The statutory text is not limited to what this Court calls "adverse employment actions" or to decisions that cause "objectively tangible harm." Instead, it bans all employment decisions based on protected categories that relate to any term, condition, or privilege of an individual's employment. The anti-retaliation provision, 42 U.S.C. § 2000e-2(a)(1), also contains no materiality provision and is generally construed more broadly than the discrimination standard, encompassing adverse actions in discrimination claims. *Mogenhan*, 613 F.3d at 1166. And work assignments, including when an employee must work or be available for work, and what they are doing are classic "terms and conditions of employment." A change in assignments, such as the assignment of additional duty weeks which governs when an employee must be available, falls comfortably within the realm of actions which can comprise an adverse action under the plain language of 42 U.S.C. § 2000e-3(a). Plaintiff requests that the Court apply this standard to Ms. Chien's retaliation claim.

The jury had ample evidence to conclude that (1) Ms. Chien engaged in protected activity; (2) the additional assigned duty weeks were materially adverse; and (3) Ms. Chien would not have been subjected to a materially adverse action but for her prior protected activity. The jury was properly instructed on the law (defendant does not claim otherwise) and the jury already rejected all of the factual arguments the Defendant makes in its motion. A jury is presumed to have followed the jury instructions. Thus, the Defendant cannot substitute its

interpretations of the evidence of those of the jury. Where does that leave the defendant? With an adverse jury verdict it does not like, and little more.

## II. THE COURT MAY AWARD DAMAGES IN THE AMOUNT OF TITLE VII'S $300,000 CAP

Having reasonably determined that Castro and the Department retaliated against Ms. Chien, the jury determined that Ms. Chien is entitled to $650,000 in compensatory damages. Ms. Chien devoted her career to protecting the United States and its interests and was repaid with retaliation when she spoke out against discrimination. The jury reasonably, based on the testimony of Ms. Chien's medical provider, Dr. Marcey, and Ms. Chien's own testimony, found that Ms. Chien sustained substantial emotional harm caused by the Defendant's unlawful conduct. This evidence is more than sufficient to sustain a substantial verdict. The verdict may be reduced to the statutory limit of $300,000, and no further.

The jury saw Ms. Chien on the stand and evaluated the harm done by the Defendant's retaliation. The jury heard her story and saw her demeanor: the jury saw her tears, saw her anguish; considered the sleepless nights, the anxiety and the physical effects caused by the retaliation. The jury heard from Plaintiff Chien's treating therapist who confirmed the trauma Ms. Chien experienced, the need for therapy, the extent and duration of the long-lasting harm.

The jury heard Ms. Chien describe the helplessness she felt:

Q. And so how did it affect you?
A. I was reaching out to people, several people, people within the Embassy, outside of the Embassy, in Washington, D.C. -- I received no help, no support. I was isolated. I was, basically, very clearly told that no one is coming to your aid. I felt helpless, hopeless. I did not know how -- how I am going to do next day? What is going to happen now the next day? It seems like every day there is something new.

(Afternoon, 3/1/2022. Tr. at 23:12-20.) The jury saw that Ms. Chien had physical symptoms from the stress and anxiety, which, a jury could conclude, effectively destroyed her life:

Q. And so how did it affect your sleep?

A. I couldn't sleep. I had anxieties episodes. I started experiencing acute symptomatic heart palpitation and irregular beats. Also, other physical symptoms started showing. I had shingles, you know, and stress hives that -- I would just break out in hives; that the Embassy doctor would give me medicines, coatings that would not work. I would wake up in the middle of the night with my brain still wired thinking about what happened today, what happened two days ago. What is going to happen to me today, this morning, when I go into the office? I would wake up with anxiety just out of nowhere. I would just wake up with anxiety, and I couldn't go back to sleep; my brain would not stop. I had eating problems; I had sleeping problems; anxiety problems; heart palpitation.

I was afraid to even go to my bedroom -- to a point that I knew I had to seek professional help, so I did. I reached out to the Department of State's Employee Service Center. They have social workers to help employees, so I reached out. I mainly asked about curtailment. I don't – I didn't know how long I could last in Indonesia. I had no hope, nothing to look forward to.

Tomorrow, what is going to happen to me? Who is coming to my aid? Nobody. No one. And so I was contemplating curtailment, and I was talking to the social worker at the Department; and then I was talking to a new therapist that I found, Dr. Marcella Marcey. I actually called several people from Jakarta and the doctors rejected me, either because they had no capacity to take in more patients or because of the HIPAA requirement; they cannot take patients that are outside of their state. I don't know what's the law and rules regulating that profession. And I was very grateful when Dr. Marcey replied and said, yes, I can take you in. At that moment, I felt that I have grabbed to a piece of wood as I was drowning, like, finally someone can listen to me and -- and I can just try to understand what is happening to me.

Q. How have these effects changed over time, since 2016?

A. Mentally and physically. Physically, there are several things. I later went to -- the heart condition, even after I left Jakarta, it did not improve; it got worse.

(Afternoon, 3/1/2022, Tr. at 23:25-25:21.) The jury reasonably determined that Ms. Chien suffered serious harm from Castro and the Department's retaliation against her.

The jury could understand from Dr. Marcey the extent of the harm suffered by Ms. Chien: she diagnosed Ms. Chien with "major depression, first episode, moderate" and then determined that Ms. Chien suffered from Post-Traumatic Stress Disorder. (Afternoon 3/2/22 at 85:2-86:2.) Dr. Marcey explained what individuals who suffer from PTSD experience a laundry

list of harm, and that Ms. Chien displayed "all" the symptoms of that serious disorder, consistent with Ms. Chien's testimony. (Afternoon 3/2/22 at 86:22-88:3 (describing forgetfulness, blood pressure problems, nausea, irritable bowel syndrome, sleeping problems, fatigue, lack of concentration).) As a result of these serious symptoms, Ms. Chien continued treatment with Dr. Marcey for the next six years and Ms. Chien remains in treatment. (Afternoon, 3/2/2022, Tr. at 88:4-89:1.) Dr. Marcey gave a picture of Ms. Chien's continued mental health from over the course of her treatment, which included physical symptoms which made her miserable. (*Id.* at 89:1-90:1 (emphasis added).) The Defendant had no cross-examination of Dr. Marcey. (*Id.* at 90:5-7.)

Thus, the jury saw Ms. Chien, heard her describe causes of and the seriousness of the harm, the anxiety, the depression, the insomnia, the helplessness, and heard Dr. Marcey confirm she saw the same. And Ms. Chien symptoms continued for years. The jury could reasonably infer that the retaliation was a major contributing cause to the serious harm Ms. Chien suffered.

After having viewed Ms. Chien, George Terterian (Mr. Terterian testified that he observed Ms. Chien suffering from panic attacks, and that she seemed emotionally spent (Afternoon, 3/2/2022, Tr. at 27:3-25), and Dr. Marcey, the jury was instructed with no objection by the Defendant on how to calculate compensatory damages. (DE 95 at 21-22.) They jury was instructed, "[y]ou may not award damages based on sympathy, prejudice, speculation, or guesswork." (DE 95 at 21.) Recalling that the jury is presumed to have read, understood, and followed the instructions provided, *Ames*, No. 13-cv-01054 (APM), 2018 U.S. Dist. LEXIS 187822, at *14-15, the jury presumably listened to the testimony and came to its conclusions only on the evidence presented.

In arriving at its conclusions, the jury presumptively only considered the harm caused by the duty weeks retaliation in making its award. The Court instructed the jury: "[o]nly an act that you find to have been discriminatory or retaliatory can support an award of damages. . . .

Therefore, you may not award damages that were caused by any other action or inaction by the State Department or otherwise." (DE 95 at 21.) This instruction made clear that harm can have multiple causes and only the harm attributable to the retaliation was compensable: "[c]onduct causes harm if it plays a substantial part in bringing about the harm. In addition, the harm must be either a direct result or a reasonably probable consequence of the conduct. You may award damages for future harm so long as Ms. Chien shows that her injuries will probably continue. If you find that the Department of State's conduct caused only part of Ms. Chien's detriment or harms, then the Department of State is liable to pay compensation only for that part of her detriment or harms." (DE 95 at 21-22.) Thus, the instructions specifically called upon the jury to determine the root of the causes of harm and to award damages only for the acts it found unlawful. Doing just that, as the Court must presume, the jury arrived at $650,000 in compensatory damages. (DE 101.)

The amount of the verdict is a classic jury question. For this reason, the Court may require remittitur only "when (1) the verdict is beyond all reason, so as to shock the conscience, or (2) the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate." *Peyton v. DiMario*, 287 F.3d 1121, 1126-27 (D.C. Cir. 2002) (*citing Jeffries v. Potomac Dev. Corp.*, 822 F.2d 87, 96 (D.C. Cir. 1987); *Williams v. Steuart Motor Co.*, 494 F.2d 1074, 1085 (D.C. Cir. 1974)).

Importantly, it is not the case that the $300,000 cap is reserved for the most egregious cases and then provides a sliding scale from there on down. *Id.* at 1127. Title VII itself never requires a reduction below the $300,000 cap. *Id.* "By its plain language, 1981a(b)(3) does nothing other than provide a cap. Nothing in the language of that section evidences a congressional intent to specifically empower, let alone require, a trial or appellate court to reduce

a verdict in excess of $ 300,000 to some lesser figure." *Id.* The "proper approach is to determine whether the judgment awarded, regardless of whether it is the statutory maximum, is supported by evidence, and does not shock the conscience, or is not inordinately large so as to be obviously unreasonable." *Id.* In setting the upper limit for damages at $300,000, Congress addressed concerns about possibly excessive employer liability based on subjective claims of emotional distress by placing caps on the damages available for such distress. Therefore, the federal anti-discrimination legislation balances the conflict between the provision of appropriate remedies to the victims of discrimination and the avoidance of unpredictable liability. As Congress has made the determination on how damages awards above $300,000 should be handled, a remittitur to a number below the cap is not warranted here.

Under *Peyton*, the issue is to assess whether a damage award of $300,000, which is $350,000 less than the jury would have awarded, is monstrously excessive. *See id.* Thus, in reviewing a damage award, the court should consider whether it would be "a denial of justice to permit it to stand." *Id.* (*quoting Grunenthal v. Long Island R. Co.*, 393 U.S. 156, 159 (1968)). In *Peyton*, the plaintiff supported a $300,000 (approximately $480,000 in 2022 dollars)[2] verdict on the weight of the facts that she "had been the victim of retaliation, that she was distressed and that she was fearful about her work environment" and reported 'feelings of depression and sadness typical of plaintiffs in Title VII cases.'" *Id.* at 1128 (quotations in original). Plaintiff Chien convinced the jury, by a preponderance of the evidence, that she had been the victim of

---

[2] When comparing cases to ascertain the reasonableness of damages awards, the court should consider the effects of inflation to make an apples-to-apples comparison. *See Menghi v. Hart*, 745 F. Supp. 2d 89, 109 (E.D.N.Y. 2010) (adjusting comparative award for inflation using the CPI Inflation Calculator, U.S. Bureau of Labor Statistics, http://www.bls.gov/data/inflation_calculator.htm).

retaliation, that she was distressed, and that she suffered significant harm due to the unlawful conduct of the Defendant.

Ms. Chien supports her claim for damages with competent evidence, which may include "the plaintiff's own testimony, the testimony of a medical professional, or evidence of treatment by a medical professional. If the plaintiff meets this burden, then the defendant must 'take the victim as he finds her, extraordinarily sensitive or not.'" *McKinnon v. Kwong Wah Rest.*, 83 F.3d 498, 506 (1st Cir. 1996); *see also Peyton*, 287 F.3d at 1127-28 (discussing evidence supporting $300,000 verdict). A defendant is liable for all damages suffered by an extraordinarily sensitive plaintiff. *See McKinnon*, 83 F.3d at 506.

Even a $650,000 award is fully supported by the evidence. Courts sometimes compare damages awards with other cases in evaluating if the award is "grossly excessive." The Court need look no further than *Peyton* to see that Ms. Chien's damages are fully supported by the evidence Ms. Chien presents. Especially when viewed through this lens, a $300,000 award (if the award is reduced to the cap) fits squarely in the run of cases where the plaintiff suffered serious medical harm like PTSD and depression. *Menghi*, 745 F. Supp. 2d at 106 ($500,000 for emotional damages as well as post-traumatic stress disorder ("PTSD") leading to Graves' disease; CPI adjusted to $655,865). The plaintiff, like Ms. Chien, presented evidence that she was diagnosed with PTSD, had a friend testify to changes in her personality, all of which supported an award more than double the $300,000 cap in this case. *Id.* at 106-08.

*Menghi* is not an outlier. Higher awards have also been warranted where the emotional distress was accompanied by physical damages. *See Mathie v. Fries*, 121 F.3d 808 (2d Cir. 1997) ($250,000 award where plaintiff-prisoner was sexually assaulted by guard and suffered from PTSD including depression, anxiety, fear and disturbed sleep and evidence included testimony

from plaintiff, his mother, and several health professionals; CPI adjusted $451,000); *Martinez v. Thompson*, 2008 WL 5157395, at *3, 8 (N.D.N.Y. Dec. 8, 2008) (award of $500,000 in § 1983 excessive force case where plaintiff suffered from PTSD including nightmares, fear of law enforcement officials, anxiety, depression, but also had physical injuries including broken rib, chronic headaches; CPI adjusted $683,790). *Hoback v. City of Chattanooga*, 550 F. App'x 257 (6th Cir. 2013) (PTSD, $250,000 award; CPI adjusted $312,000).

In *Guzman v. Boeing Co.*, 366 F. Supp. 3d 219, 228-29 (D. Mass. 2019), the court upheld an award of approximately $1.5 million which compensated the plaintiff for "PTSD, major depressive disorder and, to a lesser extent, decompression sickness." The plaintiff noted that "in a survey of 1,369 civil jury verdicts across all jurisdictions, two-thirds of plaintiffs received compensation for PTSD, and about one-third of those were awarded $ 1 million or more." *Id.* at 228. The court further observed that courts have upheld damages "in excess of $1 million for PTSD claims even absent significant physical injuries." *Id.* (citing *Lloyd v. Am. Airlines (In re Air Crash at Little Rock Ark.)*, 291 F.3d 503, 512-13 (8th Cir. 2002) ($ 6.5 million jury verdict for severe PTSD but limited physical injuries following plane crash reduced to $ 1.5 million by Appeals Court in light of limitations on recovery imposed by the Warsaw Convention); *Webb v. TECO Barge Line, Inc.*, No. 07-514-DRH, 2012 WL 780851, at *31-32 (S.D. Ill. Mar. 7, 2012) (after bench trial, judge awards $ 2,750,000 for pain and suffering as a result of PTSD), and cases cited. This court recognizes that "[i]ndividual cases can differ from each other enormously in terms of witness credibility, the quality of presentation, the nature and extent of the injuries, the vulnerability of the victim, the reactions of jurors to the particular circumstances, and hosts of other variables"); *Ibanez v. Velasco*, No. 96 C 5990, 2002 WL 731778, at *11 (N.D. Ill. Apr. 25, 2002) (declining to reduce $ 2.5 million compensatory damage award in excessive force case

despite fact that plaintiff's physical injuries were "not severe," because of plaintiff's significant emotional injuries, including PTSD).

Especially if reduced to the statutory cap, a $300,000 award would be a fraction of the awards in other cases where plaintiffs suffered serious medical harm from unlawful conduct. Such an award surely does not shock the conscience. Indeed, Defendant tries to minimize the harm suffered by Ms. Chien through by arguing that the conduct here—imposing additional duty weeks--was not egregious. However, the egregiousness of the conduct serves "merely as a proxy to assess the distress" a plaintiff suffers. *Peyton*, 287 F.3d at 1128. Put simply, the fact that a person suffered an adverse action as *retaliation for protected activity* is enough to cause harm, regardless of the specific form of the retaliatory adverse action. It is for the jury to ascertain the extent of that harm. The Court must decide the appropriateness of a $300,000 based on the harm suffered by Ms. Chien, not on the nature of the adverse action.

Defendant relies heavily on *Nyman v. FDIC*, 967 F. Supp. 1562, 1572 (D.D.C. 1997) as the basis of comparison for the appropriate damages award. However, *Peyton* **expressly rejected** the approach taken in *Nyman* for the remittitur of an award, and *Nyman* provides no support for a remittitur here. *Peyton*, 287 F.3d at 1126. Even so, the *Nyman* court remitted damages to $175,000 in 1997—which is *more than $300,000 in 2022 dollars* on descriptions of damages which are very different than those experienced by Ms. Chien*. The plaintiff in *Nyman* described hypertension and blood pressure concerns supported by expert testimony. Ms. Chien suffered the laundry list of symptoms—depression, anxiety, and more--consequent to Defendant's actions.

Similarly, Defendant relies on *Jean-Baptiste v. District of Columbia*, 931 F. Supp. 2d 1, 19 (D.D.C. 2013), which itself relied on *Nyman* for ascertaining the appropriate range of

damages in discrimination cases. And in that case, a $3.5 million verdict was reduced to $350,000 ($431,700 in 2022 dollars)—above the $300,000 cap applicable here. Indeed, the plaintiff in *Jean-Baptiste* "testified that the sexual harassment and retaliation affected her deeply" and but "she did not detail the severity or duration of her psychological injuries." *Id.* (cleaned up). Ms. Chien's proof, as described above, had no such infirmities—she had evidence and testimony from a friend and medical provider corroborating the seriousness of the harm and its duration. The proof in her case at least matches the proof in *Jean-Baptiste*, *Nyman*, *Peyton* and other decisions awarding more than $300,000 in 2022 dollars.

Otherwise, the Defendant cherry-picks cases surveyed in *Nyman* (DE 106-1 at 31-32) for support that remitter is appropriate. Yet, those case by and large are decades stale and do not involve the same level of harm suffered by Ms. Chien, and do not provide an apt comparison for deciding of the damages award here is grossly excessive.

Ms. Chien's own testimony, corroborated by her treating health care provider, amply supports an award of $650,000, let alone $300,000. A $300,000 award would below (adjusted for inflation) the award in *Peyton*, and below the awards in a run of cases where juries have awarded damages for harms similar to those suffered by Ms. Chien. Ms. Chien had anxiety and panic attacks, difficulty sleeping, feelings of profound hopelessness, stress hives, shingles, eating problems and all the hallmarks of PTSD. All these conditions continued for years on an intermittent basis. This was the record on which the jury reasonably awarded $650,000 in damages, and this record fully supports an award of $300,000, which is the statutory cap. *See Guzman*, 366 F. Supp. 3d at 228-29.

**CONCLUSION**

Accordingly, Plaintiff respectfully requests that the Court deny Defendant's Motion in its entirety.

DATE: May 5, 2022

Respectfully Submitted,

*/s/ Geoffrey H. Simpson*
Geoffrey H. Simpson, D.C. Bar #988437
Bruce A. Fredrickson, D.C. Bar #933044
Webster & Fredrickson, PLLC
1101 Connecticut Avenue, NW, Suite 402
Washington, DC 20036
(202) 659-8510
gsimpson@websterfredrickson.com


Kel McClanahan, D.C. Bar #984704
National Security Counselors
4702 Levada Terrace,
Rockville, MD 20853
Kel@NationalSecurityLaw.org
(301) 728-5908
***Counsel for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2022, Plaintiff's Opposition to Defendant' Renewed Motion for Judgment as a Matter of Law or, In the Alternative, for a New Trial, exhibits, and proposed order, were electronically filed with the Clerk of Court using the CM/ECF system that will automatically send email notification of such filing to all counsel of record.

*/s/ Geoffrey H. Simpson*
Geoffrey H. Simpson, D.C. Bar #988437
Webster & Fredrickson, PLLC
1101 Connecticut Avenue, NW, Suite 402
Washington, DC 20036
(202) 659-8510
gsimpson@websterfredrickson.com
***Counsel for Plaintiff***