UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSEPHINE CHIEN, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 16-cv-01583 (APM) |
| MARCO RUBIO,[1] *in his official capacity as U.S. Secretary of State*, | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

**I.**

Pending before the court are the parties' post-trial motions in this case brought under Title VII.[2] Defendant seeks entry of judgment as a matter of law on the sole count of retaliation on which Plaintiff Josephine Chien prevailed at trial. Def.'s Mot. for J. as a Matter of Law or, in the Alternative, for a New Trial or Remittitur, ECF No. 106 [hereinafter Def.'s Mot.], Mem. of P. & A. in Supp. of Def.'s Mot., ECF No. 106-1 [hereinafter Def.'s Mem.], at 13–25. At the relevant time, Plaintiff was an Assistant Regional Security Officer (ARSO) at the U.S. Embassy in Jakarta, Indonesia. The jury found that Plaintiff's supervisor retaliated against her by assigning her a disproportionate number of duty weeks relative her colleagues. Defendant maintains that these additional duty weeks were not sufficiently adverse to support the verdict. *Id.* Alternatively, Defendant asks for a new trial on liability or remittitur of the $650,000 the jury awarded on that single claim. *Id.* at 25–33.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes the current Secretary of State as the defendant in this case.
[2] This decision is a long overdue. The court apologizes to the parties for the time it has taken to rule on the motions.

Plaintiff also seeks entry of judgment on a different claim, albeit in an unusual procedural posture. At trial, Plaintiff asserted a discrimination claim based on race or sex related to the denial of a career-enhancing, temporary assignment in Kuala Lumpur, Malaysia. Pl.'s Mot. for Recons. & to Amend Verdict on the Kuala Lumpur Discrimination Claim, ECF No. 110 [hereinafter Pl.'s Mot.], Mem. of P. & A. in Supp. of Pl.'s Mot., ECF No. 110-1 [hereinafter Pl.'s Mem.], at 2. Consistent with then-binding D.C. Circuit precedent, the court instructed the jury that, to find that the denial was materially adverse, it had to be "a significant change in employment status," which could include "materially adverse consequences affecting the terms, conditions, or privileges of . . . future employment opportunities." Jury Instructions, ECF No. 95, at 12; Trial Tr. (3/8/22), ECF No. 126, at 70:20–73:13. The jury found that Plaintiff's race or sex was the but-for cause of the denied assignment but nevertheless ruled in favor of Defendant because it found that the denial was not a materially adverse action. Jury Verdict, ECF No. 101, at 1.

Then, the controlling law changed. In *Chambers v. District of Columbia*, the D.C. Circuit held that a Title VII discrimination plaintiff no longer had to prove "objectively tangible harm" to make out a claim; rather, once the plaintiff has shown that "an employer has discriminated against an employee with respect to that employee's 'terms, conditions, or privileges of employment' because of a protected characteristic, the analysis is complete." 35 F.4th 870, 874–75 (D.C. Cir. 2022) (en banc). Plaintiff contends that *Chambers* requires the court to undo the jury's verdict and enter judgment in her favor on the Kuala Lumpur discrimination claim. As she puts it: "Considering this clarification of Title VII law, Plaintiff Chien has proven all she is required to prove on her discrimination claim, and judgment as a matter of law must be entered on behalf of the Plaintiff." Pl.'s Mem. at 1. Defendant opposes entry of judgment but alternatively urges the

court to grant no more than a new trial.  Def.'s Mem. in Opp'n to Pl.'s Mot., ECF No. 112 [hereinafter Def.'s Opp'n], at 2–3, 11–12.

The court presumes the parties' familiarity with the factual record, so does not detail it in this decision except as needed to resolve the motions.  For the reasons explained below, the court denies Defendant's requests for entry of judgment or remittitur, and it grants Plaintiff a new trial as to her discrimination claim.

## II.

### A.

The court begins by denying Defendant's request to enter judgment in its favor on the retaliation claim.  In the present posture, post-verdict, "[j]udgment as a matter of law is appropriate only if 'the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not' have reached a verdict in plaintiff's favor." *McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000) (citation omitted).  A court may not "lightly disturb a jury verdict." *Id.*

First, the relevant legal principles.  As the court instructed the jury—and Defendant does not dispute the instruction—an action qualifies as materially adverse for a retaliation claim if "[a] reasonable employee might well be dissuaded from filing an EEO complaint if she thought that her employer would retaliate by burying her in work." Jury Instructions at 16.  The text for that instruction came directly from the D.C. Circuit's decision in *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010).  *Mogenhan* relied on an earlier D.C. Circuit decision, *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364 (D.C. Cir. 2007).  Quoting *Mayers*, the court in *Mogenhan* wrote that "ordinarily, 'increas[ing an employee's] workload and tighten[ing] her deadlines in retaliation for her seeking a reasonable accommodation . . . might

3

suffice to defeat summary judgment on a retaliation claim.'" *Id.* (alteration in original) (quoting *Mayers*, 478 F.3d at 369).

Now the evidence. Plaintiff testified that it was not desirable to be put on duty weeks. Trial Tr. (3/1/22 AM), ECF No. 121, at 67:22-23. They required an agent to be "on call 24/7 for all kinds of responses, emergency or nonemergency." *Id.* at 67:16-21. Taking such calls "within or outside of the office hours" was "extra work on top of your assigned programs already." *Id.* 68:1-4. She added that, "if you're the duty agent, you cannot leave, not just the District, but you cannot leave the city . . . because you need to respond within one hour. And in Jakarta, that basically means you cannot go anywhere." *Id.* at 68:5-8. Officers regularly took trips outside of Jakarta for "morale purposes," which duty weeks prevented. *Id.* at 68:9-10. "[J]ust the fact that you are limited of what you can do outside of your office hours," Plaintiff testified, "is not very desirable for everybody." *Id.* at 68:17-19.[3] Plaintiff's supervisor, Robert Castro, corroborated Plaintiff's description of the burdens associated with duty weeks. Trial Tr. (3/7/22 PM), ECF No. 137, at 49:25–50:19.

This evidence was sufficient to sustain the verdict under *Mogenhan* and *Mayers*. A reasonable jury could find that the assignment of additional duty weeks could discourage or dissuade a reasonable security officer in Plaintiff's position from engaging in protected activity. The addition of duty weeks substantially burdened personal time and restricted freedom of movement; carried the potential of substantial additional work; and required the officer to take calls for events as serious as terrorist attacks, fires, and kidnappings. *Id.* at 50:12-19. Defendant argues that these extra duties were "trivial" or "minor annoyance[s]," Def.'s Mot. at 24, but the jury concluded otherwise. *See* Jury Instructions at 16 (instructing the jury that "[p]etty slights"

---

[3] Plaintiff added that agents assigned to duty week also had to abstain from drinking alcohol, though this was not a problem for her as she did not drink. *Id.* at 68:12-17.

4

and "minor annoyances" were not enough to deter future protected activities). A reasonable jury thus could find that assigning Plaintiff four duty weeks in a 12-week span, when ordinarily she would serve in that capacity once every eight weeks, was a materially adverse action. Trial Tr. (3/1/22 AM) at 68:20–69:12 ("But it came to my attention that within a 12-week span, I was assigned four duty weeks. So that leaves the eight remaining weeks for six agents to share. That's definitely not on a rotational basis.").

Defendant attempts to further downplay the significance of the extra duty-week assignments by pointing out that Plaintiff did not actually incur any additional burdens during those weeks. Defendant argues that Plaintiff did not actually serve four duty weeks, but only three, and that she failed to show that "she needed to respond to one or more emergencies during the weeks that she was assigned that required her to put in extra hours or work." Def.'s Mot. at 22–23. At most, Defendant contends, she "showed only that during one of her duty weeks, Plaintiff received one phone call." *Id.* But those assertions miss the point. "An adverse employment action becomes cognizable when the employer provides notice of the action to the employee, 'regardless of whether the employer follows through.'" *Van Horn v. Del Toro*, No. 23-5169, 2024 WL 4381186, at *3 (D.C. Cir. Oct. 3, 2024) (quoting *Singletary v. Howard Univ.*, 939 F.3d 287, 300 (D.C. Cir. 2019)). So, the additional duty weeks were adverse employment actions upon assignment. Defendant cannot shield itself from liability just because nothing extraordinary happened during those weeks.[4]

---

[4] As for Defendant's contention that the evidence did not show Plaintiff was assigned extra duty weeks compared to her colleagues, the court must defer to the jury's weighing of the evidence. *See* Def.'s Mot. at 20–23 & n.7, 8; *see, e.g.*, *id.* at 20 ("According to the revised Duty Schedule from August 2016, all four of the regular ARSOs (Special Agents Chien, Bjelajac, Wallace, and Williams) were assigned either three or four weeks between April and August 2016."). Plaintiff presented evidence to the contrary. *See, e.g.*, Trial Tr. (3/1/22 AM) at 68:20–69:12 ("But it came to my attention that within a 12-week span, I was assigned four duty weeks. So that leaves the eight remaining weeks for six agents to share. That's definitely not on a rotational basis."). Defendant cites cases for the proposition that Plaintiff should not receive the benefit of the contradictory evidence. *See* Def.'s Mot. at 21–22 n.7. But those cases so held in the context of a motion for summary judgment. The jury's very purpose is to resolve evidentiary

Defendant cites cases from this District for the proposition that for added workload to be considered adverse, it must be a "significant," "great," or "dramatic" increase, and the extra duty weeks falls short. Def.'s Mot. at 14 (first citing *Walkden v. Patient-Centered Outcomes Rsch. Inst.*, 177 F. Supp. 3d 336, 344 (D.D.C. 2016); then citing *Allen v. Napolitano*, 774 F. Supp. 2d 186, 203 (D.D.C. 2011)). But to the extent such descriptors place any greater burden on a plaintiff than what is required under *Mogenhan* and *Mayers*, the court does not find those cases helpful. Moreover, none of those cases involved a jury verdict; they were decided on summary judgment. So, to the extent they differ factually, the court here affords greater deference to the jury's determination than to the finding of a trial court on summary judgment. *See also* Def.'s Mot. at 15–16 (describing additional cases decided on summary judgment).

### B.

For these same reasons, the court denies Defendant's request for a new trial. The jury's verdict on the retaliation claim was not "against the weight of evidence." *McNeal v. Hi-Lo Powered Scaffolding, Inc.*, 836 F.2d 637, 646 (D.C. Cir. 1988).

### C.

The court now turns to Defendant's request for a new trial on damages unless Plaintiff agrees to a remittitur of the jury's award from $650,000 to $50,000. Def.'s Mot. at 26–33. According to Defendant, "an award of $650,000 based on Plaintiff's having to serve two extra 'on call' weeks is facially 'beyond all reason,' and is so obviously outside the reasonable range for the facts of this case that either a new trial on damages or remittitur is required." *Id.* at 29 (citation

---

contradictions. *See Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 35 (1944) ("The very essence of [a jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable."). This jury evidently resolved any evidentiary contradictions in favor of Plaintiff.

6

omitted). Plaintiff agrees that the award must be reduced to $300,000, Title VII's statutory damages cap, but protests any further reduction. Pl.'s Opp'n at 26–34.

The D.C. Circuit's decision in *Peyton v. DiMario* provides the framework for evaluating a remittitur request in a Title VII case. In *Peyton*, the jury awarded the plaintiff $482,000 in compensatory damages after she prevailed on her hostile work environment and retaliation claims, which the trial court reduced to the statutory maximum of $300,000. 287 F.3d 1121, 1124 (D.C. Cir. 2002). On appeal, the defendant argued that "the harm to [the plaintiff] was not serious enough to warrant the maximum penalty under the law, particularly when compared to other Title VII cases." *Id.* at 1126. In deciding whether the trial court abused its discretion in refusing to reduce the award beyond the statutory cap, the court said it "will only require remittitur when (1) the verdict is beyond all reason, so as to shock the conscience, or (2) the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate." *Id.* The court emphasized that an award at Title VII's statutory cap was not reserved only for those cases involving the worst offenders. *See id.* at 1127. "[A]ppellant provides no authority for the proposition that cases involving some perceived or even evident degree of injury less than the most egregious must inherently be awarded some figure lower than the cap." *Id.*; *see also id.* ("By its plain language, [Title VII] does nothing other than provide a cap."). Trial courts therefore must avoid the temptation of evaluating a jury's award based on a sliding-scale of perceived egregiousness. Instead, "the proper approach is to determine whether the judgment awarded, regardless of whether it is the statutory maximum, is supported by the evidence, and does not shock the conscience, or is not inordinately large so as to be obviously unreasonable." *Id.*

Applying that framework, the court in *Peyton* determined that the trial court had not abused its discretion. It noted that the court had found that the plaintiff "presented convincing and credible

7

evidence proving that her co-workers' and supervisors' conduct had a material effect upon her ability to perform and upon her *quality of life* in the workplace." *Id.* at 1128 (internal quotation marks omitted). Further, "the plaintiff convinced the jury, by a preponderance of the evidence, that she had been the victim of retaliation, that she was distressed and that she was fearful about her work environment," including that she had reported "feelings of depression and sadness typical of plaintiffs in Title VII cases." *Id.* (internal quotation marks omitted). Based on that evidence, the court declined to disturb the plaintiff's $300,000 compensatory damages award.

The record evidence of harm in this case is not all that different than in *Peyton*. Asked how her supervisor's actions had affected her, Plaintiff responded that she felt "helpless, hopeless." Trial Tr. (3/1/22 PM), ECF No. 117, at 23:17. She described in detail the physical and psychological impacts that she suffered: She "couldn't sleep," "had anxieties episodes," and "started experiencing acute symptomatic heart palpitation and irregular beats." *Id.* at 24:1-3. She also had "shingles," would "break out in hives," and had "eating problems." *Id.* at 24:4-7, 24:15. She reported waking in the middle of the night "wired thinking about what happened today, what happened two days ago," and wondering, "What is going to happen to me today, this morning, when I go into the office?" *Id.* at 24:8-11. She "had no hope, nothing to look forward to." *Id.* at 24:23-24. The impact was so great that Plaintiff contemplated asking for curtailment, that is, early release from her assignment. *Id.* at 25:2. The court recalls this testimony. It was raw and emotional, and the jury was free to credit it wholly.

Plaintiff's clinical psychologist, Dr. Marcella Marcey, corroborated Plaintiff's testimony. Dr. Marcey first met Plaintiff via teleconference when she was stationed in Jakarta and described her as being in "very difficult straits at that time." Trial Tr. (3/2/22 PM), ECF No. 118, at 84:19–85:5. She initially diagnosed her with "major depression, first episode, moderate." *Id.* at 85:12-

8

14. She also confirmed Plaintiff's physical symptomology, recalling that when they first met Plaintiff had "shingles" and "multiple physical ailments that were making her life a misery." *Id.* at 89:7-10. Based on Dr. Marcey's testimony, the court easily rejects Defendant's contention that Plaintiff "did not furnish any expert report or testimony regarding any physical, emotional, or psychological condition." Def.'s Mot. at 29. The jury reasonably could have viewed Dr. Marcey's testimony as reinforcing the seriousness of Plaintiff's conditions.

The jury also could have considered her emotional injuries aggravated by her employer's callous disregard for her welfare. *Cf. Vasquez v. District of Columbia*, 110 F.4th 282, 293 (D.C. Cir. 2024) (affirming damages award in a tort action where "[t]he jury could have reasonably found that the callous actions and stinging epithets of District of Columbia officials" supported the award). Plaintiff testified that, although she reached out to people within and outside the embassy for assistance, she "received no help, no support." Trial Tr. (3/1/22 PM) at 23:12-17. She felt "isolated," *id.* at 23:15, as if "nobody," "no one" was "coming to [her] aid," *id.* at 24:25–25:1. Eventually, Plaintiff was able to connect with Dr. Marcey, which she described as "grabb[ing] [on]to a piece of wood as I was drowning, like, finally someone can listen to me and—and I can just try to understand what is happening to me." *Id.* at 25:10-16. The jury reasonably could have found that Plaintiff's despair was particularly acute.

To be sure, a reasonable jury could not have found that *all* of Plaintiff's psychological problems arose from workplace retaliation. Dr. Marcey testified that she eventually diagnosed Plaintiff with post-traumatic stress disorder, Trial Tr. (3/1/22 PM) at 85:18–87:17, and in a pretrial *in limine* ruling, the court disallowed testimony from Dr. Marcey about causation, Trial Tr. (2/28/22 AM), ECF No. 120, at 8:13–10:14. The jury was instructed that it "may not award damages that were caused by any other action or inaction by the State Department or otherwise," Jury

9

Instructions at 21, so it could not award damages for any pre-existing condition. But it certainly could take her vulnerabilities into account and find that the retaliatory conduct exacerbated them. *Cf. Canterbury v. Spence*, 464 F.2d 772, 795 (D.C. Cir. 1972) ("A tortfeasor takes his victim as he finds him . . . .").

Defendant urges the court to remit the award because other courts have done so in similar cases where the plaintiff suffered "modest injuries." Def.'s Mot. at 31. But the D.C. Circuit has said that "it is awkward to discuss the size of an award through comparison with past decisions" because the circumstances of cases are unique and adjustment for inflation must be considered. *Peyton*, 287 F.3d at 1127 (internal quotation marks and citation omitted). Further, courts "must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries." *Vasquez*, 110 F.4th at 293 (internal quotation marks and citation omitted).

Here, because the damages award was exclusively non-economic and "thus particularly within the province of the jury's subjective judgment," *id.*, and because the amount of the award is not so much as to "shock the conscience" or "so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate," *Peyton*, 287 F.3d at 1127, the court will not remit the jury's award. The court, however, will reduce the award to the statutory maximum cap of $300,000.

## III.

The court now turns to Plaintiff's motion for entry of judgment on the Kuala Lumpur discrimination claim. Defendant advances two arguments in opposition. First, he contends that neither Federal Rule of Civil Procedure 59 nor 60 permit the court to effectively undo a jury's verdict and enter judgment in favor of the losing party. Def.'s Opp'n at 5–7. Second, he argues that Plaintiff cannot prevail on the merits because *Chambers* is limited only to private-sector

10

discrimination claims under Title VII and, because this case involves federal employment, *Chambers* does not apply. *Id.* at 7–10. The court disagrees with the latter contention, and does not need to reach the former because, as explained below, a Supreme Court decision issued after *Chambers* requires the claim's submission to a new jury for consideration.

As to Defendant's assertion that *Chambers* does not apply to federal-sector discrimination claims, the court believes that every judge in this District to have considered this argument has rejected it. *See, e.g.*, *Rhone v. Rubio*, No. 24-cv-3389 (RC), 2025 WL 3017791, at *4 (D.D.C. Oct. 28, 2025); *Wilson v. Noem*, No. 20-cv-100 (GMH), 2025 WL 1000666, at *21–22 (D.D.C. Apr. 3, 2025) (collecting cases). This court did so in *Garza v. Blinken*, No. 21-cv-02770 (APM), 2023 WL 2239352, at *5 (D.D.C. Feb. 27, 2023), and reaffirms that decision here. *Chambers* applies to federal-sector discrimination cases. *Cf. Van Horn*, 2024 WL 4381186, at *3 (applying *Chambers*'s holding to a federal-sector age discrimination case).

But *Chambers* is not the end of the story. Following that decision, the Supreme Court decided *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024). *Muldrow* clarified that Title VII requires an employee alleging discrimination related to a job transfer to show only that the transfer "brought about some 'disadvantageous' change in an employment term or condition." *Id.* at 354 (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998)). The Court emphasized, however, "[w]hat the transferee does not have to show . . . is that the harm incurred was significant" or "serious, or substantial, or any other similar adjective." *Id.* (internal quotation marks and citation omitted). In a concurring opinion, Justice Kavanaugh expressed the view that requiring a plaintiff in a discriminatory-transfer case to make a showing of at least "some harm" beyond the discrimination itself is more than what Title VII requires, and he pointed to *Chambers* for that

11

proposition. *See id.* at 364 (Kavanaugh, J., concurring). He emphasized, however, that the "some-harm requirement appears to be a relatively low bar." *Id.* at 365.

*Muldrow* counsels against directing a verdict on Plaintiff's discrimination claim, even if the court has the power to grant it. *Muldrow*'s holding that a Title VII plaintiff must show "some harm" from a forced transfer likely applies to the denied temporary duty assignment in Kuala Lumpur. The court can discern no difference between the two actions for Title VII purposes. And *Muldrow* applies retroactively. *See Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 94 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."). Although the "some harm" standard is less stringent than the pre-*Chambers* standard on which the court instructed the jury, whether Plaintiff can meet her burden under *Muldrow* is best left to a jury in the first instance.

Accordingly, the court denies Plaintiff's request for entry of judgment as to the Kuala Lumpur discrimination claim but grants her a new trial on that claim.

### IV.

For the above reasons, the court denies Defendant's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or Remittitur, ECF No. 106, and grants Plaintiff's Motion for Reconsideration and to Amend Verdict on the Kuala Lumpur Discrimination Claim, ECF No. 110, insofar as she is entitled to a new trial.

Dated: November 21, 2025

Amit P. Mehta
United States District Judge