Exhibit 4

```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA


JOSEPHINE CHIEN,                    )
                                    )
          Plaintiff,                )
                                    )     CV No. 16-1583
        vs.                         )     Washington, D.C.
                                    )     March 7, 2022
ANTONY J. BLINKEN,                  )     11:40 a.m.
                                    )
          Defendant.                )     Morning Session
_____)         Day 6


            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
            BEFORE THE HONORABLE AMIT P. MEHTA
               UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          Geoffrey H. Simpson
                            WEBSTER & FREDRICKSON
                            1775 K Street, NW
                            Suite 290
                            Washington, D.C. 20006
                            (202) 659-8510
                            Email: gsimpson
                            @websterfredrickson.com

                            Kelly Brian McClanahan
                            NATIONAL SECURITY COUNSELORS
                            4702 Levada Terrace
                            Rockville, MD 20853
                            (301) 728-5908
                            Email:
                            kel@nationalsecuritylaw.org
```

APPEARANCES CONTINUED:

For the Defendant:          Daniel Patrick Schaefer
                            Christopher Hair
                            U.S. ATTORNEY'S OFFICE
                            FOR THE DISTRICT OF COLUMBIA
                            555 Fourth Street, NW
                            Washington, D.C. 20530
                            (202) 252-2531
                            Email:
                            Daniel.Schaefer@usdoj.gov
                            Email:
                            christopher.hair@usdoj.gov

Also Present:               Samuel Birnbaum
                            Rafael Gallardo

Court Reporter:             William P. Zaremba
                            Registered Merit Reporter
                            Certified Realtime Reporter
                            Official Court Reporter
                            E. Barrett Prettyman CH
                            333 Constitution Avenue, NW
                            Washington, D.C. 20001
                            (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

- - -

WITNESS INDEX

- - -

<u>WITNESSES</u>          <u>DIRECT  CROSS  REDIRECT  RECROSS</u>

DEFENDANT'S:

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PATRICIA CRAMPTON | 5 | 7 | 30 | |
| JAMES MURPHY | 33 | 45 | | |

```
 1                    P R O C E E D I N G S

 2              COURTROOM DEPUTY:  Jury panel.

 3              (Jury entered the courtroom.)

 4              COURTROOM DEPUTY:  All rise.

 5              All rise.  The Honorable Amit P. Mehta presiding.

 6              THE COURT:  Good morning.  Please be seated,

 7    everyone.

 8              COURTROOM DEPUTY:  Your Honor, this is Civil

 9    Action 16-1583, Josephine Chien versus Antony Blinken.

10              Geoffrey Simpson, Kel McClanahan for the

11    plaintiff.

12              Christopher Hair, Daniel Schaefer,

13    Samuel Birnbaum, and Rafael Gallardo for the defendant.

14              THE COURT:  Okay.  Members of the jury,

15    good morning to all of you.  Welcome back.  I hope everybody

16    had a nice weekend.

17              You know, sometimes the best laid plans go awry,

18    and our expectation was to start earlier today.  But there

19    was a personal matter that arose for one of the counsel; and

20    as a result, I was asked to -- we needed to push things back

21    for a couple hours.  So that's the reason for the late start

22    this morning.  So thank you for indulging that.

23              What we'll do then today is, now that we're

24    starting at 11:45, we're going to go till 1:00.  We'll take

25    our lunch break at 1:00 today and then resume at 2:00, and
```

1     then we'll go till the end of the day, okay?

2             All right.  Are you ready to resume your

3     examination, Ms. Crampton?  Ms. Crampton, welcome back.

4             THE WITNESS:  Thank you.

5                         - - -

6     PATRICIA CRAMPTON, WITNESS FOR THE DEFENDANT, HAVING BEEN

7     PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED FURTHER AS

8     FOLLOWS:

9                     DIRECT EXAMINATION (CONTINUED)

10                        - - -

11    BY MR. HAIR:

12        Q    Good morning, Ms. Crampton.  Thank you for joining

13    us again after the weekend.

14        A    Of course.

15        Q    When we left off, we were discussing Ms. Chien's

16    interview -- security-clearance interview in June 2013.

17             Do you recall that?

18        A    Yes.

19        Q    And can you remind the jury what the purpose of

20    that interview was, in your view?

21        A    So the -- that particular interview was a

22    follow-up in regards to a five-year re-investigation that

23    was taking place.  And the -- I believe there were some

24    issues, derogatory information that was developed during

25    that course of investigation, and so I was tasked to

```
1        Q     -- at Embassy Jakarta?

2        A     Yes, there was.  Sorry.

3        Q     Who was that?

4        A     I don't recall off the top of my head.  It shifted

5    around.  It could have been Todd Wallace maybe, or I think

6    we had Joe Williams for a little bit.

7              I don't remember exactly who had that.

8        Q     So I'm going to show you a document that's been

9    marked Joint Exhibit 6.  Can we pull that up, please?

10             If you could take a look at the email at the

11   bottom and let me know once you've had a look at it.

12       A     Okay.

13       Q     Do you recognize this document?

14       A     Yes.

15       Q     And what is this document?

16       A     It would have been a request from

17   Diplomatic Security headquarters to support a visit in

18   Kuala Lumpur.

19       Q     And if you look at the top of the email that's at

20   the bottom of the document under the to line, it says,

21   DS-IP-EAP-RSO.

22             Do you see that?

23       A     Yes.

24       Q     Was that a distribution list?

25       A     Yes, it would have been a distribution list to the
```

1    RSOs in East Asia Pacific.

2          Q    Were you on that distribution list?

3          A    Yes.

4          Q    And do you recall what DS-IP-EAP-RSO stands for?

5          A    Diplomatic Security, International Programs, East

6    Asia Pacific, Regional Security Officers.

7          Q    And who is Eugene Henwood?

8          A    Eugene would have been the desk officer for East

9    Asia at headquarters in DS.

10         Q    Now, the first sentence of this email reads,

11   "We are looking for one RSO to provide TDY support to RSO

12   Kuala Lumpur during the U.S.-ASEAN Summit for about ten

13   days, from November 14th to 23rd, 2015."

14              Do you see that?

15         A    Yes.

16         Q    What is a TDY?

17         A    Temporary duty.

18              Generally what happens is the -- when they're

19   going -- you're going have a big visit like this, and

20   I believe the President was supposed to be at this ASEAN

21   Summit, they'll make a request to other posts to provide

22   ARSOs in a temporary duty status to assist the RSO in

23   whatever country.

24              So this would have been a request to RSOs

25   throughout East Asia to provide an ARSO for the -- to assist

1    the RSO in Kuala Lumpur.

2        Q    And what was the U.S.-ASEAN Summit?

3        A    It would have been a gathering of U.S. and Asian

4    countries, East Asian and Pacific countries to discuss

5    policies like China and weapons and trade types of things.

6            But that was not really my realm.

7        Q    And in 2015, when and where -- or -- strike that.

8            In 2015, when was the U.S.-ASEAN Summit scheduled

9    it?

10       A    14th through the 23rd --

11       Q    And where was that?

12       A    -- of November.

13       Q    And where was it scheduled to take place?

14       A    Kuala Lumpur, Malaysia.

15       Q    What was your understanding of the support that

16   was needed for the summit?

17       A    Well, basically that they needed an individual to

18   go in and assist the RSO.

19       Q    And what kind of work would that individual have

20   been doing?

21       A    Well, it would be at the behest of the RSO, but

22   generally it is to provide liaison with law enforcement.

23   Liaison in this case to the Secret Service, advances, hotel

24   stays, ensuring that classified material was being taken

25   care of properly.  There's a ton of issues.

```
 1                 Motor vehicles, armored vehicles, routes.
 2        Q     And do you recall that President Obama attended
 3   and represented the United States at this summit?
 4        A     I believe he did.  I don't remember exactly if he
 5   did show up or not, but I think that that was part of the --
 6        Q     Was this an important TDY assignment?
 7        A     Absolutely.
 8        Q     So what did you do after you received this email
 9   from Mr. Henwood looking for TDY support for the summit?
10        A     I discussed who we might volunteer, with Rob
11   Castro, and we decide on Mike Bjelacac.
12        Q     And why did you choose Mike Bjelacac?
13        A     Well, again, this is the President of the
14   United States and I'm responsible to provide security.  It's
15   not something to be taken lightly.  We picked Bjelacac
16   because Mike had just -- his previous post before arriving
17   in Jakarta was with the Secretary's detail, the Secretary of
18   State's protective detail.  So 24 hours a day he worked to
19   protect the Secretary of State.
20                 The philosophy behind what this was was that he
21   often did joint details with the Secret Service, the
22   President's detail, because the Secretary of State and
23   President traveled together, Mike knew what was going on,
24   Mike knew who all the players were and that he would be the
25   best person for the job.
```

1      Q    And whose ultimate decision was it to send

2  Mike Bjelacac on this assignment?

3      A    Mine.

4      Q    And aside from yourself and Mr. Castro, was

5  anybody else at Embassy Jakarta involved in the decision to

6  select Mike Bjelacac?

7      A    No.

8           THE COURT:  I'm sorry, could you repeat your

9  answer as to whose responsibility it was to make the

10 decision?  I think I missed -- I didn't hear you.

11          THE WITNESS:  Yes.  It would have been mine.

12          THE COURT:  Okay.  Thank you.

13 BY MR. BIRNBAUM:

14     Q    And how did you put Mr. Bjelacac's name forward?

15     A    I would have sent it back -- or I would have had

16 Rob send it back to Gene Henwood.

17     Q    And who ultimately decided who would go on this

18 TDY?

19     A    Well, from my perspective, me.  I'm not sure of

20 who decided back in Washington.  If they needed more people

21 or less people, you know, they asked for one from me.

22     Q    And are you aware of whether Mr. Bjelacac was

23 ultimately selected for this TDY assignment at the summit?

24     A    Yes.

25     Q    Was that a yes?

1       A    Yes.

2       Q    Are you aware that Josephine Chien expressed an

3  interest to Mr. Castro in being sent on this TDY assignment?

4       A    Yes.

5       Q    Did any of your other ARSOs besides Ms. Chien

6  express an interest to either you or Mr. Castro in being

7  selected?

8       A    I don't recall off the top of my head, no, but

9  generally I found that most ARSOs would like to go.

10      Q    And why do you think that Mr. Bjelacac, as opposed

11  to Ms. Chien or any of the other ARSOs, was the best choice

12  to serve on this detail?

13      A    I think that he was more qualified at the time

14  because he had just gotten off the protective detail of the

15  Secretary of State.  He knew -- he knows what's supposed to

16  be taken care of at the hotel.  He knows how to set up -- do

17  advances.  He knows how motorcades run.  He was familiar

18  with the people that would be there on the secretary's

19  detail if he went and also the President's detail.

20      Q    And after Mr. Bjelacac was selected for this TDY,

21  did you meet with Ms. Chien to explain why she wasn't

22  selected?

23      A    I don't remember doing that, no.

24      Q    Was meeting with somebody who wasn't selected for

25  one of these assignments your usual practice?

```
 1        A    No.
 2        Q    And did Ms. Chien's sex or race factor in any way
 3   into your decision to select Mike Bjelacac for the TDY in
 4   Kuala Lumpur?
 5        A    No.
 6             MR. SCHAEFER:  One moment with the Court's
 7   indulgence.
 8             (Defense counsel conferred off the record.)
 9             MR. BIRNBAUM:  Nothing further.
10             THE COURT:  All right.  Cross-examination?
11                         CROSS-EXAMINATION
12   BY MR. SIMPSON:
13        Q    Good afternoon, Mr. Murphy.
14        A    Good morning -- or afternoon.  Sorry.
15        Q    We had a late start today, so it's already the
16   afternoon.
17             So you know that Ms. Chien made a complaint of
18   discrimination against Mr. Castro, right?
19        A    I did not know until -- I know now, but I did not
20   know.
21        Q    Yeah.
22             And so at any point during your time in Jakarta
23   with Ms. Chien, did you become aware that Ms. Chien made a
24   complaint of discrimination against Mr. Castro?
25        A    No.
```

```
 1        A     Yes, it would have.

 2        Q     And it would have been a popular assignment --

 3        A     It is --

 4        Q     -- meaning it's prestigious, right?

 5              THE COURT:  Hold on.

 6              Counsel and Mr. Murphy, I'm going to just

 7   interrupt you both.

 8              Be mindful of not talking over one another for the

 9   court reporter for whom that makes it difficult to take down

10   the testimony.

11              MR. SIMPSON:  Thank you, Your Honor.  I apologize.

12   BY MR. SIMPSON:

13        Q     So just to restate my question:  This was a

14   popular assignment, correct?

15        A     It would have been a popular assignment --

16        Q     And --

17        A     -- however, it's not selected on popularity.  It's

18   not selected on whether you want to go or not want to go.

19   It's selected on who's the best person to make sure that the

20   safety of the VIPs in that visit --

21        Q     That's not my question.

22              My question is that this was a desirable

23   assignment, right?

24        A     Yes.

25        Q     And it was a desirable assignment because it was a
```

1   high-profile assignment, right?

2       A    Yes.

3       Q    You're going to go work and protect and provide

4   security and protection for the President of the

5   United States, right?

6       A    Yes.

7       Q    And that is something that would help any agent's

8   career, right?

9       A    Correct.

10      Q    And so when the -- when Mr. Henwood writes that it

11  was a career enhancing opportunity, that means that if you

12  get this assignment, then, in the future, you're going to be

13  up for promotions?

14      A    No.  It depends on how successful you are in this

15  visit, isn't it?

16      Q    Yeah.

17      A    You go and screw up, it doesn't help your career

18  either, does it?

19      Q    Yeah.

20           But it's the opportunity?

21      A    Yes, it is.

22      Q    Helps your career.

23           So if somebody sees that you were on the TDY, the

24  promotions board sees that you were on the TDY to the ASEAN

25  conference and you did a good job, then that could help you

1    get your next assignment, right?

2        A    I could -- no, not necessarily.  It might help you

3    in your evaluation.  It doesn't necessarily mean you're

4    going to be promoted, but it would help in your -- it could

5    be used in your evaluation.

6        Q    Yeah.  But it is absolutely career enhancing,

7    though, if you go do the job?

8        A    I don't know about that.

9        Q    Well --

10       A    It's something.  You know, it's career enhancing

11   to a point, but it's something that every ARSO, every

12   Special Agent in DS has done at some point in their career.

13   In this case, it just was beneficial.

14       Q    And so the -- you did wind up, you and Mr. Castro

15   did wind up selecting Mike Bjelacac, right?

16       A    Yes.

17       Q    And he is polite?

18       A    Yes.

19       Q    He's male?

20       A    Yes.

21       Q    And Ms. Chien is Asian, correct?

22       A    Yes.

23       Q    And she's female?

24       A    Yes.

25       Q    And Mr. Bjelacac had less seniority in the post at

```
 1    the time in Kuala -- not Kuala Lumpur, in Jakarta, correct?
 2         A    I believe so.
 3         Q    All right.
 4              And he was a junior agent to Ms. Chien;
 5    is that correct?
 6         A    I don't think he was.  Junior meaning, what,
 7    grade-wise?
 8         Q    Well, junior meaning how long he had been with DS?
 9         A    I don't know that.
10         Q    You don't know one way or another?
11         A    No.
12         Q    When you're making the selection, did you look
13    into that?
14         A    No.
15         Q    Did you look into Ms. Chien's background at all
16    when making the selection?
17         A    I knew her background.
18         Q    But what -- you knew her background?
19         A    I knew her background from as far as where she
20    came from, the last post she was at.
21         Q    Yeah.
22         A    I think she was in counterintelligence.
23         Q    And so --
24         A    Again, I made the decision based on the more
25    experienced individual, someone that had an interaction with
```